No. 24-60341

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NETCHOICE, L.L.C.,
*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
No. 1:24-cv-170-HSO-BWR

### OPPOSED MOTION TO STAY THE DISTRICT COURT'S
### PRELIMINARY-INJUNCTION ORDER PENDING RESOLUTION OF APPEAL

LYNN FITCH
  *Attorney General*
SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Under this Court's Rule 28.2.1, governmental parties need not furnish a certificate of interested persons.

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

i

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF AUTHORITIES....................................................................iii

INTRODUCTION.................................................................................... 1

BACKGROUND ...................................................................................... 5

ARGUMENT .......................................................................................... 10

I.   The State Is Likely To Succeed On Appeal From The District Court's Ruling That Mississippi's Act Regulating Interactive Online Platforms Is Likely Facially Unconstitutional.................. 11

    A.   The District Court Failed To Perform The Demanding Facial Analysis That Applies To NetChoice's Claims ..................... 11

    B.   NetChoice Failed To Show That Any Part Of The Act Likely Facially Violates The First Amendment ............................. 13

    C.   NetChoice Failed To Show That Any Part Of The Act Is Likely Facially Void For Vagueness ................................................. 19

II.  The Equities Favor A Stay Allowing Mississippi's Act To Address The Harms To Minors That Proliferate Online............................. 22

CONCLUSION ....................................................................................... 25

CERTIFICATE OF CONFERENCE....................................................... 26

CERTIFICATE OF SERVICE................................................................ 27

CERTIFICATE OF COMPLIANCE....................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ...................................................................... 22

*Dallas v. Stanglin,*
  490 U.S. 19 (1989) ..................................................................... 16, 18

*Ginsberg v. New York,*
  390 U.S. 629 (1968) ......................................................................... 22

*McClelland v. Katy Independent School District,*
  63 F.4th 996 (5th Cir. 2023) .................................................. 12, 19, 22

*Moody v. NetChoice, LLC,*
  603 U.S. — (U.S. July 1, 2024) ............................. 1, 3, 4, 11-19, 23, 24

*NetChoice, LLC v. Griffin,*
  No. 5:23-CV-05105, 2023 WL 5660155
  (W.D. Ark. Aug. 31, 2023) ............................................................ 20-21

*Ohio v. EPA,*
  603 U.S. — (U.S. June 27, 2024) ...................................................... 10

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) ........................................................................... 15

*Sable Communications of California, Inc. v. FCC,*
  492 U.S. 115 (1989) ......................................................................... 17

*United States v. Conlan,*
  786 F.3d 380 (5th Cir. 2015) ............................................................ 20

*United States v. Williams,*
  553 U.S. 285 (2008) ................................................................... 20, 22

iii

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ........................................................................ 17

## Constitutional Provisions

U.S. Const. amend. I ........................................ 2, 4, 8, 9, 11-13, 15, 16, 19

U.S. Const. amend. XIV ........................................................................ 19

## Statutes

47 U.S.C. § 230 ........................................................................ 8

2024 H.B. 1126 ........................................................................ 1-10, 12-24

Miss. Code Ann. § 75-24-19 ........................................................................ 8

Miss. Code Ann. § 75-24-20 ........................................................................ 8

## Other Authority

*Starkville father speaks out on 'sextortion' and his son's suicide*,
  Mississippi Clarion Ledger (Feb. 22, 2023) .......................................... 6

iv

## INTRODUCTION

This Court should stay, pending resolution of this appeal, the district court's preliminary injunction blocking central provisions of the Walker Montgomery Protecting Children Online Act, H.B. 1126 (2024) (App. A), the State of Mississippi's targeted effort to address the life-altering and life-threatening harms to children that proliferate on interactive social-media platforms. Op. (Dkt. 30) (App. B). The order rests on serious errors—errors made especially clear after the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. — (U.S. July 1, 2024), which vacated a lower-court decision for making the same basic error the district court made here: failing to apply the demanding standards that govern a facial constitutional challenge.

