# In the United States Court of Appeals for the Fifth Circuit

NETCHOICE, L.L.C.,

*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Mississippi, Southern Division
Civil Action No. 1:24-cv-00170-HSO-BWR

## APPELLEE NETCHOICE L.L.C.'S RESPONSE TO APPELLANT'S MOTION TO STAY THE DISTRICT COURT'S PRELIMINARY-INJUNCTION ORDER PENDING RESOLUTION OF APPEAL

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW Suite 700
Washington, DC 20001

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
scott@lkcfirm.com

*Counsel for Plaintiff-Appellee*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-60341
NetChoice, L.L.C.,
*Plaintiff-Appellee*,
*v.*
Lynn Fitch, in her official capacity as Attorney General of Mississippi,
*Defendant-Appellant*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiff-Appellee NetChoice, LLC has no parent corporation, and no publicly held corporation owns 10% or more of its stock. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellee:**
NetChoice, LLC

**Counsel for Plaintiff-Appellee:**

| | |
|---|---|
| Scott A. Keller | J. William Manuel |
| Steven P. Lehotsky | Stephen L. Thomas |
| Jeremy Evan Maltz | BRADLEY ARANT BOULT CUMMINGS |
| Joshua P. Morrow | LLP |
| Jared B. Magnuson | |
| LEHOTSKY KELLER COHN LLP | |

**Defendant-Appellant:**
Lynn Fitch, in her official capacity as Attorney General of Mississippi

**Counsel for Defendant-Appellant:**
Clarence Lee Lott, III
Elizabeth Claire Barker
Wilson D. Minor
MISSISSIPPI ATTORNEY GENERAL'S OFFICE

DISTRICT COURT AMICI

**Amicus in Support of Plaintiff-Appellee:**
Electronic Frontier Foundation

**Counsel for Electronic Frontier Foundation:**
Aaron David Mackey
David Allen Greene
ELECTRONIC FRONTIER FOUNDATION

J. Cal Mayo , Jr.
MAYO MALLETTE PLLC

*/s/ Scott A. Keller*
SCOTT A. KELLER
*Counsel of Record for*
*Plaintiff-Appellee*

# T<small>ABLE OF</small> C<small>ONTENTS</small>

**Page**

Table of Authorities ............................................................................ iv

Introduction ...................................................................................... 1

Background ....................................................................................... 3

    A.  Factual background .......................................................... 3

    B.  Mississippi House Bill 1126 ........................................... 4

Argument .......................................................................................... 7

  I.    Mississippi House Bill 1126 is unlawful. ............................ 8

    A.  The Act's content-based, speaker-based, and vague coverage definition renders the entire Act unconstitutional ................................................................. 8

        1.  The coverage provisions trigger and fail First Amendment strict scrutiny. ............................... 8

        2.  The coverage provisions are unconstitutionally vague. ...... 12

    B.  The Act's age-verification requirement to access speech (§4(1)) violates the First Amendment. ......................... 13

    C.  The Act's parental-consent requirement for minors to access speech (§4(2)) violates the First Amendment. ................. 14

    D.  The Act's monitoring-and-censorship requirements (§6) are unconstitutional and preempted by 47 U.S.C. §230. ................................................................. 16

        1.  The monitoring-and-censorship requirements are unconstitutional. ......................................... 16

        2.  The monitoring-and-censorship requirements are preempted by 47 U.S.C. §230. ............................. 21

    E.  NetChoice's facial challenge is proper. ........................ 22

  II.  None of the remaining factors favor a stay. ...................... 23

Conclusion ....................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States,*
    509 U.S. 544 (1993) ...................................................... 16

*Am. Booksellers Found. v. Dean,*
    342 F.3d 96 (2d Cir. 2003) ............................................ 13

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ......................................... 10, 11, 22

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ......................................... 2, 11, 13

*Ashcroft v. Free Speech Coal.,*
    535 U.S. 234 (2002) ...................................................... 18

*Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas,*
    83 F.4th 958 (5th Cir. 2023) ........................................ 10

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) ...................................................... 20

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ................................................. 16, 19

*Barr v. Am. Ass'n of Pol. Consultants,*
    591 U.S. 610 (2020) ........................................................ 8

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) ................................................. 11, 19

*Book People, Inc. v. Wong,*
    91 F.4th 318 (5th Cir. 2024) ................................... 20, 23

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969) .......................................................18

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ...............................................*passim*

*Butler v. Michigan,*
    352 U.S. 380 (1957) .......................................................19

*City of Houston v. Hill,*
    482 U.S. 451 (1987) ..................................................17, 20

*City of L.A. v. Patel,*
    576 U.S. 409 (2015) .......................................................14

