No. 24-60341

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NETCHOICE, L.L.C.,
*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
No. 1:24-cv-170-HSO-BWR

**DEFENDANT-APPELLANT'S OPENING BRIEF**

LYNN FITCH
  *Attorney General*
SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Under this Court's Rule 28.2.1, governmental parties need not furnish a certificate of interested persons.

<u>*s/ Scott G. Stewart*</u>
Scott G. Stewart
*Counsel for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

The district court preliminarily enjoined the enforcement of an important state law that protects children from the harms inflicted on interactive social-media platforms. This case raises significant questions about state authority to address those harms and about the burden— recently reemphasized by the Supreme Court—that a plaintiff must satisfy where, as here, it challenges a law facially rather than as applied. Oral argument would aid the Court in resolving the issues presented in this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................i

STATEMENT REGARDING ORAL ARGUMENT ................................ii

TABLE OF AUTHORITIES ...................................................... v

INTRODUCTION................................................................ 1

STATEMENT OF JURISDICTION ........................................... 6

STATEMENT OF THE ISSUES.............................................. 6

STATEMENT OF THE CASE ................................................. 7

    Factual Background ...................................................... 7

    Procedural Background.................................................. 9

SUMMARY OF ARGUMENT ................................................. 18

STANDARD OF REVIEW.................................................... 19

ARGUMENT .................................................................. 20

I.    This Court Should Vacate The Preliminary-Injunction Order Because It Rests On Claims That NetChoice Lacks Standing To Bring ...................................................................... 20

II.   This Court Should Reverse The Preliminary-Injunction Order Because The District Court Erred In Ruling That The Mississippi Act Is Likely Facially Unconstitutional........................................ 30

    A.   The District Court Failed To Perform The Demanding Facial Analysis That Applies To NetChoice's Claims ..................... 31

    B.   The District Court Erred In Ruling That The Act Likely Facially Violates The First Amendment ............................... 34

iii

C.    The District Court Erred In Ruling That The Act Is Likely Facially Void For Vagueness ................................................. 46

D.    NetChoice's Preemption Claim Cannot Support The Preliminary-Injunction Order............................................... 50

III.  Even Putting The Merits Aside, This Court Should Reject Or Dramatically Narrow The Preliminary Injunction ....................... 52

CONCLUSION ......................................................................... 55

CERTIFICATE OF SERVICE.................................................... 56

CERTIFICATE OF COMPLIANCE........................................... 56

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
 138 S. Ct. 2305 (2018) ........................................................................ 52

*Alario v. Knudsen,*
 704 F. Supp. 3d 1061 (D. Mont. 2023) ............................................. 27

*Barber v. Bryant,*
 860 F.3d 345 (5th Cir. 2017) ............................................................ 24

*Canal Authority of State of Florida v. Callaway,*
 489 F.2d 567 (5th Cir. 1974) ............................................................ 54

*City of Dallas v. Delta Air Lines, Inc.,*
 847 F.3d 279 (5th Cir. 2017) ............................................................ 19

*City of Dallas v. Stanglin,*
 490 U.S. 19 (1989) ...................................................... 15, 37-39, 43, 44

*City of Renton v. Playtime Theatres, Inc.,*
 475 U.S. 41 (1986) ............................................................................. 40

*DaimlerChrysler Corp. v. Cuno,*
 547 U.S. 332 (2006) ..................................................................... 20, 54

*Doe I v. Landry,*
 909 F.3d 99 (5th Cir. 2018) ................................................... 40, 46, 49

*Doe v. MySpace, Inc.,*
 528 F.3d 413 (5th Cir. 2008) ............................................................ 51

*Elk Grove Unified School District v. Newdow,*
 542 U.S. 1 (2004) ............................................................................... 26

*Free Speech Coalition, Inc. v. Paxton,*
   95 F.4th 263 (5th Cir. 2024),
   *cert. granted,* 2024 WL 3259690 (U.S. July 2, 2024)................... 50, 51

*Gill v. Whitford,*
   585 U.S. 48 (2018)............................................................... 54

*In re Facebook, Inc.,*
   625 S.W.3d 80 (Tex. 2021) ................................................... 25

*In re: Google Location History Litigation,*
   No. 5:18-cv-05062-EJD (N.D. Cal.)...................................... 25

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004)............................... 2, 20, 21, 24, 26-29

*Lemmon v. Snap, Inc.,*
   995 F.3d 1085 (9th Cir. 2021)...................................... 25, 26

*Louisiana Fair Housing Action Center, Inc. v.*
   *Azalea Garden Properties, LLC,*
   82 F.4th 345 (5th Cir. 2023) ............................... 22, 23, 24

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)....................................................... 20, 24

*Madsen v. Women's Health Center, Inc.,*
   512 U.S. 753 (1994).............................................................. 54

*McClelland v. Katy Independent School District,*
   63 F.4th 996 (5th Cir. 2023) ............................... 31, 46, 49

*Moody v. NetChoice, LLC,*
   144 S. Ct. 2383 (2024)........ 3, 4, 23, 27, 31-34, 36-39, 42-45, 51, 52, 54

*NAACP v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010).............................. 21, 22, 23

*NetChoice, LLC v. Bonta*,
  — F.4th —, 2024 WL 3838423
  (9th Cir. Aug. 16, 2024) ............................................................. 33, 34

*NetChoice, LLC v. Griffin*,
  No. 5:23-CV-05105, 2023 WL 5660155
  (W.D. Ark. Aug. 31, 2023).............................................. 15, 28, 29, 48

*NetChoice, LLC v. Yost*,
  — F. Supp. 3d —, 2024 WL 555904
  (S.D. Ohio Feb. 12, 2024)................................................. 14-15, 29, 30

*Planned Parenthood of Greater Texas v. Kauffman*,
  981 F.3d 347 (5th Cir. 2020) (en banc) ............................................. 19

*Powers v. Ohio*,
  499 U.S. 400 (1991)......................................................................... 21

*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006)..................................................................... 36, 37

*Sable Communications of California, Inc. v. FCC*,
  492 U.S. 115 (1989)................................................................... 41, 52

*United States v. Conlan*,
  786 F.3d 380 (5th Cir. 2015)............................................................ 47

*United States v. Williams*,
  553 U.S. 285 (2008)............................................................. 46, 47, 49

*U.S. WeChat Users Alliance v. Trump*,
  488 F. Supp. 3d 912 (N.D. Cal. 2020) ............................................... 27

*Virginia v. American Booksellers Ass'n*,
  484 U.S. 383 (1988)......................................................................... 38

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)............................................................. 39, 40, 41

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................... 28

*Willey v. Harris County District Attorney*,
  27 F.4th 1125 (5th Cir. 2022) .......................................... 19

## Constitutional Provisions

U.S. Const. art. III, § 2 ..................................................... 20

U.S. Const. amend. I .......... 2, 4, 6, 10-18, 20, 22, 27, 28, 30-32, 34, 36-40,
                                          44-46, 50, 51, 54

U.S. Const. amend. XIV ....... 2, 3, 5, 6, 10-12, 14, 15, 17, 18, 30-32, 46-50

## Statutes

28 U.S.C. § 1292 ..................................................................... 6

28 U.S.C. § 1331 ..................................................................... 6

28 U.S.C. § 1343 ..................................................................... 6

47 U.S.C. § 230 .......................................................... 12, 50, 51

2024 H.B. 1126 ................................................ 1-19, 21-23, 27, 30, 32-53

Miss. Code Ann. § 75-24-19 .................................................. 9

Miss. Code Ann. § 75-24-20 .................................................. 9

## Other Authorities

*Class-Action Snapchat Settlement Approved in Illinois.
  Here's What's Next*,
  NBC Chicago (Nov. 23, 2022) ........................................... 25

*Google to destroy browsing data to settle consumer privacy lawsuit*,
  Reuters (Apr. 1, 2024) ....................................................... 25

*Meta agrees to $1.4B settlement with Texas in privacy lawsuit over facial recognition*,
AP News (July 30, 2024)....................................................................25

Social Media and Youth Mental Health:
The U.S. Surgeon General's Advisory (2023).........................24, 25, 41

*Starkville father speaks out on 'sextortion' and his son's suicide*,
Mississippi Clarion Ledger (Feb. 22, 2023).........................................7

## INTRODUCTION

This Court should reject the district court's preliminary injunction blocking enforcement of the Walker Montgomery Protecting Children Online Act, H.B. 1126 (2024), the State of Mississippi's targeted effort to address the life-altering and life-threatening harms to children inflicted on interactive social-media platforms. The order rests on serious errors.

Enacted after a sextortion scheme led a 16-year-old Mississippian to take his own life, the Act imposes modest duties on the interactive online platforms that are especially attractive to predators. The Act requires covered platforms to take "commercially reasonable" actions to verify a user's age, to obtain parental consent for child users, and to adopt a strategy to mitigate the harms to children inflicted on those platforms—sex trafficking, sexual abuse, child pornography, targeted harassment, sextortion, incitement to suicide, and more. The Act requires what any responsible covered platform would already do: make "commercially reasonable" efforts to protect minors—not perfect, state-of-the-art, cost-prohibitive, or even effective efforts, but efforts reflecting a bare minimum of reasonable care in light of the platform's resources.

NetChoice—a group representing billion-dollar social-media companies that routinely sues to halt States' efforts to protect children from online predators—brought this facial challenge against the Act. NetChoice purports to sue on behalf of itself, its members (like Google and Meta), and its members' users. It claims that the Act's age-

verification, parental-consent, and strategy provisions violate the First Amendment and that the Act is unconstitutionally vague.

