No. 24-60341

# In the United States Court of Appeals for the Fifth Circuit

NETCHOICE, L.L.C.,

*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Mississippi, Southern Division
Civil Action No. 1:24-cv-00170-HSO-BWR

## BRIEF OF PLAINTIFF-APPELLEE NETCHOICE, LLC

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
 *Counsel of Record*
Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
scott@lkcfirm.com

*Counsel for Plaintiff-Appellee*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-60341
NetChoice, L.L.C.,
*Plaintiff-Appellee*,
*v.*
Lynn Fitch, in her official capacity as Attorney General of Mississippi,
*Defendant-Appellant*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiff-Appellee NetChoice, LLC has no parent corporation, and no publicly held corporation owns 10% or more of its stock. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellee:**
NetChoice, LLC

**Counsel for Plaintiff-Appellee:**

| | |
|---|---|
| Scott A. Keller | J. William Manuel |
| Steven P. Lehotsky | Stephen L. Thomas |
| Jeremy Evan Maltz | BRADLEY ARANT BOULT CUMMINGS |
| Joshua P. Morrow | LLP |
| Jared B. Magnuson | |
| LEHOTSKY KELLER COHN LLP | |

**Defendant-Appellant:**
Lynn Fitch, in her official capacity as Attorney General of Mississippi

**Counsel for Defendant-Appellant:**
Lynn Fitch
Scott G. Stewart
Justin L. Matheny
Anthony M. Shults
Wilson D. Minor
Clarence Lee Lott, III
Elizabeth Claire Barker
MISSISSIPPI ATTORNEY GENERAL'S OFFICE

DISTRICT COURT AMICI

**Amicus in Support of Plaintiff-Appellee:**
Electronic Frontier Foundation

**Counsel for Electronic Frontier Foundation:**
Aaron David Mackey
David Allen Greene
ELECTRONIC FRONTIER FOUNDATION

J. Cal Mayo, Jr.
MAYO MALLETTE PLLC

                              /s/ Scott A. Keller
                              Scott A. Keller
                              *Counsel of Record for*
                              *Plaintiff-Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee NetChoice, LLC agrees with Appellant that oral argument would aid the Court in resolving the issues presented in this appeal.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons.................................................................i

Statement Regarding Oral Argument ........................................................ iii

Table of Authorities................................................................................ vi

Introduction.............................................................................................1

Statement of Jurisdiction ........................................................................4

Issues Presented.....................................................................................4

Statement of the Case.............................................................................4

      A.  Background. ...............................................................................4

           1.  Covered websites disseminate speech protected by
the First Amendment..............................................................4

           2.  Covered websites' content-moderation policies
prioritize user safety. ...........................................................5

           3.  Parents have many options to oversee and control
how their children use covered websites and the
Internet..............................................................................7

      B.  Mississippi House Bill 1126 is a content-based and
speaker-based law that restricts access to protected
speech and overrides websites' content-moderation
efforts. .................................................................................9

      C.  Procedural history....................................................................15

Summary of the Argument .......................................................................16

Standard of Review .................................................................................18

Argument.................................................................................................18

    I.  NetChoice has associational standing to seek relief on
behalf of its members, and NetChoice independently has
standing to assert the rights of members' users. ...............................18

II. NetChoice is likely to succeed on the merits. ....................................22

    A. The district court complied with *Moody*'s framework for evaluating First Amendment facial challenges. ...................22

    B. All of the Act's speech regulations are unconstitutional because they depend on content-based, speaker-based, and vague coverage definitions. ....................................................27

    C. The Act's age-verification, parental-consent, and monitoring-and-censorship provisions are each independently unlawful....................................................37

        1. The age-verification requirement (§ 4(1)) violates the First Amendment. ........................................................37

        2. The parental-consent requirement (§ 4(2)) violates the First Amendment. ....................................................40

        3. The monitoring-and-censorship requirements (§ 6) are unlawful....................................................................42

III. The other preliminary-injunction factors favor NetChoice. .............53

Conclusion....................................................................................................55

Certificate of Service ...............................................................................56

Certificate of Compliance.......................................................................56

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*ACLU v. Mukasey,*
534 F.3d 181 (3d Cir. 2008) ............................................................38

*Alexander v. United States,*
509 U.S. 544 (1993) ........................................................................43

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003) ..............................................................38

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ...........................................................22, 33, 40

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) .................................................................*passim*

*Ashcroft v. Free Speech Coal.,*
535 U.S. 234 (2002) ................................................................30, 47

*Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas,*
83 F.4th 958 (5th Cir. 2023) ...........................................................32

*Baggett v. Bullitt,*
377 U.S. 360 (1964) ........................................................................49

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) .............................................................43, 44, 48

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020) ........................................................................29

*Bartnicki v. Vopper,*
532 U.S. 514 (2001) ................................................................34, 48

*Book People, Inc. v. Wong,*
91 F.4th 318 (5th Cir. 2024) ....................................................18, 53

*Brandenburg v. Ohio,*
395 U.S. 444 (1969) ........................................................................47

vi

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) .................................................................*passim*

*Butler v. Michigan,*
    352 U.S. 380 (1957) .................................................................49

*Canady v. Bossier Par. Sch. Bd.,*
    240 F.3d 437 (5th Cir. 2001) ...................................................39

*Career Colls. & Schs. of Tex. v. United States Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) ...................................................19

*Citizens United v. FEC,*
    558 U.S. 310 (2010) .................................................................30

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    596 U.S. 61 (2022) ...................................................................31

*City of Dallas v. Stanglin,*
    490 U.S. 19 (1989) ...............................................................39, 41

*City of Houston v. Hill,*
    482 U.S. 451 (1987) .................................................................45

*Civ. Beat Law Ctr. for the Pub. Int., Inc. v. Maile,*
    2024 WL 3958954 (9th Cir. Aug. 28, 2024)..............................24

*Club Retro, L.L.C. v. Hilton,*
    568 F.3d 181 (5th Cir. 2009) ...................................................39

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
    2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) .......................*passim*

*Conway v. United States,*
    647 F.3d 228 (5th Cir. 2011) ...................................................24

*Counterman v. Colorado,*
    600 U.S. 66 (2023) ...................................................................46

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008) ...............................................51, 52

*Elk Grove Unified Sch. Dist. v. Newdow,*
    542 U.S. 1 (2004) .....................................................................21

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012) ........................................................................... 35

*FEC v. Cruz,*
596 U.S. 289 (2022) ............................................................... 24, 30, 48

*Free Speech Coal., Inc. v. Paxton,*
95 F.4th 263 (5th Cir. 2024) ................................................ 50, 51, 52

*Garrett v. Lumpkin,*
96 F.4th 896 (5th Cir. 2024) .............................................................. 2

*Gay Lesbian Bisexual All. v. Pryor,*
110 F.3d 1543 (11th Cir. 1997) ........................................................ 45

*Ginsberg v. New York,*
390 U.S. 629 (1968) ......................................................................... 13

*Henderson v. Source for Pub. Data, L.P.,*
53 F.4th 110 (4th Cir. 2022) ............................................................ 52

*Hess v. Indiana,*
414 U.S. 105 (1973) ......................................................................... 46

*Hiett v. United States,*
415 F.2d 664 (5th Cir. 1969) ........................................................... 24

*Kowalski v. Tesmer,*
543 U.S. 125 (2004) ......................................................................... 21

*La. Fair Hous. Action Ctr. v. Azalea Garden Props., L.L.C.,*
82 F.4th 345 (5th Cir. 2023) ............................................................ 19

*McClelland v. Katy Indep. Sch. Dist.,*
63 F.4th 996 (5th Cir. 2023) ............................................................ 36

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
460 U.S. 575 (1983) ......................................................................... 26

*Moody v. NetChoice, LLC,*
144 S. Ct. 2383 (2024) ...............................................................*passim*

*Moore v. City of Kilgore,*
877 F.2d 364 (5th Cir. 1989) ........................................................... 43

*NAACP v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) ........................................................19

*Nat'l Gay Task Force v. Bd. of Educ. of City of Oklahoma City*,
  729 F.2d 1270 (10th Cir. 1984) ...................................................45

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) ........................................................................28

*Nat'l Press Photographers Ass'n v. McCraw*,
  90 F.4th 770 (5th Cir. 2024) .........................................................37

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024) ................................................................43, 44

*Near v. Minnesota ex rel. Olson*,
  283 U.S. 697 (1931) .......................................................................44

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) .....................................17, 24, 27, 43

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ......................*passim*

*NetChoice, LLC v. Reyes*,
  2024 WL 4135626 (D. Utah Sept. 10, 2024) ..............................1, 28

*NetChoice, LLC v. Yost*,
  2024 WL 555904 (S.D. Ohio Feb. 12, 2024) ...................1, 20, 36, 41

*Netflix, Inc. v. Babin*,
  88 F.4th 1080 (5th Cir. 2023) .......................................................53

*Nken v. Holder*,
  556 U.S. 418 (2009) .......................................................................54

*Nwanguma v. Trump*,
  903 F.3d 604 (6th Cir. 2018) .......................................................46

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) .......................................................54

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ...............................................................2, 5, 30

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) .......................................................27, 28, 29, 32

*Reno v. ACLU,*
   521 U.S. 844 (1997) .................................................................*passim*

*Roark & Hardee LP v. City of Austin,*
   522 F.3d 533 (5th Cir. 2008) .............................................................35

*Robinson v. Hunt Cnty.,*
   921 F.3d 440 (5th Cir. 2019) .............................................................48

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   592 U.S. 14 (2020) ...........................................................................53

*Rumsfeld v. FAIR, Inc.,*
   547 U.S. 47 (2006) ...........................................................................40

*Sable Commc'ns of Cal., Inc. v. FCC,*
   492 U.S. 115 (1989) ....................................................................24, 30

*Seals v. McBee,*
   898 F.3d 587 (5th Cir. 2018) .............................................................45

*SEIU, Loc. 5 v. City of Houston,*
   595 F.3d 588 (5th Cir. 2010) ........................................................21, 35

*Smith v. California,*
   361 U.S. 147 (1959) ....................................................................36, 44

*Smith v. Daily Mail Pub. Co.,*
   443 U.S. 97 (1979) ...........................................................................43

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ..........................................................................48

*Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin,*
   37 F.4th 1078 (5th Cir. 2022) ......................................................18, 19

*Tenth St. Residential Ass'n v. City of Dallas,*
   968 F.3d 492 (5th Cir. 2020) .............................................................19

*Tex. Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n,*
   989 F.3d 368 (5th Cir. 2021) .............................................................18

