# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 24-60341

NETCHOICE, L.L.C.,

*Plaintiff-Appellee,*

v.

LYNN FITCH, in her official capacity as Attorney General of Mississippi,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI, GULFPORT, IN NO. 1:24-CV-170,
HONORABLE HALIL S. OZERDEN, U.S. DISTRICT JUDGE

## *AMICUS* BRIEF OF FOUNDATION
## FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
## IN SUPPORT OF APPELLEE

ROBERT CORN-REVERE
ARLEIGH P. HELFER
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)
*Attorneys for Amicus Curiae*
700 Pennsylvania Avenue, SE, Suite 340
Washington, DC 20003
(215) 717-3473

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons are entities as described in Local Rule 29.2 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| Foundation for Individual Rights and Expression (FIRE) | *Amicus curiae* |
| Robert Corn-Revere | Counsel to *amicus* FIRE |
| Arleigh P. Helfer | Counsel to *amicus* FIRE |

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus* certifies that (1) *amicus* does not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amicus*.

/s/ Robert Corn-Revere
October 3, 2024

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ................................... i

TABLE OF AUTHORITIES ........................................................ iii

INTEREST OF *AMICUS CURIAE* ........................................... 1

SUMMARY OF ARGUMENT ................................................... 2

ARGUMENT ........................................................................ 5

    I.    H.B. 1126 IS A CONTENT-BASED SPEECH
REGULATION THAT CANNOT SATISFY STRICT
SCRUTINY ................................................................. 6

        A.    H.B. 1126 is Content-Based in Both its Overall
Coverage and in the Speech it Restricts ........................ 7

        B.    H.B. 1126 Fails Strict Scrutiny Because it is
Not Narrowly Tailored to Serve a Compelling
Interest ........................................................ 13

            1.    Mississippi has not demonstrated a
compelling interest ............................. 14

            2.    Mississippi has not shown H.B. 1126 is a
narrowly tailored solution ................................... 16

    II.    THE ACT'S VAGUE TERMS FAIL TO GIVE FAIR
NOTICE OF WHAT SPEECH VIOLATES THE LAW ........ 25

CONCLUSION ....................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ACLU v. Mukasey,*
    534 F.3d 181 (3d Cir. 2008) ................................................. 19, 20, 21

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ........................................................... 4, 10

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234 (2002) ........................................................... 12, 22

*Boos v. Barry,*
    485 U.S. 312 .................................................................. 9, 12

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 7865 (2011) ........................................................ *passim*

*City of Dallas v. Stanglin,*
    490 U.S. 19 (1989) ............................................................... 11

*City of Renton v. Playtime Theatres, Inc.,*
    475 U.S. 41 (1986) ............................................................... 12

*Computer & Comm'ns Indus. Ass'n v. Paxton,*
    No: 1:24-CV-849, 2024 WL 4051786
    (W.D. Tex. Aug. 30, 2024) .................................................. *passim*

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) ............................................................. 13

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................. 26

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ............................................................... 26

*Interstate Circuit, Inc. v. City of Dallas,*
    390 U.S. 676 (1968) ............................................................. 26

*Moody v. NetChoice, LLC,*
    144 S. Ct. 23833 (2024) ....................................................... 2, 5

iii

*NetChoice, LLC v. Bonta,*
    113 F.4th 1101 (2024) ...................................................... 3, 9, 10, 24

*NetChoice, LLC v. Fitch,*
    Civ. No. 1:24-cv-170, 2024 WL 3276409
    (S.D. Miss. July 1, 2024) ...................................................... *passim*

*NetChoice, LLC v. Griffin,*
    No. 5:23-CV-5105, 2024 WL 1262476
    (W.D. Ark. Mar. 24, 2024) .................................................. 3, 10, 25

*NetChoice, LLC v. Reyes,*
    Nos. 2:23-cv-911 & 2:24-cv-31, 2024 WL 4135626
    (D. Utah Sept. 10, 2024) ............................................ 3, 10, 15, 25

*NetChoice, LLC v. Yost,*
    No. 2:24-cv-47, 2024 WL 555904
    (S.D. Ohio Feb. 12, 2024) ........................................ 3, 10, 25, 28

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) ................................................................ 10, 11

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) .................................................................... 14

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................ 7, 9, 16

*Reno v. ACLU,*
    521 U.S. 844 (1997) .............................................................. *passim*

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) .................................................................... 18

*United States v. Miselis,*
    972 F.3d 518 (4th Cir. 2020) ...................................................... 22

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000) .............................................................. *passim*

