NO. 24-60341

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NetChoice, L.L.C.,

PLAINTIFF -APPELLEE,

v.

Lynn Fitch, in her official capacity as Attorney General of Mississippi,

DEFENDANT-APPELLANT.

On Appeal from the United States District Court
for the Southern District of Mississippi
Case No. 1:24-CV-170-HSO-BWR
The Honorable Halil S. Ozerden

## BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, AMERICAN CIVIL LIBERTIES UNION, AND AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI IN SUPPORT OF PLAINTIFF - APPELLEE AND AFFIRMANCE

Vera Eidelman
AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
125 Broad St., 18 Fl.
New York, NY 10004
Email:
veidelman@aclu.org
Tel.: (212) 549-2500

Joshua Tom (Miss. Bar
No. 105392)
AMERICAN CIVIL
LIBERTIES UNION OF
MISSISSIPPI FOUNDATION
101 South Congress St.
Jackson, MS 39201
Email: JTom@aclums.org
Tel.: (601) 354-3408

David Greene
Molly Buckley
Aaron Mackey
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: davidg@eff.org
Tel.: (415) 436-9333
Fax: (415) 436-9993

*Counsel for Amici Curiae*

**SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES**

Pursuant to this Court's Rule 29.2, the undersigned counsel of record for *amici curiae* certifies that the following additional persons and entities have an interest in the outcome of this case:

1. Electronic Frontier Foundation, *amicus curiae*. *Amicus curiae* is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

2. American Civil Liberties Union, *amicus curiae*. *Amicus curiae* is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

3. American Civil Liberties Union of Mississippi, *amicus curiae*. *Amicus curiae* is a nonprofit organization recognized as tax exempt under Internal Revenue Code § 501(c)(3). It has no parent corporation and no publicly held corporation owns 10 percent or more of their stock.

4. David Greene, attorney for *amicus curiae*.

Dated: October 3, 2024      /s/ David Greene
                                David Greene

                                *Counsel for Amici Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ..........................i

TABLE OF CONTENTS ...........................................................................ii

TABLE OF AUTHORITIES.....................................................................iv

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................1

INTRODUCTION ...................................................................................2

ARGUMENT ..........................................................................................4

    I.      HB 1126 BLOCKS ADULTS AND MINORS FROM
           SPEAKING ON AND ACCESSING SOME OF THE
           MOST IMPORTANT DIGITAL FORUMS. .......................................4

           A.      Adults and Minors Rely on the Internet to Engage
                  in a Diverse Range of Protected Expression. ............................4

           B.      The Vast Majority of Online Content That Will Be
                  Age-Gated by HB 1126 Is Constitutionally Protected
                  as to Both Adults and Minors..................................................12

                  1.      HB 1126 Targets Constitutionally Protected
                          Speech. ........................................................................13

                  2.      The Law Restricts Minors' Access to
                          Constitutionally Protected Speech. ...............................14

    II.     HB 1126 IMPERMISSIBLY BURDENS ALL USERS'
           ABILITY TO EXPRESS THEMSELVES AND RECEIVE
           INFORMATION ONLINE.................................................................16

           A.      Online Age Verification Entirely Blocks Access
                  to Protected Speech for the Millions of Adults
                  Who Lack the Requisite Proof of Identification.......................17

                  1.      Millions of U.S. Adults Lack Adequate
                          Government-Issued ID. .................................................17

2.      Alternative Methods of Age Verification Will
        Also Block Adults' Access to Protected Online
        Speech. ........................................................................19

B.      Online Age Verification Chills Users From Accessing
        Protected Speech by Impermissibly Burdening the
        Right to Be Anonymous Online. ...............................................20

C.      Online Age Verification Further Chills Users From
        Accessing Protected Speech by Forcing Them to
        Put Their Most Sensitive Data at Risk of Inadvertent
        Disclosure, Breach, or Attack.....................................................23

D.      Pervasive Private Online Surveillance Exacerbates
        the Threat to Anonymity and Privacy. ......................................24

CONCLUSION .......................................................................................28

CERTIFICATE OF COMPLIANCE ......................................................30

CERTIFICATE OF SERVICE................................................................31

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Gonzales*,
  478 F. Supp. 2d 775 (E.D. Pa. 2007) ............................................................22, 23

*ACLU v. Johnson*,
  194 F.3d 1149 (10th Cir. 1999) ...........................................................................28

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008) ...................................................................2, 21, 23

*ACLU v. Reno*,
  31 F. Supp. 2d 473 (E.D. Pa. 1999) .......................................................................1

*ACLU v. Reno*,
  929 F. Supp. 824 (E.D. Pa. 1996) ..........................................................................1

*Am. Amusement Mach. Ass'n v. Kendrick*,
  244 F.3d 572 (7th Cir. 2001) ...........................................................................8, 15

*Am. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d Cir. 2003) .......................................................................17, 20, 28

*Bd. of Educ. v. Pico*,
  457 U.S. 853 (1982)................................................................................................5

*Brown v. Entertainment Merchs. Ass'n*,
  564 U.S. 786 (2011)......................................................................................*passim*

*Carey v. Population Servs. Int'l*,
  431 U.S. 678 (1977)..............................................................................................13

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
  2024 WL 4051786 (W.D. Tex. Aug. 30, 2024)......................................................4

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975)........................................................................................14, 15

*Free Speech Coalition v. Paxton*,
  95 F.4th 263 (5th Cir. 2024) ................................................................................16

*Free Speech Coalition v. Paxton*,
  144 S. Ct. 2714 (2024)..........................................................................................16

*In re Anonymous Online Speakers*,
  661 F.3d 1168 (9th Cir. 2011) .............................................................................21

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
   329 F.3d 954 (8th Cir. 2003) ................................................................. 13

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
   594 U.S. 180 (2021) .................................................................... 2, 15

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) ....................................................................... 21

*NetChoice, LLC v. Griffin*,
   2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ........................................ 4, 22, 27

*NetChoice, LLC v. Reyes*,
   2024 WL 4135626 (D. Utah Sept. 10, 2024) .................................................. 4, 27

*NetChoice, LLC v. Yost*,
    2024 WL 555904 (S.D. Ohio Feb. 12, 2024) ............................................... 4, 27

*Packingham v. North Carolina*,
   582 U.S. 98 (2017) .................................................................. 2, 5, 7, 8

