IN THE

# United States Court of Appeals for the Fifth Circuit

---

NETCHOICE, LLC

*Plaintiff-Appellee*,

v.

LYNN FITCH, in her Official Capacity as Attorney General of Mississippi,

*Defendant-Appellant*,

---

On Appeal from the United States District Court for the Southern District of Mississippi,
No. 1:24-CV-170-HSO-BWR
Hon. Halil S. Ozerden

---

## BRIEF OF CHAMBER OF PROGRESS, THE COALITION FOR RESPONSIBLE HOME EDUCATION, LGBT TECH, AND THE WOODHULL FREEDOM FOUNDATION AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE

---

Kerry Maeve Sheehan
Legal Advocacy Counsel
CHAMBER OF PROGRESS
1390 Chain Bridge Road #A108
McLean, VA 22101

Carlos Gutierrez
Deputy Director & General Counsel
LGBT TECH
123 W. Frederick Street, #214
Staunton, VA 24401

Lawrence Walters
WALTERS LAW GROUP
195 W. Pine Avenue
Longwood, FL 32750

Mark W. Brennan
Sean Marotta
J. Ryan Thompson
Thomas B. Veitch
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

*Counsel for Amici Curiae*

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. *Amici curiae on this brief*: Chamber of Progress, the Coalition for Responsible Home Education, LGBT Tech, and the Woodhull Freedom Foundation.

2. *Counsel for amici curiae on this brief*:

**Hogan Lovells US LLP**: Sean Marotta,

<u>/s/ Sean Marotta</u>
Sean Marotta

October 7, 2024

## TABLE OF CONTENTS

Page

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES................................i

TABLE OF AUTHORITIES ................................................................iv

INTEREST OF AMICI CURIAE .........................................................1

SUMMARY OF ARGUMENT ..............................................................4

ARGUMENT ...................................................................................7

I.    SOCIAL MEDIA PLATFORMS FACILITATE A BUSTLING
      MARKETPLACE OF IDEAS THAT IS INTEGRAL TO MODERN
      DEMOCRACY AND A CRITICAL RESOURCE FOR YOUNG
      PEOPLE................................................................................7

      A. ACCESS TO SOCIAL MEDIA IS FUNDAMENTAL TO FIRST
      AMENDMENT LIBERTIES. ......................................................7

      B. MINORS DO NOT SHED THEIR FIRST AMENDMENT
      RIGHTS AT THE GATEWAY TO THE INTERNET. ......................8

      C. YOUNG PEOPLE, ESPECIALLY MARGINALIZED YOUTH,
      BENEFIT SUBSTANTIALLY FROM ACCESS TO SOCIAL MEDIA. ...12

II.   AFFIRMING HB 1126 WILL HARM ADULTS AND THE VERY
      SAME YOUNG PEOPLE THAT THE STATE OF MISSISSIPPI AIMS
      TO PROTECT.........................................................................15

      A. HB 1126'S AGE-VERIFICATION REQUIREMENTS ARE
      PRIVACY-INVASIVE, UNCONSTITUTIONAL, AND HARMFUL
      TO VULNERABLE INDIVIDUALS AND GROUPS. .......................16

          1. AGE VERIFICATION AND ESTIMATION
          FUNDAMENTALLY COMPROMISE THE PRIVACY OF ALL
          USERS OF DIGITAL SERVICES................................................16

          2. THIS INTRUSION ON PRIVACY CAN LEAD TO SERIOUS
          HARM TO CHILDREN AND VULNERABLE INDIVIDUALS
          OF ANY AGE. ....................................................................17

B. HB 1126'S PARENTAL CONSENT REQUIREMENTS ARE UNCONSTITUTIONAL AND HARMFUL TO VULNERABLE MINORS. ........................................................................ 19

III. UPHOLDING HB 1126 WOULD CHILL PARTICIPATION IN THE ONLINE MARKETPLACE OF IDEAS AND DISPROPORTIONATELY HARM MARGINALIZED YOUTH. .......................... 22

A. HB 1126'S AGE-VERIFICATION REQUIREMENTS WILL CHILL PARTICIPATION ON SOCIAL MEDIA AND OTHER COVERED PLATFORMS. ................................................................ 22

B. H.B. 1126 SECTION 6(1)'S VAGUE CONTENT-MODERATION PROVISIONS WILL ENCOURAGE OVER-CENSORSHIP AND DISPROPORTIONATELY HARM MARGINALIZED AND VULNERABLE YOUTH. ........................ 23

IV UPHOLDING HB 1126 WOULD FRAGMENT THE INTERNET AND IMPOSE AN UNDESIRABLE AND IMPRACTICABLE COMPLIANCE REGIME. ............................................................. 25

CONCLUSION ............................................................................... 27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page

**CASES:**

*ACLU v. Gonzales,*
478 F. Supp. 2d 775 (E.D. Pa. 2007)..................................................................23

*Ashcroft v. ACLU,*
542 U.S. 656 (2004).............................................................................................12

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
457 U.S. (1982)......................................................................................................8

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011)..............................................................5, 9, 10, 11, 12, 20

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975)........................................................................................10, 11

*Free Speech Coal., Inc. v. Paxton,*
144 S. Ct. 2714 (2024).........................................................................................11

*Joseph Burstyn v. Wilson,*
343 U.S. 495 (1952).............................................................................................10

*Lamont v. Postmaster General,*
381 U.S. 301 (1965)...............................................................................................8

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy,*
594 U.S. 180 (2021)...............................................................................................9

*Moody v. NetChoice, LLC,*
144 S. Ct. 2383 (2024).......................................................................................7, 9

*NetChoice, LLC v. Griffin,*
No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).............17

*NetChoice, LLC v. Reyes,*
No. 2:23-CV-00911-RJS-CMR,
2024 WL 4135626 (D. Utah Sept. 10, 2024).....................................................13

