No. 24-60341

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

NETCHOICE, L.L.C.,
*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
No. 1:24-cv-170-HSO-BWR

## DEFENDANT-APPELLANT'S REPLY BRIEF

LYNN FITCH
  *Attorney General*
SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................... 1

ARGUMENT ......................................................................................... 2

I.    This Court Should Vacate The Preliminary-Injunction Order Because It Rests On Claims That NetChoice Lacks Standing To Bring ............................................................................................. 3

II.    This Court Should Reverse The Preliminary-Injunction Order Because The District Court Erred In Ruling That The Mississippi Act Is Likely Facially Unconstitutional ......................................... 7

    A.    The District Court Failed To Perform The Demanding Facial Analysis That Applies To NetChoice's Claims ....................... 7

    B.    The District Court Erred In Ruling That The Act Likely Facially Violates The First Amendment ............................. 12

    C.    The District Court Erred In Ruling That The Act Is Likely Facially Void For Vagueness ................................................. 23

    D.    NetChoice's Preemption Claim Cannot Support The Preliminary-Injunction Order .............................................. 25

III.    Even Putting The Merits Aside, This Court Should Reject Or Dramatically Narrow The Preliminary Injunction ....................... 26

CONCLUSION .................................................................................... 28

CERTIFICATE OF SERVICE ................................................................. 29

CERTIFICATE OF COMPLIANCE ......................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ........................................................ 16

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ........................................................ 24

*Brown v. Entertainment Merchants Ass'n,*
  564 U.S. 786 (2011) ........................................................ 19

*CCIA v. Paxton,*
  — F. Supp. 3d. —,
  2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) .................... 25

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ........................................................ 14

*City of Dallas v. Stanglin,*
  490 U.S. 19 (1989) .................................................... 17, 18

*Club Retro, LLC v. Hilton,*
  568 F.3d 181 (5th Cir. 2009) .......................................... 18

*Doe I v. Landry,*
  909 F.3d 99 (5th Cir. 2018) ............................................ 15

*Doe v. MySpace, Inc.,*
  528 F.3d 413 (5th Cir. 2008) .......................................... 26

*Free Speech Coalition, Inc. v. Paxton,*
  95 F.4th 263 (5th Cir. 2024),
  *cert. granted,* 144 S. Ct. 2714 (2024) ........................ 25, 26

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) .......................................................... 5

*MainStreet Organization of Realtors v. Calumet City*,
　505 F.3d 742 (7th Cir. 2007) ................................................3-4

*Moody v. NetChoice, LLC*,
　144 S. Ct. 2383 (2024) ..................................... 1, 7-12, 14, 21

*National Press Photographers Ass'n v. McCraw*,
　90 F.4th 770 (5th Cir. 2024) ............................................ 24

*NetChoice, LLC v. Bonta*,
　113 F.4th 1101 (9th Cir. 2024) ........................................ 12

*NetChoice, LLC v. Paxton*,
　49 F.4th 439 (5th Cir. 2022) ........................................ 7, 8

*New York State Club Ass'n v. City of New York*,
　487 U.S. 1 (1988) ............................................................ 3

*Packingham v. North Carolina*,
　582 U.S. 98 (2017) .......................................................... 15

*Reno v. ACLU*,
　521 U.S. 844 (1997) ........................................................ 16

*Rollins v. Home Depot USA*,
　8 F.4th 393 (5th Cir. 2021) ............................................ 11

*Sable Communications of California, Inc. v. FCC*,
　492 U.S. 115 (1989) ........................................................ 15

*Secretary of State of Maryland v. Joseph H. Munson Co.*,
　467 U.S. 947 (1984) .......................................................... 5

*Smith v. California*,
　361 U.S. 147 (1959) ........................................................ 24

*United States v. Williams*,
　553 U.S. 285 (2008) ........................................................ 24

iii

*Virginia v. American Booksellers Ass'n*,
    484 U.S. 383 (1988) ........................................................................ 4

## Constitutional Provisions

U.S. Const. amend. I ............................................. 2-6, 8-12, 17, 18, 26, 27

U.S. Const. amend. XIV ........................................................ 2, 10, 23, 24

## Statutes

47 U.S.C. § 230 ............................................................................ 2, 25, 26

2024 H.B. 1126 ............................................................................ 1, 2, 7-27

**INTRODUCTION**

This Court should reject the preliminary injunction. NetChoice's contrary arguments fail.

NetChoice insists that it can assert the rights of its members' users. NetChoice Br. 18-21. But NetChoice does not—and does not claim to—meet the requirements of third-party standing. It claims that it does not need to meet those requirements. That view defies caselaw holding that a plaintiff may assert third parties' rights only when those third parties face a hindrance to suing and have a close relationship with the plaintiff. State Br. 20-30. On NetChoice's view, it can assert the claims of *billions* of users—despite the manifest conflicts of interest that prompt users to sue NetChoice members for exploiting and harming them.

NetChoice claims that the district court performed the facial analysis required by *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024). NetChoice Br. 22-27. But that court never assessed "how" the Act "works in all of its applications." 144 S. Ct. at 2409; State Br. 31-34. NetChoice cites two pages where the court quoted parts of the Act without analyzing how they "work[ ]." But *Moody* vacated a decision of this Court that analyzed a law in far more depth. Upholding the district court's facial analysis would defy *Moody* and create a circuit conflict. State Br. 33-34.

