# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 17, 2025

Lyle W. Cayce
Clerk

No. 24-60341

NetChoice, L.L.C.,

*Plaintiff—Appellee*,

*versus*

Lynn Fitch, *in her official capacity as Attorney General of Mississippi*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:24-CV-170

Before Higginbotham, Willett, and Ho, *Circuit Judges*.
Patrick E. Higginbotham, *Circuit Judge*:

This case continues our struggle with the interface of law and the rapidly changing universe of technology. A recently enacted Mississippi statute would regulate a minor's use of internet platforms. NetChoice, L.L.C. here challenges the statute's constitutionality under the First and Fourteenth Amendments. After the district court granted a preliminary injunction to halt the enforcement of the statute, the Supreme Court issued its opinion in a

No. 24-60341

separate First Amendment case, *Moody v. NetChoice, LLC*,[1] which reframed the analysis for facial challenges. *Moody* makes clear that the district court here should have undertaken more detailed factual analysis before making the requisite finding for preliminary injunctive relief that NetChoice, L.L.C is substantially likely to succeed on the merits of its facial challenge. We in turn VACATE the preliminary injunction and REMAND this case to the district court for the required factual analysis.

## I.

### A.

Mississippi House Bill 1126 (the "Act") was signed into law on April 30, 2024 to take effect on July 1, 2024. The Act purports to protect minor children from "online harmful material." To briefly summarize the Act, Section 1 provides the title of the Act; Section 2 defines terms; Section 3 establishes applicability of the Act; Section 4 requires digital service providers ("DSPs") to make "commercially reasonable" efforts to verify users' ages and obtain parental consent before allowing known minors to create an account; Section 5 limits the information of a known minor that a digital service provider may collect; Section 6 requires digital service providers to make commercially reasonable efforts to implement a strategy to mitigate a known minor's exposure to content that facilitates harm to minors; and Sections 7-8 provide civil remedies and criminal penalties for violating the Act.[2]

---

[1] 603 U.S. 707 (2024).

[2] Miss. Code Ann. § 45-38-1, *et seq.*; Miss. Code Ann. § 75-24-5.

No. 24-60341

**B.**

NetChoice, L.L.C. ("NetChoice") is a nonprofit trade association for internet-focused companies, ranging from AirBnB to PayPal to Wing.[3] NetChoice brought this suit challenging the Act, requesting an order and judgment declaring it to be unlawful as violative of the First Amendment and the Fourteenth Amendment's Due Process Clause, and as overbroad, among other arguments. NetChoice also moved for a preliminary injunction to enjoin Lynn Fitch, in her official capacity as Attorney General of Mississippi, from enforcing the law.

The district court granted a preliminary injunction, finding that NetChoice carried its burden of showing that it is substantially likely to succeed in its contention that the Act is unconstitutional under a First Amendment facial challenge and a Fourteenth Amendment vagueness challenge. The AG appeals the preliminary injunction, alleging that the district court erred in several ways: first, in finding that NetChoice has associational standing; second, in failing to perform the facial analysis mandated by *Moody v. NetChoice, LLC*;[4] third, in rejecting the argument that the Act regulates non-expressive conduct; fourth, in finding that the Act is likely facially void for vagueness; and fifth, by holding that the equities weigh in favor of granting a preliminary injunction.

**II.**

We first, as we must, address standing.[5] To establish standing, a plaintiff must demonstrate: (1) that it has suffered or likely will suffer an injury in

---

[3] NetChoice.org/about.

[4] *See Moody*, 603 U.S. 707.

[5] *Delta Com. Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 272 (5th Cir. 2004).

fact; (2) that the injury likely was caused or will be caused by the defendant; and (3) that the injury likely would be redressed by the requested judicial relief.[6] A plaintiff must also satisfy "both constitutional limitations on federal-court jurisdiction and prudential limitations on [the court's] exercise."[7] Constitutional standing "enforces the Constitution's case-or-controversy requirement" while prudential standing "embodies judicially self-imposed limits on the exercise of federal jurisdiction."[8]

## A.

We turn to constitutional standing, here whether NetChoice can vindicate the rights of its members.

An association has standing to bring claims on behalf of its members when it meets three requirements: (1) its individual members would have standing to bring the suit; (2) the association seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation.[9] The district court correctly held that NetChoice satisfied the three requirements of associational standing.

NetChoice easily meets the first. As the district court noted, the Supreme Court has recognized that plaintiffs have standing to bring a pre-enforcement facial challenge against a law when "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take

---

[6] *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

[7] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[8] *Servicios Azucareros de Venez., C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 801 (5th Cir. 2012) (cleaned up).

[9] *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022).