Enacted in the wake of a sextortion scheme that led a 16-year-old Mississippian to take his own life, the Act imposes modest duties on the interactive social-media platforms whose features are especially attractive to predators. The Act requires covered platforms to take "commercially reasonable" actions to verify a user's age, to obtain parental consent for child users, and to adopt a strategy to mitigate the harms to children that those platforms host—sex trafficking, sexual abuse, child pornography, targeted harassment, sextortion, incitement to suicide, and more. The Act requires what any reasonable and responsible

covered platform would already do: make "commercially reasonable" efforts to protect minors—not perfect, state-of-the-art, cost-prohibitive, or even effective efforts, but efforts reflecting a bare minimum of reasonable care in light of the platform's resources.

NetChoice—a group representing billion-dollar social-media companies that routinely sues to halt States' efforts to protect children from online predators—brought this facial challenge to block the Act's core provisions. NetChoice claims that the Act's age-verification, parental-consent, and strategy provisions violate the First Amendment and that the Act is unconstitutionally vague.

The district court granted a preliminary injunction. On the First Amendment claim, the court ruled that strict scrutiny applies because the Act regulates the content of speech and that the Act likely fails that standard. Op. 16-32. On the vagueness claim, the court ruled that the Act's "central coverage definition"—which asks how a platform "[p]rimarily functions" and whether it allows users to "socially interact"—is "overly indefinite" and so the Act is "impermissibly vague in all of its applications." Op. 32, 34, 35; *see* Op. 32-35. On the equities, the court relied on its merits ruling and credited a NetChoice member's claim that compliance costs could put it out of business. Op. 35-37.

2

All factors strongly support staying the district court's order. The Court should at least stay the order to the extent that NetChoice failed to carry its burden on any challenged provision or application of the Act.

This Court will likely reject the district court's order on the merits. First, this Court will likely at least vacate that order because the district court failed to apply the standards that govern facial challenges. As the Supreme Court just made clear in *Moody v. NetChoice*, when ruling on a facial challenge a court must undertake a rigorous three-step "inquiry" to assess whether the plaintiff has "carr[ied]" the demanding "burden" that makes such a challenge so "hard to win." *Moody* Op. 4, 9, 30. The court must first evaluate "the state law['s] scope" by assessing "how [the] law works in all of its applications." *Moody* Op. 10, 30. The court must then "decide which of the law['s] applications violate" the Constitution. *Moody* Op. 11. Last, the court must "compare" the law's valid and invalid applications to decide whether "the constitutionally impermissible" applications are pervasive enough for success on a facial challenge. *Moody* Op. 12. The district court here did nothing like this. Rather than conduct step 1, it block-quoted parts of the challenged provisions, Op. 2-3: it never assessed "how [the] law works in all of its applications." *Moody* Op. 30. At what should have been steps 2 and 3, the court never acknowledged the Act's many permissible applications or "compare[d]"

3

those applications to any properly found impermissible ones. *Moody* Op. 12. The Supreme Court just vacated a decision of this Court for failing to undertake the required facial analysis. *Moody* Op. 10, 12, 31. This Court will likely do the same here. The Court should stay the preliminary-injunction order on this basis alone.

Second, this Court will likely reject NetChoice's facial First Amendment claim. NetChoice does not bring a viable First Amendment claim *at all*—let alone a viable *facial* claim. The Act here regulates the non-expressive conduct of covered online platforms. It requires those platforms to make reasonable efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. None of those requirements regulates speech and so none is subject to First Amendment scrutiny. The district court ruled otherwise by holding that the Act incorporates an "inherent" "content-based distinction" and by invoking "evidence" that people use NetChoice members' websites for "political, social, economic, educational, religious, and cultural" activities. Op. 20, 22-23. But the Act distinguishes between platforms based on the dangerous *conduct* that is likely to occur on some platforms, not based on the content of anyone's speech. And the Act's modest requirements do not burden any speech. At the least, each challenged

4

provision can be validly applied in many circumstances, so no provision can be enjoined based on a facial claim.