*Dallas v. Stanglin,*
    490 U.S. 19 (1989) .......................................................9, 10

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008) ....................................21, 22

*FEC v. Cruz,*
    596 U.S. 289 (2022) .....................................................9, 19

*Free Speech Coal., Inc. v. Paxton,*
    95 F.4th 263 (5th Cir. 2024) ....................................21, 22

*Garrett v. Lumpkin,*
    96 F.4th 896 (5th Cir. 2024) .........................................3

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .......................................................20

*Hess v. Indiana,*
    414 U.S. 105 (1973) .......................................................17

*La'Tiejira v. Facebook, Inc.,*
    272 F. Supp. 3d 981 (S.D. Tex. 2017)............................21

*Moody v. NetChoice, LLC,*
 144 S. Ct. 2383 (2024) ....................................................*passim*

*Nat'l Rifle Ass'n of Am. v. Vullo,*
 602 U.S. 175 (2024) ...................................................16

*NetChoice, LLC v. Bonta,*
 692 F. Supp. 3d 924 (N.D. Cal. 2023) .............................1

*NetChoice, LLC v. Griffin,*
 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ........................*passim*

*NetChoice, LLC v. Yost,*
 2024 WL 555904 (S.D. Ohio Feb. 12, 2024) .................1, 10, 15

*Ohio v. EPA,*
 144 S. Ct. 2040 (2024) ...............................................7, 24

*Packingham v. North Carolina,*
 582 U.S. 98 (2017) ....................................................*passim*

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) ....................................................9

*Reno v. ACLU,*
 521 U.S. 844 (1997) ..............................................2, 10, 13

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
 592 U.S. 14 (2020) ...................................................23

*Rumsfeld v. FAIR, Inc.,*
 547 U.S. 47 (2006) ...................................................10

*Sable Commc'ns of Cal., Inc. v. FCC,*
 492 U.S. 115 (1989) ...............................................9, 14

*SEIU, Local 5 v. City of Houston,*
 595 F.3d 588 (5th Cir. 2010) .........................................13

*Smith v. California,*
361 U.S. 147 (1959) ........................................................17

*Smith v. Daily Mail Pub. Co.,*
443 U.S. 97 (1979) ..........................................................16

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) ........................................................19

*United States v. Hansen,*
599 U.S. 762 (2023) ........................................................20

*United States v. Playboy Ent. Grp.,*
529 U.S. 803 (2000) ........................................................11

*United States v. Williams,*
553 U.S. 285 (2008) ........................................................20

*Veterans of Foreign Wars v. Tex. Lottery Comm'n,*
760 F.3d 427 (5th Cir. 2014) .........................................12

*Virginia v. Am. Booksellers Ass'n,*
484 U.S. 383 (1988) ....................................................8, 12

**Statutes**

47 U.S.C. §230 ............................................................11, 21

Miss. Code §75-24-9 .........................................................7

Miss. Code §75-24-19 .......................................................7

Miss. Code §75-24-20 .......................................................7

Mississippi House Bill 1126 (2024)..............................*passim*

**Other Authorities**

Hunter S. Thompson, *Fear and Loathing in Las Vegas* (1971) ..........................18

**INTRODUCTION**

Mississippi House Bill 1126 (2024) ("Act") violates the First Amendment by restricting protected speech on social media websites. The Act's central coverage definition selects websites for regulation using a content-based, speaker-based, and vague test. Specific operative restrictions are also independently unconstitutional. Section 4(1) requires covered websites to verify all users' ages.[1] Section 4(2) requires websites to obtain parental consent before allowing minors to create accounts. And Section 6 directs websites to monitor and censor certain categories of protected speech. None of this is constitutional.

The district court correctly enjoined Defendant's enforcement of the Act against NetChoice's members. *See* ROA.402-16. Courts nationwide have enjoined similar laws. *See NetChoice, LLC v. Yost*, 2024 WL 555904, at *14 (S.D. Ohio Feb. 12, 2024) (parental consent); *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 961, 966 (N.D. Cal. 2023) (age estimation); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023) (age verification and parental consent).

This nationwide consensus follows from Supreme Court precedent. Such laws restrict access to "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North*

---

[1] This brief uses "minor," "adult," "user," and similar terms to refer only to residents of Mississippi.

*Carolina*, 582 U.S. 98, 107 (2017). Age-verification requirements restrict access to such speech. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 881-82 (1997). And States lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 & n.3 (2011). The "First Amendment . . . does not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024).

Defendant's primary response is that the Act regulates "conduct, not speech." Mot.9. Yet Defendant concedes the "Act has a targeted scope," "regulat[ing] [] interactive social-media platforms." Mot.6. Because this lawsuit challenges restrictions on access to protected speech and governmentally compelled censorship, NetChoice's facial challenge is both proper and likely to prevail.