The district court granted a preliminary injunction. ROA.385-424. On standing, the court ruled that NetChoice may "bring claims on behalf of both its members and its members' Mississippi users." ROA.400; *see* ROA.394-400. On the First Amendment claim, the court ruled that strict scrutiny applies because the Act regulates the content of speech and that the Act likely fails that standard. ROA.400-416. On the vagueness claim, the court ruled that the Act's coverage definition—which asks how a platform "[p]rimarily functions" and whether it allows users to "socially interact"—is "overly indefinite" and so the Act is "impermissibly vague" in all applications. ROA.416, 418, 419; *see* ROA.416-419. On the equities, the court relied on its merits ruling and on a NetChoice member's claim that compliance costs could put it out of business. ROA.419-421.

This Court should reject the preliminary injunction.

*First*, the injunction rests on claims that NetChoice lacks standing to bring. NetChoice does not claim that the Act regulates *its* speech. It claims that the Act regulates the First Amendment rights of its *members' users* and (to a narrower extent) its *members*. But to assert the First Amendment rights of users, NetChoice must establish its own standing, show a close relationship with users, and show that users face a hindrance to asserting their own rights. *Kowalski v. Tesmer*, 543 U.S. 125, 129, 130 (2004). NetChoice made none of those showings. In seeking

2

injunctive relief, NetChoice did not even *assert*—let alone establish with evidence—that it has standing to sue in its own right. NetChoice failed to show that it has *any* relationship with users. Far from being close, any relationship between NetChoice (or its members) and users is plagued by a conflict of interest. Users wants to stay safe online; NetChoice and its members want to minimize spending on online safety and (as this and other NetChoice-led lawsuits show) to fight laws that could make members spend more to protect users' safety. Last, NetChoice showed no hindrance. Online users often sue to assert their own rights. NetChoice claims that the Act violates the First Amendment rights of billions of its members' users—on platforms that are "inescapable" today. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393 (2024). It defies belief that users cannot readily assert their own rights here. Because the injunction rests on rights that NetChoice cannot assert, it must at least be vacated.

*Second*, the district court erred when it ruled that NetChoice will likely win on its facial First Amendment and facial vagueness claims.

To start, the district court failed to apply the standards that govern facial claims. As the Supreme Court just made clear in *Moody v. NetChoice*, when ruling on a facial challenge a court must conduct a rigorous three-step "inquiry" to assess whether the plaintiff has "carr[ied]" the demanding "burden" that makes such a challenge so "hard to win." 144 S. Ct. at 2394, 2397, 2409. The court must first "assess the state law['s] scope" by "determin[ing]" the law's "full set of applications."

3

*Id.* at 2394, 2398. The court must then "decide which of the law['s] applications violate" the Constitution. *Id.* at 2398. Last, the court must "compare" the law's valid and invalid applications to decide whether "the constitutionally impermissible" applications are pervasive enough for success on a facial challenge. *Ibid.* The district court here did nothing like this. Rather than conduct step 1, it block-quoted parts of the challenged provisions, ROA.386-387: it never assessed "how [the] law works in all of its applications." 144 S. Ct. at 2409. At what should have been steps 2 and 3, the court never acknowledged the Act's many permissible applications or "compare[d]" those applications to any properly found impermissible ones. *Id.* at 2398. The Supreme Court just vacated a decision of this Court for failing to undertake the required facial analysis. *Id.* at 2394, 2397-99, 2409. Vacatur (at the least) is required here too—on this basis alone.

Next, NetChoice's facial First Amendment claim fails. NetChoice does not bring a viable First Amendment claim *at all*—let alone a viable *facial* claim. The Act regulates the non-expressive conduct of covered platforms. It requires those platforms to make reasonable efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. None of those requirements regulates speech and so none is subject to First Amendment scrutiny. The district court ruled otherwise by holding that the Act incorporates an "inherent" "content-based distinction" based on "the message a speaker conveys." ROA.404, 405. That is wrong. The

4

Act's coverage turns on where *harmful conduct* toward minors online is most likely: the interactive social-media platforms that allow predators to interact with and harm children. The Act's coverage does not turn on the ideas discussed, the messages conveyed, or who speaks. And the Act's modest requirements do not burden any speech. At the least, each challenged provision can be validly applied in many circumstances, so no provision can be enjoined based on a facial claim.

Last, NetChoice's facial vagueness claim fails. The Act's coverage definition relies on plain terms—it asks whether a platform has certain objective features and how it "[p]rimarily functions." Anyone can read the Act and tell whether a particular platform is covered. Indeed, NetChoice *concedes* that, "[b]ased on the Act's definitions," the Act covers seven of its members and "does not regulate all NetChoice members." Complaint ¶ 13 (ROA.12-13). That admits that the Act is *not* vague in at least *some* applications. That dooms this facial claim.

*Third*, equitable factors also require reversal. The injunction is profoundly damaging: it blocks a state law that protects children from predators. In assessing the equities the district court relied on its flawed merits rulings and on a misreading of the Act. At the least, the injunction is overbroad and must be narrowed to account for NetChoice's limited showing of standing, a sound understanding of any injuries the Act causes, and the Act's many permissible applications.

5

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. On July 1, 2024, the district court issued an order preliminarily enjoining the Act's enforcement. ROA.385-424. On July 3, 2024, the Attorney General filed a timely notice of appeal. ROA.526-527. This Court has jurisdiction under 28 U.S.C. § 1292.

## STATEMENT OF THE ISSUES

I. Should this Court reject the preliminary-injunction order because it rests on claims that NetChoice lacks standing to bring?

II. Should this Court reject the preliminary-injunction order because: (A) the district court failed to perform the facial analysis that applies to NetChoice's claims; (B) the Act does not facially violate the First Amendment because it rationally regulates non-expressive conduct rather than speech; (C) the Act is not facially vague because a reasonable person can tell what it covers and requires; and (D) NetChoice's preemption claim—which the district court did not reach—cannot support the injunction?

III. Should this Court reject the preliminary-injunction order because: (A) the equities weigh against blocking the Act, a state law that protects children from predatory harm; and (B) the injunction exceeds NetChoice's showing of standing and irreparable harm?

**STATEMENT OF THE CASE**

**Factual Background.** The internet has a dark side. It provides a forum for conduct that inflicts life-altering and even life-ending harms on children—sex trafficking, sexual abuse, child pornography, targeted harassment, sextortion, incitement to suicide, and more. Sophisticated online platforms host this conduct.

Recognizing these harms, the State of Mississippi acted this year to address them. The Legislature was especially moved by the case of Walker Montgomery, a 16-year-old Mississippian who in 2022 fell prey to sextortion on Instagram. After a predator "catfished" Walker and "demanded money to keep from outing him," the Starkville Academy sophomore took his own life. *Starkville father speaks out on 'sextortion' and his son's suicide*, Mississippi Clarion Ledger (Feb. 22, 2023). Spurred by Walker's plight and by the harms that proliferate online, the Legislature passed and the Governor signed the Walker Montgomery Protecting Children Online Act, H.B. 1126 (2024) (ROA.48-60).

The Act has a targeted scope. It "applies only to" online platforms that "[c]onnect[ ] users in a manner that allows users to socially interact with other users," "[a]llow[ ] a user to create a" profile that others may be able to see, and "[a]llow[ ] a user to create or post content" that others can view. § 3(1)(a)-(c); *see* § 2(a)-(b). The Act thus regulates the interactive social-media platforms that let predators interact with children and feed those predators information about those children. The

Act reaffirms this targeted aim by carving out many other online platforms. § 3(2). This carveout includes platforms that generally do not present the dangers that interactive social-media platforms do—such as those that mainly provide "access to news, sports, commerce, [or] online video games" and only "incidental[ly]" offer "interactive" ("chat") functions. § 3(2)(c).

Within that targeted ambit, the Act imposes on interactive social-media platforms three basic duties to address harms to children.

First, covered platforms must register—and make "commercially reasonable efforts to verify"—the age of those who create an account with the platform. § 4(1).

Second, covered platforms must secure, through a "commercially reasonable" method, "express consent from a parent or guardian" before allowing a known minor to hold an account. § 4(2). The Act lists several "[a]cceptable methods" for obtaining that consent, including by filling out a form, making a phone call, or responding to an email, § 4(2)(a)-(e), and adds a catchall for "[a]ny other commercially reasonable method" "in light of available technology," § 4(2)(f).

Third, covered platforms must make "commercially reasonable efforts" to adopt a strategy to address certain harms. § 6(1). "In relation to a known minor's use of a digital service," a covered platform "shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful

material and other content that promotes or facilitates" listed "harms to minors." § 6(1). Those harms are: "[c]onsistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors"; "[p]atterns of use that indicate or encourage substance abuse or use of illegal drugs"; "[s]talking, physical violence, online bullying, or harassment"; "[g]rooming, trafficking, child pornography, or other sexual exploitation or abuse"; "[i]ncitement of violence"; or "[a]ny other illegal activity." § 6(1)(a)-(f). Nothing in this strategy provision "shall be construed to require" a platform "to prevent or preclude": (a) "[a]ny minor from deliberately and independently searching for, or specifically requesting, content"; or (b) the covered platform or those on it "from providing resources for the prevention or mitigation of the" listed harms, "including evidence-informed information and clinical resources." § 6(2)(a)-(b).

The Act provides for private enforcement by an affected minor's parents, § 7(2), and for enforcement by the Attorney General, § 8. State law allows, in cases of knowing and willful violations, civil monetary penalties and criminal liability. Miss. Code Ann. §§ 75-24-19, -20.

The Act was to take effect July 1, 2024. § 10.