*Tex. Ent. Ass'n v. Hegar,*
  10 F.4th 495 (5th Cir. 2021) ...............................................................19

*United States v. Miselis,*
  972 F.3d 518 (4th Cir. 2020) ..............................................................45

*United States v. Playboy Ent. Grp.,*
  529 U.S. 803 (2000) ................................................................... 17, 33

*United States v. Williams,*
  553 U.S. 285 (2008) ................................................................... 35, 50

*Veterans of Foreign Wars v. Tex. Lottery Comm'n,*
  760 F.3d 427 (5th Cir. 2014) ..............................................................34

*Virginia v. Am. Booksellers Ass'n,*
  484 U.S. 383 (1988) ............................................................. 20, 21, 34

*X Corp. v. Bonta,*
  2024 WL 4033063 (9th Cir. Sept. 4, 2024) ................................... 24, 27

**Statutes**

28 U.S.C. § 1292 ...................................................................................4

28 U.S.C. § 1331 ...................................................................................4

28 U.S.C. § 1343 ...................................................................................4

47 U.S.C. § 230 ............................................................................*passim*

Miss. Code § 11-77-3 ..........................................................................13

Miss. Code § 75-24-9 ..........................................................................14

Miss. Code § 75-24-19 ........................................................................14

Miss. Code § 75-24-20 ........................................................................14

Miss. Code § 97-3-49 ..........................................................................34

Mississippi House Bill 1126 (2024) .............................................*passim*

Mississippi House Bill 1196 (2024) ...................................................33

## Introduction

Mississippi House Bill 1126 (2024) ("Act") violates the First Amendment by restricting protected speech on social media websites. The Act's central coverage definitions select websites for regulation based on content. § 3.[1] These disfavored websites must conduct age-verification for all users (§ 4(1)); deny access to all minors who lack affirmative parental consent (§ 4(2)); and "develop and implement a strategy to prevent or mitigate [a] known minor's exposure" to six categories of content reaching vast amounts of protected speech (§ 6(1)).[2] All of this unconstitutionally restricts speech.

The district court correctly enjoined Defendant's enforcement of the Act against NetChoice's members, and courts nationwide have enjoined similar laws. *NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *3, *8 (D. Utah Sept. 10, 2024) (content-based coverage, parental consent, and age assurance); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *10 (W.D. Tex. Aug. 30, 2024) ("*CCIA*") (content-based coverage and monitoring-and-censorship); *NetChoice, LLC v. Yost*, 2024 WL 555904, at *14 (S.D. Ohio Feb. 12, 2024) (content-based coverage and parental consent); *NetChoice, LLC v.*

---

[1] Citations in this form refer to the Act's internal numbering. NetChoice challenged only §§ 1-8, so references to "the Act" refer only to those sections. *See* ROA.10 & n.2 (Complaint). References to covered "website[s]" include covered "application[s]," "program[s]," and "software." § 2(a).

[2] "Minor," "adult," "user," and similar terms herein refer only to Mississippi residents. This brief generally employs the term "user" to encompass both of what the Act refers to as "users" and "account holder[s]." *See* §§ 3, 4(2).

*Griffin*, 2023 WL 5660155, at *21 (W.D. Ark. Aug. 31, 2023) (age verification and parental consent).

This nationwide consensus follows Supreme Court precedent. Age-verification requirements to access protected speech violate the First Amendment. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 881-82 (1997). Likewise, States lack the "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 & n.3 (2011). The "First Amendment . . . does not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024). And *Moody*'s "explication" of social media websites' First Amendment rights is binding authority. *See Garrett v. Lumpkin*, 96 F.4th 896, 902 & n.4 (5th Cir. 2024).

Defendant's primary response is that the Act regulates only "non-expressive conduct"—not speech. *E.g.*, Appellant's Br. 4 ("Br."). Yet Defendant has conceded that the "Act has a targeted scope" (Br. 7), and that the Act's "clear focus is online social-media platforms," ROA.343; *see* Br. 48. Covered websites disseminate a "staggering amount" of protected speech. *Moody*, 144 S. Ct. at 2395. Defendant readily admits that the Act's entire purpose is to "mak[e] it harder for minors to participate in . . . [certain] online platforms." Br. 39. This necessarily restricts speech, as social media websites are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

The Act's restrictions on protected speech cannot survive strict scrutiny or any level of heightened First Amendment scrutiny. The Act's tailoring flaws restrict too much speech on too many websites where there are ample private alternatives to State regulation. NetChoice's members give parents tools to control their children's online experiences, complementing the many other tools parents have. And NetChoice's members work tirelessly to protect users from harmful content. But Mississippi would penalize websites up to $10,000—and with potential criminal penalties, too—each time those efforts fall short in Defendant's view. Similarly, certain provisions of the Act are unconstitutionally vague, and § 6's monitoring-and-censorship requirements are preempted by 47 U.S.C. § 230.

Defendant's threshold attacks also fail. The district court complied with the facial-challenge framework from *Moody*, 144 S. Ct. 2398-99. Defendant's brief does not identify a single website or function that she believes the district court erroneously omitted in assessing the Act's coverage. And the district court correctly identified the "actors" and "activities" that the Act regulates. *Id.* at 2398; *see* ROA.403, 419. In fact, the district court agreed with *Defendant's* explanation of what the Act regulates. ROA.393, 408, 414 (quoting Defendant). Next, the district court held that "a substantial number, if not all, of [the Act]'s applications are unconstitutional judged in relation to its legitimate sweep." ROA.415; *see Moody*, 144 S. Ct. at 2398. That is the proper First Amendment facial-challenge framework under *Moody*. Defendant's disagreements with the district court's First Amendment *merits*

holdings about the actors and activities everyone agrees are covered by this Act (Br. 34) cannot establish a threshold problem with the district court's analysis under *Moody*'s facial-challenge framework (*contra* Br. 31). Finally, NetChoice has associational standing to assert its members' First Amendment and economic injuries caused by the Act, and Defendant never contests NetChoice's associational standing. Article III jurisdiction is thus secure.

This Court should therefore affirm.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction under 28 U.S.C. § 1292.

## ISSUES PRESENTED

Whether the district court abused its discretion by preliminarily enjoining Defendant from enforcing the challenged provisions of Mississippi's House Bill 1126, including its age-verification, parental-consent, and monitoring-and-censorship requirements, against NetChoice and its members.

## STATEMENT OF THE CASE

### A. Background.

### 1. Covered websites disseminate speech protected by the First Amendment.

NetChoice is a leading trade association for Internet companies. ROA.81. The Act covers websites operated by the following NetChoice members: Dreamwidth, Google (YouTube), Meta (Facebook and Instagram),

Nextdoor, Pinterest, Snapchat, and X (this brief uses "members" to refer to these NetChoice members covered by the Act). *See* ROA.388-89. Each "engage[s] in expression" by "curat[ing]" and "display[ing]" protected "third-party speech." *Moody*, 144 S. Ct. at 2393; *see* ROA.83.

These covered websites "are in the business . . . of combining multifarious voices to create a distinctive expressive offering." *Moody*, 144 S. Ct. at 2405 (cleaned up). They "allow users to upload content—messages, pictures, videos, and so on—to share with others." *Id.* at 2394-95. That amounts to "a staggering amount of content." *Id.* at 2395. For example, "Facebook users . . . share more than 100 billion messages every day," *id.*, and Facebook and YouTube "alone have over two billion users each," *id.* at 2393.

To access the protected speech and speech-facilitating functions on these websites, users typically must create an account. ROA.86, 99-100. Doing that allows minors and adults across Mississippi and the world to use these websites to "gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. These subjects include art, literature, politics, religion, and vast quantities of other speech that the First Amendment prohibits governments from regulating. *Id.*

### 2. Covered websites' content-moderation policies prioritize user safety.

Each member develops and enforces its own set of rules about what speech it disseminates on each covered website. *E.g.*, ROA.86-96, 115-17, 134-

35, 151-58. These rules are known as "content moderation" policies. *Moody*, 144 S. Ct. at 2393. They "limit[ the] publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities." ROA.87.

Content moderation takes many forms. A website might remove content merely for being off-topic. *E.g.*, ROA.96 ("Nextdoor is intended primarily for neighbors to share community-related information, [not] personal interests."). Websites also must contend with speech that is lawful yet considered objectionable by many, such as hate speech and graphic violence. *E.g.*, ROA.96 ("Meta prohibits hate speech."); ROA.96 ("Pinterest prohibits . . . 'content that shows the use of violence.'"). Content moderation also seeks to block material that is illegal, such as child sexual abuse material. *E.g.*, ROA.90 ("YouTube prohibits all 'sexually explicit content featuring minors and content that sexually exploits minors.'"). NetChoice's members have content-moderation policies disallowing broad categories of harmful or objectionable speech, including content regulated by the Act. ROA.87-96.

At the same time, content moderation is difficult. ROA.96-98. Scale is one reason. "For instance, in just a six-month span from July to December 2020, Facebook (≈5.7 billion), Instagram (≈65.3 million), Pinterest (≈2.1 million), Snapchat (≈5.5 million), YouTube (≈17.2 million), and X (≈4.5 million) removed approximately 5.9 billion posts." ROA.97. Complexity and subjectivity are others. "Whether a given piece of content violates a website's policies can turn on a complicated interaction between the intent of the user, the

content itself, the social and cultural context, the context on the service, and the effect on the reader." ROA.97-98.

Successful content moderation also requires constant innovation, because "malicious actors always attempt to find ways to avoid moderation." ROA.98. Despite these hurdles, the record reflects that "'companies are successfully prioritizing the safety of their users.'" ROA.87 (citation omitted).

### 3. Parents have many options to oversee and control how their children use covered websites and the Internet.

Parents and guardians have many overlapping and complementary options to oversee and control how their children engage with covered websites and the Internet. ROA.83-86.

Foremost, parents control their children's *devices*—including whether their children have access to Internet-connected devices at all. ROA.84. Many devices offer options for parents to restrict how their children use the device. ROA.84. For example, many popular mobile phone and tablet manufacturers—such as Apple, Google, Microsoft, and Samsung—allow parents to limit screen time across devices. ROA.84. These devices also have tools that let parents control what apps their children use, set age-related restrictions on those apps, filter content, and control privacy settings. ROA.84.

Next, parents control what *networks* their children's devices can connect to. Many mobile-service and broadband Internet providers have tools for parents to block Internet access altogether. ROA.83. These same tools often allow parents to block certain apps, websites, and contacts from their

children's phones, and to restrict screen time. ROA.83-84. Similarly, wireless routers offer parental control settings that parents can use to block specific websites, allow only the specific websites that a parent specifies, limit the time that their children spend on the Internet, set individualized content filters, monitor the websites that their children visit, and more. ROA.84.