*United States v. Stevens,*
    559 U.S. 460 (2010) ................................................................ 20, 28

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ............................................................... 5

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ........................................................... 25

## Constitutional Provisions and Statutes:

First Amendment ............................................................... *passim*

H.B. 1126 ......................................................................... *passim*

H.B. 1126, § 2(b). ................................................................. 7

H.B. 1126, § 4(1) ................................................................ 19

H.B. 1126, § 6 ................................................................. 9, 22

H.B. 1126, § 6(1) ............................................................... 22

H.B. 1126, § 6(2)(a) ........................................................... 18

# INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the rights of all Americans to the freedoms of speech, expression, and conscience—the essential qualities of liberty. Founded in 1999 as the Foundation for Individual Rights in Education, FIRE's sole focus before the expansion of our mission in 2022 was defending student and faculty rights at our nation's colleges and universities. Given our decades of experience combating censorship, FIRE is all too familiar with the constitutional, pedagogical, and societal problems presented by silencing minority or dissenting viewpoints. FIRE has successfully defended the rights of individuals through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights under the First Amendment. *See, e.g.*, *Villarreal v. City of Laredo, Tx.*, No. 20-40359 (5th Cir. 2024); *Rogers v. Smith*, No. 22-30352 (5th Cir. 2023); Brief of FIRE as *Amicus Curiae* in Support of Plaintiffs-Appellees, *Little v. Llano Cnty.*, No. 23-50224 (5th Cir. filed Sept. 20, 2024).

---

[1] No counsel for a party authored this brief in whole or part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to filing of this brief.

## SUMMARY OF ARGUMENT

Mississippi's H.B. 1126, the "Walker Montgomery Protecting Children Online Act," is the latest in a series of well-intentioned but fundamentally flawed efforts to protect minors from speech online. As with the Communications Decency Act (CDA) and the Child Online Protection Act (COPA) at the federal level, and numerous laws passed by various states, Mississippi fails to confront the First Amendment rule that "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804–05 (2011). As the Supreme Court reaffirmed this past term, the First Amendment principles "do not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2403 (2024).

H.B. 1126 violates basic First Amendment principles and erodes individuals' rights to participate in social discourse critical to a democratic republic. The law is content-based: it singles out digital service providers that offer social communications and their users for regulation while excepting providers that offer news, sports, professional development, commercial communications, or content that they

themselves generate or select. It requires age registration before anyone is permitted to open a social media account, and thus impermissibly chills participation in online discussion sites and burdens the right to receive information. *See Reno v. ACLU*, 521 U.S. 844, 856 (1997). And it requires service providers to identify "harmful" content based on fifteen specified speech categories and to take steps to limit minors' access to that information.

Such content-based social media regulations must satisfy strict scrutiny, as five other courts have recently confirmed.[2] In this case, the district court correctly held H.B. 1126 is unlikely to withstand strict scrutiny because Mississippi cannot show the Act's speech restrictions are necessary or the least restrictive alternatives available to advance its asserted interest to protect children online. And its age verification requirements, which also fail strict scrutiny, impose excessive burdens on access to protected speech.

---

[2] *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (2024); *NetChoice, LLC v. Reyes*, Nos. 2:23-cv-911 & 2:24-cv-31, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *Computer & Comm'ns Indus. Ass'n v. Paxton*, No: 1:24-CV-849, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024); *NetChoice, LLC v. Griffin*, No. 5:23-CV-5105, 2024 WL 1262476 (W.D. Ark. Mar. 24, 2024); *NetChoice, LLC v. Yost*, No. 2:24-cv-47, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024).

The State's defense of H.B. 1126 is perplexing. The main thrust of its argument is to assert the law regulates "non-expressive conduct," *e.g.*, Appellant's Br. 34–37, yet it tries to support this conclusion simply by relabeling speech as "conduct" while mentioning *none* of the foundational precedents establishing that laws limiting minors' access to potentially harmful speech is "the essence of content-based regulation." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 811–12 (2000); *Brown*, 564 U.S. at 794–95; *Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004); *Reno*, 521 U.S. at 874. Apart from blinking reality (and avoiding precedent), the bulk of the State's defense on the merits is to insist that its law doesn't actually *do* anything. *E.g.*, Appellant's Br. 35 ("The Act does not require age verification."); 36 ("And the Act does not require any platform to prevent harm or to alter, block, or remove content."). This is an odd choice, since it is the State's burden to show that the restrictions it imposes will materially serve its asserted interests. *Playboy*, 529 U.S. at 813.