*PSINet, Inc. v. Chapman*,
   167 F. Supp. 2d 878 (W.D. Va. 2001) ......................................................... 23

*PSINet, Inc. v. Chapman*,
   362 F.3d 227 (4th Cir. 2004) ........................................... 17, 22, 23, 28

*Reno v. ACLU*,
   521 U.S. 844 (1997) .................................................................... *passim*

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ...................................................................... 13, 14

*State v. Weidner*,
   235 Wis. 2d 306 (2000) ...................................................................... 22

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ........................................................................... 2

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) .......................................................................... 15

*Winters v. New York*,
   333 U.S. 507 (1948) .......................................................................... 13

**Statutes**

18 U.S.C. §§ 2721 *et seq.* ...................................................................... 23

Mississippi House Bill 1126 .......................................................... *passim*

## Other Authorities

Alina Selyukh & Tirzah Christopher, *Welcome to America! Now
Learn to Be in Debt*, NPR (May 24, 2023) .........................................................19

Amanda Lenhart, *Chapter 4: Social Media and Friendships*,
Pew Rsch. Ctr. (Aug. 6, 2015) ..................................................................8

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'*
BBC (Nov. 28, 2020) ..................................................................12

*Are YouTube Advertisers Inadvertently Harvesting Data From Millions of
Children?*, Adalytics (Aug. 2023) ..................................................................25

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror:
A Deep Dive Into the Technology of Corporate Surveillance*,
EFF (Dec. 2, 2019) ..................................................................24

Bennett Cyphers & Gennie Gebhart, *The Google+ Bug Is More About
The Cover-Up Than The Crime*, EFF (Oct. 11, 2018) .........................................25

Beth Israel Congregation, Facebook ..................................................................10

Brian E. Weeks et al., *Too Scared to Share? Fear of Social Sanctions
for Political Expression on Social Media*, 29 J. of Computer-Mediated
Commc'n (Jan. 2024) ..................................................................22

Brooke Auxier, *Social Media Continue to Be Important Political
Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020) .........................11

Carrie Back, *How Indigenous Creators Are Using TikTok to Share
Their Cultures*, Travel & Leisure (Oct. 21, 2022) ...............................................11

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*,
Pew Rsch. Ctr. (Sept. 17, 2024) ..................................................................6

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems
a Clear Net Benefit*, N.Y. Times (May 24, 2023) .............................................12

Common Sense & Hopelab, *A Double-Edged Sword: How
Diverse Communities of Young People Think About the Multifaceted
Relationship Between Social Media and Mental Health* (2024) .........................6

Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles*
(May 2015) ..................................................................19

*Digital Advertising in the United States – Statistics & Facts*,
Statista (June 18, 2024) ..................................................................25

Douglas A. Blackmon et al., *Birth of a Movement*,
Wall St. J. (Oct. 29, 2010) .................................................................6

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*,
N.Y. Times (Jul. 25, 2021) ...............................................................10

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media:
Key Findings From Pew Research Center Surveys*,
Pew Rsch. Ctr. (Apr. 24, 2023)...........................................................9

Erica Chen et al., *Online Social Networking and Mental Health
Among Older Adults: A Scoping Review*, Canadian J. on Aging
(2022)...............................................................................................12

First Baptist Jackson, YouTube..............................................................10

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing
the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022).....................11

Frank Landymore, *Twitter Caught Selling Data to Government Spies While
Complaining About Surveillance*, Byte (Mar. 28, 2024) .....................25

Gov. Tate Reeves (@TateReeves), Twitter...............................................7

J.L. Heinze, *Online Communities for Survivors: Websites and
Resources Offering Support and Health*, Nat'l Sexual Violence
Res. Ctr. (Mar. 1, 2022) .....................................................................11

Jackie Snow, *Why Age Verification Is So Difficult for Websites*,
Wall St. J. (Feb. 27, 2022) .................................................................20

Jason Kelley, *Thousands of Young People Told Us Why the Kids
Online Safety Act Will Be Harmful to Minors*, EFF (Mar. 15, 2024) ...................9

Jason Wise, *How Many Videos Are Uploaded to YouTube a Day in 2022?*
Earthweb (Nov. 22, 2022).....................................................................9

Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media
Use and Socioemotional Well-Being Through the Lens of the
COVID-19 Pandemic*, Perspect Psych Sci. (May 9, 2022)...................8

Jillian Andres Rothschild et al., *Who Lacks ID in America Today?
An Exploration of Voter ID Access, Barriers, and Knowledge*,
Univ. Md. Ctr. for Democracy & Civic Engagement (Jan. 2024)......................18

Jim Reed, *EE Data Breach 'Led to Stalking'*,
BBC (Feb. 7, 2019)............................................................................27

Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016) ...........................10

JVG, *Data Suggests People Using Pseudonyms Leave Better Comments*, Venture Beat (Jan. 15, 2012) ...............................................................21

Kai Ngu, *My Family Came to the U.S. to Start a New Life. An Obscure Credit Score Held Us Back*, Guardian (Feb. 17, 2023).......................19

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021) .................................................11

Kashmir Hill*, Facebook Is Giving Advertisers Access to Your Shadow Contact Information*, Gizmodo (Sept. 26, 2018) ..................................25

Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence From Access Inequalities and Restrictive Media Parenting in Rural America*, Soc. Sci. Comp. Rev. (Aug. 5, 2022).........................................12

Kim Ward, *Social Media to Improve Learning This Fall*, Mich. State. Univ. (June 23, 2020) ......................................................................8

Lee Brown, *Russian Hackers Post Nude Photos of US Cancer Patients to Dark Web in Sick Extortion Plot*, N.Y. Post (Mar. 8, 2023) ..........................27

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013)......................................................................21, 22

Maria Bada & Jason R.C. Nurse, *The Social and Psychological Impact of Cyber-Attacks* (2020)...........................................................27

Marsy's Law for Mississippi, Facebook ...................................................7

Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement (Mar. 2023).....................18

Michelle Faverio et al., *Online Religious Services Appeal to Many Americans, But Going in Person Remains More Popular*, Pew Rsch. Ctr. (Jun. 2, 2023) .............................................................10