## TABLE OF AUTHORITIES—Continued

<u>Page</u>

*NetChoice, LLC v. Yost,*
No. 2:24-CV-00047, <u>2024 WL 555904</u> (S.D. Ohio Feb. 12, 2024)..................15

*Packingham v. North Carolina,*
<u>582 U.S. 98</u> (2017)...................................................................4, 5, 7, 8, 9

*PSINET v. Chapman,*
<u>362 F.3d 227</u> (4th Cir. 2004) ..................................................................23

*Reno v. ACLU,*
<u>521 U.S. 844</u> (1997)..........................................................................4, 5, 9, 12

*United States v. Stevens,*
<u>559 U.S. 460</u> (2010)...............................................................................11

**OTHER AUTHORITIES:**

Ángel Díaz & Laura Hecht-Felella, *Double Standards in Social Media Content Moderation, Brennan Center for Justice*, (2021), https://bit.ly/497xuUH.........24

Anti-Defamation League, *Online Hate and Harassment Survey*, (2022), https://www.adl.org/sites/default/files/pdfs/2022-09/Online-Hate-and-Harassment-Survey-2022.pdf ...............................................................19

Asaka Park, *I'm a Disabled Teenager and Social Media is My Lifeline*, N.Y. TIMES (June 5, 2019), https://www.nytimes.com/2019/06/05/learning/im-a-disabled-teenager-and-social-media-is-my-lifeline.html ......................................14

Ashley Austin, et al., *It's My Safe Space: The Life-Saving Role of the Internet in the Lives of Transgender and Gender Diverse Youth*, 21 INT'L. J. OF TRANSGENDER HEALTH 33 (2020) ...........................................................13

Coalition for Responsible Home Education, Parental Control or Withholding of ID, https://responsiblehomeschooling.org/advocacy/policy/identification-documents ...................................................................21

Ellen Sirull, *Do You Know How to Protect Your Child from Identity Theft?*, Experian (Jan. 8, 2018), https://www.experian.com/blogs/ask-experian/know-protect-child-identity-theft...............................................................18

**TABLE OF AUTHORITIES—Continued**

Page

Eric Goldman, *The Plan to Blow Up the Internet, Ostensibly to Protect Kids Online*, CAPITOL WKLY. (Aug. 18, 2022), https://bit.ly/3Uv76Q2 ....................19

Human Rights Campaign Foundation, *2023 LGBTQ+ Youth Report*, (Aug. 2023), https://bit.ly/3UCHIYO .................................................................................13

J. Maya Hernandez & Linda Charmaraman, *Research on teen social media use has a racial bias problem*, FAST COMPANY (Feb 22, 2023) https://www.fastcompany.com/90853552/research-on-teen-social-media-use-has-a-racial-bias-problem. ....................................................................14

Jacqueline Nesi, et al., *Teens and Mental Health: How Girls Really Feel about Social Media*, COMMON SENSE MEDIA (2023), https://www.commonsensemedia.org/sites/default/files/research/report/how-girls-really-feel-about-Social-media-researchreport_final_1.pdf.......................14

Jared Eckert & Makenna McCoy, *Young Children Are Being Targeted With Sexual Content. The Equality Act Would Make It Worse*, The Heritage Foundation (June 11, 2021), https://herit.ag/49v3aD7 ....................................................25

Joseph Cox, *ID Verification Service for TikTok, Uber, X Exposed Driver Licenses*, 404 MEDIA (June 26, 2024), https://bit.ly/3NdMKq9 .........................................18

Maarten Sap et al., *The Risk of Racial Bias in Hate Speech Detection,* Proceedings of the 57th Annual Meeting of the Association for Computational Linguistics, (2019), https://bit.ly/3ODPs8S .............................................................24

Mark A. Lemley, *The Splinternet*, 70 DUKE L.J. 1397 (2021) ................................25

Mike Masnick, *State Legislators Are Demanding Websites Moderate Less AND Moderate More; Federal Law Prohibits Both*, TECHDIRT (Apr. 8, 2022), https://bit.ly/46KYOFW .................................................................................25

Samuel Gibbs, *Facebook Bans Women for Posting 'Men Are Scum' After Harassment Scandals*, THE GUARDIAN (Dec. 5, 2017), https://bit.ly/49sRWio.......................................................................................25

Sarah Forland, et al., *Age Verification: The Complicated Effort to Protect Youth Online*, NEW AMERICA 20 (Apr. 23, 2024),

**TABLE OF AUTHORITIES—Continued**

Page

https://www.newamerica.org/oti/reports/age-verification-the-complicated-effort-to-protect-youth-online/challenges-with-age-verification/ .......................16

Savannah Kuchar, *When social media censorship gets it wrong: The struggle of breast cancer content creators*, USA TODAY (Sept. 12, 2023), https://bit.ly/49sRReA .................................................................................24

Shoshana Weissmann, *Social Media Was Useful For Me, As An Ill, Nerdy Teenager*, TECHDIRT (June 28, 2023), https://www.techdirt.com/2023/06/28/social-media-was-useful-for-me-as-an-ill-nerdy-teenager..........................................................................................14

Shoshana Weissmann, *The technology to verify your age without violating your privacy does not exist*, R Street Inst. (May 16, 2023) , https://www.rstreet.org/commentary/the-technology-to-verify-your-age-without-violating-your-privacy-does-not-exist ...........................................16, 17

Shoshana Weissmann, et al., *25 percent of kids will face identity theft before turning 18. Age-verification laws will make this worse*, R Street Inst. (July 25, 2024), https://www.rstreet.org/commentary/25-percent-of-kids-will-face-identity-theft-before-turning-18-age-verification-laws-will-make-this-worse ..18