On the merits, NetChoice claims that the Act regulates speech based on its content and fails strict scrutiny. NetChoice Br. 27-35, 37-49. But the Act's coverage definition turns on platforms' interactive functions

1

and thus on the harmful conduct those platforms host. That focus does not regulate speech. The Act regulates covered platforms' non-expressive conduct only and thus is subject to—and satisfies—rational-basis review. State Br. 34-46. NetChoice claims that the Act requires platforms to demand government IDs, verify parental relationships, and monitor and block content. NetChoice Br. 37, 41, 42. The Act requires none of that. It requires "commercially reasonable" efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. Those requirements pose no facial First Amendment problem.

Nothing else that NetChoice says supports the injunction. On vagueness, NetChoice doomed its facial claim when it conceded that it knows that the Act applies to several of its members and not to others. State Br. 46-49. On preemption, NetChoice ignores this Court's holding that 47 U.S.C. § 230 does not block laws that, like the strategy provision, impose liability on online platforms independently of whether third-party speech hosted on those platforms harms anyone. *Id.* at 50-51. And the equities favor letting the Act protect Mississippi children. *Id.* at 52-54.

## ARGUMENT

This Court should reject—and stay—the preliminary injunction.

I. **This Court Should Vacate The Preliminary-Injunction Order Because It Rests On Claims That NetChoice Lacks Standing To Bring.**

The district court erred in allowing NetChoice to assert the First Amendment rights of its members' users. State Br. 20-30. NetChoice does not claim that it meets the requirements of third-party standing. It claims that it does not need to meet those requirements. NetChoice Br. 18-21. It is wrong.

*First*, NetChoice claims that, because it has associational standing to sue on behalf of its members, it can "raise" all "claims that [its] members can assert." NetChoice Br. 21; *see id.* at 18-19. But NetChoice has not shown that its "members can assert" users' First Amendment claims. Those users are third parties, yet NetChoice has not shown that its members have a close relationship with users or that users face a hindrance to protecting their own interests. NetChoice must show not only that it has associational standing to represent its members but also that its members have third-party standing to represent users. State Br. 20-27; *compare New York State Club Ass'n v. City of New York*, 487 U.S. 1, 8-10 (1988) (plaintiff association consisting of member associations could assert the rights of the latter associations' individual members where the plaintiff had associational standing to assert its member associations' rights and the member associations had associational standing to assert their individual members' rights), *with MainStreet Organization of Realtors v. Calumet City*, 505 F.3d 742, 743-46 (7th Cir.

2007) (Posner, J.) (although plaintiff had associational standing to sue on behalf of its real-estate-broker members, plaintiff could not assert the rights of third-party homeowners where broker members lacked standing to assert those rights). It has not shown the latter.

*Second*, NetChoice claims that it does not need to meet the requirements for third-party standing because, "for First Amendment free-speech claims, speech disseminators (such as NetChoice's members) can raise their users' rights." NetChoice Br. 20; *see id.* at 20-21. But that is true only when "speech disseminators" are *parties with standing* (and even then, the requirements of third-party standing still apply, *infra* p. 5). Thus, in *Virginia v. American Booksellers Association*, 484 U.S. 383 (1998) (quoted at NetChoice Br. 20), the Supreme Court ruled that two plaintiff bookstores could, in challenging a law regulating the display of certain books, assert "the First Amendment rights" of plaintiffs' book-buyer customers where the law caused the bookstores "injury in fact." *Id.* at 392-93. And in *SEIU, Local 5 v. City of Houston*, 595 F.3d 588 (5th Cir. 2010) (quoted at NetChoice Br. 21), this Court explained that, to assert third parties' First Amendment rights against a law, "the plaintiff must establish injury" to "*its[elf]*" under that law. *Id.* at 598 (emphasis added). No speech disseminator is a party here. NetChoice is the sole "plaintiff," yet it has not shown "injury" to itself—so it cannot assert its members' users' rights. *Ibid.*; *contra* NetChoice Br. 19 (arguing that "whether NetChoice *itself* suffered any injury-in-fact" is "irrelevant").

4

*Third*, NetChoice claims that the close-relationship and hindrance requirements of third-party standing do not apply "when a plaintiff with 'constitutional standing' raises the 'First Amendment rights of other parties not before the court.'" NetChoice Br. 21 (quoting *SEIU*, 595 F.3d at 598; emphasis and some internal quotation marks omitted); *see id.* at 20-21. Again, any such rule cannot help NetChoice because it lacks its own "constitutional standing." *Id.* at 21. And NetChoice misstates the law. *SEIU* says that the rule that "litigants must assert their own legal rights and not those of others" "is not applied when a plaintiff demonstrates that a provision that validly restricts its own speech is overbroad." 595 F.3d at 598 (citing *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956-57 (1984)). All that means is that, for some claims, a plaintiff is not barred from asserting third parties' rights—not that such a plaintiff is excused from showing (for example) a close relationship before asserting those rights. The Supreme Court in *Joseph H. Munson* thus allowed third-party standing yet still made sure that the plaintiff suffered its own "injury-in-fact" and could be "expected" to properly "frame the issues in the case"—that it did not (for example) have a conflict of "interests." 467 U.S. at 958. The intervening decision on third-party standing in *Kowalski v. Tesmer*, 543 U.S. 125 (2004), reaffirms those requirements. State Br. 20-21.