No. 24-60341

significant and costly compliance measures or risk criminal prosecution."[10] The statute would increase regulatory requirements of NetChoice's members, causing financial harm.[11] This alone is sufficient to meet the first requirement of associational standing.[12]

NetChoice can also independently satisfy the first requirement under the theory that the Act will violate its members' First and Fourteenth Amendment rights by proscribing their intended actions and credibly threatening to prosecute those actions.[13] More specifically, NetChoice's members seek to disseminate protected speech to minors and adults, which would be prohibited (at least in part) by the Act, and its members have a Fourteenth Amendment right to be free of impermissibly vague laws.

As for the second requirement, NetChoice has presented evidence that its purpose is "to make the Internet safe for free enterprise and free expression" and as the lawsuit is centered on doing exactly that, it seeks to vindicate interests germane to its purpose.

NetChoice has also satisfied the third requirement of associational standing as no claim asserted nor relief requested requires the participation of each member. Instead, NetChoice's "claims can be proven by evidence from representative injured members" and "the participation of [certain] individual members does not thwart associational standing."[14]

---

[10] *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988).

[11] One NetChoice member even claims that the Act will jeopardize its ability to continue offering its online service at all.

[12] *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement.").

[13] *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

[14] *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010).

No. 24-60341

The AG argues that NetChoice has not satisfied constitutional standing because it lacks organizational standing.[15] But NetChoice need not show organizational standing when it has shown associational standing.[16]

NetChoice has also demonstrated injury in fact, causation, and redressability. As noted by the district court, the Act will cause financial injury to NetChoice's members and "[a]n increased regulatory burden typically satisfies the injury in fact requirement."[17] And the defendant—here, the AG—is the moving force of injury, one that would likely be redressed by the requested judicial declaration that each of the Act's challenged provisions is unconstitutional and ought to be enjoined. NetChoice has satisfied each element of constitutional standing.

**B.**

We next turn to prudential standing, here whether NetChoice can vindicate the rights of its members' users. Plaintiffs must generally assert their own legal rights and interests, not those of third parties,[18] and injury must be "within the 'zone of interests' protected by the constitutional

---

[15] While associational standing allows an association to raise claims based on injuries to its members, organizational standing allows an association to raise claims based on injuries to the association itself. *Students for Fair Admissions, Inc.*, 37 F.4th at 1084 & n.6. *See also OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) ("Associational standing is derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose. By contrast, organizational standing does not depend on the standing of the organization's members.") (footnotes omitted).

[16] *See Students for Fair Admissions, Inc.* 37 F.4th at 1084 n.6 (stating that organizational standing is an "alternative" to associational standing); *Fund Texas Choice v. Paxton*, 658 F. Supp. 3d 377, 406 (W.D. Tex. 2023).

[17] *Contender Farms, L.L.P.*, 779 F.3d at 266. *See also American Booksellers Ass'n, Inc.*, 484 U.S. at 392 (holding that plaintiffs have standing to bring a pre-enforcement facial challenge to a law when the law would require "significant and costly compliance measures or risk criminal prosecution.").

[18] *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

guarantee invoked."[19] "This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation."[20]

However, a plaintiff may assert the rights of another if: (1) that "the party asserting the right has a close relationship with the person who possesses the right," and (2) "there is a hindrance to the possessor's ability to protect his own interests."[21]

The AG brings a litany of arguments challenging NetChoice's prudential standing to bring this suit. But they fall short. The AG argues that NetChoice's members' *users* might have standing, but NetChoice itself does not. But, as we held above, NetChoice itself has associational standing to bring this suit.

The AG also asserts that NetChoice failed to show the third-party standing requirements of (1) a "close relationship" to the users and (2) a "hindrance" to users' ability to protect their own interests. Regarding the "hindrance" requirement for asserting the rights of another, the AG argues that NetChoice did not show that its members are hindered in their efforts to protect their own interests. The AG also urges that users can vindicate their rights by challenging regulations of online platforms.

NetChoice replies that the "close relationship" and "hindrance" requirements have no purchase with claims of First Amendment-protected free speech. NetChoice notes the Supreme Court's holding in *Virginia v. American Booksellers Association* that:

---

[19] *Moore ex rel. Moore v. Tangipahoa Parish Sch. Bd.*, 771 F. App'x 540, 543 (5th Cir. 2019) (quoting *Barlow v. Collins*, 397 U.S. 159, 164 (1970)).

[20] *Kowalski*, 543 U.S. at 129.

[21] *Id.* at 130 (quotations omitted).

No. 24-60341

in the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.[22]

The Supreme Court has also explained that:

Within the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing. Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."[23]

This court has likewise recognized that in First Amendment facial challenges, "federal courts relax the prudential limitations and allow yet-unharmed litigants to attack potentially overbroad statutes to prevent the statute from chilling the First Amendment rights of other parties not before

---

[22] 484 U.S. at 392-93 (cleaned up).