Third, this Court will likely reject NetChoice's facial vagueness claim. The Act's coverage definition relies on plain terms—it asks whether a platform has certain objective features and how it "[p]rimarily functions." Anyone can read the Act and tell whether a particular platform is covered. Indeed, NetChoice *concedes* that, "[b]ased on the Act's definitions," the Act covers 7 of its members and "does not regulate all NetChoice members." Complaint ¶ 13 (Dkt. 1). That admits that the Act is *not* vague in *some* applications. That dooms this claim: a facial vagueness claim can succeed only if the Act is vague in *all* applications.

The equities favor a stay. The injunction is especially damaging because it blocks a law that protects children from predators. NetChoice's view of the equities rests on a gross misreading of the Act that pervaded and infected the district court's ruling. This Court should issue a stay.

## BACKGROUND

**Factual Background.** The internet provides a forum for conduct that inflicts life-altering and even life-ending harms on children—sex trafficking, sexual abuse, child pornography, targeted harassment, sextortion, incitement to suicide, and more. Sophisticated online platforms host this conduct.

5

Recognizing these harms, the State of Mississippi acted this year to address them. The Legislature was especially moved by the case of Walker Montgomery, a 16-year-old Mississippian who in 2022 fell prey to sextortion on Instagram. After a predator "catfished" Walker and "demanded money to keep from outing him," the Starkville Academy sophomore took his own life. *Starkville father speaks out on 'sextortion' and his son's suicide*, Mississippi Clarion Ledger (Feb. 22, 2023). Spurred by Walker's plight and by the harms that proliferate online, the Legislature passed and the Governor signed the Walker Montgomery Protecting Children Online Act, H.B. 1126 (2024).

The Act has a targeted scope. The Act "applies only to" online platforms that "[c]onnect[] users in a manner that allows users to socially interact with other users," "[a]llow[] a user to create a" profile that others may be able to see, and "[a]llow[] a user to create or post content" that others can view. § 3(1)(a)-(c); *see* § 2(a)-(b). The Act thus regulates the interactive social-media platforms that present opportunities for predators by letting them interact with children directly and feeding them information about those children. The Act reaffirms this targeted aim by carving out many other platforms. § 3(2). This carveout includes platforms that generally do not present the dangers that interactive social-media platforms do—such as those that mainly

provide "access to news, sports, commerce, [or] online video games" and only "incidental[ly]" offer "interactive" ("chat") functions. § 3(2)(c).

Within that targeted ambit, the Act imposes on interactive social-media platforms three basic duties to address harms to children.

First, covered platforms must register—and make "commercially reasonable efforts to verify"—the age of those who create an account with the platform. § 4(1).

Second, covered platforms must secure, through a "commercially reasonable" method, "express consent from a parent or guardian" before allowing a known minor to hold an account. § 4(2). The Act lists several "[a]cceptable methods" for obtaining that consent, including by filling out a form, making a phone call, or responding to an email, § 4(2)(a)-(e), and adds a catchall for "[a]ny other commercially reasonable method" "in light of available technology," § 4(2)(f).

Third, covered platforms must make "commercially reasonable efforts" to adopt a strategy to address certain harms. § 6(1). "In relation to a known minor's use of a digital service," a covered platform "shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" listed "harms to minors." § 6(1). Those harms are: "self-harm, eating disorders, substance

use disorders, and suicidal behaviors"; "substance abuse or use of illegal drugs"; "[s]talking, physical violence, online bullying, or harassment"; "[g]rooming, trafficking, child pornography, or other sexual exploitation or abuse"; "[i]ncitement of violence"; or "[a]ny other illegal activity." § 6(1)(a)-(f).

The Act provides for private enforcement by an affected minor's parents, § 7(2), and for enforcement by the Attorney General, § 8. State law allows, in cases of knowing and willful violations, civil monetary penalties and criminal liability. Miss. Code Ann. §§ 75-24-19, -20.

The Act was to take effect July 1, 2024. § 10.