The Act's restrictions on protected speech are unconstitutional unless they survive strict scrutiny. They cannot, as the Act's tailoring flaws preclude them from surviving any level of heightened First Amendment scrutiny. The Act restricts too much speech on too many websites where there are private alternatives to governmental regulation. NetChoice members give parents tools to control their children's online experiences, complementing the many other tools parents have. Furthermore, NetChoice members work tirelessly to protect users from harmful content. But Mississippi would penalize websites up to $10,000—with potentially criminal penalties—each time those efforts fall short (in Defendant's view).

Defendant's motion should be denied because it meets none of the criteria necessary to obtain a stay. Rather, a stay would allow the unconstitutional Act to take effect without Defendant showing a likelihood of success on the merits. The Act's restrictions on speech would irreparably harm Internet users and NetChoice members.

## BACKGROUND

### A. Factual background

NetChoice is an Internet trade association. The Act's regulatory scope includes websites operated by NetChoice "members": (1) Dreamwidth; (2) YouTube (Google); (3) Facebook (Meta); (4) Instagram (Meta); (5) Nextdoor; (6) Pinterest; (7) Snapchat; and (8) X. *See* ROA.388-89. Each member operates a website that "engage[s] in expression" by "display[ing]" protected "third-party speech." *Moody*, 144 S. Ct. at 2393.[2] Teens and adults use these websites to "gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107.

The district court found parents have many means of overseeing their children online. ROA.411. Parents can control what *devices* minors access— and when. ROA.83 ¶ 8. These devices have many parental-control options. ROA.84-85 ¶ 8.b. Parents also control the *networks* connecting minors to the

---

[2] *Moody*'s discussion of social media websites' First Amendment rights is binding authority. *Garrett v. Lumpkin*, 96 F.4th 896, 902 & n.4 (5th Cir. 2024).

Internet. ROA.83-84 ¶8.a. Parents can control *software*, including via browsers, third-party software, and tools offered by members themselves. ROA.85-86 ¶8.c-d.

NetChoice members also address potentially harmful speech through "content moderation." Among other things, members restrict nudity and sexual content, self-harm, substance abuse, harassment and bullying, and child exploitation. ROA.86-96 ¶¶10-19. Members' efforts are effective. ROA.86-87 ¶10.

## B.  Mississippi House Bill 1126

*The Act's scope.* The Act has a "targeted scope," Mot.5-7, 14, regulating "digital services" that "allow[] users to socially interact with other users," §3(1).[3] In other words, the Act targets "social media" websites. *E.g.*, Mot.21.

Specifically, the Act applies to any entity that (1) "[o]wns or operates a digital service"; and (2) "[d]etermines" both the "purpose" and "means" of "collecting and processing [users'] personal identifying information." §2(a)-(b). A "digital service" is "a website, an application, a program, or software that collects or processes personal identifying information." §2(a). But the Act only regulates "digital service[s]" that:

(a) Connect[] users in a manner that allows users to *socially* interact with other users on the digital service;
(b) Allow[] a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and

_____

[3] All similar citation are to sections of House Bill 1126.

(c) Allow[] a user to create or *post* content that can be viewed by other *users* of the digital service, including *sharing* content on: (i) A *message board*; (ii) A *chat room*; or (iii) A *landing page*, video *channel* or main *feed* that presents to a user content created and *posted* by other *users*.

§3(1) (emphases added). These emphasized terms limit the Act to services that publicly disseminate speech for multiple users to see. Accordingly, the Act excludes "direct messaging" and "email." *See Moody*, 144 S. Ct. at 2398.

The Act also excludes websites that "primarily function[] to provide a user with access to" certain content:

(c)(i) . . . news, sports, commerce, online video games or content primarily generated or selected by the [website]; and (ii) Allows chat, comment or other interactive functionality that is incidental to the digital service; or
(d) . . . career development opportunities, including: . . . Professional networking.

§3(2). Accordingly, the Act excludes "ride-sharing," "payment," "online marketplace," and similar services. *See Moody*, 144 S. Ct. at 2398.

Defendant acknowledges the Act "focus[es] on online social-media platforms." Mot.21. The district court agreed with Defendant's explanations of what the Act "covers." ROA.393, 408, 414 (quoting Defendant). It also performed its own analysis of "the Act's coverage," *e.g.*, ROA.404, and what the Act "carve[s] out," ROA.414.

The Act regulates social media websites by restricting speech in the following three ways relevant here.

*Age verification (§ 4(1)).* Covered websites "shall make commercially reasonable efforts to *verify* the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the" website. § 4(1) (emphasis added). Many members require users to create accounts to speak and access some or all speech on their services. ROA.178 n.5.