**Procedural Background.** On June 7, NetChoice, LLC filed this suit challenging the Act. Complaint (ROA.9-46).

NetChoice is a "trade association for Internet companies." Complaint ¶ 10 (ROA.12). It claims that it has standing to challenge the

9

Act "on at least three grounds." *Id.* ¶ 11 (ROA.12). First, it claims that it has associational standing—standing to sue on behalf of its members. *Id.* ¶¶ 12-13 (ROA.12-13). It says that, "[b]ased on the Act's definitions," the Act covers and regulates seven of NetChoice's members: Google (which operates YouTube); Meta (which operates Facebook and Instagram); X (formerly Twitter); Snap Inc. (which operates Snapchat); Pinterest; Nextdoor; and Dreamwidth. *Id.* ¶ 13 (ROA.12). NetChoice also says that the Act "does not regulate all NetChoice members." *Ibid.* (ROA.12-13). Second, NetChoice claims that it has third-party standing—"standing to assert the First Amendment rights of [its] members' current and prospective users." *Id.* ¶ 14 (ROA.13). Third, NetChoice claims that it has organizational standing—standing to sue "on its own behalf." *Id.* ¶ 15 (ROA.13). It alleges that it "has incurred costs and will continue to divert finite resources to address the Act's implications and compliance costs for Internet companies." *Ibid.* (ROA.13).

NetChoice brings three sets of claims—all raising only "facial challenge[s]," Complaint ¶ 58 (ROA.26), and seeking declaratory and injunctive relief, *id.* ¶¶ 157-68 & pp. 37-38 (ROA.44-46).

First, NetChoice claims that the Act's age-verification, parental-consent, and strategy provisions violate the First Amendment (applied to States through the Fourteenth Amendment). Complaint ¶¶ 60-82, 93-140 (ROA.26-30, 33-41) (Counts I, III-V). For "[e]ach First Amendment challenge," NetChoice alleges that it "raises the rights of" its "members"

and those members' "use[rs]," but not any First Amendment rights of NetChoice itself. *Id.* ¶ 59 (ROA.26); *see id.* ¶¶ 82, 103, 114, 140 (ROA.30, 34, 35, 41). NetChoice claims that the Act's age-verification provision regulates users' access to speech, that the provision is subject to strict scrutiny, and that it cannot satisfy that standard. *Id.* ¶¶ 93-103 (ROA.33-34). NetChoice claims that the parental-consent provision regulates minor users' access to speech, that the provision is subject to strict scrutiny, and that it cannot satisfy that standard. *Id.* ¶¶ 104-14 (ROA.34-35). And NetChoice claims that the strategy provision is a prior restraint of members' and users' speech, is a content-based regulation of speech, and is a viewpoint-based regulation of speech; that the provision is subject to heightened scrutiny; and that the provision cannot satisfy heightened scrutiny. *Id.* ¶¶ 115-40 (ROA.35-41). In an overarching count, NetChoice claims that the Act's coverage definition is content-based and speaker-based, that the three core operative provisions (and entire Act) are thus subject to strict scrutiny, and that no provision can satisfy that standard. *Id.* ¶¶ 60-82 (ROA.26-30); *see id.* ¶¶ 98, 109, 120 (ROA.33, 35, 36).

Second, NetChoice claims that the Act's coverage definition and strategy provision are unconstitutionally vague. Complaint ¶¶ 83-92, 141-47 (ROA.31-32, 41-42) (Counts II, VI). NetChoice says that the coverage definition relies on undefined terms ("socially interact," "[p]rimarily function[ ]," "incidental to") whose meaning "[m]any

11

websites will have no way of knowing." *Id.* ¶¶ 86-90 (ROA.31-32). And NetChoice says that the strategy provision does not make clear what it covers and what it requires of platforms. *Id.* ¶¶ 142-46 (ROA.41-42).

Third, NetChoice claims that the strategy provision is preempted by federal law. Complaint ¶¶ 148-56 (ROA.42-44) (Count VII). NetChoice contends that, in conflict with 47 U.S.C. § 230 (commonly known as section 230), the strategy provision "would permit lawsuits and impose liability on covered websites for failing to monitor, screen, filter, or otherwise censor third-party content." *Id.* ¶ 155 (ROA.43).

NetChoice moved for a preliminary injunction. ROA.63-64, 166-200, 353-365. In doing so, it invoked associational and third-party standing, but not organizational standing. ROA.180, 355-357. On the merits, NetChoice thus asserted the rights only of its members and their users. For its First Amendment challenges to the age-verification and parental-consent provisions, NetChoice asserted the rights of users. *E.g.*, ROA.181-182, 191 (age-verification provision); ROA.182-183, 191 (parental-consent provision). For its First Amendment challenge to the strategy provision, NetChoice asserted the rights of members and users. *E.g.*, ROA.183-188, 190, 191. And for its vagueness and preemption claims, NetChoice asserted the rights of members. *E.g.*, ROA.188-189, 195-196 (vagueness); ROA.197-198 (preemption).

NetChoice submitted declarations from its general counsel and from officials with YouTube, Nextdoor, and Dreamwidth (each of which

is—or is owned by—a NetChoice member, Complaint ¶ 13 (ROA.12)). Those declarations describe covered members' policies and practices for protecting minors on their platforms. Szabo Dec. ¶¶ 11-19 (ROA.87-96) (addressing seven members); Veitch Dec. ¶¶ 16-28 (ROA.113-122) (YouTube); Pai Dec. ¶¶ 5-19 (ROA.132-136) (Nextdoor); Paolucci Dec. ¶¶ 16-21 (ROA.151-155) (Dreamwidth). The declarations claim that complying with the Act would be hard, costly, and damaging for covered members. Szabo Dec. ¶¶ 28-33 (ROA.99-102); Veitch Dec. ¶¶ 29-42 (ROA.122-127); Pai Dec. ¶¶ 20-33 (ROA.136-141); Paolucci Dec. ¶¶ 9-15, 22-26, 33-36 (ROA.148-151, 155-158, 161-164). One member (Dreamwidth) claims that the costs of complying with the Act may force it to shut down. Paolucci Dec. ¶ 37 (ROA.164). NetChoice's general counsel asserts that "NetChoice itself has been irreparably harmed as it has incurred costs and will continue to divert finite resources to address the Act's implications for Internet companies." Szabo Dec. ¶ 34 (ROA.103). He adds that, if the Act takes effect, "NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt." *Id.* ¶ 35 (ROA.103).

On July 1, the district court granted a preliminary injunction barring the Act's enforcement "against ... NetChoice ... and its members." ROA.423-424; *see* ROA.385-424.

*First*, the court held that NetChoice has standing "to bring claims on behalf of both its members and its members' Mississippi users."

ROA.400; *see* ROA.394-400. To start, the court held that NetChoice has associational standing and so can assert its members' rights. ROA.395-398. The court ruled that members "would have standing to sue in their own right" because the Act will impose "substantial compliance costs" on members, will violate members' "First Amendment right to 'disseminate' protected speech," and will violate members' "Fourteenth Amendment right to have laws be reasonably clear about the entities to which they apply." ROA.396, 397, 398. The court ruled that this lawsuit "is germane to [NetChoice's] purpose" of "mak[ing] the Internet safe for free enterprise and free expression." ROA.398. And the court ruled that the case would not require NetChoice members to participate "because the nature of the suit is unlikely to require fact-intensive inquiry of each member." ROA.398. The court said that, "[h]aving concluded that NetChoice has associational standing to bring this lawsuit, the Court need not resolve whether it has organizational standing." ROA.398. The court then held that NetChoice can assert the rights not just of its members but also of its members' users. ROA.399-400. The court found "persuasive" two district-court decisions allowing NetChoice to challenge "similar state laws imposing age-verification requirements on many of its members" and concluded that NetChoice "is in a unique position to advocate for the rights of [Mississippi] users" and "may ... do so here.'" ROA.400 (citing *NetChoice, LLC v. Yost*, — F. Supp. 3d —, 2024 WL

555904, at *5 (S.D. Ohio Feb. 12, 2024), and *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *12 (W.D. Ark. Aug. 31, 2023)).

*Second*, on the merits the court held that NetChoice will likely win on its facial First Amendment claim (ROA.400-416) and facial vagueness claim (ROA.416-419). The court did not reach NetChoice's preemption claim. ROA.422 n.7.

On the First Amendment claim: The court ruled that the Act's coverage definition "makes the Act content-based, and therefore subject to strict scrutiny." ROA.405; *see* ROA.400-407. The Act covers platforms that (among other things) allow users to "socially interact," but excludes platforms that "[p]rimarily function[ ]" to provide users with access to "news, sports, commerce, [or] online video games." § 3(1)(a), (2)(c)(i); *see* ROA.403. According to the district court, this coverage definition draws a "content-based distinction" based on "the message a speaker conveys" ("i.e., news and sports") or the speech's "function or purpose" ("i.e., providing news and sports"). ROA.404-405. "Because" the Act "regulates content," the court ruled, "strict scrutiny applies." ROA.407. The court rejected the State's argument that the Act is subject to rational-basis review because it regulates covered platforms' non-expressive conduct, not speech. ROA.405-407. The court distinguished *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), which rejected a First Amendment challenge to a law restricting certain dance halls to persons aged 14-18, because the users here (unlike the dance-hall patrons in *Stanglin*) "take

15

positions on and engage with others" in pursuit of "political, social, economic, educational, religious, and cultural" activities. ROA.406-407.

The court ruled that the Act likely fails strict scrutiny because it "is likely not narrowly tailored" to protect minors online. ROA.409; *see* ROA.407-416. The court "accept[ed] as true the Attorney General's position that safeguarding the physical and psychological wellbeing of minors online is a compelling interest." ROA.409. But the court ruled that the Act is likely "overinclusive or underinclusive, or both, for achieving" that interest in "a substantial number, if not all, ... applications." ROA.415. The Act is likely overinclusive, the court said, because: the age-verification provision aims to protect minors yet it applies to all users and so "burdens adults' First Amendment rights" (ROA.411); the parental-consent provision requires all minors to obtain consent even though many parents will not "care whether" their children "create such accounts" (ROA.412); and the strategy provision could, by spurring overly broad content-blocking, prevent all users from accessing "valuable content" (ROA.411-412). The court thought that the Act is likely underinclusive because: "it permits a child to create an account with certain websites, but not others" (ROA.412-413); the parental-consent provision "requires only one parent or guardian's consent" and does not "require verifying" the parental or guardian relationship (ROA.413-414); the coverage definition may not reach some websites that present the dangers that covered platforms do (ROA.414-415); and the strategy

16

provision permits minors to view "otherwise-prohibited content simply because they initiated it by 'searching for' or 'requesting' it" (ROA.415).