Another option is parental control over *software*. Many of the most popular Internet browsers allow parents to control what websites their children can access. ROA.85. These tools allow parents to block services, or to limit their children to accessing only a specific list of Internet destinations. *See* ROA.85. Some browsers also offer a "kids mode," or allow parents to see what online services their children are accessing the most. ROA.85. Browser extensions—which integrate into the software that allows Internet users to access the web—are also widely available. ROA.85. So is standalone supervision software that parents can install on a device itself. ROA.85.

Many of NetChoice's members have also developed their own tools allowing parents to set further restrictions on how their children use websites. ROA.85. Meta has developed its "Family Center," which provides for parental supervision on Instagram. ROA.85. Parents can, among other things, see their minor children's followers and who their minor children are following; see how long the minor spends on Instagram; and set time limits and scheduled breaks. ROA.85. Similarly, Pinterest provides parents of minors "'under 16'" the ability to "'lock[] certain settings related to account management, privacy and data, and social permissions on [a] teen's Pinterest

account.'" ROA.85 (citation omitted). YouTube's "supervised experience" allows parents to "'select a content setting that limits the videos and music [their] children under 13 can find and play.'" ROA.110 (citation omitted). And Snapchat offers the "Family Center" tool, which allows parents and guardians to: see their teen's friends, see which friends their teen has been communicating with, and limit their teen's ability to view certain content. ROA.85-86.

### B. Mississippi House Bill 1126 is a content-based and speaker-based law that restricts access to protected speech and overrides websites' content-moderation efforts.

As Defendant admits, the Act "mak[es] it harder for minors to participate in . . . [certain] online platforms." Br. 39. The Act does that by singling out a select group of Internet services for burdensome and intrusive regulation based on the content those services display and disseminate.

**1. Covered actors and activities. § 3.** As Defendant acknowledges, the "Act has a targeted scope," Br. 7, and its "clear focus is online social-media platforms," ROA.343; *see* Br. 48. The Act achieves this through a content-based coverage definition: it regulates providers of certain "digital service[s]" that "allow[] users to socially interact with other users." § 3(1).

The Act applies to any entity that (1) "[o]wns or operates a digital service" and (2) "[d]etermines" both the "purpose" and "means" of "collecting and processing [users'] personal identifying information." § 2(a)(b). A

"digital service" is "a website, an application, a program, or software that collects or processes personal identifying information." § 2(a).

But the Act regulates only a certain type of "digital service," one that:

> (a) Connects users in a manner that allows users to *socially* inter-act with other users on the digital service;
>
> (b) Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
>
> (c) Allows a user to create or *post* content that can be viewed by *other users* of the digital service, including sharing content on:
>
>> (i) A *message board*;
>>
>> (ii) A *chat room*; or
>>
>> (iii) A *landing page*, video *channel* or main *feed* that presents to a user content created and posted by other users.

§ 3(1) (emphases added). These emphasized terms limit the Act to services that publicly disseminate speech for multiple users to see. Accordingly, the Act excludes "direct messaging" and "email" functions. *Moody*, 144 S. Ct. at 2398. Defendant's brief never argued otherwise, so Defendant has forfeited any such argument.

The Act also expressly excludes certain digital service providers:

> (a) A digital service provider who processes or maintains user data in connection with . . . employment . . . ;
>
> (b) A digital service provider's provision of . . . e-mail or direct messaging services, if the digital service facilitates only those ser-vices;
>
> (c) A digital service provider's provision of a digital service that:

(i) Primarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider; and

(ii) Allows chat, comment or other interactive functionality that is incidental to the digital service; or

(d) A digital service provider's provision of a digital service that primarily functions to provide a user with access to career development opportunities, including:

(i) Professional networking; (ii) Job skills; (iii) Learning certifications; (iv) Job posting; and (v) Application services.

§ 3(2) (some line breaks deleted). Thus, the Act excludes websites that primarily provide "commerce," § 3(2)(c)(i)—such as "ride-sharing," "payment," "online marketplace," and similar services, *Moody*, 144 S. Ct. at 2398.

The Act also excludes "Internet service provider[s] . . . , search engine[s,] or cloud service provider[s]." § 3(3).

**2. Speech regulations.** Covered websites are subject to multiple regulations restricting protected speech.

**a. Age verification. § 4(1).** Covered websites must "verify the age" of any person who wishes to create an account. § 4(1). Websites must "register[]" the person's age, and they also must "make commercially reasonable efforts to *verify* the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." § 4(1) (emphasis added).

Age verification deters potential users from accessing covered websites. It subjects users to invasive burdens to access protected speech, such as

providing identification or biometric data each time they want to create an account on a covered website. Moreover, age verification implicates sensitivities many users have regarding privacy, anonymity, and security. *E.g.,* ROA.150 ("Dreamwidth's users are extremely privacy-conscious."). Various people explained this when they refused to provide age verification during Nextdoor's test of such a requirement:

- "Are you kidding me? You think I'm gonna send you my license or any personal ID"?

- "What?? I am over 60. There must be another way I do not have to give my actual [personal] info to be hacked . . . . I'm 60 years old and I am not sending a copy of my driver's license to anyone."

- "I'm 57 years old and they're asking me for my government issued ID. This is totally insane. I put my age down to zero because I thought it was a scam . . . ."

- "App rep wants my personal info to turn my account back on after using the app for over 5 years. I think this is a scam now."

- "I accidentally hit the wrong year and was told I couldn't have access anymore . . . . Since I can't access my account, I wish for it to be deleted."

ROA.137-38 (minor punctuation altered).

**b. Parental consent. § 4(2).** The Act also requires covered websites to obtain express parental consent as a precondition for minors to create or maintain an account—and therefore to access protected speech on covered websites. A covered website "shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express

12

consent from a parent or guardian." § 4(2). The Act defines "[k]nown minor" as "a child who is younger than eighteen . . . who has not had the disabilities of minority removed for general purposes, and who the digital service provider knows to be a minor." § 2(d). The Act includes a non-exhaustive list of "[a]cceptable methods of obtaining express consent," including: "a form," a "telephone number," "video conferencing," "government-issued identification," "email," and "[a]ny other commercially reasonable method." § 4(2).

But the Act nowhere accounts for the difficulties inherent in verifying a parent-child relationship. These difficulties are compounded when, for example, families are nontraditional, family members have different surnames or addresses, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated. *E.g.*, ROA.161-64.

**c. Monitoring-and-censorship provisions. § 6.** Section 6 contains monitoring-and-censorship provisions that target content- and viewpoint-based categories of speech. The Act requires covered websites to "make commercially reasonable efforts to develop *and implement* a strategy to *prevent* or mitigate [a] known minor's *exposure* to harmful material[3] and *other content* that

---

[3] The Act defines "harmful material" by reference to Mississippi Code § 11-77-3(d). § 2(c). So, "harmful material" under § 6 mirrors the legal definition of obscenity for minors. *See Ginsberg v. New York*, 390 U.S. 629, 633 (1968). Such speech is protected for adults, but not for minors. *Id.*

promotes or facilitates the following harms to minors" in enumerated categories of speech. § 6(1) (emphases added). Those categories are:

> (a) Consistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors;
>
> (b) Patterns of use that indicate or encourage substance abuse or use of illegal drugs;
>
> (c) Stalking, physical violence, online bullying, or harassment;
>
> (d) Grooming, trafficking, child pornography, or other sexual exploitation or abuse;
>
> (e) Incitement of violence; or
>
> (f) Any other illegal activity.

§ 6(1). The Act does not define these terms or limit them to unprotected speech. Most of the categories are viewpoint-based and subjective.

Section 6 has two exceptions. Websites need not "prevent or preclude . . . [a]ny minor from deliberately and independently searching for, or specifically requesting, content." § 6(2)(a). And websites are free to "provid[e] resources for the prevention or mitigation of the harms described in [§ 6(1)], including evidence-informed information and clinical resources." § 6(2)(b).[4]

**3. Enforcement.** The Act designates violations as "unfair or deceptive trade practices" under State law. § 8(1). It gives Defendant enforcement

---

[4] The district court's injunction also prohibits Defendant from enforcing § 5, because these governmental regulations of speech dissemination unconstitutionally apply due to the Act's content-based coverage definitions. ROA.386, 423-24.

authority to seek injunctive relief, civil monetary penalties of up to $10,000 per violation, and even criminal liability. Miss. Code §§ 75-24-9, -19, -20.

## C.  Procedural history.

After the Act became law, NetChoice sued the Attorney General of Mississippi and moved for a preliminary injunction. ROA.45-46; ROA.63-64.

The district court preliminarily enjoined the Attorney General "from enforcing [the Act] against [NetChoice] and its members." ROA.423-24. The court held that the Act regulates speech, ROA.407, and that its coverage definitions are "based on the message" of that speech or are "based upon the speech's function or purpose," ROA.405. That "makes the Act content-based, and therefore subject to strict scrutiny." ROA.405. In turn, the court held that the Act "likely is not sufficiently narrowly tailored to survive strict scrutiny." ROA.416. Separately, the district court held that "NetChoice has demonstrated a substantial likelihood of success on the merits of its claim that some of [the Act]'s terms are unconstitutionally vague." ROA.419. Because those holdings were sufficient for relief, the district court did not reach NetChoice's claims based on 47 U.S.C. § 230 preemption. *See* ROA.197-98.

Defendant appealed and moved the district court and this Court to stay the preliminary-injunction order pending appeal. ROA.528-538. The district court denied that motion. D. Ct. Dkt. 40. A motions panel of this Court ordered that the motion be "carried with the case." 5th Cir. Dkt. 41-2 at 1.

## SUMMARY OF THE ARGUMENT

**I.** NetChoice has associational standing to seek relief on behalf of its covered members, as Defendant concedes, so this Court has Article III jurisdiction. Although Defendant attacks NetChoice's ability to assert the rights of its members' *users*, longstanding precedent allows such arguments from trade associations and other plaintiffs in First Amendment cases. Regardless, the district court's injunction stands on its own—even without users' rights.