The Act is also impermissibly vague, both in its coverage definition and in the substantive mandate requiring digital service providers to "mitigate" or "prevent" minors' access to "harmful" speech. The district

court correctly found that NetChoice is likely to succeed on its claim that H.B. 1126 is unconstitutionally vague for failing to clearly define what online services are subject to the Act. *NetChoice, LLC v. Fitch*, Civ. No. 1:24-cv-170, 2024 WL 3276409, at *15 (S.D. Miss. July 1, 2024). Although the district court stopped there, the Act's substantive requirements are also impermissibly vague, because they fail to precisely identify what "harmful content" must be restricted or what measures will be deemed "commercially reasonable." H.B. 1126's vague requirements provide no guidance either to those who will enforce the law or to the services that must comply with it, thus inviting arbitrary enforcement.

## ARGUMENT

The First Amendment protects the creation, dissemination, and right to access ideas and expression. *Brown*, 564 U.S. at 792 & n.1; *see Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 & 757 n.15 (1976). These protections apply without qualification to the internet, *Reno*, 521 U.S. at 852–53, including social media. *See Moody*, 144 S. Ct. at 2394. They also apply to minors, who "are entitled to a significant measure of First Amendment protection," and whose rights to engage in protected speech "cannot be suppressed solely

to protect [them] from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 794–95 (citation omitted). And they prohibit the government from restricting adults' protected speech in the name of shielding children. *See Playboy*, 529 U.S. at 813.

H.B. 1126 restricts the First Amendment rights of both the providers and users of social media platforms and it fails to satisfy any level of constitutional review.

## I.    H.B. 1126 IS A CONTENT-BASED SPEECH REGULATION THAT CANNOT SATISFY STRICT SCRUTINY

Mississippi has an undisputed interest in the well-being of youth, but it must serve that interest within constitutional bounds. *Brown*, 564 U.S. at 804–05. "[E]ven where speech is indecent and enters the home, the objective of shielding children does not suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative." *Playboy,* 529 U.S. at 814. "Regardless of the strength of the government's interest in protecting children, the level of discourse . . . simply cannot be limited to that which would be suitable for a sandbox." *Reno*, 521 U.S. at 875 (cleaned up and citation omitted).

**A.    H.B. 1126 is Content-Based in Both its Overall Coverage and in the Speech it Restricts**

"Government regulation of speech is content based" and subject to strict scrutiny "if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In this regard, H.B. 1126 is content-based twice-over. It regulates digital service providers only if they provide specified types of online content, and it requires those providers to restrict speech accessible to minors in certain subject areas (such as information on self-harm, eating disorders, bullying, or harassment). As another court recently observed in enjoining a similar Texas law regulating social media, this "is as content based as it gets." *CCIA*, 2024 WL 4051786, at *14.

H.B. 1126 is content-based in the service providers it covers. The Act defines a "digital service provider" to mean any person who owns or operates a digital service (including any website, application, program, or software that collects or processes personal identifying information) with Internet connectivity. H.B. 1126, § 2(b). However, service providers are covered only if they facilitate social interactions; allow users to create public, semi-public or private profiles; or allow users to post content that

7

can be viewed by others, including by sharing information in chat rooms or on message boards, landing pages, video channels, or main feeds for sharing content. *Id.* § 3(1)(a)–(c).

The Act expressly exempts various other digital service providers based on the type of information they share on their digital services. For example, the Act does not apply to services that provide e-mail or direct messaging services. It exempts services that primarily provide access to news, sports, commerce, online video games or content primarily generated or selected by the service provider, and that allow chat, comment or other interactive functionality that is incidental to the digital service. And it does not cover services that primarily function to provide users with access to career development opportunities (*e.g.*, professional networking, job skills, learning certifications, job postings, or application services). *Id.* § 3(2)(b)–(d). The Act thus singles out the category of social communications for regulation while exempting providers of other categories of speech. *Id.* § 3(2)(c)(ii).

Beyond its definitional scope, H.B. 1126 imposes a wide variety of content-based speech restrictions for communications available to minors. It requires service providers to "prevent or mitigate" minors'

exposure to "harmful material and other content" in fifteen broadly framed content categories.[3] By definition, this provision is content-based because it literally restricts speech "because of the topic discussed" and "particular subject matter" addressed. *Reed*, 576 U.S. at 163; *see Bonta*, 113 F.4th at 1119–21 (law requiring online businesses "to opine on and mitigate that children are exposed to harmful content online" is subject to strict scrutiny).