Michelle Faverio, *Key Findings About Americans and Data Privacy*, Pew Rsch. Ctr. (Oct. 18, 2023) .............................................................27

Mississippi Muslim Ass'n, Facebook ...................................................10

Mississippi Republican Party, Facebook.................................................7

Nico Neumann et al., *Data Deserts and Black Boxes: The Impact of Socio-Economic Status on Consumer Profiling*, Mgmt. Sci. (Jan. 2024)............20

*Number of Internet and Social Media Users Worldwide as of July 2024*, Statista (Aug. 19, 2024) ......................................................................5

Paige Collings, *Debunking the Myth of "Anonymous" Data*, EFF (Nov. 10, 2023) ..............................................................25

Pastor Bartholomew Orr (@Pastor_Orr), Instagram..............................10

*Position Paper: Online Age Verification and Children's Rights*, European Digital Rights (Oct. 4, 2023) ...........................................20

Press Release, Identity Theft Res. Ctr., *ITRC 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High* (Jan. 25, 2024) ..................................26

Press Release, Identity Theft Res. Ctr., *ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023) ..................................................26

Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020) .......................................................8

Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect (May 2020).......................................6

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020) .................................10

Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers*, Carnegie Mellon CyLab (2011).............................................26

Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023) ...............................7

Sara Morrison, *This Outed Priest's Story Is a Warning for Everyone About the Need for Data Privacy Laws*, Vox (Jul. 21, 2021) ..........................27

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, Health Expectations (Feb. 2017) .............................................22

Sen. Roger Wicker (@SenatorWicker), Twitter .......................................7

Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024)...............................20

*The Robloxian Christians*, Exponential.................................................................11

Tracy Kitten, *Child Identity Fraud: A Web of Deception and Loss*, Javelin (Nov. 2, 2021)...........................................................................................27

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy (2018) .......................11

U.S. Census Bureau, CB24-62, *Quarterly Residential Vacancies and Homeownership, First Quarter 2024* 5 (Apr. 30, 2024).......................................19

United Nations, *E-Government Survey 2022: The Future of Digital Government* (2022) ................................................................................................7

*Unscoreable: Modern-Day Credit Scoring Leaves Latinos and Immigrants Out*, Unidos US (Mar. 19, 2019) .......................................................19

Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens*, Common Sense (2022) ...........................................................9

Will Evans, *Amazon's Dark Secret: It Has Failed to Protect Your Data*, Wired (Nov. 18, 2021) .....................................................................25

Worship Pastors of Mississippi, Facebook.............................................................10

## STATEMENT OF INTEREST OF *AMICI CURIAE* [1]

*Amici curiae* submit this brief to emphasize how the online age restriction at issue in this case will significantly and impermissibly burden the speech and privacy rights of all internet users, both adults and minors, to access constitutionally protected content.

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with more than 30,000 active donors that has worked for over 30 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for them both in courts and legislatures across the country. EFF has challenged laws that burden all internet users' rights by requiring online services to verify their users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824, 825 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno*, 31 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act).

The American Civil Liberties Union ("ACLU") is a nonprofit, nonpartisan membership organization devoted to protecting the civil rights and civil liberties of

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), *amici* certify that no person or entity, other than *amici curiae*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing of this brief.

all Americans, including the First Amendment rights to free speech, anonymity, and access to information online. The American Civil Liberties Union of Mississippi is a statewide nonprofit, nonpartisan organization with nearly 1,500 members dedicated to the principles of liberty and equality embodied in the U.S. Constitution and our nation's civil rights laws. A core mission of the ACLU of Mississippi is fighting to uphold the protections of the First Amendment for all Mississippians. The ACLU and ACLU of Mississippi have frequently appeared before courts to advocate for First Amendment rights online, *see, e.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus), and the free speech rights of young people, *see, e.g.*, *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel). The ACLU and ACLU of Mississippi have also litigated many of the seminal cases striking down laws that prohibited the communication of certain materials online without age verification. *See, e.g.*, *Reno*, 521 U.S. 844; *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999).

## INTRODUCTION

Mississippi House Bill 1126 is an extraordinary censorship law that violates all internet users' First Amendment rights to speak and to access protected speech on social media platforms. HB 1126 regulates social media services—providers of

an expressive medium that offers users the ability to create art, connect with loved ones, form political opinions, find community, and much more. The law requires such services to "verify the age" of any user—minor or adult—who wants to create an account. HB 1126 § 4(1). If the user is a minor, the service must additionally prohibit them from joining absent explicit parental consent. *Id.* § 4(2). HB 1126 also coerces social media services to monitor and censor their users' speech on a series of vague topics—the majority of which concern protected speech—that the statute deems harmful to minors. *Id.* § 6(1).

This law's mandatory online age-verification regime will force adults and minors alike to sacrifice anonymity, privacy, and security to engage in protected online expression. HB 1126 will block many adults from social media who lack the means to verify their ages, and it will do the same for any minor unable to show parental consent. In addition, the law's monitoring and censorship provisions will broadly inhibit protected speech for all users on a diverse range of topics.

HB 1126 thus frustrates everyone's First Amendment rights to speak and to access protected online speech. Because HB 1126 imposes a restriction on minors' and adults' ability to access lawful speech based on the content of social media services, the statute is subject to strict scrutiny. *See Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 799 (2011). Moreover, Section 6(1)'s requirement that platforms monitor and censor speech on particular topics, such as eating

disorders and substance abuse, is a classic content-based distinction that must be subjected to strict scrutiny. *Id*.

Mississippi has a legitimate interest in protecting children from harm, "but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id*. at 794. Time and time again, courts—including the Supreme Court—have struck down laws requiring parental consent for minors to access content that states have found objectionable. *Id*. Courts have also repeatedly struck down online age-verification mandates like those imposed by HB 1126 because they burden users' access to, and ability to engage with, protected speech. *See NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024); *NetChoice, LLC v. Yost*, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023). The same result is warranted here.

## ARGUMENT

### I.    HB 1126 BLOCKS ADULTS AND MINORS FROM SPEAKING ON AND ACCESSING SOME OF THE MOST IMPORTANT DIGITAL FORUMS.

#### A.    Adults and Minors Rely on the Internet to Engage in a Diverse Range of Protected Expression.

HB 1126 regulates social media services—websites, applications, and platforms that enable users to "socially interact with" and "create or post content

that can be viewed by other[s]." HB 1126 § 2. The internet plays a dominant role in the exercise of First Amendment rights today, and social media services are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). Internet users of all ages rely on online services, including social media, "to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno v. ACLU*, 521 U.S. 844, 870 (1997)).