Shoshana Weissmann, *If platforms are required to have your government IDs and face scans, hackers and enemy governments can access them too*, R Street Inst. (May 22, 2023), https://www.rstreet.org/commentary/if-platforms-are-required-to-have-your-government-ids-and-face-scans-hackers-and-enemy-governments-can-access-them-too/ .................................................................................18

Tom Tapp, *GOP Senators Call For Warning Label On "Disturbing" LGBTQ Content In Kids' TV Shows*, DEADLINE (Mar. 6, 2022), https://bit.ly/3wk58Yu. .................................................................................25

Tyler B. Valeska, *Speech Balkanization*, 65 B.C. L. REV. (2024)........................25

United States Surgeon General Advisory, Social Media and Youth Mental Health (2023) ...............................................................................................12, 13

## INTEREST OF AMICI CURIAE

Amici are nonprofit organizations committed to promoting a society in which all people benefit from technology and interconnectivity and all people enjoy the speech opportunities made available through a safe, open, and equitable internet.

**Chamber of Progress** is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. In keeping with that mission, Chamber of Progress believes that allowing a diverse range of websites and philosophies to flourish will benefit everyone—consumers, store owners, and application developers. Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or veto over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.[1]

---

[1] Chamber of Progress's partners include a16z, Airbnb, Amazon, Apple, Aurora, Automattic, Byte, Chime, Circle, CLEAR, Coinbase, Cruise, DailyPay, DoorDash, Earnin, Filecoin, Foundation, Google, Grayscale, Grubhub, Instacart, Intuit, Klarna, Kraken, Lyft, Meta, Midjourney, Paradigm, Pindrop, Ripple, StubHub, Suno, Turo, Uber, Vivid Seats, Waymo, and Zoox.

**The Coalition for Responsible Home Education (CRHE)** advocates for the safety and wellbeing of current and former homeschooled students by educating the public about the lived experiences of homeschooled students; promoting child-centered, evidence-based practices for families and child-welfare professionals; advocating for crucial changes to law and policy to protect current and former homeschooled students; and arguing against laws and policies that may harm homeschooled students and alumni. Mississippi's HB 1126 would restrict minors and those without legal identification documents from accessing important social-media platforms. Homeschooled students disproportionately suffer from identification abuse, that is, a lack of legal identification due to parental refusal to provide birth certificates and Social Security numbers. Furthermore, homeschooled students disproportionately suffer from extreme social isolation, making limited access to the internet particularly dangerous for homeschooled students experiencing abuse and neglect. As a child-welfare advocacy organization, CRHE has an interest in this litigation because HB 1126 would prevent homeschooled students and alumni experiencing abuse and neglect from accessing needed help and support online.

**LGBT Tech** is a nonprofit organization dedicated to promoting technology adoption and advocacy within the LGBTQ+ community. LGBT Tech encourages the continued early adoption and use of cutting-edge, new and emerging

technologies by providing information, education, and strategic outreach. As an organization that advocates for policies that benefit the LGBTQ+ community, we are writing to express our support of Appellee NetChoice. We believe that Mississippi's HB 1126 significantly undermines the privacy protections afforded to all social media users, especially those who are LGBTQ+.

**The Woodhull Freedom Foundation ("Woodhull")** is a non-profit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. Woodhull's name was inspired by the Nineteenth Century suffragette and women's rights leader, Victoria Woodhull. The organization works to improve the wellbeing, rights, and autonomy of every individual through advocacy, education, and action. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. The Foundation's advocacy has included a wide range of human rights issues, including reproductive justice, anti-discrimination legislation, comprehensive nonjudgmental sexuality education, and the right to define one's own family. Woodhull is particularly concerned with the burdens imposed on adults seeking access to protected expression by online age verification laws.

Amici support the development of features to keep kids safe online, such as applications that exclude age-inappropriate content and tools that permit parental supervision. But amici are concerned about Mississippi's HB 1126 because it

threatens the First Amendment rights of minors and adults. That, in turn, jeopardizes healthy and safe online communities, particularly those that are home to marginalized voices. Amici therefore submit this brief in support of Appellee NetChoice.

All parties have granted Amici permission to file this amicus brief. *See* <u>Fed. R. App. P. 29(a)</u>; Circuit Advisory Committee Note to Rule 29-3. No counsel for a party authored this brief in whole or in part, and no person other than amici and their counsel made a monetary contribution to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

Internet platforms are an essential feature of modern discourse: "While in the past there may have been difficulty in identifying the most important places . . . for the exchange of views," it is clear today that the answer is "cyberspace—the 'vast democratic forums of the Internet' in general and social media in particular."[2] Social media are where people form and share important ideas about politics, religion, and society, where people come to learn and be entertained, to discover news from around the world or a new viral dance move, and to "explor[e] the vast

---

[2] *Packingham v. North Carolina*, <u>582 U.S. 98, 104</u> (2017) (quoting *Reno v. ACLU*, <u>521 U.S. 844, 868</u> (1997) (internal citation omitted).

realms of human thought and knowledge."[3] They are also where people of all ages come to find and build community, by connecting with others who share common interests, common life stages, or common struggles, despite geographical distance. "In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics "as diverse as human thought."[4]

If permitted to take effect, Mississippi's HB 1126 would unconstitutionally curtail access to these essential fora, impairing both young people's and adults' First Amendment rights to speak and receive information. Absent explicit parental consent communicated to a platform, young Mississippians would need to wait until their 18th birthdays to access vast amounts of information and opportunities for expression that are available to their same-age or younger peers in other states and countries. As the Supreme Court has explained, it can no more "be made [illegal] to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children" or "to admit a person under 18 to church."[5]

HB 1126 is not only an unconstitutional burden on minors' exercise of their First Amendment rights in the digital age, it will also harm the very young people

---

[3] *Id.* at 99.

[4] *Packingham*, 582 U.S. at 105 (quoting *Reno*, 521 U.S. at 870).