NetChoice claims that *Kowalski* and similar cases are "inapt because they address 'prudential,' not 'Article III,' standing principles."

NetChoice Br. 21. NetChoice does not say why that matters. The prudential reasons for not allowing NetChoice to assert users' rights are overwhelming. NetChoice is not a necessary advocate for users' rights. As it does not contest, users can and do vindicate their own rights. State Br. 26-27. NetChoice also is not a sound advocate for users' rights, given the conflicts that it and its members have with users. *Id.* at 24-26. NetChoice says that "[t]here is no tension between covered websites asserting both their own and their users' First Amendment free-speech rights to challenge this Act's speech restrictions." NetChoice Br. 21. But users have a strong interest in their safety on NetChoice members' platforms, while members have a strong interest in devoting minimal resources to users' safety and in fighting laws that could require platforms to do more to promote users' safety. State Br. 26.

Imagine if NetChoice members Google and Facebook were the plaintiffs here. Many users have sued Google and Facebook. *E.g.*, State Br. 25. At the least, a court should assess that conflict before allowing those platforms to assert users' rights. That duty should not evaporate just because Google and Facebook's trade association is the plaintiff. Yet on NetChoice's view, it gets a free pass to assert users' rights despite manifest conflicts of interest. This Court should reject that view.

II.   **This Court Should Reverse The Preliminary-Injunction Order Because The District Court Erred In Ruling That The Mississippi Act Is Likely Facially Unconstitutional.**

The district court erred on the merits. State Br. 30-49.

A.   **The District Court Failed To Perform The Demanding Facial Analysis That Applies To NetChoice's Claims.**

The district court did not perform the required three-step facial analysis. State Br. 31-34. It did not "determine [the] law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024). NetChoice's contrary arguments, NetChoice Br. 22-27, fail.

1. NetChoice claims that the district court "faithfully applied" step 1 of the facial analysis because it "began by looking at the 'actors' and 'activities' ... that the Act covers." NetChoice Br. 22; *see id.* at 22-24. But step 1 requires a court to assess "how [the] law works in all of its applications." *Moody*, 144 S. Ct. at 2409; State Br. 31-32. The district court did not do that. *Compare* ROA.386-388, 403, 419, *with* State Br. 34-36. In arguing otherwise, NetChoice cites two pages of the district court's opinion: one quoting parts of the Act's coverage definition without further analysis (*see* ROA.403) and one discussing parts of that definition without assessing how they "work[ ]" (144 S. Ct. at 2409; *see* ROA.419). That fails step 1. This Court's decision in *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022), assessed a law's scope in far more depth than the district court did here. *E.g.*, *id.* at 445-46, 452, 480-81, 485, 489. Yet

the Supreme Court faulted *Paxton* for "not address[ing] the full range of activities the law[ ] cover[s]." *Moody*, 144 S. Ct. at 2397.

NetChoice does not contest that the district court's discussion of the Act's scope was "'terse[],'" but claims that "that is only because the Act's scope is undisputed." NetChoice Br. 23; *see id.* at 24. That is an astonishing claim from a party that fiercely disputes the Act's scope. *Compare, e.g.*, State Br. 35-36 (explaining that Act regulates non-expressive conduct) *with* NetChoice Br. 24, 25 (arguing that Act restricts speech in every application). And all NetChoice seems to mean is that the Act indisputably covers "online social-media platforms." NetChoice Br. 23; *see id.* at 23-24. But saying that the Act covers social-media platforms is the *beginning* of step 1—not the end. *Paxton*'s first sentence recognized that the law at issue covered "large social media platforms." 49 F.4th at 444. That is not enough. 144 S. Ct. at 2409.

2. NetChoice says that the district court performed the rest of the facial analysis. NetChoice Br. 24-27. These arguments fail too.

*First*, NetChoice claims that the district court applied "the exact standard that *Moody* articulated": it held "that 'a substantial number, if not all, of [the Act]'s applications are unconstitutional judged in relation to its legitimate sweep.'" NetChoice Br. 24 (quoting ROA.415). But *Moody* requires more than intoning the facial First Amendment standard. *See* 144 S. Ct. at 2397-99. *Moody* vacated this Court's decision in *Paxton* even though it repeatedly invoked that standard. 49 F.4th at 450, 487.

*Second*, NetChoice contends that the district court did not need to assess the Act application by application because "all aspects of the [Act], in every application to a covered [website], raise the same First Amendment issues." NetChoice Br. 24; *see id.* at 24-25. But many of the Act's applications have no effect on speech. Merely asking someone's age, requiring a phone call or email response to declare parental consent, and taking basic efforts to mitigate harms (say, offering a list of resources to those harmed online) do not "restrict protected speech." *Id.* at 25. For many covered platforms the Act may require no more. State Br. 35-37. The district court did not account for these applications.