[23] *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).

the court,"[24] that "[t]he prudential consideration of third-party standing is not applied when a plaintiff demonstrates that a provision that validly restricts its own speech . . . also reaches substantial protected speech," and that a litigant who shows constitutional standing and whose own activities are unprotected "may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."[25] Another opinion heavily relied upon by the AG also recognizes the "quite forgiving," third-party standing test that applies "[w]ithin the context of the First Amendment."[26]

We have also recognized that vendors may assert the rights of vendees, that doctors may assert the rights of patients, and that employers may assert the rights of employees.[27] Indeed, a business "may properly assert its employees' or customers' First Amendment rights where the violation of those rights adversely affects the financial interests or patronage of the business."[28] With this footing it is plain that an online platform is not barred by prudential standing when it asserts its users' First Amendment rights, at least when the violation of those rights adversely affects the platform.[29] NetChoice satisfies the prudential standing requirement.

---

[24] *Doe I v. Landry*, 909 F.3d 99, 114 (5th Cir. 2018) (cleaned up) (citations omitted).

[25] *Serv. Emps. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 598 (5th Cir. 2010) (citations omitted).

[26] *Kowalski*, 543 U.S. at 130 (citing *Sec'y of State of Md.*, 467 U.S. at 956).

[27] *Vote.Org v. Callanen*, 89 F.4th 459, 472 (5th Cir. 2023) ("Third-party standing often turns on 'categorized relationships'—*e.g.*, vendor-vendee, doctor-patient, employer-employee. Such standing 'has become firmly established with respect to a number of easily categorized relationships . . . .'") (citation omitted)).

[28] *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995).

[29] *See also American Booksellers Ass'n, Inc.*, 484 U.S. at 393 (holding that a bookstore with constitutional standing was permitted to make First Amendment arguments on behalf of its customers).

## III.

The AG also argues that the district court failed to perform the facial analysis mandated by *Moody v. NetChoice, LLC*.[30] As in *Moody*, NetChoice chose to bring a facial challenge "and that decision comes at a cost."[31] It is the plaintiff's burden to establish that not a single set of circumstances exists under which the law would be valid.[32]

"In First Amendment cases, however, [the Supreme Court has] lowered that very high bar. To 'provide[ ] breathing room for free expression,' we have substituted a less demanding though still rigorous standard."[33] "The question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"[34]

*Moody* clarified that to determine whether a substantial number of a law's applications are constitutional relative to a statute's plainly legitimate sweep requires a two-step analysis. The first step is to define the law's scope.[35] That is, the court must determine what activities and what actors are regulated, and whether the law regulates or prohibits those actors from conducting those activities.[36] The second step is "to decide which of the law['s] applications violate the First Amendment, and to measure them against the

---

[30] *See* 603 U.S. 707 (2024).

[31] *Id.* at 723.

[32] *Id.* (citations omitted).

[33] *Id.* (citation omitted) (alteration in original).

[34] *Id.* (citations omitted) (alterations in original).

[35] *Id.* at 724.

[36] *Id.* at 723-24.

rest."[37] "If the 'law's unconstitutional applications substantially outweigh its constitutional ones,' then and only then is the law facially unconstitutional."[38]

In *Moody*, the Supreme Court found that this court did not—and the Supreme Court could not—properly apply these steps because the record below was not sufficiently developed to conduct the requisite analysis.[39] On remand in *Paxton*, this court stated its expectation that the district court would determine the actors and activities that the statute would cover.[40] We also mentioned the "serious need of factual development at the second step of the analysis" to determine if the statute in that case violated the First Amendment.[41]

The AG argues that as the district court did not conduct the Supreme-Court-mandated two-step analysis, the preliminary-injunction order must be vacated. The AG highlights that the district court did not discuss the Act's "list of ways to satisfy the parental-consent provision," the Act's use of "commercially reasonable,"[42] or NetChoice's admission that the Act covers seven but not all of its members. These failures show that the district court failed to assess "how [the] law works in all of its applications."[43]

As the Supreme Court released its *Moody* opinion on the same day the district court issued its memorandum opinion and order, it could not have

---

[37] *Id.* at 725.

[38] *Paxton*, 121 F.4th at 498 (quoting *Moody*, 603 U.S. at 724).

[39] *Moody*, 603 U.S. at 726 ("the record is underdeveloped").

[40] *Paxton*, 121 F.4th at 499.

[41] *Id.*

[42] The AG asserts that this phrase "ensures that (at least most of) the Act's applications impose no burden on speech."