**Procedural History.** NetChoice, a trade association for internet companies, filed this suit challenging the Act. NetChoice claims that the Act's age-verification, parental-consent, and strategy provisions violate the First Amendment, that the Act's coverage definition and strategy provision are unconstitutionally vague, and that the strategy provision is preempted by 47 U.S.C. § 230. "For all claims," NetChoice brings "a facial challenge." Preliminary-Injunction Memorandum 7 (Dkt. 4) (Mem.). NetChoice concedes that, "[b]ased on the Act's definitions," the Act covers 7 of NetChoice's members: Google (which operates YouTube); Meta (which operates Facebook and Instagram); X (formerly Twitter); Snap

Inc. (which operates Snapchat); Pinterest; Nextdoor; and Dreamwidth. Complaint ¶ 13; *see* Mem. 3.

On July 1, the district court granted a preliminary injunction barring the Act's enforcement "against ... NetChoice ... and its members." Op. 40. *First*, the court held that NetChoice is likely to succeed on its facial First Amendment claim. Op. 16-32. The court rejected the State's argument that the Act is subject to rational-basis review because it regulates covered platforms' non-expressive conduct, not speech. Op. 21-23. The court instead ruled that the Act regulates the content of speech and so must satisfy strict scrutiny. Op. 19-21. The court held that the Act likely fails strict scrutiny because it "is likely not narrowly tailored" to protect minors online. Op. 25; *see* Op. 23-32. *Second*, the court held that NetChoice is likely to succeed on its facial vagueness claim because the Act's "central coverage definition" is "impermissibly vague in all of its applications." Op. 32, 34; *see* Op. 32-35. The Act excludes from its coverage any platform that "*[p]rimarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the" platform and that "[a]llows chat, comment or other interactive functionality that is *incidental to* the digital service." § 3(2)(c)(i)-(ii) (emphases added). The court faulted that definition as "overly indefinite" because it does not say how to determine

9

"how a digital service 'primarily' functions" or when "interactive functionality" is "'incidental.'" Op. 35. The court also said that, while the Act applies only to platforms that allow users to "socially interact," § 3(1)(a), it does not "explicate what constitutes 'social' interaction ... , as opposed to other interactions." Op. 35. The court did not reach NetChoice's preemption claim. Op. 38 n.7. *Third*, the court ruled that the equities favor relief. The court emphasized its view of the merits, the prospect of criminal liability, and alleged compliance costs that, according to NetChoice member Dreamwidth, "may threaten the very existence of its business." Op. 36; *see* Op. 35-37.

On July 3, the State moved the district court to stay its order pending this appeal and asked the court to rule by July 17. The court denied a stay on July 15. Dkt. 40 (App. C).

## ARGUMENT

This Court should stay the preliminary-injunction order pending appeal. The State will likely succeed on appeal, it will be irreparably injured without a stay, a stay will not unduly harm others, and the public interest supports a stay. *Ohio v. EPA*, 603 U.S. —, slip op. 10 (U.S. June 27, 2024).

I.   **The State Is Likely To Succeed On Appeal From The District Court's Ruling That Mississippi's Act Regulating Interactive Online Platforms Is Likely Facially Unconstitutional.**

This Court is likely to reject the preliminary-injunction order.

A.   **The District Court Failed To Perform The Demanding Facial Analysis That Applies To NetChoice's Claims.**

This Court will likely at least vacate the preliminary injunction because the district court failed to "perform[ ] the facial analysis" that applies to NetChoice's claims. *Moody v. NetChoice LLC*, 603 U.S. —, slip op. 12 (U.S. July 1, 2024). A stay is warranted on this basis alone.