*Parental consent (§ 4(2)).* Covered websites "shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian." § 4(2). A "known minor" is any unemancipated minor the website "knows to be a minor." § 2(d). The Act enumerates five "acceptable methods of obtaining express consent," plus a sixth catch-all. § 4(2).

*Monitoring and censorship (§ 6(1)).* Covered websites "shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate [] known minor[s'] exposure to harmful material and other content that promotes or facilitates the following harms to minors":

(a) Consistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors;
(b) Patterns of use that indicate or encourage substance abuse or use of illegal drugs;
(c) Stalking, physical violence, online bullying, or harassment;
(d) Grooming, trafficking, child pornography, or other sexual exploitation or abuse;
(e) Incitement of violence; or

(f) Any other illegal activity.

§ 6(1). "[H]armful material" corresponds to the legal definition of obscenity for minors. § 2(c).

This provision has two exceptions for "(a) Any minor [ ] deliberately and independently searching for, or specifically requesting, content; or (b) . . . providing resources for the prevention or mitigation of the harms described [above], including evidence-informed information and clinical resources." § 6(2).

*Enforcement and penalties.* The Act designates violations as "unfair or deceptive trade practices." § 8. Defendant may seek injunctive relief, civil monetary penalties up to $10,000 per violation, and even criminal liability. *See* Miss. Code §§ 75-24-9, -19-20.

## ARGUMENT

No stay is warranted: (1) Defendant is not "likely to succeed on the merits"; (2) Defendant will not suffer "irreparable injury"; (3) a stay would "substantially injure" NetChoice's members; and (4) there is no "public interest" in the unconstitutional Act taking effect. *Ohio v. EPA*, 144 S. Ct. 2040, 2052 (2024).

Because the Act restricts access to myriad protected speech, the Act's "unconstitutional applications substantially outweigh its constitutional

ones," regardless of any "plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted).[4]

## I. Mississippi House Bill 1126 is unlawful.

### A. The Act's content-based, speaker-based, and vague coverage definition renders the entire Act unconstitutional.

#### 1. The coverage provisions trigger and fail First Amendment strict scrutiny.

**a.** The Act's coverage definition selects websites for regulation based on content and speaker, triggering strict scrutiny.

The Act's scope regulates websites based on whether they allow users to "socially interact," §3(1)(a), excluding interactive websites that "[p]rimarily function[] to provide a user with access to [1] news, [2] sports, [3] commerce, [4] online video games," and "[5] career development opportunities." §3(2)(c)-(d). So the Act excludes websites that facilitate other kinds of content-based interactions, or that do not allow social interaction at all.

All these distinctions "treat[] or classif[y]" websites "differently based upon the nature of the material that is disseminated." ROA.404; *see Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 620-21 (2020) (controlling plurality op.) (content-based exceptions render entire law content-based). As the district court recognized, the Act is "content-based, and therefore subject to strict scrutiny," via "[t]he facial distinction . . . based on the message the

---

[4] NetChoice has standing to assert harms to its members *and* their users. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).

digital service provider conveys, or the more subtle content-based restriction based upon the speech's function or purpose." ROA.405. Such "[c]ontent-based laws . . . are presumptively unconstitutional and may be justified only if" they satisfy "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022); *see* ROA.402. Defendant has admitted that "[e]ach provision" "mak[es] it harder for minors to participate in" the "social-media platforms" targeted by the Act. Mot.16, 21. Yet government restricting "access to social media" "prevent[s] [people] from engaging in [their] First Amendment rights." *Packingham*, 582 U.S. at 108.

Seeking to avoid First Amendment scrutiny, Defendant incorrectly suggests that the First Amendment's protections are limited to websites' ability to control "content." Mot.15 (quoting *Moody*). *Moody* involved *compelled* speech and restrictions on organizing and displaying third-party speech. 144 S. Ct. at 2399. But the First Amendment also protects against governmental *restrictions* on accessing speech—including on social media websites and even individual-to-individual communications. *E.g.*, *Packingham*, 582 U.S. at 108; *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126-31 (1989). The Supreme Court's *associational*-rights decision in *Dallas v. Stanglin*, 490 U.S. 19, 23-25 (1989), is not to the contrary. There is a key constitutional difference between preventing minors' physical access to "alcohol, illegal drugs, and

promiscuous sex," *id.* at 27, versus preventing access to websites where the entire "purpose . . . is to engage in speech," *Griffin*, 2023 WL 5660155, at *16 (rejecting similar analogy). *Moody* likewise refutes Defendant's reliance on *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006), as social media websites are "engaged in expression," *Moody*, 144 S. Ct. at 2401 & n.4 (distinguishing *FAIR*). These websites are akin to "a series of essays by different authors." *Yost*, 2024 WL 555904, at *6.