On the vagueness claim: The court ruled that the Act's "central coverage definition" is "impermissibly vague in all of its applications." ROA.416, 418; *see* ROA.416-419. The Act excludes from its coverage any platform that "*[p]rimarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the" platform and that "[a]llows chat, comment or other interactive functionality that is *incidental to* the digital service." § 3(2)(c)(i)-(ii) (emphases added). The court faulted that definition as "overly indefinite" because it does not say how to determine "how a digital service 'primarily' functions" or when "interactive functionality" is "'incidental.'" ROA.419. The court added that, while the Act applies only to platforms that allow users to "socially interact," § 3(1)(a), it "does not explicate what constitutes 'social' interaction ... , as opposed to other interactions." ROA.419.

*Third*, the court held that the other injunctive factors support relief. ROA.419-421. On irreparable harm, the court said that the Act will cause a "loss" of "First Amendment freedoms" and put members at risk of unrecoverable compliance costs—which, according to NetChoice member Dreamwidth, "may threaten the very existence of its business." ROA.420 (citing Paolucci Dec. p. 20 (ROA.163)). And after observing that "[i]njunctions protecting First Amendment freedoms are always in the

public interest," the court ruled that, given its merits rulings, an injunction "is in the public interest" here. ROA.421.

On July 3, the State moved the district court to stay the preliminary-injunction order pending this appeal. ROA.528-538. On July 15, the district court denied that motion. D. Ct. Dkt. 40.

On July 16, the State moved this Court for a stay pending appeal. CA5 Dkt. 21. On August 1, a divided motions panel ordered that the stay motion is "carried with the case." CA5 Dkt. 41-2 at 1 (capitalization omitted). Judge Ho wrote that the motion "should be granted" and that the merits panel can grant the stay request. *Id.* at 2.

## SUMMARY OF ARGUMENT

I. This Court should vacate the preliminary-injunction order because it rests on First Amendment claims—asserting the rights of NetChoice members' users—that NetChoice lacks standing to bring.

II. This Court should reject the preliminary-injunction order on the merits. The district court failed to perform the facial analysis that applies to NetChoice's claims, which alone requires vacatur. NetChoice failed to show that the Act facially violates the First Amendment: the Act permissibly regulates non-expressive conduct and is valid in at least many applications. NetChoice failed to show that the Act is facially void for vagueness: the Act relies on plain terms that any reasonable person can understand—indeed, NetChoice has conceded that by its terms the Act regulates some NetChoice members and does not regulate other

18

members. And NetChoice's preemption claim—not reached below—lacks merit and cannot support the injunction.

III. The equities independently require rejecting the injunction. The equities weigh against blocking the Act—a state law that protects children. And any injunctive relief must at least be narrowed based on NetChoice's showing of standing and irreparable harm.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy." *Planned Parenthood of Greater Texas v. Kauffman*, 981 F.3d 347, 353 (5th Cir. 2020) (en banc) (internal quotation marks omitted). A movant must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Willey v. Harris County District Attorney*, 27 F.4th 1125, 1129 (5th Cir. 2022). This Court "review[s] the district court's ultimate decision to grant or deny a preliminary injunction for abuse of discretion," but it reviews "a decision grounded in erroneous legal principles de novo." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 286 (5th Cir. 2017) (internal quotation marks omitted).

## ARGUMENT

This Court should reject the preliminary-injunction order—on many grounds. The Court should also grant the State's stay motion, CA5 Dkt. 21-1, that the motions panel carried with the case, CA5 Dkt. 41-2.

## I.    This Court Should Vacate The Preliminary-Injunction Order Because It Rests On Claims That NetChoice Lacks Standing To Bring.

The district court ruled that NetChoice may assert the First Amendment rights of its members' users. ROA.399-400; *see also* ROA.394-398. The district court erred. That error alone requires vacating the preliminary-injunction order.

1. To have a chance of merits success on its preliminary-injunction motion, NetChoice must have standing. It must show an "injury in fact" that is "fairly traceable" to the Attorney General's conduct and that would likely be "redressed" by a decision in its favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (ellipses and brackets omitted); *see* U.S. Const. art. III, § 2. Standing "is not dispensed in gross," so NetChoice must make that showing "for each claim." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 353 (2006).

Because NetChoice asserts others' rights, it faces more hurdles. A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). "[T]he party with the right" is generally best positioned to assert that right and to develop

the record. *Ibid.* Courts thus "grant a third party standing to assert the rights of another" only in "limit[ed]" circumstances. *Id.* at 130. A "party asserting [another's] right" must "satisf[y] Article III" by showing its own "constitutional ... standing" and then "make two additional showings." *Id.* at 129, 130. It must show that it has "a 'close' relationship with the person who possesses the right." *Id.* at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). And it must show "a 'hindrance' to the possessor's ability to protect his own interests." *Ibid.* (quoting *Powers*, 499 U.S. at 411).

2. Under those principles, NetChoice cannot assert the rights of its members' users.

*First*, NetChoice did not "satisf[y] Article III" by showing that *it—* the party seeking "to assert the rights of another"—has "constitutional ... standing." *Kowalski*, 543 U.S. at 129, 130.

NetChoice claims that it has standing "on its own behalf to challenge the Act" based on a diversion-of-resources theory. Complaint ¶ 15 (ROA.13). To establish organizational standing on such a theory, NetChoice must show that the Act forces it to "divert[ ] significant resources to counteract the defendant's conduct"—thereby "significantly and perceptibly impair[ing]" NetChoice's "ability to provide its activities." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (internal quotation marks omitted).

NetChoice's complaint alleges that it "has incurred costs and will continue to divert finite resources to address the Act's implications and

compliance costs for Internet companies." Complaint ¶ 15 (ROA.13). NetChoice did not invoke organizational standing in seeking injunctive relief. *E.g.*, ROA.180 (invoking only "standing to assert harms to its members and their minor and adult users"); ROA.355-357 (invoking only associational and third-party standing). All NetChoice added on its own standing at that stage was its general counsel's declaration. That declaration asserts that "NetChoice itself has been irreparably harmed as it has incurred costs and will continue to divert finite resources to address the Act's implications for Internet companies" and that, if the Act takes effect, "NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt." Szabo Dec. ¶¶ 34-35 (ROA.103).

NetChoice failed to establish its standing. For one thing: "Not every diversion" or "expend[iture]" of resources "establishes an injury in fact." *Kyle*, 626 F.3d at 238. An organizational plaintiff must show that the diversion undercut its other work—by, for example, forcing it to put other "specific projects ... on hold"—and thus "perceptibly impaired" its mission. *Id.* at 238, 239. "[E]ven at the motion to dismiss stage," an organizational plaintiff must explain "how" (for example) its other activities were "canceled, postponed, or otherwise curtailed" because of a diversion of resources. *Louisiana Fair Housing Action Center, Inc. v. Azalea Garden Properties, LLC*, 82 F.4th 345, 353 (5th Cir. 2023) (alterations omitted). NetChoice failed to identify any activity or project

22

that it had to "shift resources *away from* as a result" of the Act. *Ibid.*; *compare* Szabo Dec. ¶¶ 34-35 (ROA.103) (preliminary-injunction-stage declaration with two conclusory sentences alleging diversion of resources and harm to mission) *with Louisiana Fair Housing*, 82 F.4th at 351-55 (rejecting organizational standing at motion-to-dismiss stage despite several paragraphs in complaint detailing diversion-of-resource allegations). For another thing: To establish standing based on a diversion of resources, an organization's "purportedly injurious counteractions must differ from its routine activities." *Louisiana Fair Housing*, 82 F.4th at 351 (internal quotation marks and brackets omitted). NetChoice provided nothing to make that showing. To the contrary: NetChoice regularly and enthusiastically advocates against—and sues to challenge—social-media laws. *See*, *e.g.*, *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024) (involving two such cases); ROA.400 (citing examples); Szabo Dec. ¶¶ 3 & n.2, 5 (ROA.81, 82) (addressing advocacy). For all NetChoice has shown, such efforts are central to its everyday "engage[ment] ... to ensure a bright digital future." Szabo Dec. ¶ 3 (ROA.81). The known facts thus support the view that NetChoice's "purportedly injurious counteractions" here are just part of its "routine" "activities"—or involve litigation-preparation "expenses"—and so "do not suffice" for standing. *Louisiana Fair Housing*, 82 F.4th at 351.

NetChoice thus failed to show a "diversion of resources" that "significantly and perceptibly impaired" its mission. *Kyle*, 626 F.3d at 238

(internal quotation marks omitted). Its showing would fail on a motion to dismiss. *See Louisiana Fair Housing*, 82 F.4th at 351-55. The shortfall is especially clear at the preliminary-injunction stage. *See Lujan*, 504 U.S. at 561 (a plaintiff must "support[ ]" its claim of standing "with the manner and degree of evidence required at" each "stage[ ] of the litigation"); *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (at the preliminary-injunction stage, "plaintiffs must make a 'clear showing' that they have standing").

*Second*, NetChoice failed to show that it has (or its members have) "a 'close' relationship" with users. *Kowalski*, 543 U.S. at 130.

NetChoice did not present evidence that it has any relationship "at all" with its members' users, let alone a close relationship. *Kowalski*, 543 U.S. at 131. And there is no reason to think that any relationship is close. NetChoice is an association of internet platforms, not of those platforms' users. Szabo Dec. ¶ 3 (ROA.81).