**II.** NetChoice is likely to succeed on the merits.

The district court correctly employed *Moody*'s facial-challenge framework. The district court first identified the "apps, services, functionalities, and methods for communication and connection," *Moody*, 144 S. Ct. at 2398, to which the Act applies, ROA.403, 419. The district court even agreed with *Defendant's* explanation of what the Act regulates. ROA.393, 408, 414. The district court then held that "a substantial number, if not all, of [the Act]'s applications are unconstitutional judged in relation to its legitimate sweep." ROA.415. This is the proper facial-challenge framework under *Moody*. 144 S. Ct. at 2398. Defendant's disagreements with the district court's First Amendment *merits* holdings (Br. 34-49) are no basis to hold that the district court failed to apply *Moody*'s facial-challenge framework (*contra* Br. 31-34).

All of the Act's speech regulations trigger and fail strict scrutiny, because the Act's coverage definitions select websites based on content and speaker. The Act covers certain websites that allow users to "socially interact," while excluding websites that disseminate other forms of content. § 3(1). The Act

also has an exclusion that is available only to websites that primarily disseminate "news, sports, [or] commerce." § 3(2)(c)(i). The Act's speech regulations are not the least restrictive means of achieving a compelling state interest. Parents already have tools to oversee their children online, and States do not have "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

The Act's age-verification, parental-consent, and monitoring-and-censorship requirements are each independently unlawful. The First Amendment prohibits age-verification requirements to access protected speech. *Ashcroft v. ACLU*, 542 U.S. at 667; *Reno*, 521 U.S. at 881-82. The same goes for parental-consent requirements for minors to access protected speech. *Brown*, 564 U.S. at 794-95 & n.3. The monitoring-and-censorship provisions unconstitutionally restrict speech because the State uses them to "deputize[] private actors into censoring speech based on its content." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024) (citing *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 806, 813 (2000)). Section 6's requirements are also unconstitutionally vague and preempted by 47 U.S.C. § 230.

**III.** The other preliminary-injunction factors favor NetChoice. Defendant never disputes that the loss of First Amendment freedoms or compliance costs are irreparable harms. Rather, Defendant asks this Court to reject or narrow the injunction "in light of [the] merits." Br. 54. Because NetChoice is likely to prevail on the merits, the preliminary injunction should be affirmed, and Defendant's motion for a stay pending appeal should be denied.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of [a plaintiff's motion for] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024) (cleaned up).

## ARGUMENT

NetChoice has standing and satisfies all four preliminary-injunction factors: (1) "likelihood of success on the merits," (2) "irreparable harm," (3) the "balance of equities," and (4) the "public interest." *Id.* at 336 (cleaned up).

## I.  NetChoice has associational standing to seek relief on behalf of its members, and NetChoice independently has standing to assert the rights of members' users.

**A.** NetChoice has "associational standing," as the district court properly held. ROA.395-98 (quoting *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1084 n.6 (5th Cir. 2022)). After all, "trade associations that seek to establish standing" may do so by "assert[ing] the standing of their own members." *Tex. Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021). NetChoice did that. ROA.12, 355-56. Defendant concedes that NetChoice has "associational standing" to raise the claims in this lawsuit on behalf of "its *members*." Br. 28. This Court's Article III jurisdiction over NetChoice's claims is therefore secure.

**B.** Defendant contests only whether NetChoice also independently has "organizational standing" on its own (separate from its members), Br. 21-24,

18

or has standing to raise the rights of "users" of covered websites, Br. 20-21, 24-30. Neither argument eliminates NetChoice's standing.

**1.** As to "organizational standing," the district court properly did not consider this issue, because NetChoice had "associational standing" through its members. ROA.398. Associational and organizational standing are "alternative[s]." *Students for Fair Admissions*, 37 F.4th at 1084 n.6. The former allows an association to raise claims based on injuries to its members, while the latter examines whether an association itself has suffered an injury. *Id.* A separate injury to NetChoice itself (distinct from its members) would be required only for *organizational* standing—not associational standing. *See, e.g., Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020).

It is therefore irrelevant whether NetChoice *itself* suffered any injury-in-fact under Article III. *Contra* Br. 21-24. That is because "an association may have standing to assert the claims of its members even where it has suffered no injury." *Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (citation omitted). Defendant does not contest NetChoice's associational standing, and NetChoice has "satisfied the requirements of Article III associational standing." *Career Colls. & Schs. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024) (trade group had standing). The posture here is thus the opposite of the decisions Defendant cites (Br. 21-23) where associational standing was "abandoned." *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 354-55 & n.6 (5th Cir. 2023); *NAACP v. City of Kyle*, 626 F.3d 233, 236 (5th Cir. 2010) (similar).

**2.** Defendant incorrectly insists that NetChoice member websites cannot raise the free-speech rights of their "users." Br. 20-21, 24-30. Binding precedent establishes that, for First Amendment free-speech claims, speech disseminators (such as NetChoice's members) can raise their users' rights.

As the Supreme Court has explained, "in the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (cleaned up). For example, a bookstore with Article III standing can make First Amendment arguments based on the rights of its book buyers. *Id.* at 393.

The district court properly joined the growing consensus of opinions holding that NetChoice has standing to raise the free-speech rights of "users" of its members' websites. ROA.400 (citing *Yost*, 2024 WL 555904, at *5; *Griffin*, 2023 WL 5660155, at *12). As *Griffin* recognized, "NetChoice members are well positioned" to assert "the constitutional rights of [their] users and the injuries that users are likely to suffer," as "[t]hey have a thorough understanding of the content hosted on their platforms and the ways in which their customers exercise their First Amendment rights on those platforms." 2023 WL 5660155, at *12.

Defendant's standing argument repeatedly relies on cases outside the First Amendment (or associational standing) context. *E.g.*, Br. 2, 20, 21, 24,

26-29 (citing *Kowalski v. Tesmer*, 543 U.S. 125 (2004)). These cases do not apply to the speech claims here. As just explained, binding precedent allows speech disseminators to raise their users' rights. And binding precedent also allows associations to raise claims that their members can assert. *Supra* p.18. Even *Kowalski* distinguished the lawsuit at issue there (an attorney's attempt to assert a client's rights) from the distinct, "quite forgiving," third-party-standing test that applies "'[w]ithin the context of the First Amendment.'" 543 U.S. at 130 (citation omitted).

Relatedly, Defendant incorrectly asserts that NetChoice's members must show "a close relationship" to their users and show that some "hindrance" prevents those users' from protecting their own rights. Br. 21 (cleaned up). But this "prudential consideration of third-party standing is not applied" when a plaintiff with "constitutional standing" raises "'*the First Amendment rights* of other parties not before the court.'" *SEIU, Loc. 5 v. City of Houston*, 595 F.3d 588, 598 (5th Cir. 2010) (emphasis added; citation omitted). Thus, *Kowalski* and the other cases that Defendant relies on most heavily are inapt because they address "prudential," not "Article III," standing principles. *E.g.*, Br. 26 (citing *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).

In First Amendment cases, parties can vindicate others' free-speech rights because "the statute's very existence" may chill protected speech. *Am. Booksellers*, 484 U.S. at 392-93 (citation omitted). There is no tension between covered websites asserting both their own and their users' First Amendment free-speech rights to challenge this Act's speech restrictions. *Cf.* Br. 24-26.

21

## II. NetChoice is likely to succeed on the merits.

### A. The district court complied with *Moody*'s framework for evaluating First Amendment facial challenges.

The district court complied with *Moody*'s facial-challenge framework. It "first" assessed the Act's "scope." *Moody*, 144 S. Ct. at 2398. And it "next" determined "which of the law['s] applications violate the First Amendment" while "measur[ing] them against the rest." *Id.* That is all *Moody* requires.

In the "singular context" of First Amendment facial challenges, a law should "be struck down in its entirety" if its "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 2397. "In First Amendment" facial challenges, "[t]he question is whether 'a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (alteration adopted) (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) ("*AFP*")). This "less demanding though still rigorous standard" imposes a "lower[] . . . bar" that is "different" from "other," non-First-Amendment cases. *Id.* (citation omitted).

**1.** The district court faithfully applied this standard. It began by looking at the "actors" and "activities" (*i.e.*, the "platform[s]" and "function[s]") that the Act covers. *Id.* at 2398; *see* ROA.403 (addressing what the Act "applies to"); ROA.403 (addressing what the Act "does not apply to"); ROA.419 (similar). That analysis equipped the district court to "undertake the needed inquiries" regarding the Act's scope. *Moody*, 144 S. Ct. at 2398.

22

Defendant criticizes the district court's *Moody* "step 1" assessment of the Act's scope for offering "a high-level one-paragraph summary of the Act" and for failing to "block-quote all the Act's core provisions." Br. 32. If the district court's discussion of the Act's scope was "terse[]," Br. 32, that is only because the Act's scope is undisputed. NetChoice assessed the Act's scope in its complaint and preliminary-injunction briefing. *E.g.*, ROA.12, 19, 193, 361. Defendant never disputed those assessments. And Defendant never asserted that the Act regulates any different actors or activities. Rather, Defendant emphasized that "[t]he Act's clear focus is online social-media platforms." ROA.343; *see* Br. 48. In Defendant's words, "[t]he Act has a targeted scope." ROA.323; *see* Br. 7, 48 (same). The district court agreed, even quoting Defendant's own explanation of the Act's scope. *E.g.*, ROA.393, 408, 414.

This posture is nothing like *Moody*, which noted "variegated and complex" questions about the "apps, services, functionalities, and methods for communication and connection" that the laws at issue there might regulate beyond "social media" websites' feeds. 144 S. Ct. at 2398. For instance, *Moody* noted questions about whether "email," "online marketplace[s]," "payment service[s]," "events management," and "ride-sharing service[s]" were covered by those challenged laws. *Id.* But here, the Act excludes such services,

and Defendant has never argued otherwise, so services beyond "social-media platforms" are undisputedly not covered. *See supra* p.11.[5]

**2.** Because "[t]he scope of the challenged [Act] is undisputed," *Moody* directed the district court to "proceed to determining whether a substantial number of [the Act's] applications are unconstitutional." *Civ. Beat Law Ctr. for the Pub. Int., Inc. v. Maile*, 2024 WL 3958954, at *3 (9th Cir. Aug. 28, 2024) (discussing *Moody*). The district court did that, holding that "a substantial number, if not all, of [the Act]'s applications are unconstitutional judged in relation to its legitimate sweep." ROA.415. That is the exact standard that *Moody* articulated. 144 S. Ct. at 2398.