This part of the Act "focuses *only* on the content of the speech and the direct impact that speech has on its" audience. *Playboy*, 529 U.S. at 811–12 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (opinion of O'Connor, J.)). It regulates speech based on "its function or purpose," *Reed*, 576 U.S. at 163, and cannot be justified without reference to the asserted impact of the speech on its listeners. *Boos*, 485 U.S. at 321. This is "the essence of content-based regulation." *Playboy*, 529 U.S. at 811–12.

The district court correctly held that H.B. 1126 is content-based and subject to strict scrutiny. *Fitch*, 2024 WL 3276409, at *9 (citing *Reed*, 576

---

[3] These include self-harm, eating disorders, substance abuse, suicidal behaviors, stalking, physical violence, online bullying, harassment, "grooming," trafficking, child pornography, other sexual exploitation or abuse, incitement of violence, or "any other illegal activity." H.B. 1126, § 6.

U.S. at 165). The State asks this Court to reverse this holding, variously describing the provision of online forums as "non-expressive conduct," and the regulation of communication that takes place thereon as restricting "secondary effects." Appellant's Br. at 39–41. It would be possible to take these claims more seriously if the State had bothered to analyze (or even cite) *any* of the numerous cases that have held that efforts to restrict, age-gate, or otherwise impede access to online forums is content-based and subject to strict scrutiny. *E.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 110 (2017); *Ashcroft,* 542 U.S. at 670; *Reno*, 521 U.S. at 874. Accordingly, the district court was right to reject the State's claim that H.B. 1126 regulates only "non-expressive conduct," and should be affirmed. Doing so would be consistent with *all* other recent decisions enjoining similar social media regulations.[4]

---

[4] *See Bonta*, 113 F.4th at 119–21; *CCIA*, 2024 WL 4051786, at *10–12 (materially identical provisions of Texas's H.B. 18 constitute content-based regulation of speech); *Reyes*, 2024 WL 4135626, at *10–11 (Utah's Minor Protection in Social Media Act, which applies to services that allow users to create profiles and to interact socially, is content-based and subject to strict scrutiny); *Yost*, 2024 WL 555904, at *12 ("[L]aws that require parental consent for children to access constitutionally-protected non-obscene content are subject to strict scrutiny."); *see also Griffin*, 2024 WL 1262476, at *17 (agreeing that social media restrictions are subject to strict scrutiny but holds law is invalid even under intermediate scrutiny).

The State principally relies on *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), a case involving the regulation of teen dance halls, but it ignores all cases regarding internet regulation—*or any kind of speech*. This omission speaks volumes. Appellant's Br. 37. As the Supreme Court observed in *Stanglin*, 490 U.S. at 24–25, there is no suggestion that patrons who gather to engage in recreational dancing "take positions on public questions" or otherwise engage in "the sort of expressive association that the First Amendment has been held to protect." By sharp contrast, the Court has recognized "the 'vast democratic forums of the Internet' in general . . . and social media in particular" are places where people "can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. It thus held a "fundamental principle of the First Amendment is that all persons have access" to such fora, and that courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id*. at 104, 105. On this basis the district court properly distinguished *Stanglin. See Fitch*, 2024 WL 3276409, at *10.

Otherwise, the State merely recycles tropes the Supreme Court rejected long ago. It tries to characterize H.B. 1126's speech restrictions

as regulating only "secondary effects," like those at issue in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). Appellant's Br. at 40–41. But the secondary effects argument simply does not apply where the State is seeking to combat the effects of speech on listeners. *Boos*, 485 U.S. at 321. This was made clear in the cases the State overlooks, where the Court found *Renton* is "irrelevant to the question here," and "has no application to content-based regulations targeting the primary effects of protected speech." *Playboy*, 529 U.S. at 815; *Reno*, 517 U.S. at 867–68 ("[T]he purpose of the CDA is to protect children from the primary effects of 'indecent' and 'patently offensive' speech, rather than any 'secondary' effect of such speech.").

Finally, the State tries to assert it is not really regulating content because it is seeking to restrict only bad speech. Appellant's Br. 42–43 ("The Act's coverage turns on where *harmful conduct* toward minors online is most likely: the interactive social-media platforms that allow predators to interact with and harm children."). This argument tacitly admits that speech is being regulated but incorrectly assumes that the government may restrict *all* social interactions because *some* may be problematic. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253–54

(2002) ("[T]he Government may not prohibit speech on the ground that it may encourage pedophiles to engage in illegal conduct.").

The State ignores the Supreme Court's recognition that the First Amendment denies states the power "to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. Rather, "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975). And as the district court correctly found, a blunderbuss attack on speech is not one of those circumstances. *Fitch*, 2024 WL 3276409, at *11.