This includes both speaking and listening. The "right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality). "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104.

Thanks to this staunch constitutional protection against government censorship, the internet has flourished into an important hub of diverse expressive activity. As of July 2024, there were roughly 5.45 billion people online, with 5.17 billion people using online social media platforms[2] for everything from political expression and dialoguing with elected representatives to learning new dances and

---

[2] *Number of Internet and Social Media Users Worldwide as of July 2024*, Statista (Aug. 19, 2024), https://www.statista.com/statistics/617136/digital-population-worldwide/.

finding community.

Billions of internet users routinely flock to online forums to express their political views or to get their news. Indeed, much of today's core political speech occurs on social media. For instance, 80 percent of Black young people, 69 percent of Latino young people, and 65 percent of white young people rely on social media to stay informed.[3] And 54 percent of American adults "at least sometimes" get their news from social media.[4]

Social media is also central to organizing, joining, and participating in social and political activities, from national campaigns like the Tea Party movement[5] to the #MeToo movement.[6] For Mississippi residents, it has served as a conduit for a range of state-level political participation, including organizing in support of a

---

[3] Common Sense & Hopelab, *A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* 17 (2024), https://www.commonsensemedia.org/sites/default/files/research/report/2024-double-edged-sword-hopelab-report_final-release-for-web-v2.pdf.

[4] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024), https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/.

[5] Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), http://on.wsj.com/2hZCWio.

[6] Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1, 4 (May 2020), https://pubmed.ncbi.nlm.nih.gov/32200194/.

state crime victims protection law[7] and connecting with the state's political

parties.[8]

Nearly half of American social media users say they have been politically

active on social media, whether by participating in a political group, encouraging

others to take action on a certain issue, looking up information about rallies or

protests, or posting pictures or using hashtags to show support for a cause.[9] And

the interactive nature of many online services also enables direct interactions with

elected officials. *Packingham*, 598 U.S. at 104–05.[10]

Minors' access to such information is essential to their growth into

productive members of adult society because it helps them develop their own

ideas, learn to express themselves, and engage productively with others in our

---

[7] *See* Marsy's Law for Mississippi, Facebook,
https://www.facebook.com/MarsysLawforMS/.
[8] *See, e.g.*, Mississippi Republican Party, Facebook,
https://www.facebook.com/msgop/.
[9] Samuel Bestvater et al., *Americans' Views of and Experiences With Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023),
https://www.pewresearch.org/internet/2023/06/29/americans-views-of-and-experiences-with-activism-on-social-media/.
[10] *See, e.g.*, Gov. Tate Reeves (@TateReeves), Twitter, https://x.com/tatereeves (over 76,500 followers); Sen. Roger Wicker (@SenatorWicker), Twitter,
https://x.com/senatorwicker (over 115,400 followers); *see also* United Nations, *E-Government Survey 2022: The Future of Digital Government* 106 (2022),
https://publicadministration.un.org/egovkb/en-us/Reports/UN-E-Government-Survey-2022.

democratic public sphere.[11] "[I]t is obvious that [minors] must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise," *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J), and social media is a key venue for just that.

As the Supreme Court recognized, internet users of all ages rely on social media forums for other important reasons too, including to share photos with their family and friends, to look for work, to advertise that they are hiring, and to learn new things. *See Packingham*, 582 U.S. at 104.[12]

The internet is also a prime forum for artistic creation. In one study, 71 percent of teens reported that what they see on social media makes them feel "like

---

[11] *See* Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://www.pbs.org/newshour/classroom/classroom-voices/student-voices/2020/11/student-voice-how-young-people-use-social-media-to-engage-civically; Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic* 662, Perspect Psych Sci. (May 9, 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9081105/ ("social media provides readily-accessible tools for teens to share developing thoughts and experiment with new social identities, particularly without access to traditional methods").

[12] *See, e.g.*, Kim Ward, *Social Media to Improve Learning This Fall*, Mich. State. Univ. (June 23, 2020), https://msutoday.msu.edu/news/2020/how-teachers-can-use-social-media-to-improve-learning-this-fall; Amanda Lenhart, *Chapter 4: Social Media and Friendships*, Pew Rsch. Ctr. (Aug. 6, 2015), https://www.pewresearch.org/internet/2015/08/06/chapter-4-social-media-and-friendships/ ("68% [of teens] have received support on social media during challenges or tough times.").

they have a place where they can show their creative side."[13] And thanks to

abundant new online resources,[14] children no longer need to enroll in expensive art

classes or work with private tutors to practice artistic skills; they can create and

share for free on social media. "In any given day, about one in 10 tweens and teens

will use their digital devices to create some type of art or music."[15] In addition,

minors and young adults report that the internet helps them learn about art and

music history, and affords them opportunities to distribute their creative works.[16]

Many people also take to social media to share religious beliefs, connect

with others of the same faith, or explore their religious identity. Seventeen percent

of U.S. adults say they post about religion on social media, and 42 percent say they

---

[13] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings From Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/.

[14] *See* Jason Wise, *How Many Videos Are Uploaded to YouTube a Day in 2022?* Earthweb (Nov. 22, 2022), https://earthweb.com/how-many-videos-are-uploaded-to-youtube-a-day/.

[15] Victoria Rideout et al., *The Common Sense Census: Media Use by Tweens and Teens* 41, Common Sense (2022), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

[16] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minors*, EFF (Mar. 15, 2024), https://www.eff.org/deeplinks/2024/03/thousands-young-people-told-us-why-kids-online-safety-act-will-be-harmful-minors#art.

have seen someone else's prayer request online.[17] Places of worship use social

media to share information about upcoming events, livestream services, and foster

community, and the COVID-19 pandemic made these digital connections more

necessary and popular than ever.[18] Social media is also a vital source of religious

and spiritual community and information for young people.[19] One young person

even created an online church, "The Robloxian Christians," in 2011 as a place for

kids on the Roblox gaming platform to pray for one another and talk about their

faith.[20] Over the following decade, it expanded into a "youth-led virtual church

---

[17] Michelle Faverio et al., *Online Religious Services Appeal to Many Americans, But Going in Person Remains More Popular*, Pew Rsch. Ctr. (Jun. 2, 2023), https://www.pewresearch.org/religion/2023/06/02/online-religious-services-appeal-to-many-americans-but-going-in-person-remains-more-popular/.