[5] *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 795 (2011).

the statute aims to protect, particularly young women and girls, youth of color, religious minorities, LGBTQ+ youth, and young people in abusive or unsupportive homes, and those in isolated communities. The law's parental consent and age-verification requirements will deprive many young people of access to an essential platform for self-expression as well as access to information and supportive resources.

The law's harmful reach goes beyond its impact on minors, unconstitutionally burdening the free expression rights of adult social media users. This is due to HB 1126's age-verification requirements and its vague content-moderation provisions in Section 6(1), which cover a broad range of protected speech. This lack of clarity and broad scope will likely lead social media platforms to over-censor any content that could be deemed controversial, further harming social media users, and marginalized users most of all.

To protect the speech rights of all Mississippians, and especially the state's young people and marginalized groups, this Court should affirm the lower court's decision.

## ARGUMENT

I. **SOCIAL MEDIA PLATFORMS FACILITATE A BUSTLING MARKETPLACE OF IDEAS THAT IS INTEGRAL TO MODERN DEMOCRACY AND A CRITICAL RESOURCE FOR YOUNG PEOPLE.**

### A. Access to social media is fundamental to First Amendment liberties.

As the Supreme Court declared this past term: "[The First Amendment] does not go on leave when social media are involved."[6] Social media websites "for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge."[7] They "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."[8]

Access to social media is therefore increasingly important for citizens to engage in public life, and a critical support for the "marketplace of ideas." "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more."[9] It follows that "to foreclose access to social media altogether is to

---

[6] *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024).

[7] *Packingham*, 582 U.S. at 104.

[8] *Id.* at 107.

[9] *Id.* at 104.

prevent the user from engaging in the legitimate exercise of First Amendment rights."[10]

These rights include both the right to speak and also "the right to receive ideas," which "follows ineluctably from the sender's First Amendment right to send them" and "is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom."[11] Further, without the right to receive information and ideas through social media and the Internet "[i]t would be a barren marketplace of ideas that had only sellers and no buyers."[12]

### B. Minors do not shed their First Amendment rights at the gateway to the Internet.

The First Amendment's protections apply to people of all ages—not only those over the age of 18. The Supreme Court and lower courts have repeatedly affirmed that, while a state may, in limited circumstances, restrict some categories of speech accessible to minors, "minors are entitled to a significant measure of First Amendment protection and only in relatively narrow and well-defined

---

[10] *Id.*

[11] *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion).

[12] *Id.* (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring)).

circumstances may government bar public dissemination of protected materials to them."[13]

Minors' First Amendment rights are not left behind when they seek to access and use social media. Again, "[t]he First Amendment] does not go on leave when social media are involved."[14] Just as "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," so too it can hardly be argued that young people shed their First Amendment rights when they log online.[15]

Participation in the "vast democratic forums of the Internet"[16] provides minors with the very exposure to the "marketplace of ideas," including "unpopular ideas," that is essential to a functioning democracy.[17] As the Supreme Court explained in its landmark Tinker decision, "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which

---

[13] *Ent. Merchants Ass'n*, 564 U.S. at 794.

[14] *Moody*, 144 S. Ct. at 2394.

[15] *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

[16] *Packingham*, 582 U.S. at 104 (quoting *Reno*, 521 U.S. at 868 (internal citation omitted)).

[17] *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 190 (2021) ("Our representative democracy only works if we protect the 'marketplace of ideas.' This free exchange facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will.").

9

discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'"[18]

Social media services are only the latest in a long line of media over which some individuals panic about the exposure of minors to disfavored content. But as the Supreme Court stated in striking down California's attempt to prohibit minors from purchasing or renting violent video games without their parents' permission, "'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears."[19]

And while a state may regulate to protect children from harm, "that does not include a free-floating power to restrict the ideas to which children may be exposed."[20] Instead, "[s]peech that is neither obscene to youths nor subject to some other legitimate prescription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them."[21]

---

[18] *Tinker*, 393 U.S. at 512 (1969).

[19] *Ent. Merchants Ass'n*, 564 U.S. at 790 (2011) (quoting *Joseph Burstyn v. Wilson*, 343 U.S. 495, 503 (1952)).

[20] *Id.* at 786.

[21] *Id.* at 794–95 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975)); *see also id.* at 791-92 ("[T]he First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these traditional limitations.' These limited areas—such as obscenity, incitement, and fighting words—represent 'well-defined and narrowly

This Court's decision in *Free Speech Coalition v. Paxton* is inapposite. Relying on *Ginsberg v. New York*, this Court held that Texas's HB 1181 "likely passes constitutional muster" because, it concluded, "regulations of the distribution to minors of materials obscene for minors are subject only to rational-basis review." But far from regulating "the distribution to minors of materials obscene for minors," HB 1126 regulates the distribution to minors of all content available on social media, as well as any content the minors themselves would choose to share. As this Court acknowledged in *Paxton*, it is bound not only by Ginsberg, but by "the Supreme Court's application of it in *Entertainment Merchants* and *Erznoznik*,"[22] which limited *Ginsberg* to regulations targeting content obscene for minors.[23] The Court in *Entertainment Merchants* applied strict scrutiny to

---

limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. . . . [N]ew categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated. . . . A legislature may not revise the 'judgment [of] the American people,' embodied in the First Amendment, 'that the benefits of its restrictions on the Government outweigh the costs.'" (cleaned up) (internal citations omitted) (quoting *United States v. Stevens*, 559 U.S. 460, 468-70 (2010))).

[22] *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 278 (5th Cir.), *cert. granted*, 144 S. Ct. 2714 (2024).

[23] *Ent. Merchants Ass'n*, 564 U.S. at 793–95.