NetChoice says that "the facial challenge concerns that *Moody* addressed—whether the constitutional analysis 'might differ as between' different actors and activities—are not implicated here" because the State "never expressly argues that the Act is constitutional as to some platforms or functions, yet unconstitutional as to others." NetChoice Br. 25. That argument is unavailing. Although the State does believe that the Act is lawful across the board, the State has allowed that even if that were not so, the Act's many permissible applications (like those noted above) would still doom a facial challenge. State Br. 35-37, 42, 44.

*Third*, NetChoice disputes that, in assessing the Act's applications, the district court failed to account for the Act's phrase "commercially reasonable." NetChoice Br. 25; *see id.* at 25-26. NetChoice says that the court "did not ignore" that phrase and cites a page showing one of three

times the court quoted it. *Id.* at 25. The district court did *quote* the phrase. ROA.387, 388. But it never *accounted for it*—even though it is critical to the Act's scope and thus to every step of the facial analysis. State Br. 32, 35-36. NetChoice says that "this argument" does not "implicate which 'actors' or 'activities' the Act regulates" and so does not matter at step 1. NetChoice Br. 25; *see id.* at 25-26. But step 1 asks "how [the] law works in all of its applications." *Moody*, 144 S. Ct. at 2409. The phrase "commercially reasonable" is "central" to how the Act works because it "ensures that (at least most of) the Act's applications impose no burden on speech and thus pose no First Amendment problem." State Br. 32. On the age-verification provision, for example, if for most covered platforms it is not "commercially reasonable" to do any more than ask someone's age, then NetChoice has no viable argument that the provision restricts speech—or, at least, restricts it enough for success on a facial claim. NetChoice says that "[w]henever a speech regulation requires age verification, parental consent, or monitoring-and-censorship, it violates the First Amendment." NetChoice Br. 26. But facial analysis requires assessing whether—and in how many applications—the Act *actually requires* those things. *Moody*, 144 S. Ct. at 2394, 2398. The district court never made that assessment—in part because it failed to account for the phrase "commercially reasonable." (NetChoice suggests that the term "commercially reasonable" may be "unconstitutionally vague." NetChoice Br. 26. That argument is doubly forfeited because NetChoice "rais[es] it

for the first time on appeal" and "fail[s] to adequately brief" it. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).)

*Fourth*, NetChoice claims that "the problem in *Moody* was a lack of analysis about whether" the laws at issue "might have ... covered" "*additional* websites and functions." NetChoice Br. 26. Yet on the State's view of "commercially reasonable," NetChoice says, "the Act covers *fewer* actors and activities than the district court addressed"—so that court "necessarily" "consider[ed] all of the services" the State "believes the Act to cover." *Id.* at 26-27. But the phrase "commercially reasonable" does not cause the Act to cover "fewer actors or activities": the phrase is not in the Act's coverage definition (§ 3). The phrase is in the Act's substantive provisions (§§ 4(1), 4(2), 6) and ensures that, for platforms that are covered, the Act imposes only modest duties that do not burden speech. State Br. 35-42. NetChoice's argument is just an effort to carve off the Act's permissible applications so that NetChoice can pretend that the Act has only impermissible applications and so is facially invalid. Nice try.

*Last*, NetChoice says that this Court should "either affirm the district court's *Moody* analysis or perform its own" rather than remand. NetChoice Br. 27. The record allows this Court only two options: vacate or reverse. The district court did not do what *Moody* requires. So at best for NetChoice, vacatur is required. Otherwise, the Court must reverse because the Act on its face does not violate the First Amendment. State Br. 34-46. The Court cannot affirm. NetChoice failed to "carry" its facial

11

"burden." *Moody*, 144 S. Ct. at 2409. Affirming the district court's facial analysis would conflict with *Moody* and with *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024), which vacated a district-court order that "fail[ed] to properly consider the facial nature of NetChoice's challenge[ ]" to an age-estimation provision. *Id.* at 1124; *see* State Br. 33-34.

## B.     The District Court Erred In Ruling That The Act Likely Facially Violates The First Amendment.

The district court erred in ruling that the Act likely facially violates the First Amendment. State Br. 34-46. NetChoice's responses, NetChoice Br. 27-35, 37-49, lack merit.

1. NetChoice argues that the Act's coverage definition subjects the entire Act to strict scrutiny. NetChoice Br. 27-32. It is wrong.

*First*, NetChoice claims that the coverage definition selects platforms for regulation based on the "content" of speech. NetChoice Br. 28; *see id.* at 27-29, 31. NetChoice says that by covering only platforms that allow users to "socially interact with other[s]," § 3(1)(a), the Act "target[s] speech based on its communicative content" of "*socially* interacting with others," NetChoice Br. 28. NetChoice also says that by excluding platforms that "[p]rimarily function[ ] to provide ... access to news, sports, commerce, online video games," or "career development opportunities," § 3(2)(c), (d), the Act "favor[s]" some content over other content, NetChoice Br. 29.