[43] *Moody*, 603 U.S. 744

knowingly applied the analysis required by *Moody* and it is no surprise that it did not march *Moody* to its two-step music.[44] NetChoice nonetheless argues that the district court "faithfully applied" the *Moody* analysis and completed step one when it "look[ed] at" the actors and activities that the Act covers. To the extent that the district court's analysis was terse, NetChoice asserts "that is only because the Act's scope is undisputed. NetChoice assessed the Act's scope in its complaint and preliminary-injunction briefing. Defendant never disputed those assessments. And Defendant never asserted that the Act regulates any different actors or activities." NetChoice contrasts this case's posture with *Moody*'s, where there were questions about which applications and services might be regulated by the laws there at issue.

As to the second step, NetChoice urges that the district court did find that "a substantial number, if not all, of [the Act]'s applications are unconstitutional judged in relation to its legitimate sweep."

True, while the district court did discuss the Act's inclusion and exclusion of some of the activities and actors arguably regulated by the law, it "did not address the full range of activities the law[] cover[s]," as required by *Moody*.[45]

It did not determine whether the Act applies to DSPs like Uber, Google Maps, DraftKings, Microsoft Teams, Reddit, Pinterest, or X. Uber, for example, arguably connects users (independent contractor drivers and customers of those independent contractors) and allows them to socially interact with other users on Uber's app through messages. It also allows a user to create a private profile for signing into and using Uber and to post content that can be viewed by other users of the digital service (e.g., the driver and

---

[44] *See id.* at 723-24.

[45] 603 U.S. at 724.

customer see each other's profiles' content when matched by Uber). Microsoft Teams also allows individuals to socially interact after creating a semi-public profile for purposes of signing into and using Microsoft Teams and to create content that can be used by other users. One could even puzzle over whether Google Mail is covered by the Act: it is a DSP, but it may or may not be excepted from the Act's coverage as it does not facilitate "only" e-mail or direct messaging—it also facilitates Google Meet video chats. The district court did not determine whether the Act applies to any of these actors, among many others. By not determining the full scope of actors regulated by the Act and the activities it regulates, the district court did not apply *Moody* in the manner now required.

The district court also did not determine the "commercially reasonable efforts," as used in the Act, or the Act's requirements for each DSP, requirements likely to be different with each DSP facing a unique regulatory burden. Some DSPs may not need to devote additional resources to prevent known minors from holding an account without express parental consent, verify the age of anyone seeking to create an account, or implement a strategy to mitigate minors' exposure to certain content. For other DSPs, these requirements may reach beyond their resources. Without a factual analysis determining the commercially reasonable effort demanded of each individual DSP, the district court could not "decide which of the law['s] applications violate the First Amendment, and . . . measure them against the rest."[46] Nor could the district court determine whether "the 'law's unconstitutional applications substantially outweigh its constitutional ones.'"[47]

---

[46] *Moody*, 603 U.S. at 725.

[47] *Paxton*, 121 F.4th at 498 (citation omitted).

No. 24-60341

As in *Moody*, a factual inquiry remains for the district court to resolve: It must determine to whom the Act applies the activities it regulates, and then weigh violative applications of the Act against non-violative applications. As the district court understandably did not conduct this analysis, its finding that NetChoice showed a substantial likelihood of success on the merits of its claim that the Act is facially unconstitutional under the First Amendment cannot now stand.

## IV.

We VACATE the preliminary injunction and REMAND this case to the district court for further proceedings consistent with the Supreme Court's opinion in *Moody* and Fifth Circuit precedent in *NetChoice, LLC v. Paxton*.

No. 24-60341

JAMES C. HO, *Circuit Judge*, concurring in the judgment:

In *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), Justice Thomas made clear that nothing in the First Amendment prevents states from helping parents protect their children by regulating their access to certain content. *See id*. at 821–39 (Thomas, J., dissenting). As he explained, "[t]he practices and beliefs of the founding generation establish that 'the freedom of speech,' as originally understood, does not include a right to speak to minors (or a right of minors to access speech) without going through the minors' parents or guardians." *Id.* at 821 (quoting U.S. CONST. amend. I). *Cf. Book People, Inc. v. Wong*, 98 F.4th 657, 659 (5th Cir. 2024) (per curiam) (Ho, J., dissenting from denial of rehearing en banc) ("States have a profound interest in protecting the innocence of children from various adult activities. . . . Nothing in the First Amendment prevents states from taking steps to shield children from [sexually explicit] content.").

If Justice Thomas's views in *Brown* were the law of the land, it would be a relatively easy matter for us to reverse the district court and uphold the Mississippi law challenged in this case.

But they're not. So I agree with my distinguished colleagues that we should vacate the preliminary injunction and remand for further proceedings consistent with *Moody v. NetChoice*, 603 U.S. 707 (2024).

1