"NetChoice chose to litigate" this case as a "facial challenge[ ]"— "and that decision comes at a cost." *Moody* Op. 9. The Supreme Court has "made facial challenges hard to win" and has directed lower courts to undertake a rigorous three-step "inquiry" to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs facial challenges. *Moody* Op. 4, 9, 30. First, a court must evaluate "the state law['s] scope" by assessing "how [the] law works in all of its applications." *Moody* Op. 10, 30. Second, the court must "decide which of the law['s] applications" (if any) "violate" the Constitution. *Moody* Op. 11. Third, the court must "compare" "the law['s] ... constitutionally impermissible and permissible" applications to decide whether the impermissible ones are pervasive enough to succeed on a facial challenge. *Moody* Op. 12. On that last step, a facial First Amendment challenge can succeed "only if the law's

11

unconstitutional applications substantially outweigh its constitutional ones." *Moody* Op. 9. A facial vagueness challenge can succeed "only" if the law "is impermissibly vague in all of its applications." *McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th Cir. 2023); *see Moody* Op. 9. A court must assess whether the plaintiff has made the required showings for each challenged provision. *See Moody* Op. 11, 13 n.3. The burden on a plaintiff is thus considerable—but that is the "price" of challenging a law "as a whole" rather than as applied, and a court must hold a plaintiff to its burden rather than "disregard the requisite inquiry." *Moody* Op. 30.

Here, the district court conducted nothing like "the requisite inquiry." Rather than conduct step 1, the court block-quoted parts of the Act and then offered a high-level one-paragraph summary of the Act. Op. 2-4; *see* Op. 19 (requoting parts of Act). The court did not even block-quote all the Act's core provisions: it omitted the Act's list of ways to satisfy the parental-consent provision and later alluded to them only tersely. *See* Op. 29-30. And the court did not assess "how [the] law works in all of its applications." *Moody* Op. 30. The court never accounted for the limiting phrase "commercially reasonable"—a term central to each core provision that ensures that (at least most of) the Act's applications impose no burden on speech and thus pose no First Amendment problem. The court

12

also never accounted for NetChoice's concession that, "[b]ased on the Act's definitions," NetChoice knows that the Act covers 7 of its members and "does not regulate all NetChoice members." Complaint ¶ 13; Mem. 3. That admits that the Act clearly applies to some platforms—and so is not vague in all applications.

The district court's misstep at step 1 guaranteed that it would fail to "perform[ ]" the rest of the "facial analysis." *Moody* Op. 12. After all, "[b]efore a court can do anything else with [a] facial challenge[ ], it must address ... what [the law] covers." *Moody* Op. 11. And indeed, at what should have been steps 2 and 3, the district court failed to account for the Act's many permissible applications and never "compare[d]" those applications to any properly found impermissible ones. *Moody* Op. 12; *see infra* Parts I-B & I-C. The Supreme Court just vacated a decision of this Court for failing to perform the required "facial analysis." *Moody* Op. 12. This Court will likely do the same here.

## B.    NetChoice Failed To Show That Any Part Of The Act Likely Facially Violates The First Amendment.

This Court will likely hold that nothing in the Act facially violates the First Amendment. The district court erred in ruling otherwise. Op. 16-32.

Start with the Act's "scope": "What activities, by what actors," does the Act "prohibit or otherwise regulate?" *Moody* Op. 10. On "actors": The Act regulates certain online platforms—those that "[c]onnect[ ] users in a manner that allows users to socially interact," "[a]llow[ ] a user to create a" profile that others may be able to see, and "[a]llow[ ] a user to create or post content" that others can view. § 3(1)(a)-(c). The Act carves out many other online platforms that, in the Legislature's judgment, do not present the dangers that interactive platforms do. § 3(2). On "activities": The Act regulates the non-expressive conduct of covered platforms by imposing three modest duties—to make "commercially reasonable" efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. §§ 4(1), 4(2), 6. By requiring only "commercially reasonable" efforts, the Act does not demand perfect, cost-prohibitive, or *even effective* efforts. It requires that a platform exercise minimally reasonable care given its resources. Put differently: The Act *does not require* age verification. It requires "commercially reasonable efforts" to verify age. § 4(1). For at least some platforms that may mean no more than asking someone's age—as some platforms now do—because anything more is cost-prohibitive. Paolucci Dec. ¶ 6 (Dkt. 3-5). The Act *deems* parental consent to be given by any of several easy means—a phone call, a response to an email, or any other "commercially reasonable

14

method"—without more (there is no need to verify the parental relationship). § 4(2). Some platforms require more than that to create an account. Pai Dec. ¶¶ 4-5 (Dkt. 3-4). And the Act *does not require* any platform to prevent harm or to alter, block, or remove content. It requires only "commercially reasonable efforts" to adopt a harm-mitigation *strategy*. § 6. NetChoice proclaims that its members already have policies addressing online harms. Mem. 4, 20; Szabo Dec. pp. 7-16 (Dkt. 3-2).