Defendant invokes the "secondary-effects" doctrine, Mot.17, which applies to "zoning ordinances," *Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas*, 83 F.4th 958, 969 (5th Cir. 2023) (citation omitted). *Reno* held that restrictions on access to online speech are not analogous to zoning ordinances regulating physical property. 521 U.S. at 867-68. States cannot purport to "cyberzone" the Internet by imposing "restriction[s] on speech." *Id.* Nor may they "reduce secondary effects simply by reducing speech in the same proportion." *Club Execs.*, 83 F.4th at 969. The Act does precisely that—targeting speech access and dissemination, not just its effects.

**b.** The Act cannot satisfy any level of heightened scrutiny. Defendant must show that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (cleaned up). At minimum, governmental restrictions on accessing these websites trigger heightened scrutiny. *Packingham*, 582 U.S. at 108.

Defendant asserts that the Act serves the State's interest in "protecting minors from online harms." Mot.16. But the Act is not the "least restrictive" means of accomplishing the State's goals. *AFP*, 594 U.S. at 607 (citation omitted). The district court found parents already have options to oversee their children online. *See supra* pp.3-4; 47 U.S.C. §230(d) (notification requirements for parental controls). The Supreme Court has repeatedly endorsed tools like these over governmental intervention. *E.g.*, *Ashcroft*, 542 U.S. at 667. Mississippi could instead give "parents the information needed to engage in active supervision." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000); *see* ROA.411. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not [work] perfectly." *Playboy*, 529 U.S. at 824. Whatever "modest gap in concerned parents' control" those tools may leave open, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

Websites themselves undertake great efforts to address the potentially harmful content that Defendant highlights. *See supra* p.4. The Supreme Court has endorsed similar "voluntary" efforts over governmental mandates restricting speech. *Brown*, 564 U.S. at 803.

Where States can regulate, the "normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). Mississippi law already regulates "the harmful conduct related to the speech that the Act seeks to censor." ROA.39-40 ¶135 (complaint collecting laws). In fact, Mississippi

enacted House Bill 1196 (2024) to criminalize the conduct (sextortion) that spurred this Act. *See* Mot.1.

The Act's coverage provisions are both "seriously underinclusive" and "seriously overinclusive." *Brown*, 564 U.S. at 805. The Act covers websites regardless of whether they are likely to be used by minors and without determining which (if any) may be harmful to minors. The Supreme Court has already rejected the notion that States can target "interactiv[ity]." Mot.21; *see Brown*, 564 U.S. at 798 (rejecting argument that particular speech "present[ed] special problems because [it is] interactive" (cleaned up)). Similarly, the Act is overinclusive because it fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. And the Act is underinclusive because it is not clear why the State would attempt to restrict minors' access to covered websites—but not websites excluded based on content. §3(2)(c)-(d).

Because the Act's coverage definition fails "strict scrutiny," the law is "facially invalid." *Veterans of Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 441 (5th Cir. 2014).

## 2. The coverage provisions are unconstitutionally vague.

The entire Act is also unconstitutionally vague, because its coverage definitions hinge on subjective, open-ended words like "[p]rimarily function[]," §3(2)(c)-(d), and "socially interact," §3(1)(a). "Websites are thus left to guess as to whether the Act applies at all to them, . . . present[ing] a concern over potential arbitrary and discriminatory enforcement." ROA.419; *see Griffin*,

2023 WL 5660155, at *13. This definition is *facially* vague because it "has a capacity to chill constitutionally protected conduct"—which is the standard for *speech* restrictions, not whether the law is vague in all applications. *SEIU, Local 5 v. City of Houston*, 595 F.3d 588, 597 (5th Cir. 2010) (cleaned up); *contra* Mot.13.

## B. The Act's age-verification requirement to access speech (§ 4(1)) violates the First Amendment.

The Act regulates speech by requiring all users—adults and minors alike—to verify their ages before accessing or posting speech on covered websites. Governments cannot require people to provide personal information to third parties, such as "identif[ication]," to access and engage in protected speech. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 881-82. "It is likely that many" people "who otherwise would be interested in becoming account holders . . . will be deterred—and their speech chilled—as a result of [] age-verification." *Griffin*, 2023 WL 5660155, at *17; *see Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (similar).

Here, undisputed evidence demonstrates that asking for people's birthdays—let alone age verification—deters users from accessing the websites. *E.g.*, ROA.136-41 ¶¶ 20-33. Under the Act, users would need to provide information before, *e.g.*, sharing creative writing on Dreamwidth, "petition[ing] their elected representatives" on X, "shar[ing] vacation photos . . . with their friends" on Facebook, uploading tutorials to YouTube, and looking for neighborhood jobs on Nextdoor. *Packingham*, 582 U.S. at 104-05.