NetChoice also never showed that any of its members has a close relationship with its users. NetChoice again provided no evidence—and no reason to think—that any relationship is close. It defies credulity to maintain that YouTube (for example) has a close relationship with its "billions" of users. Veitch Dec. ¶ 22 (ROA.118). A showing of closeness was especially important here, because NetChoice members are often at odds with users. Social-media platforms—like those operated by NetChoice members—are harmful to many users. *E.g.*, Social Media and

24

Youth Mental Health: The U.S. Surgeon General's Advisory 4 (2023), bit.ly/471Daz1 ("[T]he current body of evidence indicates that while social media may have benefits for some children and adolescents, there are ample indicators that social media can also have a profound risk of harm to the mental health and well-being of children and adolescents."); *id.* at 9 ("social media platforms can be sites for predatory behaviors and interactions with malicious actors who target children and adolescents" with, for example, sexual exploitation, sextortion, and lethal drugs). NetChoice members exploit their users. *See, e.g., Meta agrees to $1.4B settlement with Texas in privacy lawsuit over facial recognition*, AP News (July 30, 2024) (regarding "allegations that [Meta] used biometric data of users without their permission"). Users sue NetChoice members. *E.g., In re: Google Location History Litigation*, No. 5:18-cv-05062-EJD (N.D. Cal.) (lawsuit claiming that Google tracked users without consent); *Class-Action Snapchat Settlement Approved in Illinois. Here's What's Next*, NBC Chicago (Nov. 23, 2022) (class action claiming that Snapchat illegally collected users' biometric information); *Google to destroy browsing data to settle consumer privacy lawsuit*, Reuters (Apr. 1, 2024). Members' platforms are used to victimize users. *See, e.g., In re Facebook, Inc.*, 625 S.W.3d 80, 84-85 (Tex. 2021) (claims that predators used Facebook and its Instagram app to lure, groom, and traffic three girls who were age 14 or 15). Users die from harms inflicted on members' platforms. *See, e.g., Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1087-90 (9th

Cir. 2021) (lawsuit alleging that the Snapchat app encouraged the plaintiffs' sons to drive at dangerous speeds and thus caused the boys' deaths). The relationship between members and users is thus often "antagonistic." *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 15 (2004).

Further, any relationship that NetChoice or its members have with users is plagued by a conflict of interest. *See Newdow*, 542 U.S. at 15 & n.7, 17-18 (rejecting "prudential standing" of father whose interests were "potentially in conflict" with those of the daughter whose interests he sought to represent). Users have a strong interest in their own online safety and in protection from the life-altering and life-threatening harms inflicted on NetChoice members' platforms. NetChoice members, however, have a strong interest in devoting no more resources than they must to users' online safety and (as other NetChoice-led lawsuits confirm) in fighting laws that could make members do more to promote users' safety. NetChoice's own interests also conflict with those of users. NetChoice "is a national trade association of online businesses" that seeks to "minimiz[e] burdens on [those] businesses," Szabo Dec. ¶¶ 3-4 (ROA.81-82)—including burdens to promote users' online safety. These conflicts of interest preclude NetChoice's resort to third-party standing on behalf of its members' users.

*Third*, NetChoice failed to show that members' users face a "hindrance" to protecting their own interests. *Kowalski*, 543 U.S. at 130.

26

NetChoice never presented any evidence of a hindrance. Its lawsuit rests on the view that the Act violates the First Amendment rights of many persons—minors and adults. NetChoice gives no reason to doubt that many such persons could sue to vindicate such weighty rights. Online users have "open avenues" to assert their rights, *id.* at 131, and they often take those avenues by challenging regulations of online platforms. *E.g.*, *Alario v. Knudsen*, 704 F. Supp. 3d 1061, 1068, 1070 (D. Mont. 2023) (suit brought by TikTok and a group of its users to block a State's social-media regulation); *U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912, 916-17 (N.D. Cal. 2020) (suit by users of a messaging app). There is no hindrance when third parties have shown that they can represent themselves. *Kowalski*, 543 U.S. at 131-32. More: NetChoice members' users comprise *billions* of persons and thus many potential plaintiffs. Veitch Dec. ¶ 22 (ROA.118) ("YouTube has billions of monthly logged-in users"). In a world where all that is true and where "[s]ocial-media platforms" are now "inescapable" (*Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393 (2024)), there is no sound basis for thinking that users face a hindrance to asserting their own First Amendment rights in matters involving online platforms.

3. The district court erred at each step in assessing NetChoice's third-party standing to assert the rights of its members' users.

To begin, the district court did not require NetChoice to "satisf[y] Article III" by showing its own "constitutional ... standing." *Kowalski*, 543

U.S. at 129; *see* ROA.394-400. Indeed, the court ruled that it did "not" "need [to] resolve whether [NetChoice] has organizational standing" because it had concluded that NetChoice has associational standing. ROA.398. But associational standing permits NetChoice to assert only the rights of its *members. E.g.*, *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (under associational standing, "an association" "ha[s] standing solely as the representative of its members"). Because NetChoice also seeks to assert the rights of members' *users*, it must satisfy the requirements for third-party standing. The district court recognized this, ROA.399-400, but did not require NetChoice to show its own "constitutional ... standing"—a threshold requirement for asserting non-parties' rights. *Kowalski*, 543 U.S. at 129, 130. On this ground alone the district court should have rejected NetChoice's quest to assert users' rights.

The district court also erred in assessing the closeness and hindrance requirements. The court acknowledged those requirements, ROA.399, but did not analyze them, ROA.399-400. The court instead said that it found "persuasive" two district-court decisions allowing NetChoice to assert users' rights. ROA.400. But both decisions are flawed.

Start with *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023), which granted NetChoice third-party standing to assert its members' users' First Amendment rights. *Id.* at *10-*12. The *Griffin* court did not rule that NetChoice itself had Article III standing to sue on its own behalf. *Id.* at *9-*10. It let NetChoice assert

28

users' rights by analogizing the member-user relationship to a vendor-customer relationship that has at times supported third-party standing. *Id.* at *10-*12. But the court did not support that analogy, and the analogy does not withstand scrutiny. The analogy would mean that the YouTubes of the world can assert the rights of billions of people—which defies the tenet that third-party standing is allowed only in "limited" circumstances. *Kowalski*, 543 U.S. at 130. *Griffin* also did not apply the closeness and hindrance requirements reaffirmed in *Kowalski*. To justify that approach, the court claimed that the Supreme Court in *Kowalski* ordered dismissal because the plaintiffs lacked "constitutional standing in their own right." *Id.* at *12. But in fact, the Court in *Kowalski* "assume[d]" that the plaintiff attorneys "satisfied Article III" (543 U.S. at 129) and instead ruled that those plaintiffs could not assert the rights of non-parties because the plaintiffs failed show a close relationship or a hindrance (*id.* at 130-33). *Griffin* thus failed to apply binding Supreme Court precedent. It is not "persuasive." ROA.400.

The same goes for *NetChoice, LLC v. Yost*, — F. Supp. 3d —, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024), which does little more than adopt *Griffin*'s errors. It too did not rule that NetChoice itself had Article III standing to sue on its own behalf. *See id.* at *5 n.1 (declining to reach organizational standing). And in allowing NetChoice to assert users' rights, *Yost* found "persuasive" *Griffin*'s flawed analogy to vendor-customer relationships. *Id.* at *5. Although *Yost* briefly addressed a claim

of "tension between the interests of minor use[r]s and NetChoice's members," it summarily dismissed the claim without addressing the conflicts described above. *Id.* at *6.

4. The district court thus erred in ruling that NetChoice has standing to assert the First Amendment rights of its members' users. That error requires vacating the preliminary injunction because the error pervaded the district court's treatment of all the preliminary-injunction factors. The court's main merits basis for granting injunctive relief was NetChoice's First Amendment claims, ROA.400-416—which rest heavily on the rights of users, *supra* pp. 10-12. On irreparable harm, the court emphasized that the Act would cause a "loss" of "First Amendment freedoms." ROA.420. And in balancing the equities the court emphasized that "[i]njunctions protecting First Amendment freedoms are always in the public interest." ROA.421. The district court's flawed ruling allowing NetChoice to assert users' First Amendment rights thus infects the entire preliminary-injunction order and requires vacatur.

## II. This Court Should Reverse The Preliminary-Injunction Order Because The District Court Erred In Ruling That The Mississippi Act Is Likely Facially Unconstitutional.

On the merits, the district court ruled that NetChoice will likely win on its facial First Amendment claim (ROA.400-416) and facial vagueness claim (ROA.416-419). The district court erred.

**A.    The District Court Failed To Perform The Demanding Facial Analysis That Applies To NetChoice's Claims.**

The district court failed to "perform[ ] the facial analysis" that applies to NetChoice's claims. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2399 (2024). Vacatur is warranted on this basis alone.

"NetChoice chose to litigate" this case as a "facial challenge[ ]"— "and that decision comes at a cost." *Moody*, 144 S. Ct. at 2397; *see* Complaint ¶ 58 (ROA.26) (bringing only "facial challenge[s]"). The Supreme Court has "made facial challenges hard to win" and has directed courts to undertake a rigorous three-step "inquiry" to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs facial challenges. 144 S. Ct. at 2394, 2397, 2409. First, a court must "assess the state law['s] scope" by "determin[ing]" the law's "full set of applications." *Id.* at 2394, 2398. Second, the court must "decide which of the law['s] applications" (if any) "violate" the Constitution. *Id.* at 2398. Third, the court must "compare" "the law['s] ... constitutionally impermissible and permissible" applications to decide whether the impermissible ones are pervasive enough to succeed on a facial challenge. *Ibid.* On that last step, a facial First Amendment challenge can succeed "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 2397. A facial vagueness challenge can succeed "only" if the law "is impermissibly vague in all of its applications." *McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th Cir. 2023). A court

must assess whether the plaintiff has made the required showings for each challenged provision. *E.g.*, *Moody*, 144 S. Ct. at 2398, 2399 n.3 (using provision-by-provision analysis). The burden on a plaintiff is thus considerable. But that is the "price" of challenging a law "as a whole" rather than as applied. *Id.* at 2409. And a court must hold a plaintiff to its burden rather than "disregard the requisite inquiry." *Ibid.*

Here, the district court conducted nothing like "the requisite inquiry." Rather than conduct step 1, the court block-quoted parts of the Act and then offered a high-level one-paragraph summary of the Act. ROA.386-388; *see* ROA.403 (requoting parts of Act). The court did not even block-quote all the Act's core provisions: it omitted the Act's list of ways to satisfy the parental-consent provision, ROA.387, and later alluded to them only tersely, *see* ROA.413-414. The court did not assess "how [the] law works in all of its applications." *Moody*, 144 S. Ct. at 2409. The court never accounted for the limiting phrase "commercially reasonable"—a term central to each core provision that ensures that (at least most of) the Act's applications impose no burden on speech and thus pose no First Amendment problem. The court also never accounted for NetChoice's concession that, "[b]ased on the Act's definitions," NetChoice knows that the Act covers seven of its members and "does not regulate all NetChoice members." Complaint ¶ 13 (ROA.12-13); *see* ROA.176 (preliminary-injunction memorandum). That admits that the Act clearly applies to some platforms—and so is not vague in all applications.