The district court's merits analysis properly applied *Moody*'s facial-challenge framework, and Defendant's contrary arguments fail. *See* Br. 31-34. "That is because all aspects of the [Act], in every application to a covered [website], raise the same First Amendment issues." *X Corp. v. Bonta*, 2024 WL 4033063, at *6 (9th Cir. Sept. 4, 2024) (discussing *Moody*); *see NetChoice v.*

---

[5] Any contrary argument is forfeited and cannot be raised in Defendant's reply brief. *See Conway v. United States*, 647 F.3d 228, 237 n.8 (5th Cir. 2011). Regardless, this Act *restricts* access to speech, while the laws in *Moody* sought to *compel* speech dissemination. 144 S. Ct. at 2399. Here, "the Government bears the burden of proving the constitutionality of" speech "restrict[ions]." *FEC v. Cruz*, 596 U.S. 289, 305 (2022). That principle applies even to restrictions on individual-to-individual communications, like email or direct messaging. *See e.g., Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126-31 (1989) (invalidating restriction on telephone messages); *Hiett v. United States*, 415 F.2d 664, 669 (5th Cir. 1969) (invalidating postal restriction).

*Bonta*, 113 F.4th at 1116 (analysis was correct under *Moody* where state law "in every application to a covered business, raise[d] the same First Amendment issues"). The Act's content- and speaker-based coverage definitions are unconstitutional *every* time they restrict protected speech, as the district court held. *E.g.*, ROA.404 ("The law's content-based distinction is inherent in the definition of 'digital service provider,' which is at the core of defining the Act's coverage."). So too for the Act's age-verification, parental-consent, and monitoring-and-censorship provisions. *E.g.*, ROA.411-15.

Defendant focuses on an all-or-nothing approach, arguing that these requirements "do not burden *any* speech" at all. Br. 5 (emphasis added); *see* Br. 36, 37. In other words, Defendant never expressly argues that the Act is constitutional as to some platforms or functions, yet unconstitutional as to others. Therefore, the facial-challenge concerns that *Moody* addressed—whether the constitutional analysis "might differ as between" different actors and activities—are not implicated here. 144 S. Ct. at 2398.

Defendant also posits that the district court "did not assess how the law works in all of its applications" because the district court supposedly "never accounted for the limiting phrase 'commercially reasonable,'" which purportedly "ensures that (at least most of) the Act's applications impose no burden on speech." Br. 32 (quoting §§ 4(1), 4(2)(f), 6(1)). But the district court did not ignore the phrase "commercially reasonable." *E.g.*, ROA.388. Nor does this argument implicate which "actors" or "activities" the Act regulates. *Moody*, 144 S. Ct. at 2398. Rather, the statutory phrase "commercially

reasonable" sets the degree of duty that the Act's requirements impose. It does not identify which actors or activities the Act regulates.

This "limiting phrase 'commercially reasonable,'" Br. 32, is irrelevant to the facial-challenge framework—and to the constitutional merits analysis. Whenever a speech regulation requires age verification, parental consent, or monitoring-and-censorship, it violates the First Amendment. *See infra* pp.37-50. That is so whether the requirement is "commercially reasonable" or unreasonable: States cannot restrict speech just because compliance may not be "cost-prohibitive" for a particular company. Br. 35. Even if larger, well-resourced websites would be "better able to bear the burden" of implementing government-imposed speech restrictions, the First Amendment still prohibits these laws. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983). Singling out "a small group" of "large[r]" websites for additional speech restrictions itself violates the First Amendment. *Id.* at 591-92. Plus, this provision is unconstitutionally vague if it requires some sliding scale that looks at each possibly regulated company's financial position and asks whether the compliance costs are commercially reasonable in Defendant's subjective view.

Furthermore, the problem in *Moody* was a lack of analysis about whether *additional* websites and functions might have been covered by those laws. 144 S. Ct. at 2398-99. But under Defendant's interpretation of "commercially reasonable," the Act covers *fewer* actors and activities than the district court addressed. Br. 32. That necessarily means that the district court did consider

all of the services that Defendant believes the Act to cover. Thus, the Court here can "undertake the needed inquiries," because it can "review" the district court's analysis of all the Act's applications. *Moody*, 144 S. Ct. 2398-99.

This Court has everything it needs to review the district court's holdings. In other words, "unlike the record in the *Moody* case, the record here is sufficiently developed to consider the scope of the [Act] and whether its unconstitutional applications substantially outweigh its constitutional ones." *NetChoice v. Bonta*, 113 F.4th at 1116. Even assuming for the sake of argument that the district court did not pay sufficient "'attention to' the requirements for a facial challenge," that is no basis for reversal or vacatur. *X Corp.*, 2024 WL 4033063, at *6 (quoting *Moody*, 144 S. Ct. at 2397). The Court should either affirm the district court's *Moody* analysis or perform its own—not remand for the district court to redo its assessment of websites and functions that the district court already considered. *Contra* Br. 45. Regardless, no remand is necessary, because the Act's unconstitutional sweep is apparent "from the face of the law." *X Corp.*, 2024 WL 4033063, at *6.

## B. All of the Act's speech regulations are unconstitutional because they depend on content-based, speaker-based, and vague coverage definitions.

**1.** Strict scrutiny applies to all of the Act's speech regulations, because the Act's central coverage definitions (§ 3) select websites for "[g]overnment regulation of speech" based on "content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). "Content-based laws—those that target speech based on

its communicative content—are presumptively unconstitutional and may be justified only if" they satisfy "strict scrutiny." *Id.* (citations omitted). The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). The coverage definitions also "distinguis[h] among different speakers," and Supreme Court precedent is "deeply skeptical" of such laws. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018).

The Act's coverage definitions select only websites that allow users to "socially interact with other[s]." § 3(1)(a). That distinction is content-based, as the district court correctly held, because it "treats or classifies [websites] differently based upon the nature of the material that is disseminated." ROA.404. The "entire Act is facially content based because the [central coverage definitions] draw[] distinctions between websites that allow users to interact socially and websites that serve another function or purpose." *Reyes*, 2024 WL 4135626, at *9 (citation omitted). The Act "target[s] speech based on its communicative content" of *socially* interacting with others. *Reed*, 576 U.S. at 163-64 (citations omitted). "Non-social interactions, such as professional interactions, are not covered, while social interactions are." *CCIA*, 2024 WL 4051786, at *10. The Act thus presumes that there is no overlap between social and professional interactions, and that NetChoice's members can categorize each of the millions of daily interactions that occur on covered websites.

The Act's coverage exclusions are content-based, too, which renders all of the Act's speech regulations content-based. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 630-31 (2020) (controlling plurality op.). The Act offers an exclusion to websites that "[p]rimarily function[] to provide a user with access to [1] news, [2] sports, [3] commerce, [4] online video games," or "[5] career development." § 3(2)(c)-(d). But when a website "chooses not to primarily offer news" or another favored category of content, "and instead focuses on social engagement, it changes from an uncovered to [a] covered" website. *CCIA*, 2024 WL 4051786, at *12. If a covered website changed to allow only (state-favored) speech about these excluded "topic[s]," it could escape coverage. *Reed*, 576 U.S. at 163. But if a covered website continues to primarily allow users to post and view "updates on what [their] friends and family are doing," it *is* covered. *CCIA*, 2024 WL 4051786, at *12.

The Act's coverage definitions are also speaker-based, because they favor "provider-generated content over user-generated content." *Id.* at *10. The Act excludes websites with "content primarily generated or selected by the *digital service provider*." § 3(2)(c)(i) (emphasis added). Meanwhile, the Act restricts otherwise similar websites that primarily disseminate *user-generated* content. *Id.* The Act thus distinguishes between two types of speakers: "digital service provider[s]" versus "user[s]," providing state-favored treatment for the former.

Defendant recasts all this speech as mere "participat[ion] in" certain "conduct." Br. 39. But States cannot "control or suppress speech" by

isolating a "different point[] in the speech process" and calling it conduct. *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). The law in *Brown* unconstitutionally restricted speech, even though it involved "the sale or rental of 'violent video games.'" 564 U.S. at 789. Opening the register, confirming the purchaser is not a minor, ringing up a total, and completing the transaction all require action—just like the physical and digital action that would be required for age-verification, parental consent, and monitoring-and-censorship under this Act. The Act's regulations all affect "access" to protected speech, so they each must satisfy strict scrutiny. *Sable*, 492 U.S. at 131.

Defendant's focus on "conduct" is also belied by her own admission that the Act aims to "mak[e] it harder for minors to participate in" certain online communities. Br. 39. That alone triggers strict scrutiny. The Supreme Court has already held that "[t]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. And "the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).

The age-verification, parental-consent, and monitoring-and-censorship requirements also restrict access to "user speech." *Moody*, 144 S. Ct. at 2399. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. at 305 (citation omitted). Age-verification requirements to access protected speech inherently regulate speech. *See Ashcroft v. ACLU*, 542 U.S. at 667; *Reno*, 521

U.S. at 881-82; *infra* p.37. Parental-consent requirements do, too. *Brown*, 564 U.S. at 799; *infra* p.40. If Defendant's "conduct" theory were correct, there would be *no* First Amendment scrutiny for age-verificaiton or parental-consent requirements for minors to buy books or participate in religious services. *Brown* has already rejected that view. 564 U.S. at 795 n.3. And as for the monitoring-and-censorship requirements, websites' "content choices" are expressive editorial choices, which means that "States [cannot] regulate them free of the First Amendment's restraints." *Moody*, 144 S. Ct. at 2399; *infra* p.42.

Next, Defendant argues that the Act regulates covered websites "based on their *functions*," which Defendant claims "is not based on content or speaker." Br. 42-43. But the so-called "functions" that Defendant points to are all *speech*: whether the website allows users to "to 'socially interact,' 'create . . . profile[s],' and 'post content.'" Br. 42 (citing § 3(1)(a)-(c)). Even if things like "posting content" were mere functions, "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022). The Act is content-based because it offers favorable treatment to websites that allow interaction solely regarding some "content" (*e.g.*, news or sports), while restricting websites that allow people to interact regarding other "content" (*e.g.*, politics or religion). § 3. Defendant cannot escape strict scrutiny by labeling that content as a mere "function." Br. 42.

Defendant invokes the "secondary-effects" doctrine to suggest that the Act is "subject at most to intermediate scrutiny" even if it "could be said to regulate based to some extent on content." Br. 39. But that doctrine applies to only physical "zoning ordinances" that incidentally affect speech—not to laws that directly target speech. *Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas*, 83 F.4th 958, 969 (5th Cir. 2023) (citation omitted). The Supreme Court in *Reno* held that restrictions on access to online speech are not analogous to zoning ordinances regulating physical property. 521 U.S. at 867-68. States cannot "cyberzone" the Internet by imposing "restriction[s] on speech." *Id.* States also cannot "reduce secondary effects simply by reducing speech in the same proportion." *Club Execs.*, 83 F.4th at 969. Yet the Act targets speech access and dissemination, not just its effects.