## B.   H.B. 1126 Fails Strict Scrutiny Because it is Not Narrowly Tailored to Serve a Compelling Interest

A law subject to strict scrutiny is presumptively invalid unless the government shows it is necessary to achieve a compelling interest and uses the least restrictive means. *See Playboy*, 529 U.S. at 813. This is a "demanding standard" and "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Id*. at 818; *Brown*, 564 U.S. at 799. Under this standard, Mississippi must prove that H.B.

13

1126 is justified by a compelling state interest and that it is narrowly drawn to serve that interest. *Brown*, 564 U.S. at 799 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)). The State must identify an "actual problem" in need of solving, and the "curtailment of free speech must be actually necessary to the solution." *Id*. As Justice Scalia wrote for the majority in *Brown*, "[t]hat is a demanding standard. It is rare that a regulation restricting speech because of its content will ever be permissible." *Id*. (cleaned up). Here, the State cannot satisfy either prong of the strict scrutiny analysis.

### 1. Mississippi has not demonstrated a compelling interest

The State has made almost no effort to identify specific harms of social media that H.B. 1126 is designed to address. To be sure, it has asserted a generalized interest in protecting minors—which no one disputes—and has littered its brief with warnings on online "predators." Appellant's Br. 5, 7, 39, 41, 43, 47. But it must provide more than speculation. *Playboy*, 529 U.S. at 820–22. The State must "show a direct causal link between [social digital services] and harm to minors." *Brown*, 564 U.S. at 799.

14

Yet Mississippi has offered nothing but anecdote and supposition to support this law. It cites a news account about one tragic episode involving a sixteen-year-old Mississippian, and, without describing any of the relevant facts at issue, states that the "Legislature was especially moved by the case" and passed H.B. 1126 as a result. Appellant's Br. 7. This is precisely the kind of anecdotal showing the Supreme Court has rejected as deficient. *Playboy*, 529 U.S. at 820–21. And its paucity of proof is not bolstered by its abbreviated, almost offhand reference to the Surgeon General's Advisory on Social Media. Appellant's Br. at 41 (citing Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 9 (2023)).

What the State fails to mention is that the Surgeon General's Advisory reached far more nuanced conclusions that do not provide a basis for this regulation. The Advisory found, for example, that use of social media positively affects many young people and has varied effects that cannot be generalized—let alone causally linked—to any adverse outcomes overall. *See Social Media and Youth Mental Health* 4, 6, 11. Looking at the same data, the court in *NetChoice v. Reyes* rejected the proffered support for Utah's similar social media law. 2024 WL 4135626,

at \*12 (the "Advisory suggests social media can benefit minors by 'providing positive community and connection with others who share identities, abilities, and interest,'" as well as by "provid[ing] access to important information and creat[ing] a space for self-expression," "promoting help-seeking behaviors[,] and serving as a gateway to initiating mental health care").

Such mixed findings do not support broad speech restrictions. Yet even if the State could establish the need for legislation, it must also show that the Act's restrictions on free speech in fact advance that interest and are a narrowly tailored solution. *Reed*, 576 U.S. at 171. This, it has failed to do.

### 2. Mississippi has not shown H.B. 1126 is a narrowly tailored solution

The district court correctly held that H.B. 1126 is not narrowly tailored and is both over- and underinclusive. *Fitch*, 2024 WL 3276409, at \*11–12.

***First***, the State has not attempted to demonstrate that the Act is the least restrictive means of addressing concerns about young peoples' use of social media. "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."

*Playboy,* 529 U.S. at 813. In this regard, voluntary tools that enable parents to tailor use of social media to the needs of individual households are inherently less restrictive than blanket mandates by the State. *Id.* at 821–22; *Brown*, 564 U.S. at 803.

For online networks—and social media in particular—less restrictive alternatives include numerous existing technologies that permit parents to supervise and control their children's online activities. Those technologies include devices and software that allow parents to block access to specific websites, limit the amount of time children can spend on the internet, filter internet content to remove objectionable materials, and monitor children's online activities, such as logging which websites they visit. *Fitch*, 2024 WL 3276409, at *11. On the record before it, the district court properly concluded that the Attorney General could not meet her burden to prove that such less-restrictive alternatives in the hands of parents would be insufficient to protect children from potential online harms. *Id.* at *12.