[18] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://www.vox.com/recode/2020/9/18/21443661/religion-logging-off-online-engagement-content-creators; *see also, e.g.*, Worship Pastors of Mississippi, Facebook, https://www.facebook.com/groups/419898995442548/; First Baptist Jackson, YouTube, https://www.youtube.com/channel/UC8FVnjITUTy8lV8iLYxxXGw; Pastor Bartholomew Orr (@Pastor_Orr), Instagram, https://www.instagram.com/pastor_orr/; Beth Israel Congregation, Facebook, https://www.facebook.com/bethisraelms/ (streaming weekly Shabbat services on Facebook and YouTube); Mississippi Muslim Ass'n, Facebook, https://www.facebook.com/MIssissippiMuslimAssociation/.

[19] *See* Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (Jul. 25, 2021), https://www.nytimes.com/2021/07/25/us/facebook-church.html.

[20] Joely Johnson Mork, *Teen's Online Church Draws Young People From Around the World*, Faith & Leadership (Aug. 23, 2016), https://faithandleadership.com/teens-online-church-draws-young-people-around-the-world.

ministry serving upwards of 40,000 young people from over 85 countries."[21]

Finally, social media enables individuals whose voices would otherwise not be heard to make vital and even lifesaving connections with one another, and to share their unique perspectives more widely.[22] For example, people with disabilities have used social media to build community, reduce isolation and stigma, and educate others.[23] Survivors of abuse, especially women and children who have survived domestic violence, rely on the accessibility and anonymity of online communities to seek advice and resources to help them cope.[24] Social media

---

[21] *The Robloxian Christians*, Exponential, https://exponential.org/the-robloxian-christians.

[22] *See, e.g.*, Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://www.pewresearch.org/short-reads/2020/12/11/social-media-continue-to-be-important-political-outlets-for-black-americans; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://www.travelandleisure.com/culture-design/how-indigenous-creators-use-tiktok-to-share-their-cultures.

[23] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://www.teenvogue.com/story/chronic-illness-influencers-on-tiktok-are-showing-the-reality-of-being-sick; Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation.

[24] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44, 44–45 (2018), https://www.crimejusticejournal.com/article/view/893; *see also, e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr. (Mar. 1, 2022), https://www.nsvrc.org/blogs/online-communities-survivors-websites-and-resources-offering-support-and-help1.

use has also been shown to reduce loneliness, social isolation, and depression in rural and elderly populations, both of whom face limited mobility and decreased ability to socialize in person.[25] And many young LGBTQ+ people who face discrimination and judgment offline turn to social media for community, exploration, and support.[26]

**B.    The Vast Majority of Online Content That Will Be Age-Gated by HB 1126 Is Constitutionally Protected as to Both Adults and Minors.**

Minors and adults alike enjoy the First Amendment right to access and engage in protected speech online. No legal authority permits lawmakers to burden adults' access to political, religious, educational, and artistic speech with restrictive age-verification regimes out of a concern for what minors might see. Nor is there any legal authority that permits lawmakers to block minors categorically from engaging in protected expression on general purpose internet sites like those

---

[25] Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence From Access Inequalities and Restrictive Media Parenting in Rural America*, Soc. Sci. Comp. Rev. (Aug. 5, 2022), https://journals.sagepub.com/doi/full/10.1177/08944393221117466; Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, Canadian J. on Aging 26, 26-27 (2022), https://psycnet.apa.org/record/2022-43114-005.
[26] *See* Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://www.nytimes.com/2023/05/24/upshot/social-media-lgbtq-benefits.html; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'* BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

regulated by HB 1126.

### 1.    HB 1126 Targets Constitutionally Protected Speech.

The speech that HB 1126 targets is overwhelmingly, if not wholly, protected

speech. As the foregoing examples demonstrate, there is an abundance of socially

valuable speech on social media and the internet more broadly. But online speech

and access to it is protected even if its social value is not obvious.

Even speech which may be considered harmful, indecent, or offensive to

some nonetheless remains constitutionally protected as to adults. This is because

"speech cannot be restricted simply because it is upsetting or arouses contempt."

*Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *see Carey v. Population Servs. Int'l*,

431 U.S. 678, 701 (1977); *Reno*, 521 U.S. at 874. Thus, regardless of whether this

Court believes speech on social media "adds anything of value to society," it is "as

much entitled to the protection of free speech as the best of literature." *Interactive*

*Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 958 (8th Cir. 2003) (quoting

*Winters v. New York*, 333 U.S. 507, 510 (1948)); *see also Brown*, 564 U.S. at 790

(noting that First Amendment principles apply to new forms of communication

regardless of their esthetic and moral value).

This holds true for the topics specifically singled out by Section 6 of HB

1126: "harmful material and other content that promotes, glorifies or facilitates" a

list of enumerated harms, from self-harm to substance abuse to any other illegal

activity. Despite the legislatures' goal in preventing such harms, the means are ill-advised and unconstitutional. Section 6 will broadly censor speech about the enumerated harms, including online mental health resources and communities that many children turn to for support. Services may censor reporting about school shootings, war, climate change, and teen suicide. And services might silence minors' own political or religious speech, or even posts about deaths in their families, rejections from colleges, or breakups.

The First Amendment prohibits lawmakers from banning speech that causes deep anguish or severe emotional distress based on "the content and viewpoint of the message conveyed[.]" *Snyder*, 562 U.S. at 457; *see also Reno*, 521 U.S. at 868 (noting that a statute regulating minors' access to "indecent" and "patently offensive" material on the Internet was "a content-based blanket restriction[] on speech").

## 2. The Law Restricts Minors' Access to Constitutionally Protected Speech.

HB 1126 broadly restricts minors' access to all speech that appears on social media and denies them the ability to speak. But bedrock First Amendment principles apply "[e]ven where the protection of children is the object." *Brown*, 564 U.S. at 804–05 (invalidating regulation of violent video games for minors); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975) (invalidating restriction on drive-in movies designed to protect children from nudity); *Reno*, 521

U.S. at 874 (invalidating statute prohibiting indecent communications available to minors online). And they apply not only to what children can hear, but also to what they can say. *See Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 594 U.S. 180, 187 (2021).