California's attempted regulation of minors' access to violent video games; this Court should follow suit.[24]

### C. Young people, especially marginalized youth, benefit substantially from access to social media.

Social media can be incredibly beneficial to many young people. A 2022 survey by Pew Research Center found that, for a majority of teens, social media helped them feel more connected to their friends, share creative content, get support in tough times, and find communities that make them feel accepted.[25] While observing risks associated with social media, a 2023 United States Surgeon General Advisory also suggest[ed] "social media can benefit minors by 'providing positive community and connection with others who share identities, abilities, and interest,' 'provid[ing] access to important information and creat[ing] a space for

---

[24] *Ent. Merchants Ass'n*, 564 U.S. at 799; *see also generally Reno*, 521 U.S.; *Ashcroft v. ACLU*, 542 U.S. 656 (2004).

[25] Monica Anderson et al., *Connection, Creativity and Drama: Teen Life on Social Media in 2022*, Pew Research Center (Nov. 16, 2022), https://pewrsr.ch/3whSY2z ("Eight-in-ten teens say that what they see on social media makes them feel more connected to what's going on in their friends' lives[;] . . . 71% say it makes them feel like they have a place where they can show their creative side[;] . . . 67% say these platforms make them feel as if they have people who can support them through tough times[;] . . . a majority [] say the same for feeling more accepted. These positive sentiments are expressed by teens across demographic groups").

self-expression,' 'promoting help-seeking behaviors[,] and serving as a gateway to initiating mental health care.'"[26]

Consistent with these findings, young people rely on the Internet to find communities where they can engage in open dialogue in ways that may not be possible offline. For example, LGBTQ+ youth find solace in online spaces, reducing feelings of isolation, anxiety, and suicidal ideation.[27] Likewise, recent research on teens of color and social media have shown that social media has been helpful in supporting academic success,[28] alleviating feelings of loneliness and

---

[26] *NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626, at *12 (D. Utah Sept. 10, 2024) (quoting United States Surgeon General Advisory, *Social Media and Youth Mental Health* (2023)).

[27] Ashley Austin, et al., *It's My Safe Space: The Life-Saving Role of the Internet in the Lives of Transgender and Gender Diverse Youth*, 21 INT'L J. OF TRANSGENDER HEALTH 33 (2020); *see also* Human Rights Campaign Foundation, 2023 LGBTQ+ Youth Report, (Aug. 2023), https://bit.ly/3UCHIYO ("Over 8 in 10 . . . LGBTQ+ youth have ever used the internet to seek out LGBTQ+ specific sexual health and behavior information, and well over 9 in 10 . . . have used the internet to seek out information about LGBTQ+ identities, and their own identity as an LGBTQ+ person . . . .").

[28] *See* Alvin Thoms et al., *Taking the good with the bad?: Social Media and Online Racial Discrimination Influences on Psychological and Academic Functioning in Black and Hispanic Youth*, 52(2) J. YOUTH & ADOLESCENCE 245, 245-57 (2023); Tate LeBlanc & Aerika Loyd, *Freedom dreaming to STEM: A conceptual model for Black youth's racial and STEM identity development through social media*, 13 FRONT. PSYCHOL. 944207 (2022).

isolation,[29] and finding acceptance.[30] Indigenous youth honor and share their cultures on social media and advocate for their communities.[31] And social media can help youth with disabilities access information, build relationships and communities, and launch their careers.[32]

Social media also provides ways for youth to learn about religion and develop their spiritual identities. For example, on the popular platform Reddit, r/Christianity and r/Catholicism are forums dedicated to discussing Christianity

---

[29] J. Maya Hernandez & Linda Charmaraman, *Research on teen social media use has a racial bias problem,* FAST COMPANY (Feb. 22, 2023), https://www.fastcompany.com/90853552/research-on-teen-social-media-use-has-a-racial-bias-problem.

[30] Jacqueline Nesi et al., *Teens and Mental Health: How Girls Really Feel about Social Media*, COMMON SENSE MEDIA (2023), https://www.commonsensemedia.org/sites/default/files/research/report/how-girls-really-feel-about-Social-media-researchreport_final_1.pdf (finding that 7 out of 10 adolescent girls of color who use TikTok (71%) or Instagram (72%) report encountering positive or identity-affirming content related to race at least monthly on these platforms).

[31] Kiara Alfonseca & Kat Filardi, *Indigenous TikTokers use social media to honor their cultures*, ABC News (Oct. 12, 2021), https://abcnews.go.com/US/indigenous-tiktokers-social-media-honor-cultures/story?id=80303748; Sara Reardon, *Social media helps Native Americans preserve cultural traditions during pandemic*, CNN (Feb. 9, 2021), https://www.cnn.com/2021/02/08/health/coronavirus-native-americans-internet-khn-wellness-partner/index.html.

[32] *See* Shoshana Weissmann, *Social Media Was Useful For Me, As An Ill, Nerdy Teenager*, TECHDIRT (June 28, 2023), https://www.techdirt.com/2023/06/28/social-media-was-useful-for-me-as-an-ill-nerdy-teenager; Asaka Park, *I'm a Disabled Teenager and Social Media is My Lifeline*, N.Y. TIMES (June 5, 2019), https://www.nytimes.com/2019/06/05/learning/im-a-disabled-teenager-and-social-media-is-my-lifeline.html.

and aspects of faith-based life, providing spaces for teens seeking faith-based support and advice.[33]

## II.    AFFIRMING HB 1126 WILL HARM ADULTS AND THE VERY SAME YOUNG PEOPLE THAT THE STATE OF MISSISSIPPI AIMS TO PROTECT.

Contrary to Attorney General Fitch's assertion that "[HB 1126] regulates the non-expressive conduct of covered platforms" and that "[n]one of those requirements regulates speech and so none is subject to First Amendment scrutiny,"[34] HB 1126 unconstitutionally blocks people under 18 from receiving and distributing lawful speech on social media, that is, from exercising their First Amendment rights.[35] HB1126's requirements for age verification[36] and parental consent are unconstitutional and pose a serious risk of harm to Mississippi's youth.