These arguments fail. To start, the phrase *socially interact* means communication between two or more "users on [a] digital service." § 3(1)(a). It does not distinguish social from professional interactions— just as NetChoice members' status as *social*-media companies does not mean that they allow only non-professional interactions. State Br. 47. And none of these provisions regulates speech based on its content. The coverage definition turns on whether a platform is primarily interactive. State Br. 42-43. That does not "target[ ] speech based on its ... content." NetChoice Br. 28. It targets harms—like sex trafficking, sexual abuse, and child pornography—by focusing on the interactive platforms most likely to host those harms. The Act also does not "favor[ ]" any content. *Id.* at 29. Covered platforms and non-covered platforms alike can provide (or allow interaction about) news, sports, commerce, online video games, or career-development opportunities. Again, coverage turns on the interactive features that endanger minors, not on a judgment favoring some speech over other speech. For like reasons, the coverage definition also is not "speaker-based." *Ibid.* It does not favor "provider-generated content over user-generated content." *Ibid.* It targets interactive platforms because they present special dangers to minors.

NetChoice responds that by regulating platforms based on their interactive "functions," the Act is still content-based because it "swap[s] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." NetChoice Br. 31. But the Act does not

draw a "subject-matter distinction" or use a proxy for such a distinction. It does not (for example) prefer "news or sports" over "politics or religion." *Ibid.* Users are free to interact as they like (and platforms are free to offer what they like) on all those subjects—on covered and non-covered platforms alike. The Act draws a distinction based on whether a platform is primarily interactive and thus more dangerous to minors. Focusing on platforms' features or "functions" regulates based on conduct and harm, not based on the subject matter of speech.

NetChoice ran its coverage-definition argument in *Moody*'s companion case. The Supreme Court did not credit it—even though it would have made that case far easier to decide. State Br. 43; *see* NetChoice Br. 32 (ignoring that latter point). This Court should not credit the argument either.

*Second*, NetChoice disputes that the Act regulates conduct and not speech. NetChoice Br. 29-30. NetChoice says that the Act impermissibly "'control[s] or suppress[es] speech' by isolating a 'different point[ ] in the speech process' and calling it conduct." *Ibid.* (quoting *Citizens United v. FEC*, 558 U.S. 310, 336 (2010)). But the Act does not restrict any point in the "speech process." It does not, for example, "requir[e] a permit" before speaking or "subject[ ] [a] speaker to criminal penalties" for speaking. *Citizens United*, 558 U.S. at 336-37. Requiring commercially reasonable efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy does not restrict any point in the speech process.

14

NetChoice says that "[t]he Act's regulations all affect 'access' to protected speech, so they each must satisfy strict scrutiny." NetChoice Br. 30 (quoting *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 131 (1989)). No such rule exists. *Sable* faulted an *"outright ban"* on "adult access" to protected speech. 492 U.S. at 117, 131 (emphasis added). And *Packingham v. North Carolina*, 582 U.S. 98 (2017), struck down a law that "*foreclose[d] access* to social media *altogether.*" *Id.* at 108 (quoted at NetChoice Br. 30; emphases added). Neither case says that every law that "affects access" to protected speech triggers strict scrutiny. Laws that limit the operating hours of public libraries, restrict who can board airplanes, and set visiting hours at prisons all affect access to protected speech. That does not subject them to strict scrutiny. State Br. 37-38. So too with the Act. NetChoice says that the State's "focus on 'conduct'" is "belied" by its "admission" (NetChoice Br. 30) that the Act aims to "mak[e] it harder for minors to participate in dangerous online platforms." State Br. 39. But such an effect on "access" to speech is a permissible result of regulating non-expressive conduct. *Id.* at 37.

*Third*, NetChoice disputes that the Act would satisfy intermediate scrutiny under the secondary-effects doctrine. NetChoice Br. 32. That doctrine, NetChoice says, applies "only" to "physical 'zoning ordinances.'" *Ibid.* That is not so. *See Doe I v. Landry*, 909 F.3d 99, 107, 109-10, 113 (5th Cir. 2018) (applying that doctrine to laws prohibiting erotic dancing by performers under age 21 in businesses that serve alcohol). NetChoice

15

also says that the Supreme Court has "held that restrictions on access to online speech are not analogous to zoning ordinances regulating physical property." NetChoice Br. 32 (citing *Reno v. ACLU*, 521 U.S. 844, 867-68 (1997)). But *Reno* faulted a law because it was "a content-based blanket restriction on speech": it regulated "the primary effects" of "speech," not "any 'secondary' effect of ... speech." 521 U.S. at 868. The Act here does not "target" or regulate speech. NetChoice Br 32. It targets—and regulates to combat—secondary effects of speech. State Br. 39-42.

2. NetChoice also argues that the Act's substantive provisions each independently trigger strict scrutiny. NetChoice Br. 37-40, 40-41, 42-48; *see id.* at 30-31. These arguments fail. Those provisions regulate non-expressive conduct and satisfy rational-basis review. State Br. 36-39.

a. Start with the age-verification provision. NetChoice Br. 37-40.