"[T]he next order of business is to decide which of" these "provisions[']" "applications violate the First Amendment." *Moody* Op. 11. The answer is none—or very few. The age-verification, parental-consent, and strategy provisions each regulate the non-expressive *conduct* of covered platforms by saying what a platform "must *do*"—take reasonable steps to mitigate concrete harms to minors—"not what they may or may not *say*." *Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006). None of these provisions "limits" platforms' "power" to "control the content that will appear to users," "alters the platforms' choices about the views they will, and will not, convey," or "force[s] a private speaker ... to convey views it disapprove[s]." *Moody* Op. 22, 23, 28. Requiring a platform to make commercially reasonable efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy does not intrude on the platform's (or anyone else's) "expressive choices." *Moody* Op. 26. Nor can the Act be

faulted for purportedly burdening users' access to speech through the age-verification and parental-consent provisions. Although that could be a problem for a regulation of *speech*, the Act here regulates *conduct*. The Supreme Court endorsed that understanding in *Dallas v. Stanglin*, 490 U.S. 19 (1989), which rejected a First Amendment challenge to a law restricting certain dance halls to persons aged 14-18. *Id.* at 20-21. That law limited access to speech: adults could not access speech that occurred in those dance halls (talking, dancing, music) and minors could not access the speech of adults. *See id.* at 24-25. But the Supreme Court rejected the view that the law burdened First Amendment activity or triggered heightened scrutiny. *Id.* at 25. The Court explained that "almost every activity" has "some kernel of expression" in it, but that does not make a regulation of that activity a regulation of speech. *Ibid.* So too here.

Rational-basis review thus applies and each challenged provision satisfies that standard. Each provision rationally advances the State's legitimate interest in protecting minors from online harms. Each makes it harder for predators to prey on minors online by making it harder for minors to participate in dangerous online platforms, likelier that parents will oversee minors' online activities, and likelier that platforms will take measures to avert harms. At the least, the vast majority of the Act's applications are "plainly legitimate." *Moody* Op. 9. Applying the age-

verification and parental-consent provisions to platforms that already make commercially reasonable efforts to verify age or obtain parental consent, for example, surely does not burden expressive activity.

Even if the Act could be said to regulate based to some extent on content, it would be subject at most to intermediate scrutiny and would satisfy that standard. A State may regulate the secondary effects of some expressive conduct. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). The provisions here aim at the most serious secondary effects—life-altering and even life-ending harms to minors—and so promote the "substantial government interest" (*id.* at 799) in protecting the "well-being of minors" from harmful conduct perpetrated on covered platforms. *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). Those provisions achieve that interest by imposing modest duties that do not burden substantially more speech than necessary. *Ward*, 491 U.S. at 799.

At the last step of the facial analysis, a court must weigh—for each challenged provision—the provision's "unconstitutional applications" against its "constitutional ones," and sustain a facial challenge only if "a substantial number of" the provision's "applications are unconstitutional, judged in relation to the" provision's "plainly legitimate sweep." *Moody* Op. 9; *see Moody* Op. 11-12. As shown above, a sound analysis of the Act's

17

scope and application requires rejecting the view that any provision's "unconstitutional applications substantially outweigh its constitutional ones." *Moody* Op. 9. NetChoice at least made no showing otherwise.