This age-verification requirement fails strict scrutiny. It is not "carefully tailored" to avoid "deny[ing] adults their free speech rights." *Sable*, 492 U.S. at 126-27. Instead, the Act mandates that *all* users must undergo age verification to access protected speech on covered websites. The Act is overinclusive as to minors, too. Although "a State possesses legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citation omitted).

Defendant's insistence that the Act requires only "commercially reasonable efforts" is a further tailoring flaw. Mot.14, 23. The Act commands covered websites to "verify" users' ages. §4(1). Any time the Act requires such verification, it is unconstitutional. *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015) (facial challenges "consider[] only applications of the statute in which it actually authorizes or prohibits conduct"). If the Act only required "asking someone's age," Mot.14, Defendant has said "[t]hat obviously is not good enough to combat the harms the State is targeting," ROA.341. Nor can websites know where they fall on Defendant's atextual (and impermissibly vague) sliding scale for what efforts are "cost prohibitive" depending on "the particular platform's resources." Mot.14, 23.

## C. The Act's parental-consent requirement for minors to access speech (§4(2)) violates the First Amendment.

The Act also violates the First Amendment by requiring minors to obtain parental consent before accessing speech on covered websites. §4(2). Minors

have the "right to speak or be spoken to," and governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. Courts have consistently rejected similar online parental-consent requirements. *E.g.*, *Yost*, 2024 WL 555904, at *11-12; *Griffin*, 2023 WL 5660155, at *17.

The parental-consent requirement cannot satisfy any form of heightened scrutiny. If covered websites were indeed "dangerous," it does not make sense to allow minors access the websites "so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802. It also ignores the "biggest challenge . . . with parental consent": "actually establishing . . . the parental relationship." *Griffin*, 2023 WL 5660155, at *4; ROA.99-100 ¶ 31; ROA.162-64 ¶¶ 34-36. Websites are likely to "err on the side of caution and require detailed proof"—chilling access to speech. *Griffin*, 2023 WL 5660155, at *15. Defendant asserts "there is no need to verify the parental relationship." Mot.15. But if services need not verify that a minor's actual parent has consented, the Act does not "promot[e] parental oversight and involvement." ROA.337.[5] The parental-consent requirement is also overinclusive because not all minors "have parents who *care* whether" they access covered websites. *Brown*, 564 U.S. at 804.

---

[5] Defendant incorrectly asserts that some services "require more than" this provision requires. Mot.15. The declaration Defendant cites says nothing about parental consent. Moreover, there is a First Amendment difference between *privately* implemented versus *governmentally* imposed speech restrictions.

### D. The Act's monitoring-and-censorship requirements (§ 6) are unconstitutional and preempted by 47 U.S.C. § 230.

#### 1. The monitoring-and-censorship requirements are unconstitutional.

The Act's requirements for covered websites to "develop *and implement* a strategy to prevent or mitigate [a] known minor's *exposure to*" particular "*content*" regulates protected speech and violates the First Amendment. § 6 (emphases added). This provision violates websites' right to "control the content that will appear to users." *Moody*, 144 S. Ct. at 2404-05. It replaces websites' private content-moderation efforts with a governmental mandate not to publish certain (vague and subjective) categories of speech—including protected speech. The government cannot censor this protected speech "directly," and it cannot "coerce" websites to suppress "speech on [its] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (citation omitted).

**a.** This provision is a prior restraint: It prohibits covered websites from publishing speech "in the future" unless they meet state-imposed requirements. *Alexander v. United States*, 509 U.S. 544, 553 (1993). Even prior restraints of *unprotected* speech must meet "the most exacting scrutiny." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979) (collecting cases). The Act goes beyond the "informal" governmental "coercion" the Supreme Court has rejected. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). So it fails "the most exacting scrutiny" used to analyze prior restraints. *Daily Mail*, 443 U.S. at 102. Requiring websites to pre-screen all content using the State's

standards will necessarily chill speech. *Smith v. California*, 361 U.S. 147, 153-54 (1959).

Defendant insists that this provision does not "require[] platforms to block content," requiring them only to "adopt" a "strategy." Mot.15, 23. Yet the Act requires websites to "implement" that strategy, which forces websites to censor—"prevent . . . exposure to"—speech on minors' accounts at the government's demand. §6. And if websites only must "adopt" (but not "implement") a strategy, it is hard to see how this provision advances any governmental interest. Although Defendant acknowledges that NetChoice members have voluntary "strategies," Mot.15, Defendant has never said that *any* existing strategies comply with the Act.