The district court's misstep at step 1 guaranteed that it would fail to "perform[ ]" the rest of the "facial analysis." *Moody*, 144 S. Ct. at 2399. After all, "[b]efore a court can do anything else with [a] facial challenge[ ], it must address ... what [the law] covers." *Id.* at 2398. And indeed, at what should have been steps 2 and 3, the district court failed to account for the Act's many permissible applications and never "compare[d]" those applications to any properly found impermissible ones. *Ibid.*; *see infra* pp. 35-36, 39, 48-49 (describing some permissible applications).

The district court's failure to conduct the required "facial analysis" alone warrants vacating the preliminary-injunction order. *Moody*, 144 S. Ct. at 2399. The Supreme Court in *Moody* vacated a lower-court decision for failing to perform that analysis. *Id.* at 2394, 2399. The Ninth Circuit recently applied *Moody* to vacate, for the same reason, a facial ruling for NetChoice against (among other provisions) a California law requiring online providers to "[e]stimate the age of child users with a reasonable level of certainty." *NetChoice, LLC v. Bonta*, — F.4th —, 2024 WL 3838423, at *3, *14-*15 (9th Cir. Aug. 16, 2024). The Ninth Circuit observed that, "on [its] face," the age-estimation provision "do[es] not necessarily impact protected speech in all or even most applications," yet the district court failed to account for that feature in crediting NetChoice's facial attack. *Id.* at *15. The court of appeals concluded that "the district court's failure to properly consider the facial nature of NetChoice's challenges to" that and other provisions "makes it practically

impossible ... to determine on appeal whether [those] provisions are likely to facially violate the First Amendment." *Ibid.* "That failure alone is enough," the Ninth Circuit ruled, to warrant "vacat[ing] the district court's preliminary injunction as to those provisions." *Ibid.* (NetChoice in this case has repeatedly relied on that now-vacated ruling. Complaint ¶¶ 1, 4 (ROA.10); ROA.174; Stay Opp. 1 (CA5 Dkt. 28).) Vacatur—at the least—is warranted here too. The grounds for vacatur are especially strong because the district court relied on its flawed First Amendment merits analysis in analyzing the other preliminary-injunction factors, so the flaws in that analysis infect the entire preliminary-injunction order. ROA.419-421; *see supra* p. 30.

## B. The District Court Erred In Ruling That The Act Likely Facially Violates The First Amendment.

The district court held that the Act likely facially violates the First Amendment because the coverage definition "makes the Act content-based" and the Act likely cannot satisfy strict scrutiny. ROA.405, 409; *see* ROA.400-416. The district court erred.

1. Start with the Act's "scope": "What activities, by what actors," does the Act "prohibit or otherwise regulate?" *Moody*, 144 S. Ct. at 2398.

On "actors": The Act regulates certain online platforms—those that "[c]onnect[ ] users in a manner that allows users to socially interact," "[a]llow[ ] a user to create a" profile that others may be able to see, and "[a]llow[ ] a user to create or post content" that others can view. § 3(1)(a)-

(c). The Act carves out many other online platforms that, in the Legislature's judgment, do not present the dangers that interactive platforms do—such as platforms that "[p]rimarily function[ ] to provide ... access to" certain non-interactive material and only "incidental[ly]" offer "interactive functionality." § 3(2)(c)(i)-(ii); *see* § 3(2).

On "activities": The Act regulates the non-expressive conduct of covered platforms by imposing three modest duties—to make "commercially reasonable" efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. §§ 4(1), 4(2), 6. By requiring only "commercially reasonable" efforts, the Act does not demand perfect, cost-prohibitive, or *even effective* efforts. It requires that a platform exercise minimally reasonable care given its resources. Put differently: The Act *does not require* age verification. It requires "commercially reasonable efforts" to verify age. § 4(1). For some platforms that may mean no more than asking someone's age, because anything more is cost-prohibitive. Some platforms already ask for more. Paolucci Dec. ¶ 6 (ROA.147) (Dreamwidth "collect[s] a date of birth from all users at registration"). The Act *deems* parental consent to be given by any of several easy means—a phone call, a response to an email, or any other "commercially reasonable method"—without more. § 4(2). There is no need to verify the parental relationship. § 4(2); *see* ROA.413-414 (district court recognizing that "none of the options" in the parental-consent provision "require[s] verifying" the parental or guardian relationship). Some platforms require

more than that to create an account. Pai Dec. ¶¶ 4-5 (ROA.132) (Nextdoor requires "real names and addresses" and uses mailings to verify required information). And the Act *does not require* any platform to prevent harm or to alter, block, or remove content. It requires only "commercially reasonable efforts" to adopt a harm-mitigation *strategy*. § 6. NetChoice proclaims that its members already have policies addressing online harms. ROA.177, 193 (preliminary-injunction memorandum); Szabo Dec. ¶¶ 11-19 (ROA.87-96).

2. "The next order of business is to decide which of" these "provisions[']" "applications violate the First Amendment." *Moody*, 144 S. Ct. at 2398. The answer is that none—or very few—of the Act's applications abridge the "freedom of speech." U.S. Const. amend. I.

a. The age-verification, parental-consent, and strategy provisions "regulate[ ]" covered platforms' non-expressive "conduct, not speech." *Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006). Each provision says what a platform "must *do*"—take reasonable steps to mitigate concrete harms to minors—"not what they may or may not *say*." *Ibid.* None of these provisions "limits" platforms' "power" to "control the content that will appear to users," "alters ... platforms' choices about the views they will, and will not, convey," or "force[s] a private speaker ... to convey views it disapprove[s]." *Moody*, 144 S. Ct. at 2404, 2405, 2408. Requiring a platform to make commercially reasonable efforts to verify age, obtain

parental consent, and adopt a harm-mitigation strategy does not intrude on a platform's (or anyone else's) "expressive choices." *Id.* at 2406.

NetChoice has claimed that the age-verification and parental-consent provisions violate the First Amendment because they burden users' access to speech. *E.g.*, Complaint ¶¶ 4, 5, 93-114 (ROA.10, 11, 33-35); ROA.181-183 (preliminary-injunction memorandum). That claim fails because those provisions do not regulate speech: they regulate platforms' non-expressive conduct. The Supreme Court endorsed that understanding in, for example, *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), which rejected a First Amendment challenge to a law restricting certain dance halls to persons aged 14-18. *Id.* at 20-21. That law limited access to speech: adults could not access speech that occurred in those dance halls (talking, dancing, music) and minors could not access the speech of adults. *See id.* at 24-25. But the Supreme Court rejected the view that the law burdened First Amendment activity or triggered heightened scrutiny. *Id.* at 25. "[C]oming together to engage in recreational dancing" is not inherently expressive and so—no matter the First Amendment speech occurring in dance halls—the age restriction regulated non-expressive conduct rather than speech. *Id.* at 25; *see FAIR*, 547 U.S. at 66 (First Amendment protection extends "only to conduct that is inherently expressive"). The same is true with covered platforms. Although covered platforms host some speech, they also host illegal and harmful activity—sex trafficking, child pornography, sexual abuse, and

more. A State can regulate online platforms' conduct to address those evils. *Cf. Stanglin*, 490 U.S. at 25-28.

NetChoice also has claimed that the strategy provision violates covered platforms' First Amendment "right to 'control the content that will appear to users.'" Stay Opp. 16 (quoting *Moody*, 144 S. Ct. at 2404); *see, e.g.*, Complaint ¶¶ 6, 115-40 (ROA.11, 36-41); ROA.183-188 (preliminary-injunction memorandum). NetChoice says that that provision imposes on platforms "monitoring-and-censorship requirements"—duties to "pre-screen all content" and to "block" certain content. Stay Opp. 16, 19 (emphasis omitted). That is nonsense and it misreads the strategy provision. The strategy provision regulates covered platforms' non-expressive conduct only. It requires platforms to make "commercially reasonable efforts" to adopt a "strategy" to address certain harms. § 6. It does not regulate speech, restrict platforms' "content choices" (Stay Opp. 17), or require blocking, altering, or removing any content. NetChoice has *never* connected its view of the strategy provision with that provision's text. This Court should rely on the provision's text, not NetChoice's distortion of that text. Indeed, "in determining a facial [First Amendment] challenge to a statute," courts must adopt "a narrowing construction that would make [the statute] constitutional" if the statute is "readily susceptible" to that construction. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988). The strategy provision is at least "readily susceptible" to the State's construction—that

38

construction rests on the provision's plain text, after all—so this Court must adopt that construction.

b. Because each challenged provision regulates non-expressive conduct, rational-basis review applies. *Stanglin*, 490 U.S. at 25. The Act satisfies that standard. Each challenged provision rationally advances the State's legitimate interest in protecting minors from online harms. Each makes it harder for predators to prey on minors online by making it harder for minors to participate in dangerous online platforms, likelier that parents will oversee minors' online activities, and likelier that platforms will take measures to avert harms. At the least, the vast majority of the Act's applications are "plainly legitimate." *Moody*, 144 S. Ct. at 2409. Further, applying the age-verification and parental-consent provisions to platforms that already make (or could readily make) commercially reasonable efforts to verify age or obtain parental consent, for example, does not burden those platforms' expressive activity. And applying the strategy provision to platforms that have adopted or could readily adopt a harm-mitigation strategy that does not burden those platforms' speech likewise poses no First Amendment problem.