Defendant's final argument against strict scrutiny is that *Moody* "did not credit" the view "that a similar coverage definition rendered a [similar] law's operative provisions content- and speaker-based." Br. 43. But *Moody* did not "decide whether to apply strict or intermediate scrutiny." 144 S. Ct. at 2407. The reason was that "'Texas's law did not pass' either intermediate or strict scrutiny, at least applied to key respects of the law." *CCIA*, 2024 WL 4051786, at *11 (quoting *Moody*, 144 S. Ct. at 2407). *Moody* did not displace the longstanding rule that "[c]ontent-based laws . . . are presumptively uncon-stitutional." *Reed*, 576 U.S. at 163.

**2.** The central coverage definitions that define the scope of the Act's speech regulations cannot satisfy strict scrutiny or any level of heightened

scrutiny. To satisfy strict scrutiny, Defendant must show that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *AFP*, 594 U.S. at 607 (cleaned up). Even accepting that "safeguarding the physical and psychological wellbeing of minors online is a compelling interest," the district court correctly held that the Act's coverage definitions are not the least restrictive means of achieving it. ROA.409.

First, parents already have many options to oversee their children online. *Supra* p.7. The Supreme Court has repeatedly endorsed parental tools like these as a less-restrictive means than imposing governmental speech restrictions. *E.g., Ashcroft v. ACLU*, 542 U.S. at 667. Rather than attacking protected speech online, Mississippi could give "parents the information needed to engage in active supervision" by promoting these tools. *Playboy*, 529 U.S. at 826; *see* ROA.411. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not [work] perfectly." *Playboy*, 529 U.S. at 824. Whatever "modest gap in concerned parents' control" those tools may leave open, filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

Second, websites already undertake extensive content-moderation efforts to address the content that Defendant highlights. *Supra* p.5. The Supreme Court has endorsed similar "voluntary," industry-led efforts over governmental mandates restricting speech. *Brown*, 564 U.S. at 803.

Third, even where States *can* regulate, the "normal method of deterring unlawful conduct is to impose an appropriate punishment on the person

who engages in it." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). Mississippi already regulates the harmful conduct of bad actors online related to the speech the Act targets. ROA.39-40 ¶ 135 (Complaint collecting Mississippi laws). In fact, Mississippi enacted an entirely separate House Bill 1196 (2024) to criminalize the conduct (sextortion) that spurred this Act. *See* Br. 1. Aiding or abetting suicide is already unlawful in Mississippi. Miss. Code § 97-3-49. So is trafficking in controlled substances. *Id.* § 41-29-139(a). And so is "cyber-stalking," *id.* § 97-45-15, and various other harms to minors, *see* ROA.39-40.

Moreover, the Act's coverage definitions are both "seriously underinclu-sive" and "seriously overinclusive." *Brown*, 564 U.S. at 805. The Act is over-inclusive because it covers websites no matter whether minors are likely to use them, and without determining which websites (if any) may be harmful to minors. The Act is also overinclusive because it fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. And the Act is underinclusive, because it is unclear why the State would attempt to restrict minors' access to covered websites while ignoring the many other websites that also allow interaction between users. § 3(2)(c)-(d). Because the Act's coverage definitions fail "strict scrutiny," the Act's speech regulations depending on these coverage definitions are "facially invalid" and unconstitutional. *Veterans of Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 441 (5th Cir. 2014).

Defendant's only response is that these arguments somehow "rest[] on [a] misreading of the Act['s]" substantive requirements, which supposedly

can be "easily" satisfied. Br. 45. But Defendant's arguments about the Act's compliance burdens cannot establish that the Act's coverage definitions are narrowly tailored. Defendant's response also does not grapple with the existing parental tools, Mississippi's separate laws that already target the harmful conduct Defendant highlights, or the Act's serious over- and under-inclusiveness. At most, this is another version of Defendant's argument that covered websites can afford to pay for the State's speech restrictions. That argument fails on its own terms, (*see supra* p.26), and it also cannot establish that the Act's coverage definitions are the least restrictive means.

**3.** The Act's coverage definitions are also unconstitutional because they are vague in multiple respects. For a First Amendment free-speech facial vagueness challenge, "rigorous adherence" to principles of "precision" and fair notice are "necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). Consequently, "void-for-vagueness challenges are successfully made when laws have the capacity 'to chill constitutionally protected conduct, especially conduct protected by the First Amendment.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (citation omitted) (collecting cases); *see SEIU*, 595 F.3d at 597 (similar).

Here, the Act's vague terms are unconstitutional because they fail to "give fair notice of conduct that is forbidden," *FCC v. Fox*, 567 U.S. at 253, and are "so standardless [as to] authorize[] or encourage[] seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008)

(citation omitted); *see Yost*, 2024 WL 555904, at *13 (coverage definition was vague); *Griffin*, 2023 WL 5660155, at *13-14 (similar).

The Act excludes websites that "[p]rimarily function[] to provide a user with access to" content-based categories of speech and that only "[a]llow[] chat, comment or other interactive functionality that is incidental to the digital service." § 3(2)(c). Yet the Act gives no guidance about when a website crosses either the "primary" or "incidental" threshold. *Griffin* held that similar statutory terms were vague. 2023 WL 5660155, at *13. The coverage definitions also do not define what it means to "allow[] users to socially interact," as compared to other forms of interaction. § 3(1)(a). That leaves covered websites guessing whether the Act applies to all types of interactions (in which case the word "socially" lacks independent meaning), or merely applies to some subset that the State dubs sufficiently "social."

Defendant responds by arguing that "[t]o be facially vague, a law must be 'impermissibly vague in all of its applications.'" Br. 46 (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023)). But that is the standard outside the free-speech context. Inside the free-speech context, "stricter standards of permissible statutory vagueness" apply to laws that have a "potentially inhibiting effect on speech." *Smith v. California*, 361 U.S. 147, 151 (1959) (citation omitted). Therefore, "vagueness may be grounds for a pre-enforcement challenge insofar as [a law] chills protected speech under the First Amendment"—even if the law is not vague in every application.

*Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 & n.32 (5th Cir. 2024).

## C. The Act's age-verification, parental-consent, and monitoring-and-censorship provisions are each independently unlawful.

The Act's substantive speech regulations each trigger and fail strict scrutiny, or any form of heightened scrutiny, for independent reasons.

### 1. The age-verification requirement (§ 4(1)) violates the First Amendment.

The Act violates the First Amendment by requiring every user to "verify" their "age" to "creat[e] an account" on covered websites. § 4(1). The Supreme Court has held that governments cannot require people to provide personal information or documentation—such as "identif[ication]" or "credit card information"—to access protected speech. *Ashcroft v. ACLU*, 542 U.S. at 667; *see Reno*, 521 U.S. at 874. Yet under the Act, covered websites must place *all* content behind an age-verification system. *See* § 4(1). That is much broader than the age-verification law—held unconstitutional in *Ashcroft v. ACLU*—for "sexually explicit materials on the Internet." 542 U.S. at 659. Section 4(1) is therefore unconstitutional. *See id.* at 666-67 (private actors' voluntary "[b]locking and filtering software is an alternative that is less restrictive than [age-verification]").

Last year, *Griffin* applied these principles to another State's similar law, concluding that "[i]t is likely that many" people "who otherwise would be interested in becoming account holders . . . will be deterred—and their

speech chilled—as a result of [] age-verification requirements." 2023 WL 5660155, at *17. The record further confirms that age-verification deters users. ROA.137 (users describing various verification methods as, among other things, "totally insane," "a scam," or "unreasonable"). In other words, "[r]equiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourages users from accessing the regulated sites.'" *Griffin*, 2023 WL 5660155, at *17 (cleaned up; quoting *Reno*, 521 U.S. at 856). These intrusive requirements also burden speech by forcing users to "forgo the anonymity otherwise available on the internet." *Griffin*, 2023 WL 5660155, at *17; (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (similar).

Defendant's four counterarguments fail. Defendant begins by suggesting that the "Act does not require age verification," but rather "requires 'commercially reasonable efforts' to verify age." Br. 35. This distinction does not matter. Whatever limitation the phrase "commercially reasonable efforts" may provide, it does not cure the constitutional defect with requiring covered websites "to *verify* the age of the person creating an account." § 4(1) (emphasis added). Whenever Defendant believes "age verification," Br. 41, 45, needs to occur under the Act, this violates the First Amendment. *See Ashcroft v. ACLU*, 542 U.S. at 667; *Reno*, 521 U.S. at 881-82. Covered websites' users cannot be forced to provide identifying information to access protected

speech, regardless of whether it would be "commercially reasonable" for the website to implement an age-verification system. *Id.*

Defendant also argues that covered websites could comply just by "asking someone's age." Br. 35. But the Act contains a separate age-*registration* requirement, which already directs covered websites to "register[] the person's age" for new accounts. § 4(1). Defendant's view would render "verify the age" meaningless. § 4(1). Moreover, Defendant told the district court that "accept[ing] users' ages or birthdates on the honor system . . . . is not good enough to combat the harms the State is targeting." ROA.341.

Next, Defendant compares age-verification to "a law restricting certain dance halls to persons aged 14-18." Br. 37 (citing *City of Dallas v. Stanglin*, 490 U.S. 19 (1989)). But *Stanglin* was an associational-rights decision holding that the First Amendment "does not protect chance encounters at a dance club that contain *no* element of expression." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 211 (5th Cir. 2009) (emphasis added) (citing *Stanglin*, 490 U.S. at 25). By contrast, "conduct coupled with communicative content raises First Amendment concerns." *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001); *see id.* (citing *Stanglin*, 490 U.S. at 25). Just so here: age-verification is *always* "coupled with" a user's attempt to access expressive content. *Id.*

There is a key constitutional difference between preventing minors' physical access to "alcohol, illegal drugs, and promiscuous sex," *Stanglin*, 490 U.S. at 27, versus preventing access to websites where the entire "purpose . . . is to engage in speech" protected by the First Amendment, *Griffin*,

2023 WL 5660155, at *16 (rejecting similar analogy). *Moody* also refutes Defendant's reliance on *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006); *see* Br. 37. Social media websites, unlike the job fairs in *FAIR*, are "engaged in expression." *Moody*, 144 S. Ct. at 2401, 2402 n.4 (distinguishing *FAIR*).

Finally, Defendant argues that the age-verification requirement survives strict scrutiny. Br. 45. But regardless of any interest Defendant may assert, § 4(1) is not "the least restrictive means" of protecting minors. *AFP*, 594 U.S. at 607. As the district court correctly held, "the Act requires all users (both adults and minors) to verify their ages before creating an account to access a broad range of protected speech on a broad range of covered websites . . . . and that alone makes it overinclusive." ROA.411.