Although the State tries to cast doubt about the effectiveness of voluntary tools, it has shirked its burden of proof. To begin with, it has offered nothing to suggest that the Act's restrictions would actually

17

address the asserted harms of social media. *See Brown*, 564 U.S. at 799 (strict scrutiny requires the chosen regulatory response to "be actually necessary to the solution"); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994) (opinion of Kennedy, J.) (government has the obligation to show speech restrictions will "in fact" further its interests in a "direct and material way"). Yet even for the tragic example the State claims drove the Act's passage—where a teen reportedly was threatened with being "outed" by an online predator—it offers no explanation how H.B. 1126 would have made any difference in that case (or in any other case, for that matter). Appellant's Br. 7.

The law does not prevent "[a]ny minor from deliberately and independently searching for, or specifically requesting, content," H.B. 1126, § 6(2)(a), and the State is defending the law by asserting "the Act *does not require* any platform to prevent harm or to alter, block, or remove content." Appellant's Br. 36. How, exactly, will forcing social media platforms to adopt "harm mitigation strategies" solve the problem? The State never says.

And even if it did try to explain how H.B. 1126 is supposed to work and could back that up with proof, that would not discharge the State's

burden. The government must show that speech restrictions are more effective than available less restrictive alternatives. *Playboy*, 529 U.S. at 824–26. This is a tall order, since courts have found repeatedly that voluntary, individually tailored solutions based on technology are inherently more effective than government-imposed content restrictions. *E.g.*, *ACLU v. Mukasey*, 534 F.3d 181, 202–04 (3d Cir. 2008).

***Second***, the Act is both overinclusive and underinclusive. It requires everyone to comply with an age registration and verification regime irrespective of age or maturity, and requires platforms to mitigate or eliminate minors' access to constitutionally protected speech. Yet at the same time, the Act's selective coverage leaves minors exposed to the same type of online communications that the State claims is harmful. Such underinclusiveness is "alone enough to defeat it." *Brown*, 564 U.S. at 802; *CTIA*, 2024 WL 4051786, at *15 (content exposure provisions underinclusive).

The age registration requirement is vastly overinclusive in that it will prevent numerous adults from creating social media accounts if they will not or cannot verify their age with a digital service provider. H.B. 1126, § 4(1); *see Fitch*, 2024 WL 3276409, at 2 ("H.B. 1126 requires all

users, adults and minors alike, to verify their age before they may open an account with non-excluded digital service providers . . . while Section 4(2) requires parental consent before a known minor may create an account."). Adults without state-issued identification or who wish to remain anonymous, as is their right, are banned from participating in social digital service platforms. This violates the well-established rule that the government cannot "suppress[] a large amount of speech that adults have a constitutional right to receive and to address to one another" in order "to deny minors access to potentially harmful speech." *Reno*, 521 U.S. at 874; *Mukasey*, 534 F.3d at 196 (age verification requirement would deter access to protected speech).[5]

The age verification and content mitigation requirements are also overinclusive as they relate to minors in three ways. First, barring all

---

[5] The State insists that H.B. 1126 "does not require age verification" because it only requires "commercially reasonable efforts," which it asserts, for some platforms, "may mean no more than asking someone's age." Appellant's Br. 35. However, noncompliance carries potential criminal penalties, so it is doubtful that many services would be willing to forego age verification in the hope the Attorney General will agree with what the service considers "commercially reasonable." *See United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). On the other hand, if compliance is essentially "voluntary," it is hard to see how the State can demonstrate that the law will directly and materially address the asserted problem.

those under 18 from having social media accounts unless they have
parental consent is an obvious violation of minors' First Amendment
rights. *Brown*, 564 U.S. at 795 n.3 (observing that the state could not
make it criminal to admit persons under 18 to a political rally or religious
meeting without their parents' prior written consent). Second, H.B. 1126
lumps all minors as a single group, treating toddlers the same as older
teens on the cusp of adulthood, which is another obvious violation. *Reno*,
521 U.S. at 878 ("the strength of the Government's interest in protecting
minors is not equally strong throughout the coverage of this broad
statute" to the extent it applies equally to older teens and younger
children); *Mukasey*, 534 F.3d at 205 ("[M]aterials that could have 'serious
literary, artistic, political, or scientific value' for a 16-year-old would not
necessarily have the same value for a three-year-old."). Third, H.B. 1126
seeks to create "a wholly new category of content-based regulation that
is permissible only for speech directed at children," something the
Supreme Court has flatly rejected. *Brown*, 564 U.S. at 794.