The fact that a speaker is young is reason not for the diminution of their rights, but "for scrupulous protection of [their] Constitutional freedoms . . . , if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Even when children are involved, "we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization." *Id.* at 641. Indeed, this serves important democratic ends. "To shield children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Kendrick*, 244 F.3d at 577.[27]

---

[27] While minors' First Amendment rights are not completely co-extensive with those of adults, the narrow exception for sexual material that is harmful to minors does not apply to HB 1126, which is in no way limited to such content. *Erznoznik*, 422 U.S. at 212–13. There is no diminished constitutional protection to minors' right to access any other speech, be it violent or offensive. *See Brown*, 564 U.S. at 793–95.

## II.    HB 1126 IMPERMISSIBLY BURDENS ALL USERS' ABILITY TO EXPRESS THEMSELVES AND RECEIVE INFORMATION ONLINE.

If allowed to go into effect, Mississippi's HB 1126 will require every person—including every adult—to verify their age before they can access their existing social media accounts or create new ones. *See* HB 1126 § 4(1). If a user fails to show that they are 18 or older, HB 1126 will additionally require them to obtain explicit parental consent to use social media. *Id.* § 4(2). Because HB 1126 blocks all users from speaking and accessing speech on social media services, the law imposes content-based restrictions that are subject to strict scrutiny.[28] As Plaintiff-Appellee NetChoice shows, the statute cannot survive strict scrutiny.

Besides imposing content-based restrictions, HB 1126's age-verification mandate also burdens the First Amendment rights of all users to access lawful content. The age-verification provision robs people of anonymity, discourages access by privacy- and security-minded users, and blocks some individuals entirely from online access to content that remains fully protected by the First Amendment.

---

[28] This Court's decision in *Free Speech Coalition v. Paxton*, currently under review by the Supreme Court, is not to the contrary. 95 F.4th 263 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024) (mem.). HB 1126 targets social media services, a far broader universe of speech than the "distribution to minors of materials obscene for minors" that this Court took to be the focus of the Texas law in *FSC. Id.* at 269. As this Court noted, *Ginsberg* set out a lower standard only for sexual material; it does not govern minors' access to violent content, much less the political, artistic, and educational content at issue here. *See id.* at 267 (citing *Brown*, 564 U.S. at 793–94). Accordingly, the rational basis review applied in *FSC* cannot apply here.

**A. Online Age Verification Entirely Blocks Access to Protected Speech for the Millions of Adults Who Lack the Requisite Proof of Identification.**

HB 1126 requires online services to make "commercially reasonable efforts" to verify users' ages, *see* HB 1126 § 4(1), but provides no further guidance on the mechanisms services must use. Whether services require verification via government-issued ID or other means, the result will be the same: it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of identification, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004), and will "discourage" even those users who have the requisite identification "from accessing" all services that require it. *Reno*, 521 U.S. at 856; *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-verification requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). By enacting an age-verification scheme to identify minors, Mississippi thus burdens all users' First Amendment right to receive online speech.

**1. Millions of U.S. Adults Lack Adequate Government-Issued ID.**

About 15 million adult U.S. citizens do not have a driver's license, while about 2.6 million do not have any form of government-issued photo ID.[29]

---

[29] Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2, Univ. Md. Ctr. for

Estimates show another 21 million adult U.S. citizens do not have a *non-expired* driver's license, and over 34.5 million adult citizens have neither a driver's license nor a state ID card with their current name or address.[30]

Certain demographics are disproportionately burdened when government-issued ID is used in age verification. Black Americans and Hispanic Americans are disproportionately less likely to have current and up-to-date driver's licenses. And 18 percent of Black American adults do not have a driver's license at all.[31] Young adults are also less likely to have the requisite ID: 41 percent of U.S. citizens between 18 and 24 do not have an up-to-date driver's license. The same is true for 38 percent of citizens between the ages of 25 and 29.[32] Americans with disabilities and Americans with lower annual incomes are also less likely to have a current driver's license.[33]

---

Democracy & Civic Engagement (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf.

[30] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* 3, 5, Univ. Md. Ctr. for Democracy & Civic Engagement (Mar. 2023), https://www.voteriders.org/wp-content/uploads/2023/04/CDCE_VoteRiders_ANES2020Report_Spring2023.pdf ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

[31] Rothschild, *supra* note 29, at 3.

[32] *Id*.

[33] *Id*. at 3–4.

## 2.    Alternative Methods of Age Verification Will Also Block Adults' Access to Protected Online Speech.

Non-ID-based methods also exclude many internet users.

Age verification based on public or private transactional data will exclude many adults. For example, a service relying on mortgage documents would exclude the nearly 35 percent of Americans who do not own a home.[34] Should credit data be used, 26 million Americans—including over 80 percent of 18- and 19-year-olds—are "credit invisible," meaning they do not have a credit record for age-verifying vendors to check.[35] Foreign-born residents also usually arrive in this country as "credit invisible," and face additional challenges obtaining credit "however exceptional their financial history might have been back home."[36]

Online services may also look to data brokers and commercial verification

---

[34] *See* U.S. Census Bureau, CB24-62, *Quarterly Residential Vacancies and Homeownership, First Quarter 2024* 5 (Apr. 30, 2024), https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

[35] Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* 12 (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf; *see also Unscoreable: Modern-Day Credit Scoring Leaves Latinos and Immigrants Out*, Unidos US (Mar. 19, 2019), https://unidosus.org/blog/2019/03/19/credit-scoring/.

[36] Alina Selyukh & Tirzah Christopher, *Welcome to America! Now Learn to Be in Debt*, NPR (May 24, 2023), https://www.npr.org/2023/05/24/1175798797/immigrants-credit-score-credit-card-debt; Kai Ngu, *My Family Came to the U.S. to Start a New Life. An Obscure Credit Score Held Us Back*, Guardian (Feb. 17, 2023), https://www.theguardian.com/money/commentisfree/2023/feb/17/fico-credit-scores-immigrants-expansion.

services that purchase and collect massive amounts of private data.[37] But these

entities often hold inaccurate or outdated information, resulting in errors that could

mistakenly block adults from accessing social media.[38]

### B. Online Age Verification Chills Users From Accessing Protected Speech by Impermissibly Burdening the Right to Be Anonymous Online.