_____

[33] Anonymous, REDDIT (Mar. 23, 2022, 10:34 AM)), https://www.reddit.com/r/Christianity/comments/tkvbfy/im_13_and_my_parents_a rent_christian_nobody_in_my/ ("So I need your help on how to become Christian what to do in the daily life and everything because I don't know anybody who is Christian or is even religious."); Anonymous, REDDIT (July 21, 2023, 4:17 PM), https://www.reddit.com/r/Christianity/comments/155ywop/how_do_i_tell_my_par ents_im_christian, ("So I'm Christian but my parents are atheist/humanist. I really want to tell my parents that I'm Christian but I don't think they'll be the most receptive to my belief.").

[34] Appellant's Br. 4.

[35] _See NetChoice, LLC v. Yost_, No. 2:24-CV-00047, 2024 WL 555904, at *6 (S.D. Ohio Feb. 12, 2024) (addressing a similar law, stating "it regulates minors' ability to both produce speech and receive speech").

[36] Attorney General Fitch's assertion that "[t]he Act does not require age verification" and instead "requires 'commercially reasonable efforts to verify age'" is a tautology undeserving of serious consideration. _See_ Appellant's Br. 35.

**A. HB 1126's age-verification requirements are privacy-invasive, unconstitutional, and harmful to vulnerable individuals and groups.**

**1. Age verification and estimation fundamentally compromise the privacy of all users of digital services.**

An April 2024 report from the New America Foundation found that "[a]s of this report's publication, strict age verification—confirming a user's age without requiring additional personal identifiable information (PII)—is not technically feasible in a manner that respects users' rights, privacy, and security" and "there are no available technologies that verify age in a private and secure manner, much less any that could do so at the scale required by large social media platforms."[37]

Under HB 1126, new and existing social media users—both minors and adults—will be forced to choose between giving up privacy (their own or, in the case of a minor user's parents, their children's) and accessing online speech, which is untenable under the First Amendment. In other words, age-verification schemes like those contemplated by HB 1126 "are not only an additional hassle," but "they

---

[37] Sarah Forland, et al., *Age Verification: The Complicated Effort to Protect Youth Online*, NEW AMERICA 20 (Apr. 23, 2024), https://www.newamerica.org/oti/reports/age-verification-the-complicated-effort-to-protect-youth-online/challenges-with-age-verification (emphasis added); *see also* Shoshana Weissmann, *The technology to verify your age without violating your privacy does not exist*, R Street Inst. (May 16, 2023), https://www.rstreet.org/commentary/the-technology-to-verify-your-age-without-violating-your-privacy-does-not-exist (explaining that existing age-verification methods "either lack[] accuracy or deeply invade[] privacy" and noting that France's data protection agency has concluded as such).

16

also require that website visitors forgo the anonymity otherwise available on the internet."[38] Pressed to verify age "with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider"[39] and faced with options with low accuracy rates, social media and other internet platforms employing age-verification procedures would inevitably need to require "users to submit to biometrics such as face scanning or provid[ing] government IDs."[40] Depending on how age verification is managed, it creates significant risks to both children's and adults' privacy.

### 2. This intrusion on privacy can lead to serious harm to children and vulnerable individuals of any age.

Forcing a company to collect an enormous trove of sensitive personal information would create a substantial cybersecurity or ransomware risk. These are not theoretical concerns. More than 80 percent of U.S. companies have been hacked successfully with the aim to steal, change or make public important data.[41]

---

[38] *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003); *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (finding age-verification requirements force users to "relinquish their anonymity to access protected speech"); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *1 (W.D. Ark. Aug. 31, 2023) (enjoining social media age-verification law on constitutional grounds).

[39] HB 1126 §4(1).

[40] Weissmann, *supra* n. 37

[41] Shoshana Weissmann, *If platforms are required to have your government IDs and face scans, hackers and enemy governments can access them too*, R Street

For example, a third-party ID and age-verification company serving several online platforms was recently found to have left sensitive personal data insecure for more than a year, "potentially allowing hackers to access that sensitive data."[42] Children's personal information is an especially attractive target for fraud and identity theft. Credit reporting company Experian reported in 2018 that "child identity fraud or theft will affect 25% of kids before turning 18."[43] Accordingly, institutions that collect children's PII, like foster care systems and schools, are prime targets for fraud, identity theft, and ransomware.[44]

Age verification's increased privacy risk is especially dangerous for individuals and groups that need to keep their identities private to ensure their offline safety.[45] For example, women who have experienced sexual harassment,

---

Inst. (May 22, 2023), https://www.rstreet.org/commentary/if-platforms-are-required-to-have-your-government-ids-and-face-scans-hackers-and-enemy-governments-can-access-them-too/.

[42] Joseph Cox, *ID Verification Service for TikTok, Uber, X Exposed Driver Licenses,* 404 MEDIA (June 26, 2024), https://bit.ly/3NdMKq9.

[43] Ellen Sirull, *Do You Know How to Protect Your Child from Identity Theft?,* Experian (Jan. 8, 2018), https:/www.experian.com/blogs/ask-experian/know-protect-child-identity-theft.

[44] Shoshana Weissmann, et al., *25 percent of kids will face identity theft before turning 18. Age-verification laws will make this worse,* R Street Inst. (July 25, 2024), https://www.rstreet.org/commentary/25-percent-of-kids-will-face-identity-theft-before-turning-18-age-verification-laws-will-make-this-worse.