NetChoice claims that "governments cannot require people to provide personal information or documentation ... to access protected speech." NetChoice Br. 37; *see id.* at 30-31, 37-39. But the cases it cites for that rule struck down content-based regulations of speech because they were not narrowly tailored. *Reno*, 521 U.S. at 868, 871, 874, 879, 881-82; *Ashcroft v. ACLU*, 542 U.S. 656, 660, 665, 666-67, 670 (2004). Neither case bars—or subjects to strict scrutiny—age-verification mechanisms that (like the one here) regulate non-expressive conduct.

Anyway, the age-verification provision does not require users to provide personal information or documentation. *Contra* NetChoice Br.

37-39. Its text imposes no such requirement. At least some platforms may have to do no more than ask someone's age to satisfy the provision—which alone defeats NetChoice's facial challenge. State Br. 35. NetChoice says that this "would render [the Act's words] 'verify the age' meaningless." NetChoice Br. 39. But the Act says that platforms must make "*commercially reasonable efforts* to verify the age" of users—which is not a blanket requirement to verify every user's age. § 4(1) (emphasis added). It is true (as the State has said) that "'accept[ing] users' ages or birthdates on the honor system ... is not good enough to combat the harms the State is targeting.'" NetChoice Br. 39 (quoting ROA.341). But that just means that the Act's modest steps are a partial rather than full solution to those harms.

NetChoice says it "does not matter" to the Act's validity if it requires only "commercially reasonable efforts" to verify age rather than universal age verification. NetChoice Br. 38; *see id.* at 38-39. It matters. NetChoice brings a facial claim. If in most applications users do not need to "provide identifying information to access protected speech" (*id.* at 38-39) because demanding that is not "commercially reasonable" (§ 4(1)), then NetChoice's main argument against the age-verification provision fails.

Resisting the view that the age-verification provision regulates non-expressive conduct only, NetChoice seeks to distinguish *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), which rejected a First Amendment challenge to a law restricting certain dance halls to persons aged 14-18.

NetChoice Br. 39-40. NetChoice says that *Stanglin* holds that "the First Amendment 'does not protect chance encounters at a dance club that contain *no* element of expression.'" *Id.* at 39 (quoting *Club Retro, LLC v. Hilton*, 568 F.3d 181, 211 (5th Cir. 2009)). That incomplete account of *Stanglin* ignores its on-point teaching. The law in *Stanglin* limited access to speech. On NetChoice's view, that feature is fatal under the First Amendment. Yet that feature posed no First Amendment problem because the law regulated non-expressive conduct. So too for the Act here. State Br. 37-38. NetChoice says that accessing covered platforms is always "coupled with" an "attempt to access expressive content" and that "the entire purpose" of accessing those platforms is "to engage in speech." NetChoice Br. 39 (internal quotation marks omitted). That starry-eyed portrayal of covered platforms is insupportable. Covered platforms host some speech, but they also host huge amounts of illegal and dangerous conduct: sex trafficking, sexual abuse, targeted harassment, and more. NetChoice has touted its members' policies that exist in part to address illegal or unprotected conduct that infects their platforms. *E.g.*, Szabo Dec. ¶¶ 11-19 (ROA.87-96). It is too late for NetChoice to pretend that covered platforms host protected speech and nothing else. And even if in some activities NetChoice members are "engaged in expression," NetChoice Br. 40, that is not true for the non-expressive conduct that the Act regulates.

b. Next, the parental-consent provision. NetChoice Br. 40-41; *see id.* at 31. NetChoice claims that States cannot "'prevent children from hearing or saying anything without their parents' prior consent.'" *Id.* at 40 (quoting *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 795 n.3 (2011)). Any such rule does not help NetChoice. *Brown* struck down a law because it was a "content-based regulation" of "speech"—the law barred selling or renting video games to minors because of the games' violent content—that flunked strict scrutiny. 564 U.S. at 794, 799-805. *Brown* does not bar—or subject to strict scrutiny—parental-consent mechanisms that (like the one here) regulate non-expressive conduct. NetChoice also says that the parental-consent provision unlawfully affects "access" to speech. NetChoice Br. 31, 41. That argument fails for reasons given above. *Supra* pp. 14-15. Last, NetChoice claims that the provision creates a barrier to speech because "the Act does not address the challenges that are inherent in verifying the parent-child relationship." NetChoice Br. 41. That argument fails because the Act does not require verifying that relationship. State Br. 35.

c. Now, the strategy provision. NetChoice Br. 42-48.

*First*, NetChoice argues that this provision is "a prior restraint" that "commandeer[s] covered websites into becoming government-mandated pre-screening monitors and censors." NetChoice Br. 42; *see id.* at 42-45. This argument rests on a distortion of the strategy provision. That provision requires covered platforms to "make commercially

reasonable efforts to develop and implement a strategy to prevent or mitigate" a known minor's "exposure to harmful material and other content that promotes or facilitates" certain "harms to minors." § 6(1). Nothing in that text requires platforms to "pre-screen," "monitor[ ]," "censor," "not ... publish," or "suppress" speech. NetChoice Br. 42, 43, 44; *see* State Br. 38-39. That text allows (for example) a strategy of making available a list of resources for minors victimized by sex trafficking, sexual abuse, harassment, and other listed harms. Such a strategy could "mitigate" minors' exposure to those harms without monitoring or blocking any content.