The district court did not conduct this three-step analysis, *see supra* Part I-A, but ruled that the Act is subject to strict scrutiny because its coverage definition is "inherent[ly]" "content-based" since it "draw[s] a facial distinction based on the message the [platform] conveys (i.e., news and sports)" or "defin[es] regulated speech by its function or purpose (i.e., providing news and sports)." Op. 20-21. That is wrong. The Act's coverage definition distinguishes between platforms based on their *functions* and thus based on the harmful *conduct* that they host—whether a platform allows users to "socially interact," "create ... profile[s]," and "post content," § 3(1)(a)-(c), or instead "[p]rimarily functions to provide ... access to" certain non-interactive material and only "incidental[ly]" offers "interactive functionality," § 3(2)(c)(i)-(ii). The Act covers interactive platforms not because of the ideas expressed or topics covered on them but because of the dangers that interactive online encounters pose to children. Indeed, the district court never accounted for the limiting term "commercially reasonable" or acknowledged the Act's modest reach, which infected its analysis and led it to rule that the Act burdens speech. Op. 16-32. The district court also distinguished *Stanglin* on the ground

18

that users of NetChoice members' platforms "take positions on and engage with others" in "political, social, economic, educational, religious, and cultural" activities. Op. 22-23. But again, none of the Act's provisions regulates the content that platforms may publish or restricts anyone's speech: they regulate non-expressive conduct only. And even if the Act affected some expression that occurs on those platforms, it also regulates huge amounts of *harmful conduct* hosted on those platforms. It thus regulates a substantial amount of conduct that the First Amendment does *not* protect, which means that the Act has a plainly legitimate sweep and NetChoice's facial claim fails.

## C.    NetChoice Failed To Show That Any Part Of The Act Is Likely Facially Void For Vagueness.

This Court will likely hold that the Act is not facially void for vagueness. The district court erred in ruling otherwise. Op. 32-35.

A law "is void for vagueness when it is so unclear" that people "must necessarily guess at its meaning and differ as to its application." *McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th Cir. 2023). To be facially vague, an "enactment" must be "impermissibly vague in all of its applications." *Ibid.*; *see Moody* Op. 9.

The district court held that the Act's "central coverage definition" is "impermissibly vague." Op. 32, 34; *see* Op. 32-35. It is not. The Act

applies to certain platforms that "[c]onnect[ ] users in a manner that allows users to *socially interact* with other users." § 3(1)(a) (emphasis added). And the Act does not apply to any platform that "*[p]rimarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the" platform itself and "[a]llows ... interactive functionality that is *incidental* to the digital service." § 3(2)(c)(i)-(ii) (emphases added). The coverage definition uses plain terms that are "readily understandable by most people." *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015) (no need to define terms that "are not obscure"). In context it is clear that the phrase *socially interact* means communication between two or more "users on [a] digital service." § 3(1)(a). The word *socially* does not distinguish social from (for example) business interactions, *contra* Op. 35, but instead imports that the Act regulates platforms with a dominant "chat" (or other "interactive") feature. *See* § 3(1), (2)(c)(ii).

The terms *primarily* and *incidental* also are plain, objective terms that do not involve "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). Identifying a platform's primary and incidental functions turns on the platform's objective features, not on others' subjective "motivations." *NetChoice, LLC v. Griffin*, No. 5:23-

20

CV-05105, 2023 WL 5660155, at *14 (W.D. Ark. Aug. 31, 2023) (faulting coverage definition that turned on platform *users'* subjective "primary *purpose*") (emphasis added). Anyone can look at the definition, look at a platform's features, and know whether the Act applies. The district court suggested that the Act fails to say how to determine "how a digital service 'primarily' functions" or "when a website permits ... interactive functionality that is merely 'incidental.'" Op. 35. But the Act does not need such prolixity. The Act straightforwardly excludes platforms whose main ("[p]rimar[y]") function is not to allow users to communicate with one another but to provide some other listed service. § 3(2)(c)(i). And the Act straightforwardly directs that that exclusion does not change just because a platform has a secondary ("incidental") chat function or comment section. § 3(2)(c)(ii). That view is reinforced by the Act's structure, which shows its focus on online social-media platforms where minors interact with others who are more likely to harm them. §§ 3, 4, 6.