Defendant also claims that this provision merely "regulates conduct." Mot.16. But that is the same mistake *Moody* identified as "a serious misunderstanding" when it rejected the idea that "the content choices the major platforms make for their main feeds are 'not speech' at all." *Moody*, 144 S. Ct. at 2399.

**b.** This provision reaches "a substantial amount of constitutionally protected speech," rendering it "facially invalid." *City of Houston v. Hill*, 482 U.S. 451, 458-59 (1987). Defendant ignores that speech "promot[ing]," §6, social ills is protected by the First Amendment, and thus different from speech acts constituting a crime, *see, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973). The

Act's censorship categories encompass speech protected for adults and minors alike. *See* ROA.23-24 ¶ 52 (collecting examples).

- Culture and conversation are replete with protected speech that "promotes or facilitates . . . substance abuse or use of illegal drugs." § 6(1)(b). Examples include *Fear and Loathing in Las Vegas* (1971) and speech about using illegal drugs to address illnesses.

- Much in media "promotes or facilitates . . . [i]ncitement of violence." § 6(1)(e). Concern about minors' exposure to violent video games led to the invalid law in *Brown*, 564 U.S. at 794. Short of actual incitement to "imminent lawless action," such speech is fully protected. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

- Countless forms of protected speech could "promote[] or facilitate[] . . . other illegal activity." § 6(1)(f). "Illegal" activity will vary both within and outside Mississippi's borders. A website could violate the Act by failing to block posts "promoting" attendance at an evening movie in violation of curfew laws.

- NetChoice members work tirelessly to block content that "promotes or facilitates . . . [g]rooming, trafficking, child pornography, or other sexual exploitation or abuse." § 6(1)(d). Yet even "teenage sexual activity and the sexual abuse of children" has "inspired countless literary works" such as "Romeo and Juliet" and "American Beauty." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247 (2002).

**c.** Section 6 triggers and fails strict scrutiny. It directs websites to block content-based categories of speech. These categories are also viewpoint-based, regulating speech that "promotes" (§ 6(1)) social ills: A law is directly "aimed at a particular viewpoint" if it forbids "promot[ing]" that viewpoint. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011).

Section 6 fails strict scrutiny. Its requirements are overinclusive because they are "superimposed upon the State's criminal regulation[s]." *Bantam Books*, 372 U.S. at 69. Those existing criminal laws make the Act "largely unnecessary," *id.*, and an improper "prophylaxis-upon-prophylaxis," *FEC v. Cruz*, 596 U.S. at 306. Mississippi law already addresses the unlawful conduct related to the prohibited categories, as discussed above (at pp.11-12). Governments cannot "suppress[]" speech from "law-abiding" persons or websites "to deter conduct by a non-law-abiding third party." *Bartnicki*, 532 U.S. at 529-30.

Furthermore, because many covered websites may not be able to age-gate content, *see* ROA.101 ¶ 32.b, they may not be able to limit Section 6's effects to minors' accounts. So the Act could "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

These requirements are also underinclusive. They restrict minors' access to certain speech *unless* the minor "deliberately and independently" seeks it out. § 6(2)(a). If this speech is dangerous, making it available to minors who request it undermines the State's goals. *Brown*, 564 U.S. at 802.

**d.** The Act's monitoring-and-censorship requirements are unconstitutionally vague. They "effectively grant[] [the State] the discretion to [assign liability] selectively on the basis of the content of the speech." *Hill*, 482 U.S. at 465 n.15.

The Supreme Court has held that a speech law hinging on the word "promote" was invalid "because of vagueness," as it provided no "ascertainable standard of conduct." *Baggett v. Bullitt*, 377 U.S. 360, 371-72 (1964). Indeed, "'promotes' . . . [is] susceptible of multiple and wide-ranging meanings." *United States v. Williams*, 553 U.S. 285, 294 (2008). "Facilitates" is no better. §6(1). This Act is unlike the criminal context—where words like "promote" and "facilitate" have "longstanding and pervasive" constructions that speech regulations lack. *United States v. Hansen*, 599 U.S. 762, 773 (2023).

Members cannot be sure that their current policies will satisfy Defendant's interpretation of the Act. ROA.126 ¶39; ROA.156-58 ¶¶23-26. Whether content falls into the Act's prohibited categories will often require "contextual analyses" across many pieces of content. *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024); *see* ROA.96-98 ¶¶20, 23; ROA.154-55 ¶¶20-21. The same phrase ("drugs are great!") could be earnest, sarcastic, or just quoting another person. This categorization risks being "completely subjective." *Grayned v. City of Rockford*, 408 U.S. 104, 113 (1972).