Even if the Act could be said to regulate based to some extent on content—or might otherwise trigger heightened scrutiny—it would be subject at most to intermediate scrutiny and would satisfy that standard. The First Amendment permits a State to regulate to address the secondary effects of some expressive conduct. *See, e.g., Ward v. Rock*

*Against Racism*, 491 U.S. 781, 791-92 (1989); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-49 (1986). Such effects can include "impacts on public health, safety, and welfare." *Doe I v. Landry*, 909 F.3d 99, 109 (5th Cir. 2018). A law addressing those effects is constitutional if it "promotes a substantial government interest that would be achieved less effectively absent the regulation" and does not "burden substantially more speech than is necessary" to further that interest. *Ward*, 491 U.S. at 799. Applying these principles in *City of Renton*, the Supreme Court upheld an ordinance that prohibited adult movie theaters from locating in residential and other sensitive areas. 475 U.S. at 43, 54-55. Although the ordinance treated theaters differently based on the films they offered, the ordinance was "aimed not at the *content* of the films ... , but rather at the *secondary effects*" of adult theaters "on the surrounding community." *Id.* at 47. The ordinance sought to "prevent crime, protect the city's retail trade, maintain property values," and preserve "the quality of urban life." *Id.* at 48. And the ordinance left adult theaters with "a reasonable opportunity" to operate. *Id.* at 54. The ordinance therefore satisfied the First Amendment: it was "designed to serve a substantial governmental interest" and "allow[ed] for reasonable alternative avenues of communication." *Id.* at 50.

Here too, the challenged provisions permissibly combat harmful secondary effects of speech. Each provision aims at the most serious of secondary effects: concrete, life-altering, and even life-ending harms to

minors—sex-trafficking, sextortion, facilitation of suicide, and more. These risks are, as the Legislature recognized, especially pronounced on interactive social-media platforms—given the chat and profile features that make them fertile ground for bad actors to victimize the young. § 3.

To address the predictable—and well-known—real-world effects that flow from these platforms, the Act imposes modest regulations. Among other things, the age-verification provision puts a guardrail in place before minors are exposed to predators, the parental-consent provision provides an additional guardrail by promoting parental oversight and involvement, and the strategy provision promotes practices that may avert or mitigate a range of tragic harms. §§ 4(1), 4(2), 6. Each provision thus promotes the State's "substantial government interest" (*Ward*, 491 U.S. at 799) in "protecting the physical and psychological well-being of minors" from harmful online conduct commonly perpetrated through the online social-media platforms that the Act covers. *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989); *see* Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 9 (2023), bit.ly/471Daz1 (describing some of the minor-targeting "predatory behaviors and interactions" on "social media platforms"). And each provision will further that interest without "burden[ing] substantially more speech than is necessary." *Ward*, 491 U.S. at 799. Far from cutting off avenues for covered platforms or others to communicate their messages, the Act requires only modest steps—on age verification,

parental consent, and a harm-mitigation strategy—that will allow communication to flow freely.

3. At the last step of the facial analysis, a court must weigh—for each challenged provision—the provision's "unconstitutional applications" against its "constitutional ones," and sustain a facial challenge only if "a substantial number of" the provision's "applications are unconstitutional, judged in relation to the" provision's "plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397; *see id.* at 2398. As shown above, a sound analysis of the Act's scope and application dooms the claim that any provision's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 2397. NetChoice at least made no showing otherwise, launching as it did a sweeping and indiscriminate facial attack without accounting for the Act's permissible applications.

4. The district court ruled that the Act is subject to strict scrutiny because its coverage definition draws a "facial[ly]" "content-based distinction" based on "the message a speaker conveys" ("i.e., news and sports") or the speech's "function or purpose" ("i.e., providing news and sports"). ROA.404-405. That is wrong. The Act's coverage definition distinguishes between platforms based on their *functions* and thus based on the harmful *conduct* that they host—whether a platform allows users to "socially interact," "create ... profile[s]," and "post content," § 3(1)(a)-(c), or instead "[p]rimarily functions to provide ... access to" certain non-interactive material and only "incidental[ly]" offers "interactive

functionality," § 3(2)(c)(i)-(ii). The Act's coverage turns on where *harmful conduct* toward minors online is most likely: the interactive social-media platforms that allow predators to interact with and harm children. The Act's coverage is not based on content or speaker. It does not turn on the ideas discussed, the messages conveyed, or who speaks. Notably, in *Moody*'s companion case, NetChoice argued that a similar coverage definition rendered a Texas law's operative provisions content- and speaker-based. Brief for Petitioners 7, 16, 37, 46, *NetChoice, LLC v. Paxton*, No. 22-555 (S. Ct.); *see Moody*, 144 S. Ct. at 2395 n.2. The Supreme Court did not credit that argument—even though, if it had, the case would have been much easier to decide. The district court erred in crediting the argument here.

In refusing to apply rational-basis review, the district court distinguished *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), on the ground that users of NetChoice members' platforms (unlike the dancers in *Stanglin*) "take positions on and engage with others" in "political, social, economic, educational, religious, and cultural" activities. ROA.406-407. But again, none of the Act's provisions regulates the content that platforms may publish or restricts anyone's speech: the provisions regulate non-expressive conduct only, so rational-basis review applies. That is especially clear for the age-verification and parental-consent provisions, which NetChoice has never shown to restrict platforms' speech. It is also true for the strategy provision, which appears

to present a closer call only because NetChoice (and the district court) misread that provision. *See supra* pp. 38-39. And even if the Act affected some expression that occurs on those platforms, it also regulates huge amounts of harmful conduct hosted on those platforms. It thus regulates a substantial amount of conduct that the First Amendment does *not* protect. The Act has a dominant plainly legitimate sweep and NetChoice's facial claim fails.

The only basis the district court gave for applying strict scrutiny was its view of the Act's coverage definition. ROA.400-407. Because that view is wrong and rational-basis review applies, the district court's discussion of the Act's supposed underinclusive or overinclusive features (ROA.407-416) is irrelevant. Rational-basis review allows such features. *Stanglin*, 490 U.S. at 26-27 (rational-basis review allows for "rough"— even "illogical"—"accommodations"). NetChoice has thus never disputed that the Act's provisions satisfy rational-basis review.

Even if strict scrutiny did apply—or did apply to some parts of the Act—the district court's injunction still could not stand. For one thing, because the district court failed to perform the required three-step facial analysis, the district court never assessed the Act's constitutionality on an application-by-application basis. *See Moody*, 144 S. Ct. at 2397-99; *supra* Part II-A. Even as the Supreme Court in *Moody* faulted the Texas law before it in certain applications, *see id.* at 2394, 2407-08, the Court emphasized that "[n]othing" it "said" "addresses any of the law['s] other

44

applications, which may or may not share the First Amendment problems" the Court identified, *id.* at 2399. That logic applies here. Even if heightened scrutiny applies to the Act in some applications, the district court's failure to analyze the Act application by application requires vacatur. Again, the Court in *Moody* held that heightened scrutiny applied, *id.* at 2407, yet it still vacated and remanded to allow the lower court to conduct the required inquiry, *id.* at 2399, 2409.

For another thing, the district court here credited the State's position that it has a "compelling interest" in "safeguarding the physical and psychological wellbeing of minors online," and faulted the Act only because it "is likely not narrowly tailored" to achieving that interest. ROA.409; *see* ROA.407-416. But the district court's tailoring assessment is itself faulty because it rests on the misreading of the Act that NetChoice pressed. As examples: The court claimed that the age-verification provision "burdens adults' First Amendment rights" (ROA.411)—but the court failed to appreciate how easily that provision can be satisfied, *supra* pp. 35, 39. The court claimed that the parental-consent provision requires all minors to obtain consent even though many parents will not "care whether" their children "create [online] accounts" (ROA.412)—but that fails to show why that provision is *facially* unconstitutional, particularly when most parents *will* care that predators may victimize their children online. And the court claimed that the strategy provision could, by spurring overly broad content-blocking,

prevent all users from accessing "valuable content" (ROA.411-412)—but
that view rests on the erroneous NetChoice-peddled view that that
provision requires platforms to block content. The problems do not end
there. And the problems show that, even if strict scrutiny applies, the
district court's First Amendment analysis cannot stand. On this ground
too, the preliminary-injunction order must be vacated.

### C.    The District Court Erred In Ruling That The Act Is Likely Facially Void For Vagueness.

The district court ruled that the Act's "central coverage definition"
is "impermissibly vague in all of its applications." ROA.416, 418; *see*
ROA.416-419. The district court erred.

A law is unconstitutionally vague if it "fails to provide a person of
ordinary intelligence fair notice of what is prohibited" or "is so
standardless that it authorizes or encourages seriously discriminatory
enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see*
U.S. Const. amend. XIV, § 1 (guaranteeing "due process of law").
"[P]erfect clarity and precise guidance are not required." *Doe I v. Landry*,
909 F.3d 99, 117 (5th Cir. 2018) (internal quotation marks omitted). A
law "is void for vagueness when it is so unclear" that people "must
necessarily guess at its meaning and differ as to its application."
*McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th
Cir. 2023). To be facially vague, a law must be "impermissibly vague in
all of its applications." *Ibid.*

The Act's coverage definition is not vague. The Act applies to certain platforms that "[c]onnect[ ] users in a manner that allows users to *socially interact* with other users." § 3(1)(a) (emphasis added). And the Act does not apply to any platform that "*[p]rimarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the" platform itself and "[a]llows ... interactive functionality that is *incidental* to the digital service." § 3(2)(c)(i)-(ii) (emphases added).