## 2.  The parental-consent requirement (§ 4(2)) violates the First Amendment.

The Act also violates the First Amendment by requiring minors to secure parental consent before becoming "an account holder," and thus before accessing protected speech on covered websites. § 4(2).

Minors have the First Amendment "right to speak or be spoken to without their parents' consent," and "the state" lacks the "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3. Otherwise, governments would have authority to impose parental-consent requirements for "political rall[ies]" or "religious" services. *Id.* The Supreme Court emphatically rejected this idea in *Brown*. *Id.* After all, "minors are entitled to a significant measure of First Amendment

protection." *Id.* at 794 (cleaned up). Following *Brown*, courts have invalidated similar parental-consent requirements regulating NetChoice's members. *E.g., Yost*, 2024 WL 555904, at *11-12; *Griffin*, 2023 WL 5660155, at *17.

The parental-consent requirement creates an unconstitutional barrier for minors to access large amounts of protected speech. *See supra* p.5. That problem is exacerbated because the Act does not address the challenges that are inherent in verifying the parent-child relationship. *See supra* p.13. When enjoining a similar requirement, *Griffin* credited the State's expert testimony that "the biggest challenge . . . with parental consent is actually establishing . . . the parental relationship." 2023 WL 5660155 at *4; *see* ROA.99-100 ¶ 31 (Szabo Decl.); ROA.162-64 ¶¶ 34-36 (Paolucci Decl.) ("Disputes about . . . the person claiming to be [a] parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common."). Facing massive liability under the Act, covered websites are likely to "err on the side of caution and require detailed proof of the parental relationship." *Griffin*, 2023 WL 5660155, at *15. And facing such onerous requirements, "parents and guardians who otherwise would have freely given consent . . . will be dissuaded by the red tape" and the loss of their own anonymity. *Id.* Those obstacles will drive them to "refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Id.*

Defendant never cites *Brown*, which is fatal to her argument. The main case that Defendant does invoke—*Stanglin*—is inapt for the reasons already discussed. *Supra* p.39. The closest Defendant comes to arguing that § 4(2)

satisfies strict scrutiny is in suggesting that this parental-consent requirement reinforces parental authority. Br. 45. But *Brown* rejected that exact argument in the context of a parental-consent law to access protected speech. 564 U.S. at 802. These kinds of laws "do not enforce *parental* authority over children's speech"; they "impose *governmental* authority, subject only to a parental veto." *Id.* at 795 n.3. Nor can this requirement escape scrutiny merely by requiring only "commercially reasonable" efforts to obtain parental consent, § 4(1)-(2), as explained above (at p.26). *Brown* would not have come out differently had the State there required only "commercially reasonable" efforts to block violent-video-game sales to minors. Regardless of whether consent was easily obtainable, the parental-consent requirement violated the First Amendment because it restricted minors' rights to access protected speech. 564 U.S. at 802.

### 3. The monitoring-and-censorship requirements (§ 6) are unlawful.

The Act's requirements for covered websites to "develop and *implement* a strategy to *prevent* or mitigate [a] known minor's *exposure* to" particular "*content*" violate the First Amendment. § 6 (emphases added). These provisions are a prior restraint commandeering covered websites into becoming government-mandated pre-screening monitors and censors. And these provisions violate websites' First Amendment right to "control the content that will appear to users." *Moody*, 144 S. Ct. at 2404-05. They replace websites' private content-moderation efforts with a government mandate not to

42

publish certain vague and subjective categories of speech—including protected speech. The State cannot censor this protected speech "directly," so it also cannot "coerce" websites to suppress "speech on [its] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (citation omitted). That is why "[t]he Supreme Court has previously applied First Amendment scrutiny to laws that deputize private actors into determining whether material is suitable for kids." *NetChoice v. Bonta*, 113 F.4th at 1118.

**a.** Section 6 is a prior restraint. Even prior restraints of *unprotected* speech must meet "the most exacting scrutiny." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979). Yet this one covers all sorts of protected speech. *Infra* p.46.

*Before* a website publishes any speech, it must "implement" a strategy to actively "prevent . . . exposure" to certain vague categories of speech in the future. § 6. This necessarily entails monitoring and acting as "a pre-clearance censor" for all speech on the website. *Moore v. City of Kilgore*, 877 F.2d 364, 383 (5th Cir. 1989). So these requirements are a prior restraint, because they "bar[] speech in the future," rather than just "penalizing past speech." *Alexander v. United States*, 509 U.S. 544, 553 (1993).

States cannot enact prior restraints by commandeering private actors into becoming pre-screening tribunals for the State. *E.g., Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). *Bantam Books* involved that kind of forced deputization, and the Supreme Court invalidated that scheme as a prior restraint because "a government official cannot do indirectly what she is barred from doing directly." *Vullo*, 602 U.S. at 190 (discussing *Bantam Books*,

372 U.S. 58, 67-69).[6] Requiring websites to pre-screen content using the State's standards will necessarily chill speech—no less than if the State did the pre-screening itself. *Smith v. California*, 361 U.S. at 153-54.

Defendant insists that § 6 requires websites to simply "adopt a 'strategy,'" and "does not . . . require blocking, altering, or removing any content." Br. 38; *see* Br. 36. But that limiting construction flouts the Act's plain text in multiple ways. First, § 6 expressly requires websites to "implement" a government-mandated "strategy" that must "prevent . . . exposure" to speech. Second, the Act's exception to § 6 says that websites need not "prevent or preclude" certain preferred "content." § 6(2). The obvious inference is that covered websites must "prevent or preclude" *other* content. *Id.* Otherwise the exemption would be unnecessary. Separately, if Defendant were correct that websites must only "adopt" (but not "implement") a strategy, it is hard to see how this provision advances any governmental interest. Importantly, too, Defendant has never said that any covered websites' existing strategies comply with the Act, even though those strategies are comprehensive. *Supra* p.5.

---

[6] In addition to government licensing boards and judicial orders, statutes have the capacity to impose prior restraints. *E.g.*, *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 723 (1931) (statute was an unconstitutional prior restraint where its "operation and effect" was to "impose[] a[] . . . restraint upon" speech). Courts "look through forms" of speech regulation "to the substance," as even "informal censorship may" chill speech. *Bantam Books*, 372 U.S. at 67.

Defendant claims that these provisions merely regulate "conduct." Br. 4. But that is the same "serious misunderstanding" *Moody* identified when rejecting the idea that "the content choices the major platforms make for their main feeds are 'not speech' at all." 144 S. Ct. at 2399 (citation omitted).

**b.** Even if § 6 were not a prior restraint, it violates the First Amendment. Section 6 prohibits publication of "a substantial amount of constitutionally protected [speech]," rendering it "facially invalid." *City of Houston v. Hill*, 482 U.S. 451, 458-59 (1987); *see Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018) ("government [cannot] proscribe unprotected content through a regulation that simultaneously encompasses a substantial amount of protected content"). NetChoice member websites work tirelessly at preventing objectionable content from reaching minors. *Supra* p.5. But States cannot punish websites for imperfect content moderation that they deem insufficient. *See Moody*, 144 S. Ct. at 2399.

Section 6's prohibited speech categories cover a wide array of protected works of art, literature, philosophy, and other speech that could be said to "promote[] or facilitate[]" certain social ills. Indeed, other Circuits have held that statutes using similar language, including "promote," violate the First Amendment by restricting protected speech.[7]

---

[7] *E.g.*, *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020) ("'promote'" is "overinclusive" as "between advocacy and action."); *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997) (law prohibiting "foster[ing]," "promot[ing]," and "encourag[ing]" "was overbroad"); *Nat'l Gay*

In fact, "'mere advocacy' of illegal acts" is "speech falling within the First Amendment's core." *Counterman v. Colorado*, 600 U.S. 66, 76 (2023) (citation omitted). The "mere tendency of speech to encourage" or promote "unlawful acts" is not a "sufficient reason for banning it." *Nwanguma v. Trump*, 903 F.3d 604, 610 (6th Cir. 2018) (citation omitted). Even speech "promot[ing]," § 6, social ills is protected by the First Amendment, and thus different from speech constituting a crime, *see Hess v. Indiana*, 414 U.S. 105, 108-09 (1973).

Accordingly, the Act's monitoring-and-censorship categories encompass speech protected for adults and minors alike. Below and in Plaintiff's Complaint (ROA.23-24 ¶ 52) are examples of protected speech that the Act's monitoring-and-censorship categories could reach:

- Many protected works "promote[] or facilitate[] . . . [s]elf-harm, eating disorders, substance use disorders, and suicidal behaviors." § 6(1)(a). That includes classic literature like *The Awakening* (1899) and modern media like *The Perks of Being a Wallflower* (1999). It also includes content advocating for medically assisted dying. *See CCIA*, 2024 WL 4051786, at *15 (discussing Peter Singer's *Practical Ethics*).

- Culture and conversation teem with protected speech that "promotes or facilitates . . . substance abuse or use of illegal drugs." § 6(1)(b). Examples include *Fear and Loathing in Las Vegas* (1971) and

---

*Task Force v. Bd. of Educ. of City of Oklahoma City*, 729 F.2d 1270, 1274 (10th Cir. 1984) (similar).

speech in online support groups about using illicit drugs to address illnesses.

- Many protected works of art "promote[] or facilitate[] . . . [s]talking, physical violence, online bullying, or harassment." § 6(1)(c). Examples include The Police's *Every Breath You Take* (1983). In some cases, even posting copies (or "screenshots") of another user's speech may "facilitate" harassment of that user.

- NetChoice's members work tirelessly to block content that "promotes or facilitates . . . [g]rooming, trafficking, child pornography, or other sexual exploitation or abuse." § 6(1)(d). Yet even "teenage sexual activity and the sexual abuse of children" has "inspired countless literary works" such as "Romeo and Juliet" and "American Beauty." *Ashcroft v. Free Speech Coal.*, 535 U.S. at 247-48.

- Much in media "promotes or facilitates . . . [i]ncitement of violence." § 6(1)(e). Concern about minors' exposure to violent video games led to the unconstitutional law in *Brown*. 564 U.S. at 794. Short of actual incitement to "imminent lawless action," such speech is protected. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

- Countless forms of protected speech could "promote[] or facilitate[] . . . other illegal activity." § 6(1)(f). A website could violate the Act, for example, by failing to block posts "promoting" attendance at an evening movie in violation of curfew laws. And "illegal" activity will vary both within and outside Mississippi's borders.