Mississippi may believe it has "a free-floating power to restrict the
ideas to which children may be exposed," but the Supreme Court
regularly holds otherwise. *Id*. at 794–95. H.B. 1126 requires service

providers to "prevent or mitigate" minors' exposure to "harmful material and other content" in fifteen broadly framed content categories, only some of which even relate to illegal activity. For example, H.B. 1126, § 6 requires the "prevention" or "mitigation" of speech that relates to harassment, "grooming," trafficking, child pornography, other sexual exploitation or abuse, incitement of violence, or "any other illegal activity." But it is not confined to restricting *actual* illegal conduct, but speech *about* such conduct, something the First Amendment does not permit. *Free Speech Coalition*, 535 U.S. at 255 (argument that "protected speech may be banned as a means to ban unprotected speech . . . turns the First Amendment upside down").[6] Beyond that, the Act requires "mitigation" of speech about self-harm, eating disorders, substance abuse, suicidal behaviors, stalking, physical violence, and online bullying, none of which fall into any of the "relatively narrow and well-defined circumstances [where] government [may] bar public

---

[6] The State tries to equate these broad categories with speech integral to criminal activity, Appellant's Br. at 37–38, but is stymied by the statute's plain language. *See* H.B. 1126, § 6(1) (covering "harmful material and other content that promotes or facilitates the following harms"). *See United States v. Miselis*, 972 F.3d 518, 530, 535 (4th Cir. 2020) (verbs "encourage" and "promote" reached protected speech). Here, "if the state had intended to proscribe only speech 'integral to unlawful conduct,' it could have explicitly stated so." *CCIA*, 2024 WL 4051786, at *18.

dissemination of protected materials to [minors]." *Brown*, 564 U.S. at 794 (citation omitted).

Not to worry, the State responds, claiming H.B. 1126 does not actually ban any speech. Appellant's Br. at 36 (asserting the law "does not require any platform to prevent harm or to alter, block, or remove content" but "requires only 'commercially reasonable efforts' to adopt a harm-mitigation strategy").[7] This, however, is no defense. "It is of no moment that the statute does not impose a complete prohibition" on the categories of speech it targets for mitigation. "The distinction between laws burdening and laws banning speech is but a matter of degree." *Playboy,* 529 U.S. at 812. "The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Id.* For that reason, the Ninth Circuit recently upheld the preliminary injunction of a similar California law that required online platforms to assess their products, services, and features for potentially "harmful content" and to create "timed plans" to mitigate any exposure to minors.

---

[7] The State does not explain how the law will "mak[e] it harder for minors to participate in dangerous online platforms, [or] likelier that parents will oversee minors' online activities." Appellant's Br. at 39.

*Bonta*, 113 F.4th at 1121–22 ("[T]he DPIA report requirement falls well short of satisfying strict First Amendment scrutiny.").

Finally, the Act is underinclusive because it expressly exempts numerous categories of online digital services that include means of social interaction from its coverage. Its definition of covered services excludes news and entertainment websites commonly used by teenagers, such as Buzzfeed or Netflix. *See* Buzzfeed, Videos, https://perma.cc/6JHM-H2M4. Likewise, a minor would be permitted to open an account on a sports website and exchange social communications such as posts, comments, and direct messages unsupervised with other users there without age verification or parental consent, while the same child would be prohibited from engaging in precisely the same conduct on a social media platform like Snapchat or Facebook.

Such exclusions render the Act "wildly underinclusive when judged against its asserted justification, which … is alone enough to defeat it." *Brown*, 564 U.S. at 802. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id*. This flaw is a common feature of various state social media laws, which is another

24

reason these laws have been routinely enjoined.[8] Here, the district court reached the same conclusion and should be affirmed. *Fitch*, 2024 WL 3276409, at *14.

## II.   THE ACT'S VAGUE TERMS FAIL TO GIVE FAIR NOTICE OF WHAT SPEECH VIOLATES THE LAW

The district court correctly found that the coverage definition of H.B. 1126 is unconstitutionally vague, thus making the law "impermissibly vague in all of its applications." *Fitch*, 2024 WL 3276409, at *15. Although the district court confined its analysis to the central coverage definition, the same conclusion follows from the Act's substantive requirements as well.