Even if it were possible for users' ages to be reliably and non-intrusively

verified, HB 1126 would still impermissibly deter all users from accessing lawful

content by undermining anonymous internet browsing and anonymous speech. *See*

*Am. Booksellers Found.*, 342 F.3d at 99 (age-verification schemes "require that

website visitors forgo the anonymity otherwise available on the internet"). With 86

percent of internet users reporting that they have taken steps online to minimize

their digital footprints (and 55 percent even to "avoid observation by specific

---

[37] *See Position Paper: Online Age Verification and Children's Rights* 16-17, European Digital Rights (Oct. 4, 2023), https://edri.org/wp-content/uploads/2023/10/Online-age-verification-and-childrens-rights-EDRi-position-paper.pdf; Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J. (Feb. 27, 2022), https://www.wsj.com/articles/why-age-verification-is-difficult-for-websites-11645829728.

[38] Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024), https://therecord.media/junk-inferences-data-brokers; *see also* Nico Neumann et al., *Data Deserts and Black Boxes: The Impact of Socio-Economic Status on Consumer Profiling*, Mgmt. Sci. (Jan. 2024), https://pubsonline.informs.org/doi/abs/10.1287/mnsc.2023.4979?j (consumers "with higher incomes or living in affluent areas" are more likely to be profiled accurately by data brokers).

people, organizations, or the government"), the chilling effect that Mississippi's age-verification mandate will have on anonymous online speech cannot be overstated.[39]

Anonymity is a respected, historic tradition that is "an aspect of the freedom of speech protected by the First Amendment"—no matter whether its use is "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).[40]

A person who submits identifying information online can never be sure whether it will be retained, or how it might be used or disclosed, undermining anonymity well into the future. *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (age verification schemes force users to "relinquish their anonymity to access protected speech, and . . . create a potentially permanent record" of the sites

---

[39] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://www.pewresearch.org/internet/2013/09/05/anonymity-privacy-and-security-online/.

[40] *See* JVG, *Data Suggests People Using Pseudonyms Leave Better Comments*, Venture Beat (Jan. 15, 2012), https://venturebeat.com/social/pseudonyms-vs-real-names/.

users choose to visit); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at \*17 (same). Not surprisingly, without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236; *see also Reno*, 521 U.S. at 856. That chilling effect only underscores the impermissible burden on anonymity that Mississippi's statute imposes on its residents.

By forcibly tying internet users' online interactions to their real-world identities, HB 1126 will chill their ability to engage in dissent, discuss "sensitive, personal, controversial, or stigmatized content," or seek help from online support communities.[41] *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also State v. Weidner*, 235 Wis. 2d 306, 320 (2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity"). For example, people might not visit or post on a social media website with a particular political valence,[42] or one that concerns sensitive topics, out of fear that they will be definitively linked to the service by real-world acquaintances, employers, stalkers, or law enforcement.[43]

---

[41] *See, e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, Health Expectations (Feb. 2017), https://pubmed.ncbi.nlm.nih.gov/26725547/.

[42] *See* Brian E. Weeks et al., *Too Scared to Share? Fear of Social Sanctions for Political Expression on Social Media*, 29 J. of Computer-Mediated Commc'n 1 (Jan. 2024), https://academic.oup.com/jcmc/article/29/1/zmad041/7394121.

[43] *See* Rainie, *supra* note 39, at "Part 3: Who Internet Users Are Trying to Avoid."

**C.    Online Age Verification Further Chills Users From Accessing Protected Speech by Forcing Them to Put Their Most Sensitive Data at Risk of Inadvertent Disclosure, Breach, or Attack.**

Even when users are comfortable with foregoing their anonymity, legitimate privacy and security concerns will deter their exercise of First Amendment rights. "Requiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *Gonzales*, 478 F. Supp. 2d at 806; *see also Mukasey,* 534 F.3d at 197; *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

The personal data that HB 1126 requires platforms to collect or purchase is extremely sensitive and often immutable.[44] Whereas usernames, passwords, and even credit card information can easily be changed in the event of identity theft or data breach, users' biometric information and any personal information contained in a government-issued ID (such as date of birth, name, and home address) are much more permanent. Thus the same issues motivating the anonymity concerns described above apply equally to data privacy and security concerns.

---

[44] *See, e.g.*, Driver Privacy Protection Act, 18 U.S.C. §§ 2721 *et seq.*

**D.    Pervasive Private Online Surveillance Exacerbates the Threat to Anonymity and Privacy.**

Although Mississippi enacted HB 1126 to protect children, the law's online age-verification regime will make children and adults less safe given the realities of the online advertising industry and data insecurity.

All online data, including the sensitive personal data platforms are required to collect from all users under HB 1126, is transmitted through a host of intermediaries. This means that when a user shares identifying information with a website to verify their age, that site transmits that data not only to its third-party age-verification vendor, but also to a series of additional intermediary parties.[45] Moreover, almost all websites and services host a network of dozens of private, third-party trackers managed by data brokers, advertisers, and other companies that are constantly collecting data about a user's browsing activity.[46]

Many of these actors are not under any duty to treat such data with care. Under the plain language of HB 1126, those intermediaries are *not* required to delete users' identifying data and, unlike the online service providers themselves, they are also not restricted from sharing, disclosing, or selling that sensitive data. *See* HB 1126 § 5(2)(c). Indeed, the incentives are the opposite: to share the data

---

[45] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, EFF (Dec. 2, 2019), https://www.eff.org/wp/behind-the-one-way-mirror.
[46] *Id.*

widely. Because personal information collected online sells for astonishing

profits,[47] online actors are incentivized to collect as much data as possible,

including for use in targeted behavioral advertisements.[48]

HB 1126 also creates a new threat to minors and adults because, once

information is collected, it is likely to be disclosed more broadly. Internet users

reasonably expect that any personal information HB 1126 requires them to submit

to a platform will not remain secret, even if the company has good intentions.[49]

Indeed, such disclosures may be unintentional, but they are no less harmful—

particularly where children are involved.[50]

---

[47] *See Digital Advertising in the United States – Statistics & Facts*, Statista (June 18, 2024), https://www.statista.com/topics/1176/online-advertising/#topicOverview (the U.S. digital advertising market boasted "a revenue of over 270 billion dollars in 2023").

[48] *See* Paige Collings, *Debunking the Myth of "Anonymous" Data*, EFF (Nov. 10, 2023), https://www.eff.org/deeplinks/2023/11/debunking-myth-anonymous-data.

[49] *See, e.g.*, Frank Landymore, *Twitter Caught Selling Data to Government Spies While Complaining About Surveillance*, Byte (Mar. 28, 2024), https://futurism.com/the-byte/twitter-selling-data-government; Will Evans, *Amazon's Dark Secret: It Has Failed to Protect Your Data*, Wired (Nov. 18, 2021), https://www.wired.com/story/amazon-failed-to-protect-your-data-investigation/; Kashmir Hill*, Facebook Is Giving Advertisers Access to Your Shadow Contact Information*, Gizmodo (Sept. 26, 2018), https://gizmodo.com/facebook-is-giving-advertisers-access-to-your-shadow-co-1828476051; Bennett Cyphers & Gennie Gebhart, *The Google+ Bug Is More About The Cover-Up Than The Crime*, EFF (Oct. 11, 2018), https://www.eff.org/deeplinks/2018/10/google-bug-more-about-cover-crime.

[50] *See, e.g.*, *Are YouTube Advertisers Inadvertently Harvesting Data From Millions of Children?*, Adalytics (Aug. 2023), https://adalytics.io/blog/are-youtube-ads-coppa-compliant ("The viewers of 'made for kids' YouTube videos appear to be

Today, data breaches are an endemic and ever-increasing part of life. A record 3,205 data breaches occurred in 2023, up 78 percent from the year prior, and far exceeding the previous record of 1,860 breaches in 2021.[51] Over 350 million people—more than the entire population of the United States—have been affected by these breaches, and 69 percent of general consumers have been victims of an identity crime more than once.[52]

Unfortunately, children are not immune from this threat. To the contrary, they are even more attractive targets for identity theft due to their "uniquely valuable" unused Social Security numbers.[53] A 2021 study found that one in 50 U.S. children were victims of identity fraud, and one in 45 children had personal

---

clicking on ads, and brands' websites . . . are harvesting and sharing meta-data on those viewers with dozens of data brokers upon click through.").

[51] Press Release, Identity Theft Res. Ctr., *ITRC 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High* (Jan. 25, 2024), https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high.

[52] *Id.*; *see also* Press Release, Identity Theft Res. Ctr., *ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023), https://www.idtheftcenter.org/post/2023-consumer-impact-report-record-high-number-itrc-victims-suicidal-thoughts/.

[53] Richard Power, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* 3, Carnegie Mellon CyLab (2011), https://www.cylab.cmu.edu/_files/pdfs/reports/2011/child-identity-theft.pdf ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

information exposed in a data breach.[54]

Once their sensitive personal data gets into the wrong hands, data breach

victims are vulnerable to targeted attacks both online and off.[55] These dangers are

serious and legitimate, and users are right to fear them.[56]

\* \* \*

Given the significant First Amendment burdens age-verification regimes

impose on internet users, courts have consistently struck them down, including

those that apply specifically to social media services. *See NetChoice, LLC v. Reyes*,

2024 WL 4135626 (age verification for social media); *NetChoice, LLC v. Yost*,

2024 WL 555904 (same); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (same).

---

[54] Tracy Kitten, *Child Identity Fraud: A Web of Deception and Loss* 5, Javelin (Nov. 2, 2021), https://www.javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss.

[55] *See, e.g.*, Jim Reed, *EE Data Breach 'Led to Stalking'*, BBC (Feb. 7, 2019), https://www.bbc.com/news/technology-46896329; Lee Brown, *Russian Hackers Post Nude Photos of US Cancer Patients to Dark Web in Sick Extortion Plot*, N.Y. Post (Mar. 8, 2023), https://nypost.com/2023/03/08/russian-hackers-post-nude-photos-of-us-cancer-patients-to-dark-web/; Sara Morrison, *This Outed Priest's Story Is a Warning for Everyone About the Need for Data Privacy Laws*, Vox (Jul. 21, 2021), https://www.vox.com/recode/22587248/grindr-app-location-data-outed-priest-jeffrey-burrill-pillar-data-harvesting.

[56] *See* Michelle Faverio, *Key Findings About Americans and Data Privacy*, Pew Rsch. Ctr. (Oct. 18, 2023), https://www.pewresearch.org/short-reads/2023/10/18/key-findings-about-americans-and-data-privacy/ (76% of U.S. adults have "very little or no trust at all" that leaders of social media companies will not sell their personal data to others without their consent); Maria Bada & Jason R.C. Nurse, *The Social and Psychological Impact of Cyber-Attacks* (2020), https://arxiv.org/ftp/arxiv/papers/1909/1909.13256.pdf.

*See also Am. Booksellers Found.*, 342 F.3d at 99-102 (age verification for indecent content); *PSInet v. Chapman*, 362 F.3d at 229, 233-34; *ACLU v. Johnson*, 194 F.3d 1149, 1152, 1155-58 (10th Cir. 1999). This Court should follow suit and enjoin HB 1126.

## CONCLUSION

For the reasons stated above, this Court should affirm the lower court's decision.

Dated: October 3, 2024        Respectfully submitted,

/s/ David Greene
David Greene
Molly Buckley
Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: davidg@eff.org
Tel.: (415) 436-9333
Fax: (415) 436-9993

Joshua Tom (Miss. Bar No. 105392)
AMERICAN CIVIL LIBERTIES UNION OF
MISSISSIPPI FOUNDATION
101 South Congress Street
Jackson, MS 39201
JTom@aclu-ms.org
(601) 354-3408

Vera Eidelman
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18 Fl.
New York, NY 10004

veidelman@aclu.org
(212) 549-2500

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.      This Brief of *Amicus Curiae* the Electronic Frontier Foundation American Civil Liberties Union, and American Civil Liberties Union of Mississippi in Support of Plaintiff-Appellee and Affirmance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,493 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated October 3, 2024                        /s/ David Greene
                                                              David Greene

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on October 3, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 3, 2024                    /s/ David Greene
                                          David Greene