[45] Eric Goldman, *The Plan to Blow Up the Internet, Ostensibly to Protect Kids Online,* CAPITOL WKLY. (Aug. 18, 2022), https://bit.ly/3Uv76Q2.

assault, or domestic abuse may wish to obtain information anonymously, for fear of reprisals at work or at home. In a 2022 survey, 54% of LGBTQ+ respondents reported experiencing severe online harassment, defined as "physical threats, sustained harassment, stalking, sexual harassment, doxing (having personal information exposed, often for the purpose of further harassment), and swatting (a rare but dangerous tactic in which a harasser anonymously calls in a false report with the goal of sending an emergency response team to a target's dwelling)."[46] For these users, relinquishing anonymity and submitting PII or biometrics to comply with age verification procedures could lead to personal exposure and serious risks to their safety and survival.

### B. HB 1126's parental consent requirements are unconstitutional and harmful to vulnerable minors.

States cannot grant parents or guardians an "on/off switch" for their children's First Amendment rights, nor can they make an end run around the First Amendment by allowing minors to exercise their First Amendment rights only if their parent or guardian explicitly consents. As the Supreme Court explained in *Entertainment Merchants*, while parents may "have traditionally had the power to control what their children hear and say . . . it does not follow that the state has the

---

[46] *See* Anti-Defamation League, *Online Hate and Harassment Survey*, (2022), https://www.adl.org/sites/default/files/pdfs/2022-09/Online-Hate-and-Harassment-Survey-2022.pdf.

power to prevent children from hearing or saying anything without their parents' prior consent."[47] After all, for example, it could then "be made criminal to admit persons under 18 to a political rally without their parents' prior written consent— even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors," or "to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent."[48] The First Amendment does not tolerate these kinds of restrictions: "Such laws do not enforce parental authority over children's speech and religion; they impose governmental authority, subject only to a parental veto."[49]

HB 1126, however, attempts just such a (dubious and unconstitutional) project. Under HB 1126 Section (4)(2), a covered platform is required to prohibit minors from creating or holding an account "unless the known minor has the express consent from a parent or guardian,"[50] effectively "prevent[ing] children from hearing or saying anything" on social media, "without their parents' prior consent,"[51] regardless of the nature of the content. If HB 1126 is allowed to stand, it "would largely vitiate the rule that 'only in relatively narrow and well-defined

---

[47] *Ent. Merchants Ass'n*, 564 U.S. at 795.

[48] *Id.*

[49] *Id.*

[50] HB 1126 §4(2).

[51] *Id.*

circumstances may government bar public dissemination of protected materials to [minors].'"[52]

Conditioning social media access on explicit parental consent also jeopardizes the safety and privacy of vulnerable youth. For LGBTQ+ youth in unsupportive families or communities, online spaces may be the only places where they can safely be themselves and connect with accepting communities. In a 2023 national survey conducted by The Trevor Project, only 38% of LBGTQ+ youth reported living in affirming households, while 60% found online spaces supportive. Obtaining parental consent to access those online spaces could force those youth to come out to unsupportive parents or guardians, jeopardize their safety at home and in their offline communities, and risk losing access to online resources that are crucial to their wellbeing.

Many homeschooled students and youth in households where abuse and domestic violence are present also rely on social media to access information and support. This includes homeschooled students who are victims of identification abuse,[53] which can make them unable to acquire legal identification documents as

---

[52] *Id.*

[53] Identification abuse involves parents withholding vital documents from their children, often as a means of control or manipulation. *See* Coalition for Responsible Home Education, Parental Control or Withholding of ID, https://responsiblehomeschooling.org/advocacy/policy/identification-documents.

21

adults. Conditioning their access to those resources on the consent of the abuser(s) in the home could further isolate those children and put them at even greater risk. Indeed, HB 1126 could prevent such individuals from accessing the very social-media platforms that might help them resolve their lack of identification.

III.    **UPHOLDING HB 1126 WOULD CHILL PARTICIPATION IN THE ONLINE MARKETPLACE OF IDEAS AND DISPROPORTIONATELY HARM MARGINALIZED YOUTH.**

### A. HB 1126's age-verification requirements will chill participation on social media and other covered platforms.

Concerns about the risks associated with age verification and the loss of anonymity is likely to drive many people away from social media. According to a national survey conducted earlier this year by Chamber of Progress, majorities of voters across party lines do not feel safe providing online platforms with personal information in order to log in and 64% of Republicans, 58% of Democrats, and 59% of Independents said they would limit or modify their internet usage if required to provide identifying information to log into online platforms.[54]  A survey by the Center for Growth and Opportunity at Utah State University found similar results, reporting that two-thirds of American respondents were not

---

[54] Chamber of Progress, Digital Censorship Survey, (Jan. 30-Feb 2 2024), https://progresschamber.org/wp-content/uploads/2024/03/Polling_Digital_Censorship_Crosstabs03_24.pdf. When asked "[h]ow much, if at all, do you trust online platforms to keep your data safe from breaches?" only 7% of Republicans and 9% of Democrats responded "a lot." *Id.*

"comfortable sharing a government identification document like a driver's license with social media companies in order to verify age."[55]  Other courts reviewing regulations similar to HB 1126 found that "[r]equiring Internet users to provide . . . [PII] to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and because Internet users are afraid of fraud and identity theft on the Internet."[56]

### B. H.B. 1126 Section 6(1)'s vague content-moderation provisions will encourage over-censorship and disproportionately harm marginalized and vulnerable youth.

In its 2021 report on "Double Standards in Social Media Content Moderation," the Brennan Center for Justice explained that, when social media platforms engage in content moderation, "[all] too often, the viewpoints of communities of color, women, LGBTQ+ communities, and religious minorities are at risk of over-enforcement, while harms targeting them often remain

---

[55] Taylor Barkley, *Poll: Americans Don't Want To Share Their Photo ID To Tweet, The Center for Growth and Opportunity*, Ctr. For Growth & Opportunity at Utah State Univ. (Feb. 1, 2023), https://www.thecgo.org/benchmark/poll-americans-dont-want-to-share-their-photo-id-to-tweet/?utm_source=pocket_reader.

[56] *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also PSINET v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] ... may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

unaddressed."[57] The risk of inequitable treatment is higher when content-moderation policies are "imprecise and broad," like those imposed by HB 1126 Section 6. Such imprecise policies give enforcers considerable discretion over when to apply the policies to particular content, and "platforms regularly use this discretion to delay action against powerful figures, whereas they seem to apply a trigger-happy approach to speech from marginalized groups using aggravated language to speak out against injustice."[58]

For example, racial minorities may find that their speech is quashed because it is deemed hate speech, harassment, or abuse.[59] Girls and young women may struggle to access information about sexual assault, reproductive healthcare, and other issues due to how their bodies have been sexualized.[60] Women may find themselves banned from social media for sharing their stories about workplace sexual harassment and abuse.[61] LGBTQ+ related content is already under attack by

---

[57] Ángel Díaz & Laura Hecht-Felella, *Double Standards in Social Media Content Moderation, Brennan Center for Justice*, 3 (2021), https://bit.ly/497xuUH.

[58] *Id.*

[59] *See* Maarten Sap, et al., *The Risk of Racial Bias in Hate Speech Detection*, Proceedings of the 57th Annual Meeting of the Association for Computational Linguistics, 1668, 1671 (2019), https://bit.ly/3ODPs8S.

[60] *See* Savannah Kuchar, *When social media censorship gets it wrong: The struggle of breast cancer content creators*, USA TODAY (Sept. 12, 2023), https://bit.ly/49sRReA.

[61] Samuel Gibbs, *Facebook Bans Women for Posting 'Men Are Scum' After Harassment Scandals*, THE GUARDIAN (Dec. 5, 2017), https://bit.ly/49sRWio.

those who would paint even the most innocuous LGBTQ+ positive content as "highly sexualized" and age-inappropriate.[62]

The harms of over-enforcement are particularly pernicious, erasing the presence of marginalized people in the "marketplace of ideas" and depriving them of the opportunity to see their experiences and identities reflected in the content provided to them—harms that can be devastating to young people who are just beginning to understand and accept themselves.

## IV. UPHOLDING HB 1126 WOULD FRAGMENT THE INTERNET AND IMPOSE AN UNDESIRABLE AND IMPRACTICABLE COMPLIANCE REGIME.

Allowing HB 1126 to come into effect would result in a patchwork of Internet regulations that balkanize the Internet as we know it.[63] Conflicting legal obligations and definitions across a number of different jurisdictions will make it increasingly difficult for social media platforms, some of which are global in reach, to comply with every jurisdiction's rules. For example, some state privacy laws could come into tension with age-verification requirements, and it may be

---

[62] *See, e.g.*, Jared Eckert & Makenna McCoy, *Young Children Are Being Targeted With Sexual Content. The Equality Act Would Make It Worse*, The Heritage Foundation (June 11, 2021), https://herit.ag/49v3aD7; Tom Tapp, *GOP Senators Call For Warning Label On "Disturbing" LGBTQ Content In Kids' TV Shows*, DEADLINE (Mar. 6, 2022), https://bit.ly/3wk58Yu.

[63] *See* Mike Masnick, *State Legislators Are Demanding Websites Moderate Less AND Moderate More; Federal Law Prohibits Both*, TECHDIRT (Apr. 8, 2022), https://bit.ly/46KYOFW; Tyler B. Valeska, *Speech Balkanization*, 65 B.C. L. REV. (2024); *see also* Mark A. Lemley, *The Splinternet*, 70 DUKE L.J. 1397 (2021).

impossible to design certain digital services in a way that fulfills both sets of obligations.

These kinds of dilemmas will force social media platforms to pursue highly undesirable solutions. To comply with conflicting laws, social media platforms would need to tailor their content moderation by geolocating users. Such precision may not be technically feasible, especially in scenarios involving contiguous states with conflicting laws or users that travel, use multiple devices, or use software or a service that masks a device's location (such as a virtual private network). Developing and implementing these capabilities would also likely require privacy-invasive tools and the collection of even more personal data from users.

As a result, under laws like HB 1126, social media providers may be forced to block access for everyone in one or more of the conflicting jurisdictions (or all of them). In this scenario, Mississippians (young, old, and every age in between) would face significant , and for some insurmountable, obstacles to sharing their news, creations, and views with the rest of the world. Some startups and smaller companies may decide it is not even worth entering such a fragmented Internet marketplace, with a rapidly escalating compliance burden and an unpredictable, occasionally contradictory regulatory environment.

Even with no new conflicts between the laws of different states, speech (and its reach) may still be circumscribed. Social media providers and covered websites

26

may have practically no choice but to adopt a nationwide compliance regime that follows the most restrictive speech or privacy regulations adopted by any state. This means that a single state, like Texas, Florida, New York, or California, could effectively dictate Internet policy nationwide.

## CONCLUSION

For the reasons stated above, the Court should affirm the lower court's decision.

Respectfully submitted,

Kerry Maeve Sheehan
Legal Advocacy Counsel
CHAMBER OF PROGRESS
1390 Chain Bridge Road #A108
McLean, VA 22101

Carlos Gutierrez
Deputy Director & General Counsel
LGBT TECH
123 W. Frederick Street, #214
Staunton, VA 24401

Lawrence Walters
WALTERS LAW GROUP
195 W. Pine Avenue
Longwood, FL 32750

/s/ Sean Marotta
Sean Marotta
Mark W. Brennan
J. Ryan Thompson
Thomas B. Veitch
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

*Counsel for Amici Curiae*

October 7, 2024

## CERTIFICATE OF SERVICE

I certify that on October 7, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Sean Marotta
Sean Marotta

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,940 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ Sean Marotta
Sean Marotta