In attacking the strategy provision, NetChoice reads the words "or mitigate" out of the Act—literally. It argues that, under that provision, "*[b]efore* a website publishes any speech, it must 'implement' a strategy to actively 'prevent ... exposure'" to certain categories of speech. NetChoice Br. 43 (NetChoice's ellipsis). And it claims that the strategy provision "expressly requires websites to 'implement' a government-mandated 'strategy' that must 'prevent ... exposure' to speech." *Id.* at 44 (NetChoice's ellipsis). The provision does not require those things. It allows a platform to adopt a harm-*mitigation* strategy only. That is what *or mitigate* in "prevent or mitigate" means. § 6(1). (To suggest that the strategy provision is ineffective, NetChoice attributes to the State the view that platforms need "only 'adopt' (but not 'implement') a strategy." NetChoice Br. 44. The State uses "adopt" as a shorthand for "develop and

implement." The State has never said that the Act lets a platform not implement the strategy it develops.)

NetChoice also says that the Act's "exception" to the strategy provision "says that websites need not 'prevent or preclude' certain preferred 'content,'" and the "obvious inference is that" under the strategy provision "covered websites must 'prevent or preclude' *other* content." NetChoice Br. 44 (quoting § 6(2)). That is wrong. Section 6(2) does not announce an "exception" to the strategy provision. It provides a rule of construction. It says that "[n]othing in" section 6(1) "shall be construed to require" a covered platform "to prevent or preclude" "[a]ny minor from deliberately and independently searching for, or specifically requesting, content." § 6(2). That provision just makes doubly clear what the strategy provision does not require and reaffirms the provision's focus on interactive encounters, not content.

NetChoice faults the State for not saying "that any covered websites' existing strategies comply with the Act." NetChoice Br. 44. The State has no such duty. NetChoice chose to bring a pre-enforcement facial challenge. It has the "burden" to show that the strategy provision is facially unconstitutional. *Moody*, 144 S. Ct. at 2409. The State does not need to bless NetChoice members' conduct based on declarations that are plagued by errors. *See*, *e.g.*, State Br. 52-53.

*Second*, NetChoice claims that the strategy provision "prohibits publication" of a "substantial amount" of protected speech. NetChoice Br.

45; *see id.* at 31, 42-43, 45-48. This argument rests on the same misreading of the Act addressed above and thus fails: the provision does not "prohibit[ ] publication" of any speech. The provision also does not "punish websites for imperfect content moderation." *Id.* at 45. Platforms face liability only if they fail to make "commercially reasonable efforts" to adopt a harm-mitigation strategy. § 6(1). Nor does the provision regulate speech based on "viewpoint." NetChoice Br. 48. It regulates platforms' non-expressive conduct to address harms. And sex trafficking and sexual abuse (for example) are not viewpoints.

3. Last, NetChoice argues that the Act's challenged provisions are not properly tailored and fail heightened scrutiny. NetChoice Br. 32-35 (coverage definition); *id.* at 40 (age-verification provision); *id.* at 41-42 (parental-consent provision); *id.* at 48-49 (strategy provision). These arguments get NetChoice nothing because, as explained, heightened scrutiny does not apply and each provision satisfies rational-basis review (or intermediate scrutiny). State Br. 36-42. And in making these arguments, NetChoice fails (as the district court did) to undertake the application-by-application analysis that is required even when heightened scrutiny applies. *Id.* at 44-45. NetChoice does say that even if the Act's "substantive requirements" can be "easily" satisfied, this would not show narrow tailoring—and that "existing parental tools" and other Mississippi laws "already target the harmful conduct" the Act addresses. NetChoice Br. 34-35; *see id.* at 33-34. But the Act was enacted

because those tools and laws are not fully addressing the harms inflicted on minors online. And even if the Act were underinclusive or overinclusive in some ways, *id.* at 34, 35, that would not relieve the district court of its duty to assess the Act on an application-by-application basis and let stand provisions that present no tailoring problem, State Br. 44-45. Besides all this, the district court's tailoring analysis rests on a misreading of the Act. *Id.* at 45-46. Even if heightened scrutiny applies, the district court's order cannot stand.

### C.    The District Court Erred In Ruling That The Act Is Likely Facially Void For Vagueness.

The district court erred in ruling that the Act's coverage definition is unconstitutionally vague on its face. State Br. 46-49. One uncontested point alone dooms that ruling: NetChoice has repeatedly conceded that, based on the Act's coverage definition, the Act regulates several named NetChoice members and does not regulate some other members. That defeats any claim that the Act is *facially* vague. *Id.* at 48-49. NetChoice does not dispute this point. NetChoice Br. 35-37. On this ground alone, this Court should reject the vagueness ruling below.

NetChoice's vagueness arguments against the coverage definition otherwise lack merit. NetChoice parrots the district court's rulings faulting that definition's terms "[p]rimarily functions," "incidental," and "socially interact." NetChoice Br. 36. The State already showed why the district court erred on those points. State Br. 47-48. NetChoice ignores

that showing. NetChoice also argues that because its vagueness claim arises in "the free-speech context," it need not show that the law is "impermissibly vague in all of its applications." NetChoice Br. 36; *see id.* at 36-37. Neither case it cites says that. *Smith v. California*, 361 U.S. 147, 151 (1959) (discussing vagueness but not facial vagueness standard); *National Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 & n.32 (5th Cir. 2024) (noting that, for some speech-related vagueness claims, pre-enforcement *standing* is easier to establish). And a lighter facial standard would not help NetChoice: its concessions about the Act's application to its members doom its facial claim. State Br. 48-49.

NetChoice also argues that the strategy provision is vague because it turns on the words "promotes" and "facilitates." NetChoice Br. 49-50. The district court did not reach this argument. And it fails. The strategy provision ties those words to specific harms that flow from targeted, interactive acts perpetrated online, § 6, so statutory "context" provides the clarity that a word like "promotes" might lack "[w]hen taken in isolation." *United States v. Williams*, 553 U.S. 285, 294 (2008) (cited at NetChoice Br. 49-50) (relying on "context" to construe the word "promotes"). So the provision is unlike the hopelessly capacious statute condemned in *Baggett v. Bullitt*, 377 U.S. 360 (1964), which required taking an oath to "promote respect" for the flag and government institutions. *Id.* at 361-62, 371. And any edge cases requiring "context-

24

dependent" analyses (NetChoice Br. 50) might support as-applied challenges, but not facial invalidation. State Br. 31-32, 48-49.

### D.     NetChoice's Preemption Claim Cannot Support The Preliminary-Injunction Order.

NetChoice's preemption claim cannot support the injunction. State Br. 50-51. In pressing that claim, NetChoice Br. 50-53, NetChoice ignores this Court's holding that 47 U.S.C. § 230 does not immunize platforms from liability that is imposed "independently of whether the third-party speech that [platforms] host harms anybody." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024) (granting review on a different issue). That holding dooms NetChoice's preemption claim because the strategy provision imposes liability based on whether a platform "compl[ies] with" the Act by making commercially reasonable efforts to adopt a harm-mitigation strategy— not based on whether third-party content "harms anybody." *Ibid.*

NetChoice says nothing that overcomes this. It claims that the strategy provision is preempted because it "makes covered websites liable for failing to monitor and block ... certain user-generated content." NetChoice Br. 50; *see id.* at 51, 52. Again: That provision does not require platforms to monitor or block content. State Br. 51; *compare CCIA v. Paxton*, — F. Supp. 3d. —, 2024 WL 4051786, at *2-*3, *19 (W.D. Tex. Aug. 30, 2024) (cited at NetChoice Br. 51) (section 230 preempted law that expressly required "blocking" and "monitoring" content). It requires

commercially reasonable efforts to adopt a harm-mitigation *strategy*. § 6(1). (The Act even expressly disclaims imposing any duty to "prevent or preclude" minors from seeking certain content. § 6(2). That disclaimer does not expand the plain-text duty to make only commercially reasonable efforts to adopt a harm-mitigation *strategy*. *Supra* p. 21; *contra* NetChoice Br. 50.)

NetChoice also claims that section 230 preempts laws that hold platforms "liable for alleged 'failure[s] to implement basic safety measures to protect minors' or to 'address certain harmful content' on their websites." NetChoice Br. 50-51 (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418, 419 (5th Cir. 2008)); *see id.* at 51-52. That is not so. Section 230 bars holding platforms liable "for *harm* caused by unremoved speech on their website[s]." *Free Speech Coalition*, 95 F.4th at 285 (emphasis added); *see id.* at 285-86 (discussing *MySpace*). The strategy provision does not hold platforms liable for such harm or "assign fault for the speech's content to the speech disseminator." NetChoice Br. 51-52. It assigns fault for not adopting a strategy.

## III.    Even Putting The Merits Aside, This Court Should Reject Or Dramatically Narrow The Preliminary Injunction.

The equities support rejecting or narrowing the injunction. State Br. 52-54. NetChoice argues that the "loss of First Amendment freedoms" is irreparable harm and that protecting those freedoms is "in the public interest." NetChoice Br. 53, 54. But those arguments cannot support the

injunction to the extent that it rests on rights that NetChoice may not assert (State Br. 20-30, 54) or on First Amendment claims that fail (*id.* at 34-46, 52, 54). NetChoice says that this "conflates the merits with the equities." NetChoice Br. 55. But NetChoice itself—like the district court, ROA.420, 421—relies on its First Amendment merits view on all the equitable factors. NetChoice Br. 53, 54. NetChoice also says that "compliance costs" for covered platforms inflict irreparable harm. *Id.* at 53-54. But NetChoice's compliance-cost claims rest on clear errors about what the Act requires. State Br. 52-53. Last, NetChoice claims that the State "concedes that covered websites will need to expend 'resources.'" NetChoice Br. 54. The State did not say that. Some platforms may need to expend resources, but many may not need to do so because the Act requires what any responsible platform would already do. State Br. 53.

## CONCLUSION

This Court should vacate, reverse, or substantially narrow the district court's preliminary-injunction order.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*

SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

October 17, 2024

## CERTIFICATE OF SERVICE

I, Scott G. Stewart, hereby certify that this brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: October 17, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6488 words, excluding parts exempted by Fed. R. App. P. 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: October 17, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*