At all events, NetChoice failed to show that the Act is likely *facially* vague. NetChoice conceded that, "[b]ased on the Act's definitions" in § 3, "the Act regulates some services offered by" several named "NetChoice members" and "does not regulate" some other members. Complaint ¶ 13; *see* Mem. 3. In opposing a stay below, NetChoice agreed that "the Act's clear focus" is "online social-media platforms" and reaffirmed "that the

21

Act regulates access to ... NetChoice's members' websites." Stay Opp'n 3, 7 (Dkt. 36). These concessions admit that the Act has clear and definite (*non-vague*) applications. The district court did not account for this, but it means that NetChoice failed to show that the Act "is impermissibly vague in all of its applications." *McClelland*, 63 F.4th at 1013. And if there are edge cases where certain platforms must "guess as to whether the Act applies," Op. 35, the way to address them is in as-applied challenges. *See Williams*, 553 U.S. at 302-03; *id.* at 305-06 ("the mere fact that close cases can be envisioned," which is true of "virtually any statute," does not "render[ ] a statute vague").

## II.    The Equities Favor A Stay Allowing Mississippi's Act To Address The Harms To Minors That Proliferate Online.

The equities strongly support a stay pending appeal.

*First*, the State will suffer irreparable harm so long as the Act is enjoined. Enjoining enforcement of a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). And the Act here serves the State's powerful interest in protecting children. *Ginsberg v. New York*, 390 U.S. 629, 640 (1968). The district court itself acknowledged "the seriousness of the issue" and "accept[ed]" that "safeguarding the physical and psychological wellbeing of minors online is a compelling interest." Op. 25, 39. And as the Supreme

Court just recognized, "[s]ocial-media platforms" "create ... unprecedented dangers." *Moody* Op. 2. The injunction thwarts the State's efforts to protect children from those dangers.

*Second*, the balance of equities favors a stay. The district court's assessment of the equities rested on its flawed merits ruling. *See* Op. 36, 37. And, as explained, NetChoice's claims of harm rest on a gross misreading of the Act. NetChoice member Dreamwidth claimed, for example, that complying with the Act "may threaten the very existence of its business." Op. 36. That claim, which the district court credited, disregards that the Act requires only "commercially reasonable" efforts— not cost-prohibitive ones—based on the particular platform's resources. NetChoice's other declarations are shot through with similar errors— baselessly suggesting (for example) that the age-verification and parental-consent provisions will require "comprehensive and foolproof systems" and "cumbersome registration processes" (Szabo Dec. ¶¶ 31a, 31d), that the age-verification provision will require using facial recognition and demanding government IDs (Veitch Dec. ¶ 32 (Dkt. 3-3)), that the parental-consent provision will require expertise in family law (Paolucci Dec. ¶ 35), and that the strategy provision requires platforms to block content (Szabo Dec. ¶ 32a). Had the district court soundly analyzed the Act and its applications, it would have recognized that the

Act calls on covered platforms to make only the reasonable efforts that any responsible platform would already make.

The public interest is especially harmed by the facial relief the district court granted—which blocks the Act in many permissible applications and leaves minors needlessly at risk of harm. Facial challenges "threaten to short circuit the democratic process" by "preventing duly enacted laws from being implemented in constitutional ways." *Moody* Op. 9. The injunction here does that. It should be stayed.

# CONCLUSION

This Court should stay the district court's preliminary-injunction order pending resolution of this appeal.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*

SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

July 16, 2024

# CERTIFICATE OF CONFERENCE

On July 15, 2024, counsel for defendant-appellant contacted counsel for plaintiff-appellee and asked for plaintiff's position on this motion and whether plaintiff plans to file a response. Plaintiff's counsel advised that plaintiff opposes this motion and will file a response.

Dated: July 16, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

**CERTIFICATE OF SERVICE**

I, Scott G. Stewart, hereby certify that this motion has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: July 16, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

**CERTIFICATE OF COMPLIANCE**

This motion complies with the word limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5,194 words, excluding parts exempted by Fed. R. App. P. 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: July 16, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*