## 2. The monitoring-and-censorship requirements are preempted by 47 U.S.C. § 230.

There is an alternative basis to affirm the district court's injunction of Section 6: It is preempted by 47 U.S.C. § 230 because it requires covered websites to monitor and block third-party content.

Under § 230, no "interactive computer service shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1). Covered websites are "interactive computer service[s]." *E.g.*, *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017). Congress granted websites "broad immunity" for "all claims stemming from their *publication of information created by third parties*." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 286 (5th Cir. 2024) (cleaned up), *cert. granted* (U.S. July 2, 2024). That includes decisions about whether and how to "filter, screen, allow, [] disallow," "pick, choose," "display," and "organize," "content." 47 U.S.C. § 230(f)(4). It also includes alleged "failure[s] to implement basic safety measures to protect minors." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-19 (5th Cir. 2008) (citation omitted). Congress preempted "inconsistent" state laws imposing "cause[s] of action" or "liability." 47 U.S.C. § 230(e)(3).

Here, § 230 preempts the requirement that covered websites "prevent or mitigate . . . minor[s'] exposure to" prohibited third-party speech to address "harms" from that content. § 6. This provision impermissibly requires covered websites to "address certain harmful content." *MySpace*, 528 F.3d at 420 (citation omitted). It would require monitoring user-generated content, but

§230 "proscribes liability" for "decisions relating to the monitoring" or "screening" "of content." *Id.* (citation omitted).

This provision likewise would penalize covered websites for failing to block minors' access to user-generated content. Yet, it "is the point of Section 230[] to immunize [websites] for harm caused by unremoved speech." *Free Speech*, 95 F.4th at 284-85; *see MySpace*, 528 F.3d at 420 ("deletion of content") (citation omitted).

## E. NetChoice's facial challenge is proper.

Defendant misreads *Moody*, suggesting that it imposed a *new* analysis for facial challenges requiring courts to use magic words. Mot.3, 11-13. It does not. *Moody* restated the "less demanding though still rigorous standard" courts "have" long used for First Amendment facial challenges. 144 S.Ct. at 2397.

The district court analyzed the Act's scope, crediting *Defendant's* interpretation about what the Act "covers." *E.g.*, ROA.393, 404, 408, 414; *see supra* p.5. Defendant's motion reiterates the Act's same "targeted scope" covering "interactive social-media platforms." Mot.6. Defendant does not identify any website or activity she believes the Act covers that would have distinct First Amendment arguments—which is what *Moody* questioned. *See* 144 S.Ct. at 2397-99. Rather, the "pertinent facts . . . are the same across the board." *AFP*, 594 U.S. at 618. True, Defendant raises *merits* arguments that the Act has "many permissible applications" to social media. Mot.13, 19. But such

22

arguments cannot establish that the district court failed to properly analyze the Act's scope.

The district court then concluded "that a substantial number, if not all, of H.B. 1126's applications are unconstitutional judged in relation to its legitimate sweep." ROA.415 (citation omitted). The Act's core coverage definitions are "content-based," the operative provisions relying on those definitions fail strict scrutiny, and the coverage definitions are "unconstitutionally vague." ROA.404, 419.

## II. None of the remaining factors favor a stay.

Defendant cannot dispute that "[t]he loss of First Amendment freedoms . . . constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Nor does Defendant dispute that "injunctions protecting First Amendment freedoms are always in the public interest" and "the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment." *Book People*, 91 F.4th at 341 (cleaned up).

The district court's injunction does not eliminate all "efforts to protect children." Mot.23. NetChoice's members continue moderating potentially harmful content. *See* ROA.86-97 ¶¶ 9, 12-19, 21; ROA.107-22 ¶¶ 6-28; ROA.133-35 ¶¶ 10-14; ROA.151-52 ¶ 17. Parents can use existing private tools, which the State can support. ROA.411. And law-enforcement can investigate and enforce existing laws. *See supra* pp.11-12.

The Act's compliance costs threaten one member's "ability to continue operating." ROA.163 ¶ 35. And *any* compliance costs are "nonrecoverable" irreparable injuries. *Ohio*, 144 S. Ct. at 2053 (citation omitted). Nor were the two months Mississippi gave websites for compliance enough time. ROA.148 ¶¶ 9, 37; ROA.122 ¶ 30. Even if compliance were possible, it would restrict vast amounts of protected speech.

## CONCLUSION

The Court should deny Defendant's motion.

Dated: July 26, 2024

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
   Suite 700
Washington, DC 20001

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Respectfully submitted,
*/s/ Scott A. Keller*
Scott A. Keller
Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
scott@lkcfirm.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

On July 26, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses. No paper copies were filed in accordance with General Docket Order No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5194 words, excluding the parts of exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Scott A. Keller*
Scott A. Keller