The coverage definition thus uses plain terms that are "readily understandable by most people." *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015) (no need to define terms that "are not obscure"). In context it is clear that the phrase *socially interact* means communication between two or more "users on [a] digital service." § 3(1)(a). The word *socially* does not distinguish social from (for example) business interactions. § 3(1)(a); *contra* ROA.419. This view is reinforced by the Act's structure, which shows that the Act's focus is on platforms with a dominant "interactive" feature, § 3(1), (2)(c)(ii), where minors encounter predators who are more likely to harm them, §§ 4, 6.

The terms *primarily* and *incidental* also are plain, objective terms that do not involve "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306. Identifying a platform's primary and incidental functions turns on the platform's objective features, not on others' subjective

47

motivations. *Compare NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *2, *13-*14 (W.D. Ark. Aug. 31, 2023) (faulting coverage definition that turned on platform *users'* subjective "primary *purpose*") (emphasis added). Anyone can look at the definition, look at a platform's features, and know whether the Act applies. The district court suggested that the Act fails to say how to determine "how a digital service 'primarily' functions" or "when a website permits ... interactive functionality that is merely 'incidental.'" ROA.419. But the Act does not need such prolixity. The Act straightforwardly excludes platforms whose main ("[p]rimar[y]") function is not to allow users to communicate with one another but to provide some other listed service. § 3(2)(c)(i). And the Act straightforwardly directs that that exclusion does not change just because a platform has a secondary ("incidental") chat function or comment section. § 3(2)(c)(ii). That view is again reinforced by statutory structure, which confirms the Act's focus on interactive platforms that present special dangers to minors. §§ 3, 4, 6.

At all events, NetChoice failed to show that the Act is likely *facially* vague. NetChoice conceded that, "[b]ased on the Act's definitions," "the Act regulates some services offered by" several named "NetChoice members" and "does not regulate" some other members. Complaint ¶ 13 (ROA.12-13); *see* ROA.176 (preliminary-injunction memorandum). In opposing a stay below, NetChoice agreed that "the Act's clear focus" is "online social-media platforms" and reaffirmed "that the Act regulates ...

the ability of NetChoice's members' websites ... to engage in[ ] speech."
ROA.545, 549. These concessions admit that the Act has clear and
definite (*non-vague*) applications. The district court did not account for
this, but it means that NetChoice failed to show that the Act "is
impermissibly vague in all of its applications." *McClelland*, 63 F.4th at
1013. And in this Court, NetChoice has admitted that the Act covers
"social media" platforms, that it covers seven NetChoice members, and
that it excludes some NetChoice members—such as "ride-sharing,"
"payment," and "online marketplace" platforms. Stay Opp. 3, 4, 5; *see*
https://perma.cc/J3EZ-7EZV (listing members that apparently fall into
those last three categories). When a law's "application" to the challengers
"is plain," a court must reject a facial vagueness challenge that relies on
"uncertainty about" the law's application "in other situations." *Young v.
American Mini Theatres, Inc.*, 427 U.S. 50, 61 (1976); *see Doe I*, 909 F.3d
at 117. That is the case here. If there are edge cases where certain
platforms must "guess as to whether the Act applies," ROA.419, the way
to address them is in as-applied challenges. *See Williams*, 553 U.S. at
302-03; *id.* at 305-06 ("the mere fact that close cases can be envisioned,"
which is true of "virtually any statute," does not "render[ ] a statute
vague"). The district court was wrong to credit NetChoice's facial
vagueness claim.

**D.    NetChoice's Preemption Claim Cannot Support The Preliminary-Injunction Order.**

Besides its First Amendment and vagueness claims, NetChoice also claims that 47 U.S.C. § 230 preempts the strategy provision. Complaint ¶¶ 148-56 (Count VII) (ROA.42-44). The district court did not reach this argument. ROA.422 n.7. This Court need not either. The claim applies only to the strategy provision and it cannot sustain the injunction—both because the injunction reaches beyond that provision and because the district court's non-merits injunctive rulings rest on First Amendment claims that must be rejected. *See, e.g., supra* p. 30. And the preemption claim fails anyway. (The State addresses the claim because NetChoice has signaled that it will raise it. Stay Opp. 21-22.)

The strategy provision does not "treat[ ]" any online platform "as the publisher or speaker of any information provided by" a third party— or impose "liab[ility]" for good-faith blocking or screening of material— and so it comports with section 230. 47 U.S.C. § 230(c). Although section 230 "immunize[s]" platforms from liability "for harm caused by unremoved speech on their website[s]," it does not immunize platforms when liability is imposed "independently of whether the third-party speech that [platforms] host harms anybody." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *cert. granted*, 2024 WL 3259690 (U.S. July 2, 2024). This Court has accordingly held that section 230 does not preempt a Texas law requiring commercial pornographic

websites to use age-verification methods to prevent minors from accessing their sites. *Id.* at 266-67, 284-86. Liability under that law is based on "compl[iance] with" that age-verification provision, not on harm from third-party content. *Id.* at 285. Under that holding, section 230 does not preempt the strategy provision here. That provision imposes liability based on whether a covered platform "compl[ies] with" the Act by making commercially reasonable efforts to adopt a harm-mitigation strategy—not based on whether third-party content "harms anybody." *Ibid.*

In pressing its section 230 claim, NetChoice has invoked language drawn from *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-20 (5th Cir. 2008). ROA.197-198, 362-363. But MySpace enjoyed immunity where a negligence claim sought to hold it liable for harm caused by third-party content it hosted. *Free Speech Coalition*, 95 F.4th at 285. The strategy provision imposes liability for failing to adopt a strategy—not for harm from third-party content. And again, *supra* pp. 38-39, the strategy provision does not require platforms "to monitor and block third-party content." Stay Opp. 21. Even if NetChoice had shown that the strategy provision would, in *some* applications, be preempted—and it has not—it has not shown that those applications are extensive enough for success on its facial challenge. *Moody*, 144 S. Ct. at 2397. So this claim cannot support the injunction against even the strategy provision.

## III.    Even Putting The Merits Aside, This Court Should Reject Or Dramatically Narrow The Preliminary Injunction.

The district court ruled that the equitable factors support NetChoice and granted broad injunctive relief. ROA.419-421, 423-424. The district court erred in both respects.

*First*, the equities strongly weigh against injunctive relief. The injunction irreparably harms the State and its citizens. Enjoining enforcement of a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). The harm is especially severe here because the Act serves the powerful public interest in protecting children. *See Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). The district court itself acknowledged "the seriousness of the issue" and "accept[ed]" that "safeguarding the physical and psychological wellbeing of minors online is a compelling interest." ROA.409, 423. And the Supreme Court just recognized that "[s]ocial-media platforms" "create ... unprecedented dangers." *Moody*, 144 S. Ct. at 2393. The injunction thwarts the State's efforts to protect children against grave dangers.

The district court erred in assessing the equities. The court's assessment of the equities rests on its merits ruling. ROA.420, 421. But the court erred on the merits. *Supra* Parts II-B & II-C. On irreparable harm, the court also relied on compliance costs. ROA.420-421. But that reliance was misplaced. NetChoice member Dreamwidth claimed, for

example, that the costs of complying with the Act "threaten[ ] [its] ability to continue operating." Paolucci Dec. ¶ 35 (ROA.163). That claim, which the district court credited, ROA.420, disregards that the Act requires only "commercially reasonable" efforts—not cost-prohibitive ones—based on the particular platform's resources. NetChoice's other declarations are shot through with similar errors. The declarations baselessly suggest (to take a few examples) that the age-verification and parental-consent provisions will require "comprehensive and foolproof systems" and "cumbersome registration processes" (Szabo Dec. ¶¶ 31a, 31d (ROA.100)), that the age-verification provision will require using facial recognition and demanding government IDs (Veitch Dec. ¶ 32 (ROA.123)), that the parental-consent provision will require expertise in family law (Paolucci Dec. ¶ 35 (ROA.163)), and that the strategy provision requires platforms to block content (Szabo Dec. ¶ 32a (ROA.101)). Had the district court soundly analyzed the Act and its applications, it would have recognized that the Act calls on covered platforms to make only the reasonable efforts that any responsible platform would already make.

The public interest is especially harmed by the facial relief the district court granted, which blocks the Act in many permissible applications and leaves minors needlessly at risk of harm. Facial challenges "threaten to short circuit the democratic process" by "preventing duly enacted laws from being implemented in constitutional

ways." *Moody*, 144 S. Ct. at 2397. The injunction here does that. This Court should reject it.

*Second*, this Court should at least narrow the injunction. The Constitution and equitable principles dictate that injunctive relief must be "tailored to redress" the plaintiff's "particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Article III standing "is not dispensed in gross," so "a plaintiff must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 353 (2006). Equity requires that injunctive relief be no broader than "necessary to provide complete relief *to the plaintiffs*." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) (emphasis added). And "[t]he purpose of a preliminary injunction is always to prevent irreparable injury." *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

Given those principles, the injunction must be narrowed: first, to account for NetChoice's failure to show standing to assert users' First Amendment rights (if not full vacatur, at least partial vacatur), *see supra* Part I; second, in light of any district-court merits rulings that this Court rejects, *see supra* Part II; and last, to the extent that the district court erred in assessing the equities, *see supra* pp. 52-54.

## CONCLUSION

This Court should vacate, reverse, or substantially narrow the district court's preliminary-injunction order.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*

SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

August 27, 2024

## CERTIFICATE OF SERVICE

I, Scott G. Stewart, hereby certify that this brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: August 27, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,676 words, excluding parts exempted by Fed. R. App. P. 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: August 27, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*