47

As these examples illustrate, the Act's prohibited categories of speech trigger strict scrutiny not only because they are content-based, but also because they are viewpoint-based regulations of speech that "promotes" social ills. § 6(1). A law is directly "aimed at a particular viewpoint" if it forbids "promot[ing]" that viewpoint. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011); *see Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019). That is exactly what § 6 does.

**c.** Section 6 fails strict scrutiny.

These requirements are overinclusive because they are "superimposed upon the State's criminal regulation[s]." *Bantam Books*, 372 U.S. at 69. Those existing criminal laws make the Act "largely unnecessary," *id.*, and an improper "prophylaxis-upon-prophylaxis," *FEC v. Cruz*, 596 U.S. at 306. Mississippi law already addresses the unlawful conduct related to the prohibited categories. *Supra* p.34; ROA.39-40 ¶ 135 (Complaint collecting examples of such laws). States cannot "suppress[]" speech from "law-abiding" persons or websites "to deter conduct by a non-law-abiding third party." *Bartnicki*, 532 U.S. at 529-30. Therefore, Defendant cannot (and has forfeited any attempt to) defend § 6 merely by offering a limiting construction that cabins the monitoring-and-censorship provisions to speech that is integral to unlawful conduct. Furthermore, because many covered websites may not be able to "age-gate" content, *see* ROA.101 ¶ 32.b (Szabo Decl.), they may not be able to limit § 6's effects to minors' accounts. So the Act could "reduce the

adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

Meanwhile, § 6's monitoring-and-censorship provisions are also under-inclusive. They restrict minors' access to certain speech unless the minor "deliberately and independently" seeks it out. § 6(2)(a). If this speech is dangerous, making it available to minors who request it defeats the State's goals. *See Brown*, 564 U.S. at 802. Of course, minors can encounter this content on any number of non-covered websites, too. *CCIA*, 2024 WL 4051786, at *15.

The Act's monitoring-and-censorship requirements are also unconstitutional regardless of whether they impose only "commercially reasonable" duties. § 6(1); *see supra* p.26. If the content that § 6 targets is as "dangerous" as Defendant says (Br. 39), requiring only "commercially reasonable" efforts to censor it makes no sense. *See Brown*, 564 U.S. at 802 ("That is not how one addresses a serious social problem."). And, regardless, "[p]revent[ing] or preclud[ing]" speech (§ 6(2)) does not become constitutional merely because a website can afford it, and such efforts still unconstitutionally restrict access to protected speech. *See id.*

**d.** Section 6's monitoring-and-censorship requirements are unconstitutionally vague, too. The key consideration under § 6 is whether content "promotes or facilitates" certain social ills. § 6(1). But the Supreme Court has held that a law that hinged on the word "promote" was invalid "because of vagueness." *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964). After all, "'promotes' . . . [is] susceptible of multiple and wide-ranging meanings." *Williams*, 553

U.S. at 294. In other words, § 6 is "unconstitutionally vague" because "both the verbs (promotes . . . and facilitates) and the objects of those verbs (*e.g.*, stalking, bullying, substance abuse, and grooming) are broad and undefined." *CCIA*, 2024 WL 4051786, at *17. The context-dependent nature of content moderation only makes that guesswork tougher. *See supra* p.6.

**e.** The district court correctly enjoined enforcement of § 6's monitoring-and-censorship requirements under the First Amendment, so it did not need to consider whether § 6 is preempted by 47 U.S.C. § 230. *See* ROA.401. But § 230 preemption is an alternative basis to affirm this part of the injunction.

Section 6 makes covered websites liable for failing to monitor and block—that is, failing to "prevent or mitigate the known minor's exposure to"—certain user-generated content. § 6(1); *see id.* § 6(2) (defining limited circumstances where websites need *not* "prevent or preclude" speech).

Congress in § 230 granted websites "broad immunity" for "all claims stemming from their publication of information created by third parties." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 286 (5th Cir. 2024) (cleaned up), *cert. granted*, 2024 WL 3259690 (U.S. July 2, 2024). No "interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," *e.g.*, a user. 47 U.S.C. § 230(c)(1). Congress preempted "inconsistent" state laws, protecting websites from "cause[s] of action" and "liability." *Id.* § 230(e)(3). Congress therefore preempted laws, like § 6, that make websites liable for alleged "failure[s] to implement basic safety measures to protect minors" or to "address certain

harmful content" on their websites. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-20 (5th Cir. 2008). In other words, as this Court put it, "the point of Section 230" is "to immunize [websites] for harm caused by unremoved speech." *Free Speech Coal.*, 95 F.4th at 284-85. Defendant concedes this. Br. 50.

Requiring covered websites to "'implement a strategy to prevent [a] known minor's exposure to' certain third-party content . . . . impermissibly forces covered [websites] to 'address certain harmful content' on their services." *CCIA*, 2024 WL 4051786, at *19 (citations omitted). Section 230 "specifically proscribes liability" for "decisions relating to the monitoring" or "screening" "of content." *MySpace*, 528 F.3d at 420 (citations omitted). It also preempts liability for websites failing to "delet[e]" or block user-generated content. *Id.*; *see* 47 U.S.C. § 230(c), (f)(4) ("block[ing]," "screen[ing]," or "disallow[ing]" content). At bottom, "publishers . . . filter content," and § 230 preempts liability for "actions quintessentially related to a publisher's role." *Free Speech Coal.*, 95 F.4th at 286 (citation omitted).

Defendant argues that 47 U.S.C. § 230 is not implicated, because § 6 does not "treat" covered websites "as the publisher" of user-generated speech. Br. 50. But this Court's precedent holds that allegations about a website's "failure to implement measures that would have prevented" certain "communicat[ions]" from reaching a user "are merely another way of" attacking the website as a "publisher." *MySpace*, 528 F.3d at 420. Defendant's position also conflicts with § 230's text, which adopted the common law's conception that "treat as the publisher" means to assign fault for the speech's content to

the speech disseminator. 47 U.S.C. § 230(c)(1); *see Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 122 (4th Cir. 2022) ("[T]o hold someone liable as a publisher at common law was to hold them responsible for the content's improper character."). That is precisely what the Act's monitoring-and-censorship requirements do by mandating that websites "implement" a strategy to "prevent or mitigate" the publication of certain content to minors. § 6; *see supra* p.44.

Nor is there any tension between websites asserting both First Amendment rights and § 230's protections. The First Amendment protects websites' "content choices" with respect to the display of user-generated content. *Moody*, 144 S.Ct. at 2399. And § 230 says that websites are not liable for removing or not removing (due to mistake or otherwise) speech that was "provided by another [user]." 47 U.S.C. § 230(c)(1). In other words, § 230 protection applies to protect a website's decisions as to user-generated speech, even though websites simultaneously are engaging in First Amendment protected activity when they curate compilations of, and display and disseminate, that speech. *Moody*, 144 S. Ct. at 2399. The First Amendment and § 230 each promote free speech, and there is no conflict between them.

In sum, § 230 protects "[a]ctions quintessentially related to a publisher's role," including "filter[ing] content." *Free Speech Coal.*, 95 F.4th at 286; *see MySpace*, 528 F.3d at 419-20 (protection for "publishing, editorial, and/or screening capacities," regardless of whether a "distributor" or original

"publisher" (citations omitted)). So, §230 preempts §6's monitoring-and-censorship requirements.

## III. The other preliminary-injunction factors favor NetChoice.

NetChoice has shown "arguably the most important factor: likelihood of success on the merits." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023). NetChoice meets the other factors too.

The Act will cause irreparable harm for NetChoice's members. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Websites suffer such harm when they are forced to comply with the Act. ROA.148-50, 161-64 ¶¶ 10, 13, 33, 37 (Paolucci Decl.). Minor users suffer such harm when the Act prevents them from accessing protected speech. ROA.127 ¶¶ 41-42 (Veitch Decl.). And all users suffer such harm when they must verify their age to access protected speech. ROA.150-51 ¶¶ 14-15 (Paolucci Decl.).

The Act's penalties for covered websites magnify these harms: $10,000 per violation, or even criminal liability. The Act also requires covered websites to shoulder steep compliance costs, which are irreparable because sovereign immunity prevents later recovery from the government even if NetChoice prevails. *Book People,* 91 F.4th at 341. Each covered website will need to adopt expensive age-verification, parental-consent, and monitoring-and-censorship systems to comply with the Act. ROA.123 ¶ 33 (Veitch Decl.);

ROA.140 ¶ 31 (Pai Decl.). For some websites, these compliance costs are "far in excess of [the] available budget." ROA.164 ¶ 37 (Paolucci Decl.).

The final factors—"harm to the opposing party and weighing the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (cleaned up). That is especially true here, where the Act will restrict minors and adults' access to protected speech.

Defendant disputes none of this. *See* Br. 52-54. Instead, Defendant argues that "[t]he injunction thwarts the State's efforts to protect children against grave dangers." Br. 52. Yet the State cannot do that in an unconstitutional manner. Furthermore, many other actors will continue to protect minors against online dangers. NetChoice's members will continue moderating potentially harmful content. *See supra* p.5. Parents can use existing private tools, which the State can support. *See supra* p.7. And Mississippi law-enforcement can investigate and enforce existing laws. *See supra* p.34.

Defendant also discounts the compliance costs that NetChoice's members face, emphasizing that "the Act calls on covered platforms to make only the reasonable efforts that any responsible platform would already make." Br. 53. Yet Defendant concedes that covered websites will need to expend "resources" (Br. 53), and Defendant refuses to say that any website's current efforts are sufficient. Defendant argues that the injunction should be narrowed. Br. 54. But the district court already limited the injunction to

NetChoice "and its members." ROA.423-24. Defendant requests further narrowing "in light of any district-court merits rulings that this Court rejects" (Br. 54), but this request conflates the merits with the equities.

The Act unlawfully restricts protected speech in all sorts of ways. This Court should affirm the preliminary injunction and deny Defendant's motion for a stay pending appeal.

## CONCLUSION

This Court should affirm.

Dated: September 26, 2024

Respectfully submitted,

/s/ *Scott A. Keller*

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001

Jared B. Magnuson
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
   *Counsel of Record*
Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
scott@lkcfirm.com

*Counsel for NetChoice, LLC*

## CERTIFICATE OF SERVICE

I certify that on September 26, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. No paper copies were filed in accordance with the COVID-19 changes ordered in General Docket No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

I certify that this brief: (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,997 words, excluding the parts of the brief exempted by Rule 32(f); and (2) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Scott A. Keller*
Scott A. Keller

56