Any law that fails to provide ordinary persons with fair notice of the proscribed conduct violates due process. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). Vagueness in a law that

---

[8] *See, e.g.*, *CCIA*, 2024 WL 4051786, at *15 ("A teenager can read Peter Singer advocate for physician-assisted suicide in *Practical Ethics* on Google Books but cannot watch his lectures on YouTube or potentially even review the same book on Goodreads."); *Reyes*, 2024 WL 4135626, at *15 ("[T]he Act appears underinclusive when judged against the State's interests in protecting minors from harms associated with social media use."); *Yost*, 2024 WL 555904, at *12 (law is "a breathtakingly blunt instrument for reducing social media's harm to children"); *Griffin*, 2024 WL 1262476, at *19 ("[A]t least some exempt platforms are ones that adult sexual predators commonly use to communicate with children," such as "interactive gaming websites and platforms.").

regulates expression "raise[s] special First Amendment concerns because of its obvious chilling effect on free speech," *Brown*, 564 U.S. at 807 (quoting *Reno*, 521 U.S. at 871–72), requiring a "more stringent" test, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (citation omitted); *see Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (citation omitted).

In this case, the district court correctly observed that H.B. 1126 does not provide guidance about crucial provisions. The Act's central coverage provision provides no guidance about how a company can determine what constitutes "socially interacting" behavior or what distinguishes it from other interactions among users on a website. *Fitch*, 2024 WL 3276409, at *15. Nor does it explain how a person may determine whether a digital service "primarily functions" to provide

access to news, sports, commerce, online video games, or content primarily generated or selected by the digital service provider. *Id*. Digital service providers are left to guess whether they are covered by or exempted from the Act's requirements. Worse, the vague terms of the Act fail to provide the authorities with standards to restrict their subjective whims when it comes to enforcement of the Act's civil and criminal penalties.

Although the district court found it unnecessary to go further, the same problem infects the Act's substantive requirement that digital service providers use "commercially reasonable efforts" to verify their users' ages and to "prevent or mitigate" minors' exposure to "harmful material." The Act lists fifteen content categories to be restricted, including such broad and opaque subject areas as "self harm," "eating disorders," "substance abuse disorders," "suicidal behaviors," "stalking," "bullying," "harassment," "grooming," or "any other illegal activity." None of these terms are defined in the Act.

Such provisions are vague "because both the verbs (promotes, glorifies, and facilitates) and the objects of those verbs (e.g., stalking, bullying, substance abuse, and grooming) are broad and undefined.

27

Especially when put together, the provisions are unconstitutionally vague." *CCIA*, 2024 WL 4051786, at *17. Such ambiguous mandates "will result in wide-ranging censorship of speech" because they require service providers "to guess which broad categories of speech, likely constituting billions of posts, must be filtered from view." *Id.*

The State claims the Act will not result in censorship because service providers need only do what is "commercially reasonable." Appellant's Br. 35–36. But this facile statement ignores how laws like this operate. Such vague restrictions on social media content "practically invite arbitrary application of the law," *Yost*, 2024 WL 555904, at *13 (cleaned up), and in practice it will mean the platforms must do what they imagine *the Attorney General believes* is "economically reasonable." But "the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Stevens*, 559 U.S. at 480.

For these reasons, this Court should affirm the District Court's order preliminarily enjoining enforcement of the Act.

## CONCLUSION

Mississippi's attempt to protect minors from social media is well-intentioned but fatally flawed. The idea that *some* types of social network

use by *some* minors under certain conditions can adversely affect *some* segment of this cohort is no basis for imposing state restrictions on *all* social network use by *all* minors—just as the State does not (and cannot) keep all books under lock and key because some may be inappropriate for some children.

Such overreach typifies how lawmakers historically have sought to regulate new media forms in the name of protecting the young. Whether dime novels or "penny dreadfuls" in the nineteenth century, moving pictures in the early twentieth century, comic books in the 1950s, or video games at the dawn of the twenty-first century, the response to these successive moral panics has been largely the same: legislatures pass vague and broadly worded speech restrictions that infringe basic First Amendment rights. *Brown*, 564 U.S. at 797–98. The principles forged in these cases cited throughout this brief constitute the core First Amendment rules that compel affirming the district court in this case.

Dated: October 3, 2024                    /s/ Robert Corn-Revere

                                          ROBERT CORN-REVERE*
                                          ARLEIGH P. HELFER
                                          FOUNDATION FOR INDIVIDUAL
                                            RIGHTS AND EXPRESSION
                                          700 Pennsylvania Ave. SE
                                          Suite 340
                                          Washington, DC 20003
                                          (215) 717-3473
                                          bob.corn-revere@thefire.org
                                          arleigh.helfer@thefire.org

                                          *Counsel of Record

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 3, 2024, an electronic copy of the Foundation for Individual Rights and Expression Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: October 3, 2024

/s/ Robert Corn-Revere
ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION

**Certificate of Compliance With Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 6,011 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook, and 12-point Century Schoolbook for footnotes.

Date: October 3, 2024

/s/ Robert Corn Revere
ROBERT CORN-REVERE
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION